IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

REGAS CHRISTOU,
R.M.C HOLDINGS, L.L.C. D/B/A THE CHURCH,
BOUBOULINA, INC. D/B/A VINYL,
MOLON LAVE, INC. D/B/A 2 A. M.,
CITY HALL, LLC,
1037 BROADWAY, INC. D/B/A BAR STANDARD F/K/A THE SHELTER,
776 LINCOLN ST., INC. D/B/A/ FUNKY BUDDHA LOUNGE
1055 BROADWAY, INC. D/B/A THE LIVING ROOM

      Plaintiffs,

v.

BEATPORT, LLC,
BRADLEY ROULIER,
BMJ&J, LLC D/B/A BETA NIGHTCLUB AND BEATPORT LOUNGE,
AM ONLY INC.,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Jeffrey S. Vail
THE LAW OFFICE OF JEFF VAIL LLC
The Point at Inverness
8310 South Valley Highway, Third Floor
Englewood, Colorado 80112
Tel. (303) 800-8237
Fax. (303) 800-8237
ATTORNEY FOR PLAINTIFFS

Dated:  December 1, 2010

# TABLE OF CONTENTS

NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

INTERSTATE TRADE AND COMMERCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

GENERAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

    A Brief History of SOCO, Beatport, Beta and AM Only . . . . . . . . . . . . . . . . . . . . . . 8

    Relevant Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Defendants' Unlawful Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Anticompetitive Effects of Defendants' Unlawful Conduct . . . . . . . . . . . . . . . . . . . . .18

FIRST CLAIM FOR RELIEF
(Violation of 15 U.S.C. § 1, Unlawful Tying) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SECOND CLAIM FOR RELIEF
(Violation of 15 U.S.C. § 2, Monopolization) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

THIRD CLAIM FOR RELIEF
(Violation of 15 U.S.C. § 2, Attempted Monopolization) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

FOURTH CLAIM FOR RELIEF
(Violation of 15 U.S.C. § 2, Conspiracy to Monopolize) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

FIFTH CLAIM FOR RELIEF
(Violation of  15 U.S.C. § 1, Conspiracy to Eliminate Competition by Unfair Means) . . . . . . 31

SIXTH CLAIM FOR RELIEF
(Violation of C.R.S. § 7-74-101, *et seq*., Theft of Trade Secrets) . . . . . . . . . . . . . . . . . . . . . 33

SEVENTH CLAIM FOR RELIEF
(Violation of 18 U.S.C. § 1962, Racketeer Influenced and Corrupt Organizations Act) . . . . . .35

EIGHTH CLAIM FOR RELEIF
(Intentional Interference with Prospective Business Expectancies) . . . . . . . . . . . . . . . . . . . . . . 39

NINTH CLAIM FOR RELIEF
(Civil Conspiracy) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Plaintiffs Regas Christou; R.M.C Holdings, L.L.C. ("The Church"); Bouboulina, Inc. ("Vinyl"); Molon Lave, Inc. ("2 A.M."); City Hall, LLC; 1037 Broadway, Inc. ("Bar Standard" f/k/a "The Shelter"); 776 Lincoln St., Inc. ("Funky Buddha"); and 1055 Broadway, Inc. ("The Living Room") (Plaintiffs collectively referred to as "SOCO"), for their Complaint against Defendants Beatport, LLC ("Beatport"); Bradley Roulier; BMJ&J, LLC ("Beta"); and AM Only, Inc. ("AM Only") (collectively, "Defendants"), state as follows:

## I.   NATURE OF ACTION

1.    This is an action for damages and injunctive relief arising out of the unlawful and anticompetitive practices of a major Electronic Dance Music downloading business, Beatport, along with a major DJ booking agency, AM Only, and a Denver nightclub, Beta, as well as its owner Mr. Roulier.  Together, these Defendants acted to prevent SOCO from competing in the market for live performances by top DJs in the Denver, Colorado metropolitan area ("Denver metro area").  By conditioning access to Beatport's Electronic Dance Music download marketplace on DJs performing only at Beta, at the exclusion of SOCO's nightclubs, and by other anticompetitive and predatory practices described below, Defendants have monopolized the local market for live performances by top DJs and severely harmed SOCO's ability to compete.  As a result, the overall competition for live performances by top DJs in the Denver metro area has decreased, resulting in higher prices and fewer offerings for consumers.

## II.   PARTIES

2.    Plaintiff Regas Christou is an individual and resident of Colorado.  A naturalized citizen, Mr. Christou emigrated from the Republic of Cyprus in 1967.

3.     Mr. Christou is an entrepreneur, founder and owner of several nightclubs in Denver, Colorado.  These nightclubs include R.M.C. Holdings, L.L.C. ("The Church"), located at 1160 Lincoln Street; Molon Lave, Inc. ("2 A.M."), located at 1136 Broadway; 1037 Broadway, Inc. ("Bar Standard" f/k/a "The Shelter"); City Hall LLC ("City Hall"), located at 1144 Broadway; 776 Lincoln St., Inc. ("Funky Buddha Lounge"); and 1055 Broadway, Inc. ("The Living Room").  In addition, Mr. Christou is affiliated with Bouboulina, Inc. ("Vinyl"), which operates a nightclub located at 1082 Broadway.  Together, Plaintiffs comprise the South of Colfax Nightlife District ("SOCO").

4.     Many of SOCO's clubs, and The Church and Vinyl in particular, emphasize "Electronic Dance Music," or music that is composed live and performed live by DJs in nightclubs.  Over the past decade, The Church and Vinyl built a reputation as two of the top venues in the country to view live performances by the world's top DJs, including artists performing under the names Tiësto, Armin van Buuren, Paul van Dyk, Paul Oakenfold, DJ Dan, DJ Rap, Christopher Lawrence and Sharam.  As a result, Denver has become a hub for live performances by top DJs and for Electronic Dance Music.

5.     Defendant Beatport, LLC ("Beatport") is a limited liability company organized under the laws of the State of Colorado, with its principle place of business located at 2399 Blake Street, Suite 170, Denver, Colorado 80205.

6.     Defendant Bradley Roulier is an individual and resident of Colorado.  Mr. Roulier is a co-founder of Beatport, and upon information and belief, Mr. Roulier remains a member of Beatport. Mr. Roulier is also the founder and a member of Beta.

7.     Defendant BMJ&J, LLC ("Beta") is a limited liability company organized under the laws of the State of Colorado, with its principle place of business located at 1909 Blake Street, Denver, Colorado.

8.     Defendant AM Only Inc. ("AM Only") is a privately held corporation organized under the laws of the State of New York, with its principle place of business located at 611 Broadway, Suite 907A, New York, New York. AM Only regularly does business in the state of Colorado.

## III.   JURISDICTION AND VENUE

9.     This Court has jurisdiction over SOCO's claims relating to violations of Sections 1 and 2 of the Sherman Act and violations of the RICO Act under 28 U.S.C. §§ 1331 and 1337, 15 U.S.C. § 15 and 18 U.S.C. § 1962.  This Court has supplemental jurisdiction over SOCO's state law claims pursuant to 28 U.S.C. § 1367(a).  SOCO's federal and state law claims arise from the same events and transactions, involve substantially identical issues of fact and law, and are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391.  The acts and communications alleged herein occurred primarily in the District of Colorado, Defendants transact business in the District of Colorado, Beatport and Beta are Colorado limited liability companies headquartered in the District of Colorado, and Bradley Roulier is a resident of Colorado.

## IV.   INTERSTATE TRADE AND COMMERCE

11.     Defendants and SOCO are involved in interstate trade and commerce, and the activities of Defendants substantially and adversely affect interstate commerce.  In the conduct of their business, Defendants, directly and indirectly, use the means and instrumentalities of interstate commerce in furtherance of the acts and communications alleged herein, including but not limited to the United States postal system, the nationwide system of telecommunications, the nationwide banking system and the nationwide transportation system, through and by means of which a substantial amount of the nation's communications, information exchanges, financial transactions and transportation take place.

12.     For example, Defendants and SOCO use all of these instrumentalities of interstate commerce to communicate among one another and to contact, book, pay and transport A-list DJs to perform in the Denver metro area from places outside the State of Colorado.  Revenues generated from performances in the Denver metro area enter the stream of interstate commerce through payments to performers, vendors and others, often outside the State of Colorado, who provide goods and services in connection with the promotion and performance of these events.

13.     Beatport's unlawful acts and practices as described in this Complaint also are made possible by its ownership of the premier global marketplace for downloading of Electronic Dance Music, including sales of music by and to third-parties in states other than Colorado, as well as direct integration with the electronic system, Traktor, used by many top DJs during live performances through Beatport's partnership with the German company Native Instruments GmbH.

## V.   GENERAL ALLEGATIONS

### A.   A Brief History of SOCO, Beatport, Beta and AM Only

14.     Beginning in the 1990's, Mr. Christou founded a series of nightclubs in the South of Colfax Nightlife District of Denver, Colorado, including The Church, Vinyl, Bar Standard, 2 A.M., Funky Buddha Lounge an The Living Room.   These clubs, comprising the South of Colfax Nightlife District ("SOCO"), were instrumental in the development of the surrounding neighborhood.

15.     Several of SOCO's clubs, including The Church and Vinyl, focused on live performances of music by DJs performing "Electronic Dance Music," including the sub-genres of "techno," "house," "trance," etc.

16.     In significant part due to the effort and investment of Mr. Christou, the Denver Electronic Dance Music scene developed into one of the most important markets for Electronic Dance Music in the country.

17.     In particular, The Church and Vinyl became known as two of the most important and respected venues for the performance of live Electronic Dance Music, and these venues regularly hosted performances by the world's top DJs.   The Church was named the "Best Club in the Nation" in 2002 and 2004, and Vinyl was named the nation's "Best New Club" in 2004.

18.     Beginning in 1998, Mr. Roulier worked for Mr. Christou and Plaintiffs as a talent buyer where he assisted in booking many of the world's top DJs to perform at SOCO's venues.

19.     While working for Mr. Christou, Mr. Roulier and several partners conceived of the idea of an online marketplace for music downloads that would cater specifically to the desires and needs of both consumers and producers of Electronic Dance Music.

20.     In order to help Mr. Roulier realize this vision, Mr. Christou co-signed a $50,000 loan to fund the start up of Beatport in exchange for a promise that Mr. Roulier would later give Mr. Christou partial ownership of the company.  With this start-up money, Mr. Roulier and several partners founded Beatport in 2003.

21.     As part of its strategic plan and marketing strategy, Beatport associated with and gave ownership interests to three of the world's top DJs—William Renkosik (a/k/a "Bad Boy Bill"), Richard ("Richie") Hawtin, and John Aquaviva.

22.     Bad Boy Bill, Richie Hawtin, and John Aquaviva each own record labels and are highly influential within the Electronic Dance Music community.  Bad Boy Bill and Richie Hawtin are both represented by AM Only, along with many of the world's top DJs.

23.     Initially, Mr. Christou continued to assist in the promotion of Beatport by, among other things, advertising for Beatport in SOCO's weekly print and online advertisements, allowing Beatport to hand out promotional flyers at SOCO's clubs, and advancing an additional $15,000 for Beatport to produce a promotional video featuring Bad Boy Bill.

24.     Beatport was a commercial success and quickly grew to be embraced by the Electronic Dance Music community as the cultural hub and premier marketplace for the sale of Electronic Dance Music.  In 2005, Beatport celebrated the purchase and download of one million songs from its website.  Jonas Temple, then Beatport's CEO, stated in an interview in 2005 that "it's exciting that Beatport is becoming the industry standard for electronic music downloads from professional DJs to the avid consumer."

25.     As Beatport grew into a hub for Electronic Dance Music sales and culture, access to Beatport became increasingly financially important for DJs.   Favorable promotion or

placement of a DJ on Beatport's website could make or break album sales.  Similarly, DJs learned that Beatport could "bury" their album on the website, thereby dramatically reducing sales.

26.     Beatport continued to work to differentiate itself from potential competitors such as Apple's iTunes music marketplace by offering services uniquely tuned to the Electronic Dance Music community.  For example, unlike iTunes and other competing generic music download marketplaces, Beatport offered music free of Digital Rights Management (DRM) controls.  As a result, DJs could more effectively use and re-mix music downloaded from Beatport during their live performances.

27.     Beatport succeeded in differentiating itself from generic music download marketplaces such as Apple's iTunes.  As Beatport co-founder Jonas Temple said in one interview, "iTunes was not a suitable partner for DJ's. The files were not encoded at high enough bit rate, the DRM was unusable in all professional DJ applications, and the content was not focused on our market."

28.     Additionally, Beatport entered into a strategic partnership with the German company, Native Instruments GmbH, which manufactures Traktor, the dominant hardware system used by DJs.  As a result of this partnership, DJs were more likely to use music downloaded from Beatport during their composition and live performances because Traktor provided organic and seamless integration with the Beatport marketplace while they were performing.  As Native Instruments' CEO Daniel Haver noted in a press release, "We strongly believe in Beatport as the most relevant and upfront platform for purchasing club music on the internet . . . With the Traktor Beatport Player, we are making our Traktor technology available to

Beatport customers, and by that perfectly complement the Beatport 2.0 experience. This is just the first step in our close partnership with Beatport, and DJs all around the world can look forward to many more exciting developments in the time to come."

29.     Native Instruments GmbH is a member of Beatport and, on information and belief, recently made the strategic acquisition of a majority interest in Beatport due to the importance of Beatport to the Electronic Dance Music community.

30.     Within the Electronic Dance Music community, top DJs act as "taste makers," and one of the most important indicators of market success for a DJ's music is whether other top-DJs choose to use and re-mix their music during a live performance.   Accordingly, the strategy of associating with top DJs such as Bad Boy Bill and Richie Hawtin and facilitating the use of music downloaded from Beatport during DJs' live performances entrenched Beatport as the dominant music download marketplace within the Electronic Dance Music community, and an essential tool to the financial success of DJs.

31.     As Beatport states on its website as of November 9, 2010, "Beatport is the most relevant online source of electronic music in the world."   Additionally, Beatport's website states that it is the "recognized leader in electronic dance music downloads for DJs and club music enthusiasts."

32.     With the success and position of Beatport established, Mr. Roulier initially explored the possibility of purchasing The Church from Mr. Christou.   Mr. Roulier decided instead to open a competing nightclub in Denver.   He concealed preparations for this move while still employed by Mr. Christou by continuing to negotiate the potential purchase of The Church. Mr. Roulier opened his nightclub, Beta, in March, 2008.

33.     Despite Mr. Christou's pivotal role in financing Beatport and the subsequent financial success of the company, Mr. Roulier has never fulfilled his promise to transfer an ownership interest in Beatport to Mr. Christou.

34.     Rather, in an effort to establish his new venue, Beta, and out-compete SOCO's more established venues, Mr. Roulier and Defendants soon began to leverage the overlapping ownership among Defendants and the power of Beatport to coerce DJs to boycott SOCO's venues and to play only at Beta.

**B.     Relevant Markets**

35.     For purposes of SOCO's antitrust claims, the first relevant product market is the market for digital downloads of DRM-free, high fidelity Electronic Dance Music suitable for playing on high-performance sound systems. The relevant geographic market is global because digital downloads are possible anywhere that an internet connection exists.

36.     There are no reasonably substitutable products for digital downloads of DRM-free, high fidelity Electronic Dance Music songs because substitution of other musical genres or formats would impose on consumers a substantial and unreasonable cost, including inability to re-mix the music or realize sufficient audio fidelity for use in nighclubs or on high quality sound systems.

37.     This product market is a unique and distinct sub-market of the broader market for sale of Electronic Dance Music characterized by the above-mentioned peculiar characteristics, industry recognition and specialized vendors.

38.     The second market relevant to SOCO's antitrust claims is the market for live performances by A-list DJs playing Electronic Dance Music. The relevant geographic market is

the Denver metro area because there is extremely low cross-elasticity of demand by consumers inside the Denver metro area with providers outside of it.

39.     There are no reasonably substitutable services for live performances by A-list DJs playing Electronic Dance Music because substitution of non-live performances or live performances of other genres of music would impose on consumers a substantial and unreasonable cost.

40.     "A-list DJs" are a distinct sub-market of the broader market for live performances by DJs.  This sub-market is known and recognized by both consumers and industry insiders, and is characterized by unique pricing and sensitivity to price change as A-list DJs have the ability to draw a substantially larger number of consumers willing to pay a ticket price premium on the basis of the DJ's talent and name recognition.

41.     There are no reasonably substitutable services for live performances by A-list DJs playing Electronic Dance Music because substitution of less talented or recognizable DJs would impose on consumers a substantial and unreasonable cost.

**C.     Defendants' Unlawful Conduct**

42.     A DJ's ability to sell and promote music on Beatport's electronic download marketplace can and does determine both the awareness and acceptance of that music within the Electronic Dance Music community and significantly influences the financial success (or failure) of the DJ's music sales and live performances.  As one A-list DJ commented to SOCO's talent buyer, "it's the only electronic store that counts."  Similarly, the owner of a major Electronic Dance Music record label stated that "there's nothing bigger than Beatport to get my products out there."

43.     Beatport and Beta have been and remain closely tied through common ownership and history.  For example, one distinct area within Beta is co-branded with Beatport and operates under the name "Beatport Lounge."   Additionally, events at Beta and Beatport Lounge are frequently promoted on one of Beatport's affiliated media outlets, Beatportal.com.

44.     This cross-promotion of Beatport and Beta through the Beatport Lounge aligns the financial interests of all Defendants.  For example, the value of Beatport Lounge as a promotional tool to Beatport is enhanced by A-list DJs performing exclusively at Beta, and AM Only receives greater revenues from Bad Boy Bill and Richie Hawtin—DJs it represents and whom are owners in Beatport—by using Beatport Lounge to promote their DJs

45.     Beatport has now and had at all times relevant to this lawsuit the ability to remove a DJ from its online Electronic Dance Music marketplace if it chooses to do so in response to that DJ performing at one of SOCO's venues.

46.     Beatport has now and had at all times relevant to this lawsuit the ability to remove all artists on a DJ's label from its online Electronic Dance Music marketplace if it chooses to do so in response to that DJ performing at one of SOCO's venues.

47.     Beatport has now and had at all times relevant to this lawsuit the ability to reduce promotion of a DJ on its online Electronic Dance Music marketplace and associated media outlets if it chooses to do so in response to that DJ performing at one of SOCO's venues.

48.     Defendants recognized this potential leverage, and in early 2008 began, through words and actions, to communicate to A-list DJs and their agents that, if DJs wanted full access to and promotional support from Beatport, when performing within the Denver metro area they must perform only at Beta, at the specific exclusion of SOCO's clubs.

49.     Defendants repeatedly used their position and clout to coerce DJs, including DJs who had pre-existing business relationships with SOCO, to perform only at Beta at the exclusion of SOCO's venues.

50.     Because of the critical importance of access to Beatport and promotional support from Beatport to DJs and their labels, many DJs and agents believed they had no choice but to refuse to perform at SOCO's venues, and, within the Denver metro area, to perform only at Beta.

51.     Because payments to DJs are determined by economic factors, including the size of the venue in which they will play, and because Beta has substantially lower capacity than either The Church or Vinyl, DJs who were coerced to play at Beta also received less money than they would have received to play at SOCO's venues.

52.     For example, in late 2008, Mr. Christou was concluding negotiations for a "residency," or long-term contract for multiple future performances, between The Church and a DJ with a large and devoted following in the Denver metro area, Charissa Saverio ("DJ Rap"). However, just before formalizing the agreement, DJ Rap learned that Beta, without her awareness or permission, was advertising her as an upcoming performance at Beta.  When DJ Rap contacted Beta, Mr. Roulier, a member and founder of both Beta and Beatport, told her that she would be required to play at Beta and to not play at The Church if she wanted continued access and label support on Beatport.  Mr Roulier communicated directly to DJ Rap's booking agency, Bullit Booking, via email that he would pull both of DJ Rap's record labels entirely off Beatport if DJ Rap played at SOCO's clubs.

53.     DJ Rap expressed to SOCO's talent buyer that she would much rather perform at The Church because she was treated better by SOCO's management, but because DJ Rap could

not risk the financially damaging retribution threatened by Mr. Roulier and Beatport she acceded to Defendants' demands and canceled her performance at The Church, performing instead at Beta.

54.     Similarly, the owner of a major Electronic Dance Music record label stated that Beta and Mr. Roulier are "using their Beatport connections to make sure things happen."

55.     As Mr. Roulier said in a March 14, 2008 interview with the Denver Post, "[w]ith [Beta's] relationship with Beatport we think most of the DJs will want to play for us."

56.     On at least one occasion, Mr. Roulier also promised a top DJ increased promotion on Beatport's website in exchange for agreeing to perform at Beta.

57.     AM Only, the talent agency representing many of the world's top DJs, was an active participant in the coercion of DJs to play at Beta at the exclusion of SOCO's clubs.  AM Only participated in this scheme by, among other things, communicating to DJs, agents, and labels that Beatport would punish DJs if they played at SOCO's clubs, and by refusing to pass offers for performances from SOCO's personnel to A-list DJs represented by AM Only.

58.     For example, in a phone conversation between SOCO's talent buyer and an agent then at AM Only, Alex Chaykin, Mr. Chaykin suggested that the president of AM Only instructed him not to permit SOCO to book its top DJs.  Also during this conversation, Mr. Chaykin implied that, because of Beatport's influence over DJs and Beatport's connection to Beta, AM Only was to reserve its top DJs for performance at Beta, and that it was only permitted to book second-tier DJs at SOCO's venues.

59.     In another conversation between SOCO's talent buyer and Alex Chaykin of AM Only, when pressed as to why AM Only won't let SOCO book A-list DJs, Mr. Chaykin stated

that it "has a lot to do with [AM Only's top] artists and their relationship with Brad [Roulier] and Beatport."

60.     Mr. Chaykin also told SOCO's talent buyer that he would provide a list of DJs that SOCO did not have access to, confirming Defendants' conspiracy to set up a two-tiered system where only Beta could book A-list DJs.  SOCO would be limited to booking B-list DJs. This arrangement would not allow SOCO to effectively compete with Beta.

61.     In addition, on at least two occasions, DJs who had agreed to perform at SOCO's venues cancelled the scheduled performances shortly after changing their management representation to AM Only.

62.     In an effort to further confirm this conspiracy, Mr. Christou and SOCO's talent buyer identified dates when Beta had already announced its performance lineup, next identified A-list DJs that had not yet committed to other venues on those same dates, and then attempted to book these DJs to play at SOCO's venues.  Again, SOCO's efforts were rebuffed, demonstrating Defendants' intent to not only prevent SOCO from booking top DJs that Beta hoped to book, but also Defendants' intent to prevent SOCO from booking any top DJ that would allow SOCO to effectively compete with Beta in the local market for live performances by A-list DJs.

63.     In another instance, Mr. Christou and SOCO's talent buyer attempted to book Joel Zimmerman ("DJ Deadmau5"), an A-list DJ, to play at Vinyl following the DJ's performance earlier that day at Red Rocks.  SOCO's talent buyer offered $15,000 for Deadmau5 to perform for two hours at Vinyl, more than double the market rate for such a performance at the time. DeadMau5 expressed interest in the offer, but after conferring with his agent stated that he could not accept out of fear of angering Mr. Roulier.

64.     More recently, Mr. Christou partnered with a second talent buyer operating out of Arizona in an effort to book A-list DJs at SOCO's clubs.  AM Only informed this second talent buyer that its A-list DJs were available to play at the buyer's clubs in Phoenix, Arizona, but that these same DJs were not available on the same dates to play in Denver at SOCO's venues.

65.     Upon information and belief, AM Only was an active participant in this arrangement, and was motivated by its financial interest in currying favor with Beatport in order to enhance the promotion and access provided by Beatport to DJs represented by AM Only.

66.     Since approximately January 2008, SOCO has repeatedly and continuously tried to book performances by A-list DJs, many of whom had played at SOCO's venues on multiple prior occasions.  However, due to Defendants' intentional and improper interference with these actual and prospective contractual relationships and business expectancies, Plaintiffs have consistently been unable to book A-list DJs, and have suffered substantial economic damages as a result.

**D.    Anticompetitive Effects of Defendants' Unlawful Conduct**

67.     Defendants' monopolistic and predatory practices have had the following anticompetitive effects, among others, in the relevant market:

a.      Competition in the relevant market has been unreasonably restrained, suppressed, and, in some cases, destroyed;

b.      Potential competitors have been restrained from entering into the relevant market and have been prevented from competing effectively against Beta;

      c.      Beta's monopoly over live performances by A-list DJs in the Denver metro area has been entrenched, resulting in greater domination of the relevant market and the enhancement of barriers to entry;

      d.      Defendants' unlawful leveraging of economic strength in the global market for Electronic Dance Music downloads has resulted in the diversion to Beta of artists who, in a free and open market, would otherwise turn to Plaintiffs or others as purchasers of live performances;

      e.      Fans of Electronic Dance Music performed by A-list DJs in the Denver metro area have been denied the benefits of competition in a free and open market, have been forced to pay artificially high ticket prices, and have been forced to accept reduced selection of performances and an inferior venue for these performances;

      f.      A-list DJs have been forced to accept lower payments for services than they would have received in a free and open market;

      g.      The reduced competition among venues has resulted in inferior service and audiences for A-list DJs in the Denver metro area, and as a result the importance and attraction of Denver as a performance location for A-list DJs has diminished, reducing the quality and variety of Electronic Dance Music performances available to the Denver metro area market; and

      h.      Upon information and belief, Beta has enjoyed, and will continue to enjoy, monopolistic profits to the detriment of competitors, including Plaintiffs.

68.      The aforementioned anticompetitive effects of Defendants' conduct on competition in the relevant market outweigh any conceivable pro-competitive benefits.

**FIRST CLAIM FOR RELIEF**
**(Violation of 15 U.S.C. § 1 – Unlawful Tying – Against Beatport, Beta, Mr. Roulier)**

69.     SOCO incorporates by reference the allegations contained in paragraphs 1-68 above.

70.     Electronic Dance Music downloads and live performances by DJs constitute two separate products or services.

71.     Beatport owns, operates, and otherwise controls a key online marketplace for the sale and download of high-fidelity, DRM-free Electronic Dance Music.  Without access to Beatport's online marketplace, DJs and their labels cannot access a significant portion of the target demographic necessary for financial success, and are far less likely to have their songs popularized by being re-mixed or re-played by DJs.

72.     Beatport, and Defendants through their overlapping ownership or close association with Beatport, exercise substantial market power in the market for the sale of Electronic Dance Music, and in the sub-market for the paid online downloading of high-fidelity, DRM-free Electronic Dance Music.  Additionally, because Beatport's online marketplace provides high-fidelity, DRM-free and Traktor-compatible file formatting, Beatport's products and services occupy a unique niche in the market for Electronic Dance Music.

73.     Defendants acted in concert to advance a tying arrangement whereby A-list DJs would perform live within the Denver metro area only at Beta, at the exclusion of SOCO's venues, out of fear that otherwise they would lose their access to or promotion by Beatport.

74.     Additionally, Defendants leveraged Beatport's influence and communicated to A-list DJs that Beatport has the ability and intent to "bury" artists on its online marketplace or drop them entirely unless they agreed to only book live performances in the Denver metro area at

Beta, at the exclusion of SOCO's clubs.  As a result, Defendants afforded A-list DJs and their agents no choice but to agree to perform live at Beta, and at the exclusion of SOCO's venues, within the Denver metro area.

75.    Several A-list DJs, including DJ Rap, Christopher Lawrence, DJ Dan, Sasha and DJ Deadmau5 were coerced into agreeing to this tying arrangement.

76.    The tying arrangement advanced by Defendants has foreclosed a substantial volume of business in the market for live performances by DJs in the Denver metro area, and has impacted nearly the entirety of the sub-market for live performances by A-list DJs.  While the exact impact in this market will be proved at trial, the amount is in excess of $1 million.

77.    Defendants' unlawful tying practices prevented SOCO from competing in the market for live Electronic Dance Music performances by A-list DJs, and foreclosed to SOCO an amount of business and profit substantial enough as to not be merely *de minimis*.

78.    Further, as a direct and proximate result of Defendants' conduct, competition in the relevant market has been unreasonably restrained and injured, and SOCO has been damaged in that:    (i) its revenues and profits from performances of A-List DJs have decreased significantly; (ii) its ability to compete with Beta has been frustrated, causing SOCO to lose actual and potential customers and past and future profits and harming SOCO's goodwill; (iii) the reputation of SOCO's clubs and Mr. Christou have been diminished, resulting in inability to form business partnerships and greatly increased costs of booking all live performances, including but not limited to A-List DJs; (iv) the negative effect on SOCO's revenues has significantly reduced the going concern or sale value of SOCO's component business including The Church and Vinyl; (v) revenues from patrons visiting other of SOCO's clubs in the South of

Colfax district both before and after performances by A-list DJs has decreased; and (vi) the effect of diminishing the reputation of and number of visitors to SOCO's clubs has significantly reduced the value of real property owned by SOCO's component entities.  SOCO has suffered and will continue to suffer damages and losses to its business and property in an amount to be determined.

WHEREFORE, SOCO seeks relief as set forth at the end of this Complaint.

## SECOND CLAIM FOR RELIEF
### (Violation of 15 U.S.C. § 2 – Monopolization – Against Beta and Mr. Roulier)

79.     SOCO incorporates by reference the allegations contained in paragraphs 1-78 above.

80.     Beta and Mr. Roulier possesses monopoly power over the market for live performances by A-list DJs in the Denver metro area.  Since the opening of Beta in 2008, the vast majority of A-list DJ performances within the geographic market have taken place at Beta.

81.     Additionally, on occasion Mr. Roulier has personally coordinated performances of A-list DJs at larger venues, ensuring that A-list DJ performances remain under the control of Defendants even where economic factors require a performance venue larger than Beta.

82.     Beta's and Mr. Roulier's possession of monopoly power is not a result of superior business acumen or a superior venue or service.  Rather, Beta and Mr. Roulier willfully acquired and maintained monopoly power through anticompetitive, predatory and exclusionary conduct, including:

**Illegal Tying:**

83.     As alleged above, Defendants tied access to, and promotion by, Beatport's Electronic Dance Music marketplace and media outlets to the condition that A-List DJs perform exclusively at Beta within the Denver metro area.

**Exclusive Dealing:**

84.     Defendants entered into de facto business agreements with A-list DJs whereby those DJs would perform exclusively within the Denver metro area at Beta.  These agreements included long-term "residency" contracts between A-list DJs and Beta, as well as more generalized agreements between Beta, A-list DJs and their booking agents.

85.     While DJs and their agents were coerced to enter into and remain in these agreements indefinitely due to leverage exerted by Defendants, many of the DJs have expressed to SOCO that they would prefer to play at SOCO venues, or at a minimum, that they would like to have the opportunity to entertain bids from SOCO venues.

86.     These exclusive contracts with Beta, when taken together, had the effect of excluding all or nearly all A-list DJs from contracting with SOCO for live performances. Defendants' exclusive dealing arrangements created a very high degree of exclusivity and had the effect of excluding A-list DJs from contracting with nearly any competing venue in the market.

**Reciprocal Dealing:**

87.     Defendants, as well as other A-list DJs and their agents as coerced non-party conspirators, entered into reciprocal business agreements whereby Beatport would provide access to its online marketplace and promotion for A-list DJs, their labels, and the other DJs

represented by their agents, and in exchange, those A-list DJs would agree to play live performances at Beta.

88.     Defendants, by leveraging the influence of Beatport over DJs and their labels, have coerced A-list DJs and their agents into entering into these reciprocal agreements.

89.     Beatport, and Defendants through their association with Beatport, exercise substantial market power in the market for the sale of digital, high-fidelity, DRM-free Electronic Dance Music.

90.     The reciprocal dealing agreements alleged above have impacted a substantial volume of business in the market for live performances by A-list DJs in the Denver metro area in an amount that exceeds $1 million.

**Monopoly Leveraging:**

91.     Beatport exercises monopoly power in the market for digital downloads of high-fidelity, DRM-free Electronic Dance Music.

92.     Beatport, and Defendants through their association with Beatport, used that monopoly power to foreclose competition in the market for live performances by A-list DJs in the Denver metro area.

93.     As a direct result of this leveraging, SOCO sustained antitrust injuries as outlined below.

**Market Allocation**

94.     Beta and Mr. Roulier, through their close ties with Beatport, induced AM Only to apportion performances by DJs at Denver's nightclubs in a two-tiered system, with A-list DJs

being made available exclusively to Beta, and non-A-list DJs being made available for performances at SOCO's clubs.

**Group Boycott**

95.     By leveraging the importance of Beatport to A-list DJs, their agents and record labels, Defendants coerced A-list DJs into a de facto group boycott of SOCO for the benefit of Beta, Beatport and Mr. Roulier.

**Totality of Exclusionary Conduct Combined to Injure Competition:**

96.     Finally, when taken together, Defendants' anticompetitive and exclusionary behavior alleged above combined to injure competition in the market for live performances by A-list DJs in the Denver metro area.

97.     The several forms of anticompetitive and exclusionary behavior alleged above have been occurring for more than two years and are ongoing.

98.     Defendants' anticompetitive and exclusionary behavior alleged above has substantially lessened competition for bookings of A-list DJs in the Denver metro area, unreasonably enhanced the market position of Beta and aided Beta in creating a monopoly in the local market for live performances by A-list DJs.

99.     The several forms of anticompetitive and exclusionary behavior alleged above have reduced the quality, quantity and diversity of live performances by A-list DJs in the Denver metro area, resulting in higher ticket prices and lower availability to consumers.  Additionally, this behavior has reduced the competition for DJs by venues resulting in inferior service and lower payments to DJs.

100.    In addition to the anticompetitive and exclusionary nature of the actions alleged above, the predatory and exclusionary nature of Beta's and Mr. Roulier's acquisition of monopoly power is directly proved by the fact that numerous A-list DJs have expressed a preference to play at SOCO's venues, or at least a preference to rotate between Beta and SOCO's venues, but have in fact played only at Beta despite repeated attempts by SOCO to hire these DJs at market or above-market rates.   Several of these DJs have expressed that they played exclusively at Beta as a direct result of the illegal tying, monopoly leveraging and other anticompetitive behavior outlined above.

101.    Defendants had available to them numerous less restrictive, pro-competitive means of increasing their market share, including paying more money to A-list DJs and providing better service to A-list DJs.

102.    There is no pro-competitive justification for the behavior alleged above.

103.    There are high entry barriers associated with the business of producing live performances by A-list DJs in the Denver metro area, including, among others, the industry expertise needed to manage the required venue; the ability to develop a reputation in the industry as being a desirable and popular venue; the legal and regulatory costs of acquiring events permits and liquor licenses; and the cost of acquiring and maintaining venues for the performance of live music of sufficient size and quality to generate enough revenue to pay A-list DJs' fees.

104.    As a direct and proximate result of Beta's and Mr. Roulier's willful acquisition and maintenance of monopoly power through anticompetitive means, competition in the relevant market has been unreasonably restrained and injured, and SOCO has been damaged in that:  (i) its revenues and profits from performances of A-List DJs have decreased significantly; (ii) its

ability to compete with Beta has been frustrated, causing SOCO to lose actual and potential customers and past and future profits and harming SOCO's goodwill and reputation; (iii) the reputation of SOCO's clubs and Mr. Christou have been diminished, resulting in inability to form business partnerships and greatly increased costs of booking all live performances, including but not limited to A-List DJs; (iv) the negative effect on SOCO's revenues has significantly reduced the going concern or sale value of SOCO's component business including The Church and Vinyl; (v) revenues from patrons visiting other of SOCO's clubs in the South of Colfax district both before and after performances by A-list DJs has decreased; and (vi) the effect of diminishing the reputation of and number of visitors to SOCO's clubs has significantly reduced the value of real property owned by SOCO's component entities.  SOCO has suffered and will continue to suffer damages and losses to its business and property in an amount to be determined.

WHEREFORE, SOCO seeks relief as set forth at the end of this Complaint.

## THIRD CLAIM FOR RELIEF
**(Violation of 15 U.S.C. § 2 – Attempted Monopolization – Against Beta and Mr. Roulier)**

105.    SOCO incorporates by reference the allegations contained in paragraphs 1-104 above.

106.    Beta and Mr. Roulier engaged in the predatory and anticompetitive conduct described above, including illegal tying, exclusive dealing, reciprocal dealing, monopoly leveraging, market allocation, group boycott and the concerted combination of these actions with the specific intent to destroy competition and monopolize the relevant market.

107.    Beta and Mr. Roulier currently control significantly more than half of the market for live performances by A-list DJs in the Denver metro area, and have demonstrated a

dangerous probability of achieving monopoly power in the relevant market.  Beta and Mr. Roulier continue to dominate this market through the unlawful conduct described above, to the detriment of consumers and competition.

108.   As a direct and proximate result of Beta's and Mr. Roulier's attempted monopolization, competition in the relevant market has been unreasonably restrained and injured, and SOCO has been damaged in that:  (i) its revenues and profits from performances of A-List DJs have decreased significantly; (ii) its ability to compete with Beta has been frustrated, causing SOCO to lose actual and potential customers and past and future profits and harming SOCO's goodwill and reputation; (iii) the reputation of SOCO's clubs and Mr. Christou have been diminished, resulting in inability to form business partnerships and greatly increased costs of booking all live performances, including but not limited to A-List DJs; (iv) the negative effect on SOCO's revenues has significantly reduced the going concern or sale value of SOCO's component business including The Church and Vinyl; (v) revenues from patrons visiting other of SOCO's clubs in the South of Colfax district both before and after performances by A-list DJs has decreased; and (vi) the effect of diminishing the reputation of and number of visitors to SOCO's clubs has significantly reduced the value of real property owned by SOCO's component entities.  SOCO has suffered and will continue to suffer damages and losses to its business and property in an amount to be determined.

WHEREFORE, SOCO seeks relief as set forth at the end of this Complaint.

## FOURTH CLAIM FOR RELIEF
### (Violation of 15 U.S.C. § 2 – Conspiracy to Monopolize – Against All Defendants)

109.   SOCO incorporates by reference the allegations contained in paragraphs 1-108 above.

110.    Defendants agreed by words and conduct to coerce A-list DJs to performing within the Denver metro area only at Beta, and at the exclusion of SOCO's clubs.  Specifically, Defendants agreed to tie access to and promotion by Beatport's electronic marketplace to the condition that DJs boycott SOCO's clubs and perform exclusively at Beta; Defendants engineered exclusive dealing and reciprocal dealing arrangements between A-list DJs, Beaport and Beta; Defendants schemed to allocate DJs within the Denver metro area in a two-tiered arrangement favoring Beta; Defendants coordinated a group boycott of SOCOs nightclubs; and Defendants agreed to leverage Beatport's monopoly over the market for digital downloads of high-fidelity, DRM-free Electronic Dance Music to coerce A-list DJs to play within the Denver metro area exclusively at Beta.

111.    As a result of these agreements, Defendants have combined and conspired between themselves with the specific intent to monopolize the market for live performances by A-list DJs within the Denver metro area.

112.    Defendants have engaged in overt acts in furtherance of that conspiracy, including but not limited to:

a.    Defendants communicated to other DJs, agents, and recording labels by phone and email that if DJs play at SOCO's clubs, those DJs, their labels, and other DJs represented by these agents will be punished by Beatport as outlined above;

b.    In an overt show of control over DJs, Beta and Mr. Roulier advertised the performance by DJ Rap at Beta when she had not agreed to perform there;

c.    AM Only refused to communicate booking offers from SOCO to A-list DJs in an effort to prevent A-list DJs from performing at clubs that compete with Beta;

d.      AM Only communicated Defendants' threatened retribution to other DJs, agents and record labels in an effort to ensure compliance beyond those DJs represented by AM Only; and

e.      Agents at AM Only falsely informed SOCO's talent buyer and others that certain DJs had agreed to a long-term "residency" contract with Beta in an effort to prevent SOCO from pursuing booking of these DJs.

113.    This conspiracy was economically rational for all Defendants because it increased Beta's market share, increased the value of Beatport's cross-branded salon "Beatport Lounge," and increased AM Only's earnings by bolstering the profile and revenues of DJs associated with Beatport and represented by AM Only.

114.    In entering into that combination and/or conspiracy and engaging in overt acts in furtherance of it, Defendants have demonstrated specific intent to monopolize the market for live performances by A-list DJs in the Denver metro area.

115.    Defendants therefore have illegally combined and/or conspired – and will continue to do so – to monopolize the market for live performances by A-list DJs in the Denver metro area, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

116.    As a direct and proximate result of this conspiracy to monopolize, competition in the relevant market has been unreasonably restrained and injured, and SOCO has been damaged in that:    (i) its revenues and profits from performances of A-List DJs have decreased significantly; (ii) its ability to compete with Beta has been frustrated, causing SOCO to lose actual and potential customers and past and future profits and harming SOCO's goodwill and reputation; (iii) the reputation of SOCO's clubs and Mr. Christou have been diminished,

resulting in inability to form business partnerships and greatly increased costs of booking all live performances, including but not limited to A-List DJs; (iv) the negative effect on SOCO's revenues has significantly reduced the going concern or sale value of SOCO's component business including The Church and Vinyl; (v) revenues from patrons visiting other of SOCO's clubs in the South of Colfax district both before and after performances by A-list DJs has decreased; and (vi) the effect of diminishing the reputation of and number of visitors to SOCO's clubs has significantly reduced the value of real property owned by SOCO's component entities. SOCO has suffered and will continue to suffer damages and losses to its business and property in an amount to be determined.

WHEREFORE, SOCO seeks relief as set forth at the end of this Complaint.

## FIFTH CLAIM FOR RELIEF
**(Violation of 15 U.S.C. § 1 – Conspiracy to Eliminate Competition by Unfair Means – Against All Defendants)**

117.    SOCO incorporates by reference the allegations contained in Paragraphs 1-116 above.

118.    Defendants agreed by words and conduct to coerce A-list DJs to performing within the Denver metro area only at Beta, and at the exclusion of SOCO's clubs. Specifically, Defendants conspired to monopolize the market for live performances by A-list DJs in the Denver metro area, as outlined above; Defendants agreed to tie access to, and promotion by, Beatport's electronic marketplace to the condition that DJs boycott SOCO's clubs and perform exclusively at Beta; Defendants engineered exclusive dealing and reciprocal dealing arrangements between A-list DJs, Beaport and Beta; Defendants schemed to allocate DJs within the Denver metro area in a two-tiered arrangement favoring Beta; Defendants coordinated a

group boycott of SOCOs nightclubs; and Defendants leveraged Beatport's monopoly over the market for digital downloads of high-fidelity, DRM-free Electronic Dance Music to coerce A-list DJs to play within the Denver metro area exclusively at Beta.

119.    As a result of these agreements, Defendants have combined and conspired between themselves to eliminate SOCO's clubs as a viable competitor to Beta in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

120.    Defendants have engaged in overt acts in furtherance of that conspiracy as alleged above, and have stolen and conspired to steal and use Plaintiff's trade secrets as alleged below.

121.    In entering into that combination and/or conspiracy and engaging in overt acts in furtherance of it, Defendants have demonstrated specific intent to eliminate SOCO's clubs as viable competitors to Beta.

122.    As a direct and proximate result of this conspiracy to eliminate SOCO as a competitor, competition in the relevant market has been unreasonably restrained and injured, and SOCO has been damaged in that:  (i) its revenues and profits from performances of A-List DJs have decreased significantly; (ii) its ability to compete with Beta has been frustrated, causing SOCO to lose actual and potential customers and past and future profits and harming SOCO's goodwill and reputation; (iii) the reputation of SOCO's clubs and Mr. Christou have been diminished, resulting in inability to form business partnerships and greatly increased costs of booking all live performances, including but not limited to A-List DJs; (iv) the negative effect on SOCO's revenues has significantly reduced the going concern or sale value of SOCO's component business including The Church and Vinyl; (v) revenues from patrons visiting other of SOCO's clubs in the South of Colfax district both before and after performances by A-list DJs

has decreased; and (vi) the effect of diminishing the reputation of and number of visitors to SOCO's clubs has significantly reduced the value of real property owned by SOCO's component entities.  SOCO has suffered and will continue to suffer damages and losses to its business and property in an amount to be determined.

WHEREFORE, SOCO seeks relief as set forth at the end of this Complaint.

**SIXTH CLAIM FOR RELIEF**
**(Theft of Trade Secrets – C.R.S. § 7-74-101, *et seq.* – Colorado Law –**
**Against Beatport, Beta and Mr. Roulier)**

123.   SOCO incorporates by reference the allegations contained in paragraphs 1-122 above.

124.   To operate its business and promote its clubs, SOCO built and maintained numerous social networking websites, customer email lists, and contact lists for DJs and agents.

125.   For example, The Church and Vinyl maintain profiles on MySpace, each with over 10,000 "friends."   These "friends" receive email updates or internet notifications of upcoming events.

126.   SOCO also compiled an extensive list of customer email addresses that it used to promote upcoming events.

127.   Additionally, over more than a decade, SOCO compiled an exhaustive and confidential list of personal cell phone numbers and email addresses for he world's top DJs, agents and promoters.

128.   Mr. Roulier, while employed by SOCO as its Director of Entertainment, was paid to assist in building, maintaining and using these lists and web profiles on SOCO's behalf.

129.    Each of these lists and web profiles are secured and safeguarded by SOCO to prevent access to or use by anyone other than those limited personnel requiring access to promote SOCO's businesses.  As such, these lists and web profiles are trade secrets within the meaning of C.R.S. § 7-74-102.

130.    Upon leaving the employment of SOCO, Mr. Roulier was notified by SOCO's attorney of SOCO's ownership of these trade secrets and knew that these items were trade secrets belonging to SOCO.

131.    Mr. Roulier, without permission, took these lists and web profile login and password information when he left SOCO.

132.    Subsequently, Mr. Roulier, personally or through his assistant Catherine Nguyen, posted updates to The Church's and Vinyl's MySpace pages promoting the launch of Beta.

133.    Additionally, Mr. Roulier sent emails promoting Beta to SOCO's confidential customer email list.

134.    Finally, Mr. Roulier used the confidential DJ and Agent contact information taken from SOCO to accelerate the launch of Beta, and to engage in the various anticompetitive and predatory behavior outlined above.

135.    In using these trade secrets without SOCO's permission, Mr. Roulier acted in his personal capacity, as an agent and officer of Beta, and as an agent and officer of Beatport, to promote the cross-branded salon "Beatport Lounge" within Beta.

136.    As a direct and proximate result of Mr. Roulier's, Beta's and Beatport's theft of trade secrets, SOCO has been damaged in an amount to be proved at trial.

WHEREFORE, SOCO seeks relief as set forth at the end of this Complaint.

## SEVENTH CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962 – Racketeer Influenced and Corrupt Organizations Act – Against All Defendants)

137.    SOCO incorporates by reference the allegations contained in Paragraphs 1-136 above.

138.    All Defendants are "persons" within the context of § 1962 and together constitute an association-in-fact enterprise (the "Enterprise").  This Enterprise, informally organized and structured by the aligned financial interests and business relationships of its members, works in concert to pursue the shared goal of leveraging the influence of Beatport to intimidate A-list DJs into playing exclusively at Beta at the exclusion of SOCO's clubs and to otherwise destroy SOCO's ability to compete with Beta.  The activities of this Enterprise have continued for a period of more than two years during which time the Enterprise was engaged in and affecting interstate commerce as alleged above.

139.    Each defendant participated directly in the management and operation of the Enterprise's affairs through either the purchasing of A-list DJ services, the booking and coordination of A-list DJ services, or the promotion and sales of A-list DJs' music through, among other things, Beatport's online marketplace and Beta's Beatport Lounge, all of which formed the core operations of the Enterprise.

140.    The Enterprise engaged in a continuing and related pattern of racketeering activity.  These activities constitute a continuing and related pattern because they repeated weekly and monthly toward the same purpose—as Beta and SOCO worked, usually several weeks in advance of each date, to book A-list DJs to perform in the Denver metro area, Defendants repeatedly interacted among each other and committed the racketeering acts

described below to ensure that A-list DJs booked performances only at Beta, and at the exclusion of SOCO's clubs.

141.    This scheme includes wire fraud, mail fraud, bank fraud and theft whereby Defendants acted and agreed to act to intimidate A-list DJs into playing in the Denver metro area exclusively at Beta.

142.    Defendants, through their Enterprise, fraudulently and repeatedly communicated to patrons of live performance by A-list DJs in the Denver metro area that Beta was endorsed or approved by SOCO when Beta and Mr. Roulier used MySpaces pages belonging to The Church and Vinyl to promote the launch of Beta.   Defendants knew these representations were false when made.

143.    Because of the excellent reputation of The Church and Vinyl among its MySpace "friends," these patrons reasonably relied on these false statements when they chose to pay to see performances at Beta instead of The Church or Vinyl.   This reliance was to their financial detriment because, according to emails to SOCO from many angered customers, the quality of performances at Beta did not live up to their expectations.

144.    Defendants perpetrated this fraud on their customers, in part, through the repeated and ongoing theft of trade secrets, including but not limited to unauthorized access to and use of MySpace internet profiles owned by The Church and Vinyl and customer email lists developed by SOCO, as alleged above.

145.    Defendants, through their Enterprise, also fraudulently communicated to SOCO via interstate phone and email communications that they intended to alternate A-list DJs between Beta and SOCO's clubs, when in fact at the time of these communications they intended to

prevent A-list DJs from playing at SOCO's clubs entirely.  These representations were made during phone conversations between Mr. Roulier and Mr. Christou and via interstate email and phone communications between AM Only and SOCO, and were either false when made or Defendants knew that they did not know whether they were true or false when made.

146.  SOCO reasonably relied on these representations because of the longstanding history of SOCO booking DJs through AM Only, a member of the Enterprise.  This reliance was to SOCO's financial detriment as it resulted in the inability to book A-list DJs for live performances, delayed SOCO's ability to react to and mitigate damages from the ensuing group boycott, and caused SOCO to continue to expend considerable time and money pursuing booking A-list DJs through AM Only.

147.  Defendants, through their Enterprise, also criminally infringed upon SOCO's copyrighted event name "Hallow Freakin' Ween"—language describing an annual Halloween party developed and extensively promoted by SOCO, and a term which copyright is held by SOCO.  Defendants infringed this copyright by using it repeatedly without permission in online marketing, print flyers, and various paid media advertising to promote Halloween parties at Beta and another venue in 2007, 2008, 2009 and 2010, often featuring DJs represented by AM Only or DJs whose promotion would increase Beatport's sales.

148.  Plaintiffs maintain that Defendants had the capability and intent to carry out all of the preceding allegations at the time of communication.  However, in the alternative, and in the event Defendants argue they did not have the ability or intent to remove DJs or their labels from Beatport if those DJs did not accede to Beta's and Mr. Roulier's demands to play exclusively at

Beta within the Denver metro area, or to boycott SOCO's clubs, then Defendants, through their Enterprise, knowingly and falsely informed many DJs and their labels to that effect.

149.    Because of the known relationships between Defendants, these DJs, their labels and agents reasonably relied on such statements to their financial detriment by agreeing to Beta's and Mr. Roulier's demands, often resulting in performing at Beta for less than they would have been paid by SOCO's venues, or by foregoing the opportunity to be paid to perform at SOCO's venues.

150.    The Enterprise used interstate wire and mail communication to carry out its activities, including to communicate these statements and to utilize trade secrets stolen from SOCO.

151.    The Enterprise knowingly executed its scheme of fraud and intimidation in order to obtain money under the control or custody of financial institutions, including:

a.    The payment of money by consumers to Beta for tickets to live performances, a substantial portion of which otherwise would have been paid to SOCO;

b.    The payment of money to Beatport for music downloads, including music from DJs promoted at the Beatport Lounge within Beta; and

c.    The payment of money to AM Only by DJs promoted by Beatport and the Beatport Lounge.

152.    This pattern and these acts are related through use of the same methods, participants, victims, and purpose, and this pattern is ongoing and open-ended as the Enterprise has threatened DJs that it will continue indefinitely.

153.    This pattern of racketeering activity has numerous victims, including SOCO's clubs, the numerous DJs intimidated into performing at Beta, and consumers.

154.    SOCO are persons within the meaning of § 1964(c) which have each suffered injury to their business and property as a result of this scheme that reaches significantly beyond the damages suffered as a result of the foregoing predicate acts individually, including:  (i) revenues and profits from performances of A-List DJs have decreased significantly; (ii) ability to compete with Beta have been frustrated, causing SOCO to lose actual and potential customers and past and future profits and harming SOCO's goodwill and reputation; (iii) the reputation of SOCO's clubs and Mr. Christou have been diminished, resulting in inability to form business partnerships and greatly increased costs of booking all live performances, including but not limited to A-List DJs; (iv) the negative effect on SOCO's revenues has significantly reduced the going concern or sale value of SOCO's component business including The Church and Vinyl; (v) revenues from patrons visiting other of SOCO's clubs in the South of Colfax district both before and after performances by A-list DJs has decreased; and (vi) the effect of diminishing the reputation of and number of visitors to SOCO's clubs has significantly reduced the value of real property owned by SOCO's component entities.  SOCO has suffered and will continue to suffer damages and losses to its business and property in an amount to be determined.

WHEREFORE, SOCO seeks relief as set forth at the end of this Complaint.

### EIGHTH CLAIM FOR RELIEF
**(Intentional Interference with Prospective Business Expectancies – Colorado Law –
Against Mr. Roulier and AM Only)**

155.    SOCO incorporates by reference the allegations contained in paragraphs 1-154 above.

156.    SOCO had reasonable expectancies of hiring certain specific DJs to perform at its clubs in the Denver metro area, including but not limited to those DJs previously booked by SOCO, and desirable new DJs such as Deadmau5.

157.    Defendants knew or should have known that these business expectancies existed, in many cases because Defendant Roulier, while employed by SOCO, assisted in booking these DJs for SOCO, or because SOCO was actively working to book these DJs *through* Defendant AM Only.

158.    As outlined above, Defendants, through words or conduct, or both, intentionally and improperly interfered with these business expectancies.

159.    As a direct and proximate result of Defendants' words or conduct, or both, SOCO has suffered and will continue to suffer damages and losses to its business and property in an amount to be determined.

WHEREFORE, SOCO seeks relief as set forth at the end of this Complaint.

## NINTH CLAIM FOR RELIEF
### (Civil Conspiracy – Colorado Law – Against All Defendants)

160.    SOCO incorporates by reference the allegations contained in paragraphs 1-159 above.

161.    Defendants, amongst themselves, agreed by words and conduct to accomplish unlawful goals as outlined above, including the goal of monopolizing the market for live performances of A-list DJs in the Denver metro area.

162.    Defendants performed one or more acts to accomplish this unlawful goal, including but not limited to participating in all phases of advancing the tying, exclusive dealing

and reciprocal dealing agreements, monopoly leveraging, market allocation and group boycott as outlined above.

163.   Defendants, amongst themselves, agreed by words and conduct to accomplish a goal by unlawful means, including the goal of increasing Beta's market share in the market for live performances by A-list DJs in the Denver metro area at the expense of SOCO's clubs.

164.   Defendants performed one or more unlawful acts to accomplish this goal, including but not limited to the illegal tying and other anticompetitive behavior outlined above, and intentionally interfering with SOCO's prospective business expectancies.

165.   As a result of these conspiracies, SOCO has been damaged in the course of its business operation in that:  (i) its revenues and profits from performances of A-List DJs have decreased significantly; (ii) its ability to compete with Beta has been frustrated, causing SOCO to lose actual and potential customers and past and future profits and harming SOCO's goodwill and reputation; (iii) the reputation of SOCO's clubs and Mr. Christou have been diminished, resulting in inability to form business partnerships and greatly increased costs of booking all live performances, including but not limited to A-List DJs; (iv) the negative effect on SOCO's revenues has significantly reduced the going concern or sale value of SOCO's component business including The Church and Vinyl; (v) revenues from patrons visiting other of SOCO's clubs in the South of Colfax district both before and after performances by A-list DJs has decreased; and (vi) the effect of diminishing the reputation of and number of visitors to SOCO's clubs has significantly reduced the value of real property owned by SOCO's component entities. SOCO has suffered and will continue to suffer damages and losses to its business and property in an amount to be determined.

166.    SOCO's damages were caused by the acts performed by Defendants to accomplish these goals.

WHEREFORE, SOCO seeks relief as set forth at the end of this Complaint.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs demand judgment in their favor, and against Defendants, plus the following additional relief:

A.      A preliminary and permanent injunction enjoining and restraining Defendants, their officers, agents, servants and/or employees and all persons in active concert with them from conditioning access, promotion, or any other facet of DJs' relationship with Beatport on performance at Beta or refusal to perform at SOCO's clubs, and from engaging in any other form of predatory or anticompetitive behavior;

B.      Damages in an amount to be proven at trial;

C.      Treble damages on SOCO's antitrust claims and civil RICO claim;

D.      Reasonable attorney's fees and costs;

E.      Pre- and post-judgment interest at the highest allowable legal rates; and

F.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated:  December 1, 2010

/s/ Jeffrey S. Vail

_____

Jeffrey S. Vail
THE LAW OFFICE OF JEFF VAIL LLC
The Point at Inverness
8310 South Valley Highway, Third Floor
Englewood, Colorado 80112
Tel: (303) 800-8237
Fax: (303) 800-8237
E-mail:  jvail@vail-law.com
Attorney for Plaintiffs

Plaintiff's Address:

1155 Sherman Street
Denver, Colorado 80203