IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  10-cv-02912-RBJ-KMT

REGAS CHRISTOU,
R.M.C. HOLDINGS, L.L.C. D/B/A THE CHURCH,
BOUBOULINA, INC. D/B/A VINYL,
MOLON LAVE, INC. D/B/A 2 A.M.,
CITY HALL, LLC,
1037 BROADWAY, INC. D/B/A BAR STANDARD F/K/A THE
SHELTER,
776 LINCOLN ST., INC. D/B/A FUNKY BUDDHA LOUNGE
1055 BROADWAY, INC. D/B/A THE LIVING ROOM

       Plaintiff(s),

v.

BEATPORT, LLC,
BRADLEY ROULIER,
BMJ&J, LLC D/B/A BETA NIGHTCLUB AND BEATPORT
LOUNGE,
AM ONLY INC.

       Defendant(s).

---

## DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESS OWEN R. PHILLIPS, Ph.D.

---

Defendants, Bradley Roulier, BMJ&J, LLC, and Beatport, LLC, by and through their counsel and pursuant to Fed. R. Evid. 702, hereby respectfully submit this Motion to Exclude Plaintiffs' Expert Witness Owen R. Phillips, Ph.D., and state as follows:

### INTRODUCTION

Plaintiffs filed this suit in December, 2010 without first consulting an antitrust expert.  Plaintiffs' counsel knew, or should have known, that an antitrust expert's testimony would be necessary to define relevant markets under a rule of reason

analysis.  Plaintiffs did not seek the guidance of an antitrust expert before drafting their claims, but now attempt to go forward using opinions from economist Owen R. Phillips, Ph.D. ("Dr. Phillips").   Dr. Phillips' opinions confuse market definitions, obfuscate undisputed facts, and appear to have been tailored to fit Plaintiffs' theories without due regard for whether his conclusions actually fit this case.  This transparent attempt by Dr. Phillips to tailor his antitrust product market definitions so as to maximize Defendants' alleged market share, while consistently failing to apply reliable economic methodology, begs the Court's scrutiny.

Dr. Phillips' opinions should be excluded from this case on several grounds. First, Dr. Phillips has defined a tying product market definition that is wholly different than the tying product market definition required by both the Complaint and Dr. Phillips' own testimony.   Plaintiffs allege in their Complaint and assert in testimony that Defendants leveraged their power to promote the professional development and commercial success of electronic dance music (hereinafter "EDM") disc jockeys (hereinafter "DJs") to coerce those DJs to perform at Beta Nightclub and to boycott Plaintiffs' competing nightclubs.   There is no evidence that Defendants have any appreciable market power in the large market for promotion and professional development of DJs.  Recognizing this, Dr. Phillips does not identify the market for promotion and professional development of DJs as alleged, but instead opines that the market for downloads of digital-rights-management-free (hereinafter "DRM-free"), high-fidelity electronic dance music (hereinafter "EDM") is the tying product market.

It is well settled that where an expert's testimony does not fit the case for which it is offered, it is not helpful to the jury and should be excluded.  As described, Dr. Phillips' tying market definition does not fit the controversy before the Court.  Dr. Phillips' opinion regarding the alleged tied product market definition also fails to fit the case because it is overly-narrow and ignores undisputed market realities.  Moreover, both the methods applied and the data analyzed by Dr. Phillips fail to pass the tests for reliability that this Court must apply.  In many instances, Dr. Phillips' methods are undisclosed; where he identifies methods, he misapplies them.   Dr. Phillips relies almost exclusively on documents that were hand-selected by Plaintiffs' counsel, demonstrating a lack of diligence and skepticism that would not be tolerated if he were working outside of paid litigation consulting.   Because Dr. Phillips failed to conduct a diligent independent investigation, or to incorporate any scholarly analysis of the many facts weighing against Plaintiffs' theories, his reports and proffered testimony lack the intellectual rigor required of an economist practicing in the antitrust field.   These fatal deficiencies are compounded by the fact that Dr. Phillips assumed that the alleged anticompetitive conduct has actually occurred, which improperly limits the possible market definitions available under his unreliable analysis.

Additionally, Dr. Phillips opines that Defendants *in fact* tied, coerced, conspired, and otherwise engaged in unlawful anticompetitive conduct, and opines as to the motives and intentions of individual Defendants.   Such testimony disguises legal conclusions as expert opinions, creating a significant likelihood of misleading the fact finder.

For the foregoing reasons, as explained in detail below, Defendants respectfully request that this Court exclude Dr. Phillips' expert testimony in any capacity at any proceeding in this litigation because his opinions fail to meet well-settled standards for reliability and fit, and because any probative value that his opinions may have is outweighed by their probability of misleading the fact finder.  Defendants request an evidentiary hearing on this matter should the Court be disinclined to grant the requested relief on the pleadings.[1,2]

## RELEVANT FACTS AND ALLEGATIONS

As relevant here, Plaintiff entities and Regas Christou (hereinafter "Plaintiffs" or "SOCO") assert violations of the Sherman Act, 15 U.S.C. §§ 1-2.  Specifically, Plaintiffs allege that all Defendants engaged in anticompetitive conduct through illegal tying arrangements and conspiring to eliminate competition by unfair means, and that Defendants Bradley Roulier (hereinafter "Mr. Roulier") and BMJ&J, LLC (hereinafter "Beta" or "Beta Nightclub") have engaged in monopolization, attempted monopolization,

---

[1]    Defendants have read the Court's Practice Standards and appreciate the Court's desire for brevity in motion practice.  Unfortunately, the complex nature of Plaintiffs' antitrust claims (and proof of same), the multiple deficiencies found in Plaintiffs' antitrust expert's opinions, and the inclusion of quotations from the record to simplify the presentation of argument combine to require a lengthy brief. The Defendants thank the Court for its patience accordingly.

[2]    It bears repeating that evidence produced in this case shows the claims to be but a thinly veiled scheme to extort money from Defendants.  This litigation follows a blueprint for extortion drawn up in January 2009 during a recorded and transcribed phone call, attached hereto as **Exh. A-1,** between Plaintiff Regas Christou and Las Vegas promoter Scott Feiwell, wherein Feiwell encouraged Christou to "file suit against [Brad Roulier], OK, and you slap him with restraint of trade, interstate commerce, defamation of character - sue him for like ten different things. . . . In a lawsuit like that, if you hit him with four or five different things, he's going to have to hire four or five different lawyers."  Mr. Christou then asked "How could I prove that?" to which Mr. Feiwell replied "I don't think that you have to prove it.  You just have to scare him into backing off."

and conspiracy to monopolize the market for so-called "A-list" DJs who mix EDM for audiences during live performances.

Plaintiffs allege that "access to Beatport became increasingly financially important for DJs. Favorable promotion or placement of a DJ on Beatport's website could make or break album sales." [Complaint, ¶ 25]. Plaintiffs further allege that "Mr. Roulier and Defendants soon began to leverage the overlapping ownership among Defendants and the power of Beatport to coerce DJs to boycott SOCO's venues and to play only at Beta." [*Id*. ¶ 34]. "Because of the critical importance of access to Beatport and promotional support from Beatport to DJs and their labels, many DJs and agents believed they had no choice but to refuse to perform at SOCO's venues, and, within the Denver metro area, to perform only at Beta." [*Id*. ¶ 50]. Plaintiffs allege that Defendants were able to leverage "fear that … [DJs] would lose their access to or promotion by Beatport." [Id. ¶ 73].

The Plaintiffs endorsed specially-retained expert Owen R. Phillips, Ph.D. [*See* Plaintiff's FRCP 26(a)(2) Disclosures, attached as **Exh. A-2**; *see also* Economic Report of Owen R. Phillips, Ph.D., August 31, 2011 (hereinafter "Phillips rpt."), attached as **Exh. A-3**]. Plaintiffs offer Dr. Phillips to testify concerning his opinions of, *inter alia*, (1) the relevant antitrust product and geographic market definitions; (2) the existence and magnitude of Defendants' market share and market power in such markets; (3) the anticompetitive conduct of Defendants within the relevant markets; (4) harm to Plaintiffs as a result of Defendants' alleged anticompetitive conduct; and (5) harm to competition

as a result of the alleged anticompetitive conduct of Defendants.  [*See* Phillips rpt. at 8-9, 41-42; ***Exh. A-3***].

Dr. Phillips was deposed on November 3, 2011.  [*See* Deposition of Owen Phillips (hereinafter "Phillips dep."), attached as ***Exh. A-4***].  Dr. Phillips issued a rebuttal economic report[3] on December 21, 2011.  [*See* Rebuttal Report of Owen R. Phillips, Ph.D., December 21, 2011 (hereinafter Rebuttal rpt."), attached as ***Exh. A-5***].  This motion follows.

<u>**ARGUMENT**</u>

**A.  STANDARDS FOR EXPERT TESTIMONY DEFINING ANTITRUST MARKETS PURSUANT TO FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT*.**

The district court must act as a gatekeeper to the admission of expert testimony to ensure that it "both rests on a reliable foundation and is relevant to the task at hand." ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579,  597 (1993).  This gatekeeping requirement "ensure[s] the reliability and relevancy of expert testimony" by making certain that an expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 152 (1999).

---

[3]        In his second bite at the apple, Dr. Phillips again fails to define the tying product market actually theorized by the Complaint, again fails to analyze any relationship between the market for EDM downloads and the market for DJ promotional support, and again fails to support his opinions with scientific methods, objective data, or sufficient analysis to meet the reliability standards of our Federal Rules of Evidence.  Dr. Phillips' attempt to salvage his flawed initial report and testimony through his rebuttal report is even more outrageous than his initial offerings, and is addressed in a separate section at the end of this motion.

The touchstones for evaluating expert testimony are its reliability and its relevance.[4]  *United States v. Turner*, 285 F.3d 909, 912 (10th Cir.), *cert. denied,* 537 U.S. 895 (2002).  This standard applies to all expert testimony, including testimony regarding technical and other specialized matters.  *Kumho Tire,* 526 U.S. at 147; *see also Black v. M & W Gear Co.,* 269 F.3d 1220, 1237 (10th Cir. 2001).  Determining the relevance and reliability of an expert economist's proposed testimony falls squarely within the district court's gatekeeping obligation.  *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025 (10th Cir. 2002).

The Tenth Circuit has explained the test for relevance to be a test of "fit."  *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 *as clarified on reh'g*, 400 F.3d 1227 (10th Cir. 2004).   As the *Bitler* court explained:

> A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact.  Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant "fit."  Testimony concerning the laws of quantum mechanics may be scientifically relevant, but may have no practical relevance to testimony concerning the function and possible failure of a water heater safety valve control.  Evidence appropriate for one purpose, therefore, may not be relevant for a different purpose, and it is the trial court's task to make this fitness determination.

*Id*. (internal citations omitted).  If an expert's testimony does not fit the case for which it is offered, it is not helpful to the jury and should be excluded.  *Daubert*, 509 U.S. at 591.

---

[4]      Defendants do not dispute the qualifications of Dr. Phillips to opine on matters of antitrust economics but take issue with the reliability and relevance of his opinions.

Regarding the test for reliability, the several factors identified in **Daubert** for evaluating novel scientific testimony may not be pertinent to assessing the reliability of other expert opinions, "depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." **Kumho Tire**, 526 U.S. at 151; *see also* **Dodge v. Cotter Corp.**, 328 F.3d 1212, 1222 (10th Cir.), *cert. denied,* 540 U.S. 1003 (2003).  Courts look to five supplemental factors when the **Daubert** factors do not assist in determining the reliability of a given expert's testimony.  **Magistrini v. One Hour Martinizing Dry Cleaning**, 180 F.Supp.2d 584, 594-95 (D.N.J. 2002) (collecting cases) *aff'd*, 68 Fed. App'x 356 (3rd Cir. 2003).They are whether: (1) the expert's opinion grows naturally and directly out of research the expert has conducted independent of the litigation, *see* **Daubert v. Merrell Dow Pharms., Inc.,** 43 F.3d 1311, 1317 (9th Cir. 1995) (hereinafter "**Daubert II**"), *cert. denied,* 516 U.S. 869; (2) there is too great an analytical gap between an accepted premise and the opinion proffered (a.k.a. *ipse dixit* reasoning), *see* **General Electric Co. v. Joiner**, 522 U.S. 136, 146 (1997); (3) the expert has adequately accounted for obvious alternative explanations, *see* **Claar v. Burlington N.R.R.**, 29 F.3d 499 (9th Cir. 1994); (4) the expert is being as careful as he or she would be in their regular professional work outside of paid litigation consulting, *see* **Kumho Tire,** 526 U.S. at 152; and, (5) the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert,[5] s*ee*

---

[5]     Defendants do not dispute that economic analysis is essential to antitrust claims under the rule of reason standard, so the fifth (5th) factor need not be explored here.

Fed. R. Evid. 702, Advisory Committee Notes.  *Magistrini*, 180 F.Supp.2d at 594-95 (citing as above).

The rule of reason is the prevailing standard for determining the effect of an alleged restraint on competition under the Sherman Act.  *See* ***Business Elecs. Corp. v. Sharp Elecs. Corp.,*** 485 U.S. 717, 726 (1988) ("there is a presumption in favor of a rule-of-reason standard"); ***State Oil Co. v. Khan***, 522 U.S. 3, 22 (1997) ("[T]he majority of commercial arrangements subject to the antitrust laws[ ] should be evaluated under the rule of reason").  Competition occurs only in a market, so "before we can reach the larger question of whether [defendants] violated any of the antitrust laws, we must confront the threshold problem of defining the relevant market." ***Corey Airport Services, Inc. v. City of Atlanta***, 632 F. Supp. 2d 1246, 1300 (N.D. Ga. 2008) *rev'd in part sub nom.* ***Corey Airport Services, Inc. v. Decosta***, 587 F.3d 1280 (11th Cir. 2009) (internal quotation omitted).

"The concept of market definition itself oversimplifies the very complex interactions between a number of differently situated buyers and sellers, each of whom has different costs, needs, and substitutes." ***Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.***, 311 F. Supp. 2d 1048, 1131 (D. Colo. 2004) (citing ***SCFC ILC, Inc. v. Visa USA, Inc.,*** 36 F.3d 958, 966 (10th Cir. 1994)).  "At its simplest, the relevant product market is that market which is relevant to the legal issue before the court." *Id.* at 1130.  Dr. Phillips acknowledges that relevant antitrust markets must be defined as a threshold matter in this case.  [*See* Phillips dep. p. 37, ln. 6-24 ("…as an economist, I believe, yes, that there needs to be a determination in the market

in this case."); **Exh. A-4**; *see also id*. p. 124, ln. 11-12 ("part of my charge -- is to determine what market Beatport is in")].

## B.   THE COURT SHOULD EXCLUDE DR. PHILLIPS' TYING PRODUCT MARKET DEFINITION BECAUSE IT LACKS FIT AND RELIABILITY.

"A tying arrangement exists when a seller conditions the purchase of a highly desirable product on the purchase of an additional product." **Id**. at 1091 (citing **Systemcare, Inc. v. Wang Labs. Corp.,** 117 F.3d 1137, 1139-1140 (10th Cir. 1997)). The elements of a tying arrangement are: (1) two separate products; (2) a tie, or conditioning of the sale of one product on the sale of another; (3) sufficient economic power in the tying product market; and (4) a substantial volume of commerce affected in the tied product market.  **Multistate Legal Studies, Inc. v. Harcourt Brace, Inc**., 63 F.3d 1540, 1546 (10th Cir. 1995).

Here, Plaintiffs do not allege a typical tying arrangement, where a single seller conditions purchase of tied product A on the purchase of tying product B.  Rather, Plaintiffs allege that Beatport conspired with Mr. Roulier and Beta to restrain promotional support of DJs by Beatport's on-line music download store unless those DJs agreed to exclusive live performances by those DJs at Beta.  [Complaint, ¶¶ 69-78].  Even in this atypical posture, however, it is essential that Plaintiffs prove that Defendants hold sufficient market share and market power in the tying product market to induce the alleged anticompetitive conduct in the tied product market.  **Multistate Legal Studies**, 63 F.3d at 1546; *see also* **Sports Racing Services, Inc. v. Sports Car Club of America, Inc**., 131 F.3d 874, 890 (10th Cir. 1997) (even where complex tying

arrangements are alleged, "the market subject to direct economic power is the tying product market, rather than the tied product market").

Dr. Phillips defines the tying product market as the market for "digital downloads of DRM-free, high fidelity electronic dance music, suitable for playing on high performance sound systems" (hereinafter "EDM downloads").  [Phillips rpt. at 18; *Exh. A-3*].  This market definition bears no resemblance to the market for "access to or promotion by Beatport" that Plaintiffs' allege is the source of Defendants' tying power.  [*See, e.g.*, Complaint, ¶ 73].[6]  As such, Dr. Phillips' opinion does not have a valid connection to the pertinent inquiry raised by the claims and may be properly excluded for its lack of fit.  *See Daubert*, 509 U.S. at 591-92.  Additionally, Dr. Phillips' failure to analyze the tying product market using methods or data that reflect a level of intellectual rigor that characterizes the practice of an expert in the relevant field, his reliance on *ipse dixit* reasoning, his failure to account for obvious alternative lawful explanations, and his incorporation of proscribed assumptions about the alleged anticompetitive conduct into his analysis make his tying product market definition unreliable.  *Magistrini*, 180 F.Supp.2d at 594-95 (collecting cases).

---

[6]     Plaintiffs assert elsewhere in the Complaint that "the first relevant product market is the market for digital downloads of DRM-free, high fidelity Electronic Dance Music suitable for playing on high-performance sound systems."  [Complaint, ¶ 35].  The mere assertion of a tying market definition by Plaintiffs does not obviate the need for expert analysis to show a connection between that market, for sales of EDM music downloads, and the market for "access" and "support" and "promotion" of DJs that Defendants allege was actually leveraged.  Setting aside the dubious convenience of Dr. Phillips' adoption of Plaintiffs' exact words in his tying market definition, despite his having not been consulted by Plaintiffs until months after the Complaint was filed, Dr. Phillips' complete failure to analyze the relationship, if any, between the market for EDM download sales and the market for promotion of DJs is fatal to his tying market definition, as explained further below.

1.      **Dr. Phillips' Tying Product Market Definition Does Not Fit This Case.**

The district court's analysis in **Corey Airport** provides a roadmap for evaluating the fit and reliability of an economist's proposed product market definition.  **Corey Airport**, 632 F.Supp.2d at 1289-99.  That case involved allegations of anticompetitive conduct in the bidding for a contract to sell and manage advertising space at over 300 sites within the City of Atlanta's Hartsfield-Jackson International Airport ("Airport").  **Id**. at 1260-61.  Plaintiff Corey Airport Services offered a bid, but the contract was awarded to a Clear Channel Communications entity.  **Id**. at 1259.  The plaintiff's antitrust action followed.  **Id**.  As here, the plaintiff was required to properly define the relevant antitrust market before its claims could go forward under the rule of reason:

> Defining the relevant market requires identification of both the product at issue and the geographic market for that product.  The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.

**Id**. at 1289.

Dr. Phillips adopts a similar definition in his report.  [*See* Phillips rpt. at 9; **Exh. A-3**].  "[I]n order to identify the product at issue …, one must first identify who is the buyer and who is the seller in the given transaction."  **Corey Airport**, 632 F.Supp.2d at 1289.  "In most situations, it is quite easy to distinguish the buyer from the seller.  The party who makes payment in exchange for goods or services is the buyer, while the party who receives payment is the seller."  **Corey Airport**, 632 F.Supp.2d at 1289.

According to Dr. Phillips, "in this case, you have promises of better treatment by Beatport or threats of worse treatment by Beatport if you do not play for Beta.  That's

just boiling it down to its essence." [Phillips dep. p. 125, ln. 3-6; **Exh. A-4**].  Dr. Phillips

acknowledges that A-list DJs are the "buyers" in the market for DJ promotional support

because "part of what's going on is that there is in a sense here **a trade that goes on**, a

tie-in that goes on between something a deejay wants and what happens in a market."

[**Id**. p. 127, ln. 16-19 (emphasis added)].  The thing being leveraged is "generally being

described as access to Beatport, not saying you can't buy a download, but its access to

what Beatport represents.  It's Beatport saying, for example, 'This person's work is very

good.'" [**Id**. p. 128, ln. 2-6].  As Dr. Phillips further explains:

> Beatport has many avenues to provide enhanced promotion of DJs,
> including featuring an individual DJs 'chart' -- and I don't know if you
> want to call that promotion or marketing -- on Beatport's front page,
> highlighting the recent releases on their website, links to a DJs
> music to Beatport's various marketing e-mails, inviting deejays to
> Beatport tour events and 'Pool Parties,' holding 'remix' parties with
> their music.  So those are examples of where, you know, Beatport
> as an entity, you know, is important to the professional
> development of a deejay.

[**Id**. p. 129, ln. 3-14 (internal quotations omitted)].[7]  Note that these "enhanced

promotion" avenues do not include buying or selling a DJ's EDM downloads.

   When pressed, Dr. Phillips admits that the alleged tying product being sold by

Defendants is "access to the Beatport website.  It's access.  It's being a part of the

website."  [**Id**. p. 132, ln. 23-24].  According to Dr. Phillips, Mr. Roulier told A-list DJs,

"**Hey, I want you to play for me at Beta at a reduced rate, and if you play at Beta for**

---

[7]      Regarding these avenues for enhanced promotions, Dr. Phillips ultimately agrees that all
of these things can be fairly characterized as promotion, "[i]f you define "promotion" as the
professional development of a deejay, then we're on the same page." [Phillips dep. p. 130, ln. 2-
4; **Exh. A-4**].

***a reduced rate, then I'll do some favors for you on Beatport***[.]"  [***Id***. p. 144, ln. 15-18 (emphasis added)].  <u>This paraphrasing of Mr. Roulier's alleged negotiations with a DJ describes an unequivocal buy-sell transaction for promotional support, wherein the DJ is the buyer and Beatport is the seller</u>.  A common sense reading of Dr. Phillips' testimony reveals that promotional support of DJs generally, and access to Beatport's promotional events specifically, is the leveraged product that Plaintiff alleges DJs are buying and Defendants are selling.

While Plaintiffs and Dr. Phillips attempt to redefine the product market being leveraged as the market for sale of EDM downloads, this is a thinly-veiled effort to substitute a market in which Beatport arguably has appreciable market share for the actual product market in dispute.  While A-list DJs may be "buyers" of both promotion and EDM downloads, it is only promotion that has allegedly been threatened or promised in the tying market to induce anticompetitive behavior in the tied product market.  The market for buying EDM downloads is not alleged to have been restrained by Defendants in the slightest:

> Q. That's the basic fact, is that treatment on Beatport is what is the basic threat to normal competition that you have defined in this case?
>
> A. Yes, it has led to tying and coercion of deejays to play for a certain venue in a market.
>
> Q. Right. But you can't as you sit here today tell me of one single factual support for the fact that deejays were denied access to the music itself?
>
> [Objection omitted]

A. Yes, as you asked the question earlier, I don't know of any deejay who's been actually denied access to buying the music. I don't even know if that would be legal. And even if the deejay were -- I mean we're talking about legality here, but even if a deejay were denied access, it would seem possible to get around it with another account.

[*Id.*, p. 125, ln. 7-23].  Dr. Phillips also testifies that:

Q. But it's promotion that is being -- according to the complaint, being tied to performances at Beta, correct?

A. That is part.  That is part of the issue here.  It's part of it, but it's generally -- it's generally being described as access to Beatport, **not saying you can't buy a download**, but it's access to what Beatport represents.   It's Beatport saying, for example, "This person's work is very good." Everybody buys it.   It's like an endorsement.  Deejays value it.  They value that connection.

[*Id*. p. 127, ln. 23 – p. 128, ln. 8 (emphasis added)].

The reason that Dr. Phillips proposes the market for EDM downloads as the tying product market, despite admitting that EDM download sales have not been restrained and DJ promotion is what has allegedly been leveraged by Beatport, is because the EDM download market is the only market in which Beatport, and hence Defendants, can be argued to control an appreciable market share necessary to satisfy the rule of reason requirement for sufficient economic power in the tying product market.  As Dr. Phillips explains:

Q. And why do you consider that relevant in this case?  Why is the download of music considered by you as relevant in this case?

A. **Because there really wouldn't be a case if Beatport didn't have a large market share.  So if it was the case that deejays could go to alternative sources for their music, then the claims in the case wouldn't have merit**.

Q. All right. Now, I want to consider that a little closer. Okay? The --

A.  Can I answer a little bit more?

Q.  Sure.

A.  ***Even if after defining the market, even if Beatport had a small market share, then the claims in the case wouldn't have merit because deejays would have other readily substitutable options to Beatport and whatever anticompetitive accusations or allegations there may be against Beatport***.

[***Id***. p. 123, ln. 10 – p. 124, ln. 2 (emphasis added)].

Clearly, there is no "logical relationship between the evidence proffered and the material issue that evidence is supposed to support" in this apples to oranges assertion that DJ promotion is being leveraged in the tying market but the tying market should be defined as the market for EDM downloads.  ***Bitler***, 391 F.3d at 1121.  At best, Plaintiffs confuse two discreet markets out of ignorance of how anticompetitive tying works in antitrust markets, in which case Plaintiffs' unfounded claims merely fail.   At worst, Plaintiffs have intentionally conflated these markets in an attempt to confuse and mislead the Court.[8,9]

---

[8]     Plaintiffs' own experts disagree with each other.   Dr. Phillips insists that the revenue declines suffered by SOCO after Beta Nightclub opened in March 2008 "cannot be attributed to poor economic times[.]"   [Phillips rpt. at 39; ***Exh. A-3***].   Jay E. Freedberg, Plaintiffs' proffered damages expert, disagrees with Dr. Phillips and corrects for the economic downturn in 2008 and 2009.   [Preliminary Analysis of Lost Profit, Lost Enterprise Value and Other Damages, September 1, 2011, attached as ***Exh. A-6***, at 11].   Dr. Phillips later relies on the economic downturn to explain away Defendants' expert Dr. Langenfeld's analysis of iTunes impact on Beatport's revenues, despite maintaining that it did not affect SOCO's revenues. [Rebuttal rpt. at 8-9; ***Exh. A-5*** (asserting that Beatport's declining 2008 revenues are "explained by the timing of the economic recession in the U.S. and Europe.")].   Plaintiffs' two experts do not agree with each other, and Dr. Phillips does not agree with himself.   It should follow that any reasonable jury will likely be confused by Dr. Phillips' testimony.

[9]     Perhaps Dr. Phillips is simply stuck with the allegations and theories of a Complaint that he had no role in drafting, but Plaintiffs' counsel knew, or should have known, that Plaintiffs would need an antitrust expert to define relevant markets for their claims to succeed, and did not

At a minimum, Dr. Phillips' tying product market definition fails any common-sense test for fit when measured against the allegations of the Complaint and Dr. Phillips' own testimony.  It also fails to satisfy the ***Daubert*** standard as articulated in ***Bitler***.  The Court should exclude Dr. Phillips' opinions.

**2.     Dr. Phillips' Tying Product Market Definition is Unreliable.**

Dr. Phillips later tries to explain in testimony that his EDM download market is a necessary proxy for the too-difficult-to-define market for promotion of DJs.  "You don't collect revenue for a promotion.  You can do something, for example, in looking at advertising revenues that radio stations might collect, and, in fact, radio station revenues are measured by the advertising revenues that they have; and market shares are calculated by looking at their revenues divided by the total.  But in terms of promotion, there's nothing -- there's no exchange of money here."  [Phillips dep. p. 271, ln. 3-11; ***Exh. A-4***].  "You don't have buyers, you don't have sellers explicitly working on an exchange.  So to me, you have to define the market in looking at the sales of Beatport, and that's the way you have to go about describing it, the downloads."  [***Id***. p. 271, ln. 12-17].  When asked if there was a proxy relationship between Beatport promotion and EDM download sales, Dr. Phillips explains that "the better the site is … at promoting an artist, they're going to see more sales … [i]t's the sales that the artist sees, and that's how I measure the market."  [***Id***. p. 271, ln. 18 – p. 272, ln. 1].

_____

retain Dr. Phillips until three months after the Complaint was filed.  [Phillips dep., p. 95, ln. 22 – p. 96, ln. 3; ***Exh. A-4***].

Contrary to his explanation that the EDM download market is a reasonable proxy for the actual alleged tying product market, Dr. Phillips makes no attempt to measure advertising revenues, or sales of downloads, or any other reasonably quantifiable metric that demonstrates the relationship, if any, between promotion of a DJ and EDM download sales by that DJ.  Instead, Dr. Phillips instead engages in the worst sort of "take my word for it" speculation and outright obfuscation.  "[N]othing in either ***Daubert*** or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  ***Joiner***, 522 U.S. at 146.  "It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." ***Dodge   v.   Cotter   Corp.***, 328 F.3d 1212, 1222 (10th Cir. 2003) (internal quotation omitted).

In the Tenth Circuit, the exclusion of an antitrust expert's opinions concerning market power has been upheld where the economist substituted one distinct market for another, absent any plausible explanation based on sound economic theory for the substitution.  ***Champagne Metals v. Ken-Mac Metals, Inc.***, 458 F.3d 1073, 1077 (10th Cir. 2006).  In ***Champagne Metals***, the plaintiff was a new entrant into the "aluminum service center" market.  ***Id***.  Aluminum service centers operate as middlemen, buying bulk aluminum coils from production mills, then processing the aluminum into flat rolls and cut sheets which are then sold to end users.  ***Id***. at 1077, 1079.  Plaintiff had difficulties establishing relationships with, and acquiring aluminum from, the production

mills.  *Id*. at 1077.  Plaintiff alleged that its difficulties resulted from a conspiracy among

defendant service centers to restrict competition in the service center market.  *Id*.

Plaintiff's antitrust expert, Dr. Murry, opined that the defendants had substantial

market power in the market for purchasing bulk aluminum coils from mills.  *Id*. at 1079.

However, this conclusion was based on Dr. Murry's analysis of the defendants' sales

figures and market share in the market for processed aluminum sales to end-users.  *Id*.

Dr. Murry's *ipse dixit* belief that market share and market power in one market

demonstrated market share and market power in a separate market failed the test for

reliability, as the reviewing court explained:

> [T]here are two markets in which service centers participate: the
> "upstream" market, which involves sales of coils of aluminum by
> mills to service centers; and the "downstream" market, which
> involves sales of flat-rolled, processed and cut aluminum by service
> centers to end users. Champagne alleges that the [defendants']
> anticompetitive conduct occurred in the *upstream* market, and
> asserted in its complaint that it believed the [defendants] had
> substantial market power in this market. … The problem that the
> district court identified is that Dr. Murry's testimony is predicated
> entirely on evidence of the [defendants'] sales and market share in
> the *downstream* market. In other words, although Dr. Murry's
> opinion discussed the upstream market, the data on which his
> opinion is based was drawn from the downstream market. The
> district court found that Dr. Murry offered no plausible explanation,
> based on sound economic theory, to support substituting one
> market for the other.

*Id*. at 1079 (internal quotations omitted).  The reviewing court agreed, holding that in the

absence of any analysis to support Dr. Murry's substitution of a related product market

for the product market alleged in the complaint, his conclusions required too great an

analytical leap from data to opinion and were properly excluded.  *Id*.  "[T]he district

court's criticism was not that the explanation offered by Dr. Murry for looking to the

downstream market was unreasonable, but rather that Dr. Murry offered no explanation at all." *Id*.

Here, Dr. Phillips makes no attempt to analyze the substitutability of the EDM download market for the market for promotion of DJs. Despite his insistence that access to Beatport is critical to a DJ's success, Dr. Phillips did nothing investigate how access to, and promotion by, Beatport affected an A-list DJ's sales of EDM downloads:

> Q. Do you know what percentage of Tiesto's[10] sales are his market promotion -- are due to his market promotion on Beatport?
>
> A. No.
>
> Q. Okay. So you don't know and you've done no analysis to determine what the relationship is of promotion to sales?
>
> A. No.
>
> Q. Okay. Now, having said that, you also -- you don't know it for Beatport and you don't know it for iTunes where A-list deejays are concerned either?
>
> A. Well, what's the question?
>
> Q. Yes. You don't know what amount of promotion will produce what amount of sales for a specific A-list deejay in terms of dollar volume of that deejay's income? *You don't know how much promotion it takes to generate how much sales*?
>
> A. *That's correct, I don't know*.
>
> Q. All right. And since you don't know it for Beatport, you also haven't evaluated it for Amazon or iTunes or any of the other website marketplaces?
>
> A. Correct.

---

[10]     Tiesto is the stage name of Tijs Verwest, an A-list DJ according to Plaintiffs' definition of "A-List."

[Phillips dep. p. 174, ln. 13 – p. 175, ln. 10, **Exh. A-4** (emphasis added)].  Additionally,

Dr. Phillips attempted no analysis of how promotion of DJs across the broader spectrum

of possible advertising and promotion[11] might correlate to EDM download sales:

> Q. You don't know how much promotion it takes to generate how much sales?
>
> A. That's correct, I don't know.

[Phillips dep. p. 175, ln. 4-6; **Exh. A-4**].

> Q. [B]ecause we don't have any analysis of it, we can't determine empirically the relative numerical impact of promotion versus sales?  We just don't have any information in your report.
>
> A. Well, and as I sit here, I don't know if there is any such information.

[Phillips dep. p. 176, ln. 23 – p. 177, ln. 3; **Exh. A-4**].  Most critically, Dr. Phillips makes

no effort analyze the possible substitutes for Beatport in the market for promotional

support of DJs:

> Q. But you did not do anything to compare the value of promotion on iTunes or Amazon or any of these other websites to the value of promotion on Beatport to A-list deejays, correct?
>
> A. Correct.

[Phillips dep. p. 209, ln. 4-9; **Exh. A-4**].

---

[11]     The market for promotional support of DJs would include digital music download sites such as iTunes, social networking websites such as Facebook, MySpace, and Twitter, and more traditional media outlets such as advertising and publicity in trade magazines, newspapers, and other mainstream media, not least of which would be the *DJ Magazine* that Plaintiffs' cite to define what constitutes and A-list DJ.   [*See, e.g.,* Deposition of Veronica McNitt Smith (hereinafter "Smith dep."), attached as **Exh. A-7**, p. 33, ln. 19 – p. 35, ln. 5; Deposition of Jay Freedberg (hereinafter "Freedberg dep."), attached as **Exh. A-8**, p. 66, ln. 23 – p. 67, ln. 11; Expert Witness Report of David Waxman, November 18, 2011 (hereinafter "Waxman rpt."), attached as **Exh. A-9**, pp. 8-10].

Like the economist in *Champagne Metals*, Dr. Phillips offers no explanation at all for his substitution of one product market for another other than his *ipse dixit* belief. Like the plaintiff in *Champagne Metals*, Plaintiffs have alleged that Defendants possess sufficient market share and market power in one market, the market for promotion of DJs, to coerce those DJs.   Like *Champagne Metals*, Plaintiffs' expert relies on evidence of market share and market power in a separate market, the market for EDM downloads, to support his conclusions about economic power in the leveraged market for DJ promotion.  Like *Champagne Metals*, Dr. Phillips' report discusses the market for promotional support of DJs, but the market share and market power data on which he relies is drawn from the separate market for EDM downloads.

As the foregoing testimony details, Dr. Phillips makes no attempt to empirically analyze the relationship (if any) between the purported tying product market definition (EDM downloads) and his opinions of Beatport's market share and market power in that supposed market to Beatport's market power (if any) in the actual alleged tying product market (promotional of DJs).  The U.S. Supreme Court has announced a reliability requirement for expert testimony.  It follows that *some* analysis must be offered by the proponent to prove reliability.  Because Dr. Phillips conducts no analysis, this Court should exclude Dr. Phillips' opinions regarding tying product market definition, and Defendants' purported market share and market power in that improperly defined market.  Dr. Phillips offers no "plausible explanation based on sound economic theory" to explain his substitution of the proffered EDM download market for the market actually alleged in the Complaint.  *Id*.  Where there is too great an analytical gap between an

accepted premise and the opinion proffered, connected only by the *ipse dixit* of the expert, the expert testimony should be excluded.  ***Joiner***, 522 U.S. at 146.

Dr. Phillips fails to attempt even the most rudimentary inquiry into how promotion of DJs by Beatport, or any other promotional outlet, is reliably connected to the sale of EDM downloads because doing so would be fatal to Plaintiffs' claims.  As Dr. Phillips explains, "there really wouldn't be a case if Beatport didn't have a large market share." [Phillips dep. p. 123, ln. 13-14; ***Exh. A-4***].  "Even if after defining the market, even if Beatport had a small market share, then the claims in the case wouldn't have merit because deejays would have other readily substitutable options to Beatport and whatever anticompetitive accusations or allegations there may be against Beatport."  [***Id***. p. 123, ln. 22 – p. 124, ln. 2].   Dr. Phillips cannot establish that Beatport, or any Defendant, had sufficient appreciable market share in the broad market for promotion of DJs to satisfy the rule of reason, and has made such attempt in any event.

Dr. Phillips' erroneous market definition also derives from his proscribed assumption that the alleged anticompetitive did, in fact, occur.  Dr. Phillips testified that "***I just assumed that the exchange was made, the coercion was completed, the tie-in was done*** or there would have been a lot of e-mail or correspondence to the effect that, "Hey, Brad, you didn't follow up on the deal we made," or something like that.  I didn't see anything, though, in the record, and so, yeah, my conclusion is that the deal made between deejays and Brad Roulier was made."  [***Id***. p. 183, ln. 9-17 (emphasis added)]. Courts have consistently disapproved of expert assumptions that rely on the silence of the record for their basis.  *See, e.g., **R.F.M.A.S., Inc. v. Mimi So, et al.***, 748 F.Supp.2d

244, 272 (S.D.N.Y. 2010).  More importantly, where an antitrust expert assumes that anticompetitive conduct has, in fact, occurred as a factor in his market analysis, the analysis becomes inherently unreliable.  *Corey Airport*, 632 F.Supp.2d at 1291.

An expert economist "may assume that the factual allegations in the complaint are true for the purposes of framing his analysis, but he should not [make] the additional legal assumption that the conduct alleged in the complaint constitutes an antitrust violation."  *Id*.  "[B]y assuming that the allegations … constitute an antitrust violation, the expert is forced to define the relevant market such that a violation has occurred."  *Id*.; *see also* *Champagne Metals*, 458 F.3d at 1080 n. 4 (expert economic analysis that presents alleged or assumed facts as confirmed facts may cause confusion and not assist the trier of fact).  If follows here that Dr. Phillips offers a narrow and ill-fitting tying product market definition because his market definition had to support his conclusion that anticompetitive tying was, in fact, occurring.   By incorporating this proscribed assumption, Dr. Phillips fatally eroded the reliability of his conclusions.  *Corey Airport*, 632 F.Supp.2d at 1291.

Dr. Phillips also fails to apply reliable methodology in accepting the Plaintiffs' hand-selected sampling of discovered documents as true, without attempting any independent verification or investigation of their veracity or representativeness.  The proper procedure for evaluating an antitrust market is "to assume that the allegations *in the complaint* are true, use those allegations to determine what studies and analyses are required in order to define the relevant market, conduct the requisite research and define the relevant market, and then determine whether there has been harm in that

market such that there is a violation of the antitrust laws." ***Corey Airport***, 632 F.Supp.2d at 1291 (emphasis added).

Here, instead of limiting his assumptions to the allegations of the Complaint, Dr. Phillips not only adopts the legal conclusions of the Complaint as true, as discussed above, but also accepts the cherry-picked[12] documents selected by Plaintiffs' counsel as representative, reliable, and complete based on assurances from Plaintiffs' counsel:

> Q. You state in your report that there were certain documentation that you did not see a need to review based upon the fact that [Plaintiffs' counsel] Mr. Vail had told you that it didn't substantially change the perception you would get from the documents you had reviewed.
>
> [Objection omitted.]
>
> A. That is correct. So I relied on him to provide documents to me.

[Phillips dep. p. 23, ln. 4-11; ***Exh. A-4***].

> Q. And where have you gotten the data that you did analyze? From where?
>
> A. I got it through discovery.
>
> ***
>
> Q. And who delivered it to you?
>
> A. Through the Plaintiffs' attorney.
>
> Q. All right.  And as you admitted earlier, the amount of data you have been provided has been limited by the fact that it has been run through the Plaintiffs' attorney?  You haven't seen all of the data involved in this case, right?

---

[12]     In his report, Dr. Phillips cites to only 187 disclosed documents and 13 disclosed transcripts.  [*See generally* Phillips rpt.; ***Exh. A-3***].  Each of these was provided to him by Plaintiffs' counsel.  [Phillips dep. p. 49, ln. 12; ***Exh. A-4***].  Over 300,000 pages of documents that have been discovered in this case to date and have been available for Dr. Phillips' review.

      A.  Well, I don't know.

[*Id*. p. 49, ln. 6-12].

      Q. Right, and that's all I'm asking, is if you took documents at their face value across the board or did you do anything to independently verify the truth of the matters asserted in those documents other than the fact that it had actually been stated as set forth in the document.

      A. Usually no.  I just took documents at face value.

[*Id*. p. 137, ln. 1-8].  Dr. Phillips' method is a far cry from merely using a plaintiff's allegations "to determine what studies and analyses are required in order to define the relevant market, conduct the requisite research and define the relevant market[.]" *Corey Airport*, 632 F.Supp.2d at 1291.

The conclusions of an expert based not on independent study but solely on material provided by a party or his attorney are "only as good as the data upon which [they] rest."  ***Rowe Entertainment, Inc. v. William Morris Agency, Inc.***, 2003 WL 22124991, *4 (S.D.N.Y. 2003) (unpublished disposition attached here as ***Exh. A-10***) (citing the Federal Judicial Center, *Reference Manual on Scientific Evidence* 90 (2d ed. 2000)).  "Any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply."  ***Id***. at *3.  Unquestioning reliance by a plaintiff's retained expert on what the plaintiff tells him fails to provide "sufficient factual underpinning to pass the required 'reliability' test."  ***Gentieu v. Tony Stone Images/Chicago, Inc.***, 214 F.Supp.2d 849, 853 (N.D. Ill. 2002).  Here, Dr. Phillips places unquestioning reliance on what Plaintiffs' counsel has told him and provided him, to the point of accepting

counsel's assurance that everything he needs has been provided to him.  [Phillips dep. p. 23, ln. 4-11; *Exh. A-4*].  In his uncritical dependence on information hand-selected by Plaintiffs, Dr. Phillips has not demonstrated the same care and diligence as would be expected of his regular professional work outside of paid litigation consulting.  *Kumho Tire*, 526 U.S. at 152.

Absent any reference to a "learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like" to show that the selected approach follows a valid, reliable method, the Court should exclude expert opinions that arise from unquestioning reliance on what a litigant has provided him.  *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 173 F.R.D. 675, 682 (D. Kan. 1997) (citing *Daubert II*, 43 F.3d at 1319).  Here, Dr. Phillips fails to cite any treatise or article to support his method of substituting the market for EDM downloads for the market for promotion of DJs that is actually alleged to be the source of the claimed tying arrangements.[13]  Additionally, where economic opinions spring from litigation-specific analyses, the court's gate-keeping function is particularly important. *Id*.  Here, Dr. Phillips acknowledges that *all* of his music industry market analysis work, including his work on this case, has been for litigation purposes:

---

[13]      Dr. Phillips makes reference to the U.S. Department of Justice *Horizontal Merger Guidelines*, Wash. D.C., August 19, 2010 (hereinafter "*Guidelines*") for his method of determining product markets.  However, as described in detail below, he consistently misapplies or ignores the methods therein.  It is well settled that "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology[.]"  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994).  Moreover, nothing in the *Guidelines* supports the ad hoc substitution of one market for another as a method for defining product markets, as practiced by Dr. Phillips here.

> Q. You say -- right above that at the top of the Page 2, you say, "I have extensive experience studying the music industry and markets for live music performances."  Has all of that study been related to your testimony as an expert witness?
>
> A. I suppose so. I view a lot of the role over the last ten years as being litigation support, but it eventually leads to testimony and doing expert reports down the line.

[Phillips dep. p. 111, ln. 3-12; **Exh. A-4** ].  These two additional fatal flaws in Dr. Phillips' analyses further support the exclusion of his testimony.[14]  **Id**.

Finally, Dr. Phillips fails to analyze whether there are substitute media for EDM downloads that would provide high-fidelity, DRM-free electronic dance music suitable for playing on high performance sound systems.  In his deposition, Dr. Phillips states:

> Q. And what I'm asking is if you had done any investigation into what might be an alternative source of lossless files of music recordings other than high-density downloads on Beatport.
>
> A. No, I haven't.
>
> Q. So you don't know if vinyl records are a totally adequate substitute for lossless files in terms of an equivalent or relatively equivalent source of music to be used by deejays off of their M3P players -- MP3 players?
>
> A. I really don't know what the sound quality of a vinyl recording is compared to a digital download.
>
> Q. Okay. How about compact disks? Did you do anything to evaluate whether or not compact disks were a relatively similar

---

[14]    The same unquestioning reliance on Plaintiffs' hand-picked disclosures taints Dr. Phillips' method of including only Thursday and Saturday nights in the alleged tied product market. When  asked why data from only two nights of the week were analyzed, Dr. Phillips explains that "I'm taking SoCo at their word, and that, you know, they have these two nights, Thursday and Saturday nights, which they intend to book A-list deejays.  Those are their A-list deejays.  The other nights are theme nights for which they have music but not the A-list nights.  So to the extent that, you know, they just maybe happen to change the nights from Thursday to Wednesday or Thursday to Tuesday or something like that, I would miss it in my analysis." [Phillips dep. p. 225, ln. 11 – p. 226, ln. 2; **Exh. A-4**].

> substitute for the high-density music downloads available on Beatport?
>
> A.  No.

[Phillips dep. p. 121, ln. 18 – p. 122, ln. 10; ***Exh. A-4***].  Had Dr. Phillips considered the market for EDM across ***all*** digital and physical media, he would likely have found that Beatport lacks market share in the market for sale of ***all*** EDM music.  But of course, that would be fatal to fatal to Plaintiffs' claims, as Dr. Phillips explained when he testified that "there really wouldn't be a case if Beatport didn't have a large market share[,]" and "even if Beatport had a small market share, then the claims in the case wouldn't have merit because deejays would have other readily substitutable options to Beatport[.]"  [Phillips dep. 123:10-124:2, ***Exh. A-4***].  Dr. Phillips' omission of these obvious substitute products from his analysis demonstrates the unreliability of his methods.  ***Claar***, 29 F.3d at 499.

For the all of these reasons, the Court should exclude Dr. Phillips' opinion that the market for "digital downloads of DRM-free, high fidelity electronic dance music, suitable for playing on high performance sound systems" is the relevant tying product market.  Dr. Phillips' conclusion fails to satisfy the fundamental requirements for relevance, or fit, and reliability.  Moreover, given its inherent contradictions, convoluted  reasoning, and patent lack of analytical support for a connection between the proffered EDM download market and the actually alleged market for DJ access and promotion, Dr. Phillips' opinions have a significant probability of misleading the fact-finder, assuming any relevance or probative value could be salvaged in the first place.

**C.   THE COURT SHOULD EXCLUDE DR. PHILLIPS' TIED PRODUCT MARKET DEFINITION BECAUSE IT LACKS FIT AND RELIABILITY.**

In addition to the flaws to Dr. Phillips' proffered *tying* product market definition, Dr. Phillips proposed *tied* product market is, likewise, fatally flawed.  Dr. Phillips opines that the tied product market in this case is the market for "live performances by A-list DJs playing electronic dance music at nightclubs in the Denver metro area" (hereinafter "live DJ performances").   [Phillips rpt. at 8; ***Exh. A-3***].   This market for live DJ performances, as defined by Dr. Phillips, is undisputedly a submarket of the larger market for live performances of EDM by DJs of all ranks and at all venues within the relevant geographic area.  [***Id***.].  For many of the reasons explained above, Dr. Phillips' tied product market definition does not fit the case and arises from unreliable methods. Most significantly, the overly-narrow submarket which Dr. Phillips proposes excludes the majority of nightclubs and music venues in the Denver area that feature live DJ performances, which both fails to 'fit' this dispute and fails to meet the test for reliability. In essence, Dr. Phillips asks this Court to accept that one slice of an apple equals a bushel of apples under the unreliable methodology he applies.

**1.   Dr. Phillips' Tied Product Market Definition Does Not Fit This Case.**

Dr. Phillips' tied product market definition includes only three nightclubs:  two owned by Plaintiffs, and one owned by Defendant Beta.  [***Id***.].   It also includes live performances by slightly more than 100 different A-list DJs.[15]  [***Id***.].  Market definitions

---

[15]      The DJ Magazine Top 100, on which Plaintiffs rely in part to define a submarket for A-list DJs as distinguished from the masses of non-A-list DJs, has been published since 1995. [Phillips rpt. at 19; ***Exh. A-3***].  It is undisputed that Beatport did not exist prior to 2003.  Given that A-list DJs (as defined by Plaintiffs) were recognized and promoted by DJ Magazine for at

that are so narrow as to include only antitrust litigants, or that rely on minor price or quality variance, have been consistently disfavored. *See, e.g.*, **Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.**, 959 F.2d 468, 480 (3rd Cir. 1992) (rejecting a tying product market definition that included only Chrysler automobiles); **In re: Fresh Del Monte Pineapples**, 2009 WL 3241401, *11 (unpublished opinion attached here as **Exh. A-11**)) (S.D.N.Y. Sep. 30, 2009) (collecting cases illustrating that "Courts have repeatedly rejected efforts to define markets by price variances or product quality variances.").[16]  Setting aside for the moment the absurd convenience of only litigant nightclubs comprising the tied product market venues, Dr. Phillips' tied product market definition fails to fit this case because it excludes an abundance of non-A-list DJs that Dr. Phillips himself admits are reasonable substitutes for A-list DJs.

---

least eight years before Beatport even existed, Beatport's importance to the market for promotion of A-list DJs (which Dr. Phillips describes as being "critical" [*see* Phillips rpt. at 7; **Exh. A-3**]) deserves significant analysis.  Because no analysis whatsoever was performed concerning the market for promotion of A-list DJs, or any DJs, Dr. Phillips' tying product market analysis suffers another blow to the reliability of its methods.

[16]   Collected cases include:  **In re Super Premium Ice Cream Distrib. Litig.,** 691 F.Supp. 1262, 1268 (N.D. Cal. 1988) ("gradations among various qualities of ice cream are not sufficient to establish separate relevant markets for the purposes of determining market power"); *see also, e.g.,* **Murrow Furniture v. Thomasville Furniture Indus., Inc.,** 889 F.2d 524, 528 (4th Cir. 1989) ("The Discounters have not met their burden of establishing that "better branded" furniture is not interchangeable with other furniture lines."); **Liggett & Myers, Inc. v. FTC,** 567 F.2d 1273, 1275 (4th Cir. 1977) ("dry, semi-moist and canned [dog foods], both economy and premium are, in reality, all welcome in the same kennel."); **Com. of Pa. v. Russell Stover Candies, Inc.,** No. 93 Civ. 1972, 1993WL145264, at *11 (E.D. Pa. May 6, 1993) (rejecting submarket for gift boxed chocolates or boxed chocolates "within the general confectionery market"); **U.S. v. Joseph Schlitz Brewing Co.,** 253 F.Supp. 129, 145 (N.D. Cal. 1966) (rejecting separate markets for "premium and non-premium beer"); **Frito-Lay, Inc. v. Bachman Co.,** 659 F.Supp. 1129, 1137 (S.D.N.Y. 1986) ("corn chips are not sufficiently distinguishable from other salted snacks to have distinct customers and uses.").

Though Dr. Phillips devotes several pages of his report to explaining why A-list DJs are a distinct submarket of all live DJ performers, [*see* Phillips rpt. at 18-20; ***Exh. A-3***], those distinctions are mooted by his unequivocal testimony that reasonable interchangeability of use and cross-elasticity of demand exists between A-list DJ performances and non-A-list DJ performances:

> Q. A-list deejay performances cost more than non-A-list deejay performances, right?
>
> A. Yes.
>
> Q. So isn't it a fact that consumers will curtail their spending on more-expensive purchases in a[n economic] downturn sooner than they would on less-expensive purchases?
>
> A. Yes. Well, and, in fact, there may be some substitution between the A-list nights and the other nights if they are less expensive.  So you could have a consumer -- maybe Thursday night or Saturday night is an A-list night, and because of the economy, they aren't going to pay a $15 cover charge; they'd rather pay a $10 cover charge and go to a non-A-list night.  So there could be some of that going on there. There could be some substitution there.

[***Id***. p. 258, ln. 12 – p. 259, ln. 3].  Dr. Phillips goes on to explain that "given that there could be some substitution as I've just described…", [***Id***. p. 259, ln. 9-10], substitution of demand for non-A-list DJ performances by audience members would help regulate A-list DJ cover charge prices throughout economic downturns."  [***Id***. p. 281, ln. 22 – p. 282, ln. 4].

Recall that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  ***Corey Airport***, 632 F.Supp.2d at 1289.  Applying the law to the testimony, the reasonable interchangeability of use and cross-elasticity of

demand between A-list DJs and non-A-list DJs as described by Dr. Phillips requires the boundaries of Plaintiffs' tied product market accommodate the inclusion of non-A-list DJs.  Because Dr. Phillips' tied product market boundaries do not accommodate non-A-list DJ performances despite his admission that they constitute a substitute for A-list DJ performances, his market definition does not fit this case and should be excluded.

Moreover, Dr. Phillips excludes all but three Denver-area live-performance venues from his tied product market, despite acknowledging that A-list DJs and lesser-known DJs perform EDM at a multiple other venues throughout the region.[17]  Dr. Phillips concedes that A-list DJs play electronic dance music at Red Rocks Amphitheater, the Fillmore Auditorium, and the Ogden Theater in Denver, [*see* Phillips rpt. at 22, ***Exh. A-3***], as well as the Boulder Theater and Fox Theater in Boulder, [*see* Phillips dep. p. 61, ln. 2-10; ***Exh. A-4***].

Additionally, Plaintiffs' talent buyer April Anne Chase testified that Plaintiff entities compete for a broad demographic of potential customers depending on the performance offering:

> Q.  So who are your consumers? Who are you trying to draw in?

---

[17]     Dr. Phillips' geographic market definition derives from similarly unreliable methods.  In his report, Dr. Phillips states that "consumers travel less than 100 miles for entertainment." [*See* Phillips rpt. at 24, fn 57, ***Exh. A-3***].  Dr. Phillips then arbitrarily limits the geographic market solely to the "Denver metro area," which he defines as a seven-county statistical area that includes Boulder but excludes Fort Collins and Colorado Springs, which are within 100 miles of Denver.  [Phillips dep. p. 51, ln. 24 – p. 52, ln. 14; ***Exh. A-4*** ].  In deposition testimony, Plaintiffs' marketing director Veronica Smith testified that Plaintiffs routinely advertise in newspapers in Colorado Springs and Fort Collins to reach those potential customers, contradicting Dr. Phillips *ipse dixit* exclusion of those communities from the geographic product market.  [Smith dep. p. 116, ln. 4 – p. 117, ln. 22; ***Exh. A-7***].

A.  It depends on the night and the club, but if we're doing -- I can broadly say it's anybody in the Denver metro area between the ages of 18 and 30.  We can further break it down to say that on some of those nights, it's going to be college students; on some of those nights, it's going to be people from the Latin and Hispanic communities; and on certain of those nights, it's going to be people from the black and African-American community.

Q.  Okay. And that's based on whatever genre of music supposedly appeals primarily to that demographic --

A.  Correct.

***

Q. So for an electronic dance music performance with an A-list deejay, who is your demographic?

[objection omitted]

A. I think that that's going to be a pretty broad category….  It's probably going to be anybody who would have any interest in dance or club music whatsoever in the Denver metro area between the ages of 18 and 30.

 [Deposition of April Anne Chase, attached as *Exh. A-12*, p. 262, ln. 14 – p. 263, ln. 16.].

Because Plaintiffs' target market demographic for live DJ performances is anyone ages 18 to 30 who has an interest in dance music, and non-A-list DJs may be reasonable substitutes for A-list DJs, and there are multiple other venues offering live DJ performances (including A-list DJ performances) in the greater Denver metro area, then the market for "live performances by A-list DJs playing electronic dance music at nightclubs in the Denver metro area" as defined by Dr. Phillips is too narrow to fit this case.   As discussed above, where the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it, those boundaries must accommodate

those reasonable substitutes.   *Corey Airport*, 632 F. Supp. 2d at 1289.   Here, Dr. Phillips' tied product market definition is too narrow to accommodate all of the DJs, venues, and customers that participate in the market, and so should be excluded.

Moreover, the Plaintiff entities comprise a self-described "nightlife district" that competes in a larger market for Denver nightlife services than merely the live DJ performance market that Dr. Phillips proposes.   [*See* Complaint, ¶ 3 ("Together, Plaintiffs comprise the South of Colfax Nightlife District ("SOCO")."); ¶¶ 78, 104, 108, 116, 122, 154, 165 (alleging harm to all Plaintiff entities from loss of "revenues from patrons visiting other of SOCO's clubs in the South of Colfax district both before and after performances by A-list DJs")].   Plaintiff Regas Christou testified that not all Plaintiff entities play EDM or feature DJs.   [Deposition of Regas Christou, attached as *Exh. A-13*, p. 24, ln. 4-22].   Plaintiffs' accountant agrees with the general premise that the Plaintiff entities were in the business of selling nightlife entertainment.   [Rule 30(b)(6) Deposition of Tryfon Hristopoulos and Regas Christou (hereinafter "30(b)(6) dep."), attached as *Exh. A-14*, p. 48, ln. 18 – p. 52, ln. 17].   It is beyond dispute that there are dozens of nightclubs in the Denver metro area that (1) explicitly describe themselves as nightclubs that play dance music; (2) have DJs performing on at least weekend nights; and (3) are drinking establishments.   [*See* Reply Expert Report of Dr. James Langenfeld, PhD., November 18, 2011 (hereinafter "Langenfeld rpt."), attached as *Exh. A-15*, at Exhibit O].

Given the allegations of this case, the relevant case law, and the testimony acknowledging that more than three nightclubs (which conveniently happen to be

litigants in this case) are providing live DJ performances and a variety of other nightlife alternatives to a wide demographic across the greater Denver metro area, the lack of fit of Dr. Phillips' overly-narrow tied product market is apparent and justifies its exclusion. There is simply an insufficient "logical relationship between the evidence proffered and the material issue that evidence is supposed to support" in Dr. Phillips' conclusion that the jury should hear about only a slice of apple and be directed to ignore a bushel of substitute apples. *Bitler*, 391 F.3d at 1121.

**2.      Dr. Phillips' Method of Defining the Tied Product Market is Unreliable.**

Where, as here, an expert conclusion is unsupported by thorough analysis and relevant data, "a district court is free to determine that an impermissible analytical gap exists between premises and conclusion." *Id*.   This Court should exclude Dr. Phillips' unreliable tied product market definition for the reasons detailed below.

As analyzed in detail above for the alleged tying product market, Dr. Phillips fails to apply reliable methodology to several steps of his tied product market analyses.  First, Dr. Phillips' places the same unquestioning reliance on what the Plaintiffs' counsel provided him to support his tied product market analysis, which fails to provide "sufficient factual underpinning to pass the required 'reliability' test[.]"   *Gentieu*, 214 F.Supp.2d at 853; *see also **Kumho Tire***, 526 U.S. at 152 (expert should be as careful as he would be in his regular professional work outside of paid litigation consulting). Next, he fails to make reference to a "learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like" to show that his specific approach follows a valid, reliable method, given that his

conclusions were developed entirely for litigation purposes and rely on hand-picked documents provided by Plaintiffs.   **United Phosphorus**, 173 F.R.D. at 682 (citing **Daubert II***, 43 F.3d at 1317).   Third, Dr. Phillips assumes that anticompetitive conduct has, in fact, occurred as a factor in his market analysis, making the analysis inherently unreliable.   **Corey Airport**, 632 F.Supp.2d at 1291.   Additionally, Dr. Phillips' market analyses either fail to incorporate, or blatantly misapply, any reliable economic methodology as described below.

In **R.F.M.A.S.**, the court excluded the testimony of two causation experts because their methods failed to include sufficient consideration of alternative causes of the alleged harm.   748 F.Supp.2d at 270.   As here, the plaintiff alleged, *inter alia*, trade secret misappropriations by defendant.   **Id**. at 255.   The plaintiff offered a pair of collaborating experts, Smith and Hansen, to testify about both causation and damages. **Id**.   One metric of the plaintiff's alleged harm relied upon by the experts was the plaintiff's declining sales to retailer Neiman Marcus, despite increasing sales to retailer Saks.   **Id**. at 270.   "Both experts relied heavily on two considerations: first, that plaintiff's sales to Saks continued to increase while plaintiff's sales to Neiman Marcus decreased, and second, that there was no evidence of other possible causes for the decline in plaintiff's sales to Neiman Marcus. Neither of these proffered justifications holds up to scrutiny."   **Id**.

Like the **R.F.M.A.S.** experts, Dr. Phillips relies upon Plaintiffs' decrease in revenues on nights scheduled to host A-list DJ performances, despite steady or increasing revenue from other nights with music scheduled.   [Phillips rpt. at 39; **Exh. A-**

*3*].   Dr. Phillips also finds no evidence of possible alternative causes for Plaintiffs' declining revenues.  [*See, e.g.*, Phillips dep. p. 183, ln. 12-18 (relying on the silence of the record to show that "the exchange was made, the coercion was completed, the tie-in was done"); p. 228, ln. 18-19 ("it's not the market and it's not bad business practices that are causing the decline"); p. 230, ln. 17 – p. 231, ln. 13 (admitting no attempt was made to analyze the potential non-anticompetitive impact of Beta's market entry on SOCO's business); ***Exh. A-4***].

Next, the experts in ***R.F.M.A.S.*** failed to investigate the possibility that plaintiff's loss of sales to Neiman Marcus declined as a result of the plaintiff's strategic decisions to shift resources to other points of sale.  ***R.F.M.A.S.***, 748 F.Supp.2d at 271.  Here, Dr. Phillips failed to investigate the possibility that Plaintiffs' declining A-list DJ signings flowed from their own conduct and strategic decisions, despite the presence in the record of evidence that Regas Christou did not believe A-list DJ performances were more profitable than non-A-list DJ performances, that Plaintiffs' budget to hire DJs was extremely tight during the relevant period, and that Plaintiffs simply lacked the relationships and experience to sign the top name DJs after Mr. Roulier left Plaintiffs' employ.  [*See, generally*, Phillips rpt.; ***Exh. A-3***; *see also* 30(b)(6) dep. p. 117, ln. 14-18 (Regas Christou agreeing that he said A-list DJs really don't generate any more net profit for a club than non-A-list DJs after you consider the additional cost to get that talent versus how many additional customers will come to see an A-list DJ); ***Exh. A-14***].

Third, the plaintiff's experts in ***R.F.M.A.S.*** made no effort to ask representatives of Neiman Marcus *why* they had done less business with plaintiff during the relevant

period before concluding that the allegations explained the loss of revenue.  **R.F.M.A.S.**, 748 F.Supp.2d at 272.   Instead, the experts "relied heavily on the assurances of plaintiff's counsel … that they had ruled out alternative causes."  **Id**. at 273.  Like the **R.F.M.A.S.** experts, Dr. Phillips made no effort to ask the DJs that were allegedly coerced into boycotting Plaintiffs' nightclubs why they were playing less often for Plaintiffs:

> Q. Okay. ***And you didn't contact any of the parties whom you are relying on as having complained about the threats -- you didn't do anything to contact any of them yourself and see if they had done anything to determine if they had, in fact, had increased promotion or decreased promotion as a result of either acquiescing to the threat or refusing to be threatened***?
>
> A.  No.

[Phillips dep. p. 148, ln. 7-15 (emphasis added); ***Exh. A-4***].   On this record, it is not surprising that Dr. Phillips did not find any evidence to refute his assumptions about the cause of Plaintiffs' alleged damages – he never looked for any.  *See **Claar***, 29 F.3d at 499 (expert must adequately account for obvious alternative explanations).

"It is plain that one cannot determine whether something caused an observed effect without controlling for other equally plausible causes of that effect.  As one court has observed, '[i]t is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Fed. R. Evid. 702.'"  **R.F.M.A.S.**, 748 F.Supp.2d at 273 (quoting ***Awad v. Merck & Co.,*** 99 F.Supp.2d 301, 304 (S.D.N.Y. 1999)).   Like the experts in **R.F.M.A.S.**, Dr. Phillips' methods are based on little more than Plaintiffs' hand-selected documents and the timing of Plaintiffs' alleged revenue declines.  The

court should exclude Dr. Phillips' conclusions because they flow from unattributed methods and middling analysis, not rigorous economic study.   ***R.F.M.A.S., Inc.***, 748 F.Supp.2d at 270.

Where Dr. Phillips does reference established methodology, he has changed or misapplied the method rendering it unreliable.   It is well settled that "any step that renders the analysis unreliable under the ***Daubert*** factors renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology[.]"   ***In re Paoli R.R. Yard PCB Litig.***, 35 F.3d 717, 745 (3rd Cir. 1994).

Dr. Phillips cites to the U.S. Department of Justice *Horizontal Merger Guidelines*, Wash. D.C., August 19, 2010 (hereinafter "*Guidelines*") for his method of determining product markets.   Dr. Phillips asserts that the proper methodology "begins with the narrowest definition of a product (or product group) and expands the collection until all reasonable substitutes are included."   [Phillips rpt. at 10; ***Exh. A-3***].   However, this particular approach is <u>not</u> espoused as part of the 2010 *Guidelines*, because seeking the smallest market can lead to overly-narrow antitrust markets.  [*See Guidelines*, § 4, attached here as ***Exh. A-16***].   Because Dr. Phillips' antitrust product market definitions are derived in contravention of the very treatise upon which he relies, he "completely changes a reliable methodology" and accordingly his conclusions should be inadmissible.  ***In re Paoli R.R. Yard***, 35 F.3d at 745; *see also* ***Mitchell v. Gencorp Inc.***, 165 F.3d 778, 782 (10th Cir. 1999).

Dr. Phillips' approach also places great subjective weight on statements of Beatport officers regarding business and marketing strategies, in contravention of the *Guidelines*.  [*Cf.* Phillips rpt. at 13-17, 25; ***Exh. A-3***; *and* Guidelines §§ 2.1.2, 4; ***Exh. A-16***].   This approach lacks reliability because "there is no reason to expect that the concept of market employed by business executives when discussing issues of business strategy or marketing, whether in testimony or documents prepared for business purposes, would be the same as the concept of an 'antitrust market' or 'relevant market' defined for the purpose of antitrust litigation."   Jonathon B. Baker, *Market Definition: An Analytical Overview*, 74 ANTITRLJ 129, 139 (2007) (attached hereto as ***Exh. A-17***).

"The informed views of executives as to the nature and magnitude of likely buyer substitution are relevant to antitrust market delineation, … but the specifications of markets they adopt for business purposes unrelated to antitrust analysis should not control the definition of the market for antitrust purposes."  ***Id***.   Here, Dr. Phillips relies on statements of Beatport officers regarding business target markets to sustain his antitrust market definition, [*see, e.g.*, Phillips rpt. at 13-18, ***Exh. A-3***], but ignores evidence of Beatport substitutes that must be weighed under any reliable approach, [*see, e.g., id*. at 27, fn 66 (Beatport is "the only electronic store that counts ***apart from iTunes***…") (emphasis added); Deposition of Charissa Saverio, p.k.a. "DJ Rap", attached as ***Exh. A-18***, p. 28, ln. 25 – p. 29, ln. 3 ("Most of our sales come from iTunes.

Beatport is second.  Trackitdown is third.")].[18]  Dr. Phillips' analyses do not conform with the *Guidelines* and ignore inconvenient evidence, and so should be excluded.

Dr. Phillips deviates further from the *Guidelines* in selecting narrow submarkets and dismissing much larger markets.  For example, assuming *arguendo* that Dr. Phillips' EDM download market identified a relevant tying product market, which Defendants expressly deny, the selection of that submarket would necessarily exclude the much larger market for all digital music downloads, which would include online retail giant Apple iTunes.  To rationalize the exclusion of such a massive market participant from his market definition, Dr. Phillips focuses heavily on subjective consumer perceptions:

> The Merger Guidelines recognize that the *collective* perceptions of buyers and sellers and other persons close to the industry also must be relied upon to make a determination of the relevant market. Specifically, if participants in and others close to the industry perceive goods to be close substitutes in the sense defined by the Merger Guidelines, economists are inclined to place the goods in the same market. Information on perceptions is gathered from many sources. It can come from consumer surveys, interviews with individuals in the industry, advertising campaigns, company documents, trade and business journals, investment analysts, and other sources.

[Phillips rpt. at 11 (italics in original); ***Exh. A-3***].

This passage describes only one aspect of the many that the *Guidelines* indicate are useful in defining markets, but which are ignored in Dr. Phillips' analysis.   Dr. Phillips' myopic reliance on minor price and quality differences to justify segregating the EDM download market from the market for all digital music downloads is inconsistent

---

[18]      Dr. Phillips states in testimony that he has reviewed DJ Rap's deposition.  [Phillips dep. p. 10, ln. 23-24; ***Exh. A-4***].

with the methodology he cites.   [*Cf.* Phillips rpt. at 12-13; 16-17; ***Exh. A-3***; *and Guidelines* § 2; ***Exh. A-16***].  As detailed above, "[c]ourts have repeatedly rejected efforts to define markets by price variances or product quality variances."   ***In re: Fresh Del Monte Pineapples***, 2009 WL 3241401 at *11.  The differences between EDM and other genres of digitally downloaded music are insufficient to justify segregating EDM into a submarket, as are the minor differences in file size and price upon which Dr. Phillips relies.

Next, Dr. Phillips admits that he did not investigate whether DJs of any rank performed on nights other than Thursdays and Saturdays, or at any substitute venues on those two nights.   [Phillips dep. p. 225, ln. 18 – p. 226, ln. 2; ***Exh. A-4***].   The evidence in this case establishes that A-List DJ performances occurred at Plaintiffs' own clubs on nights other than Thursdays and Saturdays, and that A-List DJs have repeatedly and frequently performed at other venues in the Denver metro area. [Langenfeld rpt. ***Exh. A-15***; at exhibits M3, N3, O, Q1, and Q2].   Dr. Phillips never considers how these DJ performances might substitute for the Thursday and Saturday performances at The Church and Vinyl (respectively), and thereby expand the product market for A-list DJ performances.  By doing so, he defines the tied product market as being only one segment of what he expressly acknowledges is a much larger aggregate of performance opportunities, in both time and space, for both A-list DJs and their lower-priced substitutes.  Dr. Phillips unreliably seeks to substitute one slice of an apple for a bushel of apples.

Worse, when pressed to explain his overly-narrow tied product market definition, Dr. Phillips does not cite to market studies or surveys of empirical data to explain the exclusion of competing venues, nights, and DJ performances.  Rather, he relies on intuition drawn from his general music industry experience.  For example:

> A.  It's been the kind of evidence that has just been collecting ever since I've been working on, you know, the music industry, since 2001.
>
> Q.  Can you point me to a single particular survey that -- or more than one that addresses that issue, specifically that viewing a top deejay at a nightclub is a different entertainment experience than seeing that same deejay at a club or an amphitheater?
>
> A.  Not, certainly, data that would include nightclubs, but concerts versus other kinds of performances in general.

[Phillips dep. p. 269, ln. 6-16; *Exh. A-4*].

Where an expert draws on "instinct and intuition to patch holes in his methodology," his opinions should be excluded.  *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F.Supp.2d 530, 538-39 (D. Md. 2002).  Dr. Phillips claims that "since 2001, I've been talking to promoters, I've been talking to advertisers, I've been talking to people close to the industry, the artists sometimes themselves" as a basis for his opinions. [*See, e.g.*, Phillips dep. p. 71, ln. 20-23; *Exh. A-4*].  Because Dr. Phillips draws on instinct and intuition derived from generalized experience to patch holes in his methods, his opinions should be excluded.  *Berlyn*, 214 F.Supp.2d at 538-39.  Moreover, this generalized experience that Dr. Phillips apparently relies upon is all the product of paid litigation consulting, [*see* Phillips dep. p. 111, ln. 3-12; *Exh. A-4*], which further erodes its reliability, *see Daubert II,* 43 F.3d at 1317.

Additionally, the "differences" that Dr. Phillips identifies to distinguish nightclubs from substitute live performance venues are themselves the product of an unreliable methodology.  The differences include the existence of a "dance floor" at nightclubs, the need for "advance planning" to attend concert hall performances,[19] different food and drink offerings, the number and location of bars, the availability of "VIP areas," and the "quality" of the "experience," but he fails to identify any surveys, studies or other empirical support for his reliance on these "differences."  [*See* Phillips rpt. pp. 22-23; ***Exh. A-3***]; [Phillips dep. p. 111, ln. 3-12; p. 268, ln. 14 – p. 269, ln. 16; ***Exh. A-4***].  By his own admission, many of these "differences" are purely speculative:

> Q. How do you know the Fox or Boulder Theater don't have those [amenities]?
>
> A.  Based on my work in the concert industry, based on my work in the concert industry, those are theaters and not nightclubs.
>
> Q. Based --
>
> A.  Okay.
>
> Q. You haven't gone to check, have you?
>
> A.  No, I haven't been inside of them.
>
> ***

---

[19]     Dr. Phillips cites his "independent analysis of concert ticket data" as a source of information he relies upon in concluding that seeing an A-list DJ at a concert hall or amphitheater requires more advance planning than seeing an A-list DJ at a nightclub, but fails to disclose the referenced data.  He also fails to articulate the methodology for this "independent analysis," other than to admit in deposition testimony that he relies on "qualitative" impressions he collected from Regas Christou and others to distinguish nightclub performances from concerts.  [Phillips dep. p. 99, ln. 18 – p. 100, ln. 18; p. 268, ln. 8 – p. 269, ln. 16; ***Exh. A-4***].  Contrary to Dr. Phillips' assertion that nightclub attendance requires less advance planning, Plaintiffs' marketing director Veronica Smith testifies that some customers need more than a couple of days notice to plan to attend a live DJ performance at a nightclub.  [Smith dep. p. 134, ln. 7 – p. 135, ln. 5; ***Exh. A-7***].

> A. You don't have to be there to find out. I mean it's easily determined, but I haven't checked.
>
> Q. Right. You could have picked up the phone and called, right, but you didn't do that either?
>
> A. No.

[Phillips dep. p. 61, ln. 24 – p. 62, ln. 25; **Exh. A-4**].  "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."  **Goebel v. Denver & Rio Grande Western R.,** 215 F.3d 1083, 1088 (10th Cir. 2000).  The sort of "take my word for it" analysis that Dr. Phillips engages in here is precisely the kind of speculation by expert witnesses that courts reject.  **Joiner**, 522 U.S. at 146; **Dodge**, 328 F.3d at 1222 ("It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.").

In **Concord Boat Corp. v. Brunswick Corp.**, 207 F.3d 1039 (8th Cir. 2000), the 8th Circuit ruled that an expert's testimony in an antitrust trial should have been excluded where "[n]ot all relevant circumstances were incorporated into the expert's method of analysis related to antitrust liability."  **Id.** at 1056.  An antitrust expert's analysis must "account for market events that both sides agreed were not related to any anticompetitive conduct" or the resulting opinions are "mere speculation."  **Id.** at 1057 (internal citation omitted).  It is undisputed in this case that substitute live DJ performance venues operate within the geographic area that Dr. Phillips defines, and it is undisputed that these venues host A-List DJs.  [Langenfeld rpt., **Exh. A-15**, at ex. O].  Dr. Phillips' failure to incorporate these market realities into his analysis based on *ipse dixit* reasoning requires that his conclusions be excluded.

Further, even assuming *arguendo* that the differences between the venues that Dr. Phillips includes and excludes from his tied product market definition had some reliable basis, which Defendants expressly deny, more is required to support the designation of a submarket as the relevant antitrust market than a mere showing that one product differs from others.   ***Bogan v. Hodgkins,*** 166 F.3d 509, 516 (2nd Cir. 1999); ***George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,*** 508 F.2d 547, 553 (1st Cir. 1974) ("[M]ere physical differences between one product and others will not alone isolate that product in a separate submarket.").   The test for substitutes within a relevant product market is not whether potentially substitute products are reasonably interchangeable by a particular individual, such as a particular DJ or electronic dance music aficionado, but whether products are reasonably interchangeable by consumers for the same purposes.   ***Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*** 124 F.3d 430, 438 (3rd Cir. 1997) (citing ***United States v. E.I. du Pont de Nemours & Co.,*** 351 U.S. 377, 395 (1956)).   "A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general.   Thus, the relevant inquiry [in ***Queen City Pizza***] is not whether a Domino's franchisee may reasonably use both approved or non-approved products interchangeably without triggering liability for breach of contract, but whether pizza makers in general might use such products interchangeably."   ***Queen City Pizza***, 124 F.3d at 438.

Here, the relevant inquiry is not whether a particular consumer of live DJ performances would only attend at one of the three litigant nightclubs; rather, the question is whether consumers in general would partake of live DJ performances at a concert hall, amphitheater, or other nightclub interchangeably with a performance at a litigant nightclub.   By failing to perform any analysis of this fundamental economic question, Dr. Phillips' methodology is critically flawed and fails to adequately connect his conclusions to the undisputed market realities identified in this case, transforming his opinions into speculations.  *Id.*; *see also* **Concord Boat**, 207 F.3d at 1057.  Dr. Phillips' tied product market definition is therefore unreliable and should be excluded.

## D.   DR. PHILLIPS' METHODS FOR ARRIVING AT HIS REMAINING OPINIONS ARE SIMILARLY UNRELIABLE.

Several additional flaws in Dr. Phillips' methods justify the exclusion of his opinions of anticompetitive harm to Plaintiffs and to the tied product market.  First, Dr. Phillips' failure to consider obvious lawful explanations for Plaintiffs' difficulties in hiring A-list DJs resonates with the facts of **Craftsmen Limousine, Inc. v. Ford Motor Co.**, 363 F.3d 761 (8th Cir. 2004), where the court held that an antitrust expert's testimony on damages should have been excluded because the expert's "testimony did not sufficiently aid the jury in determining whether there was an unreasonable restraint on trade in violation of the Sherman Act."  *Id.* at 777.  The **Craftsmen Limousine** court reasoned that:

> [the expert] assumed that Craftsmen's alleged lost growth from 1995 through 1998 was caused by defendants' alleged conspiracy. He did not determine whether other factors, including the emergence of two direct competitors, may have affected Craftsmen's growth rate.  Under the rule of reason analysis, which

> should have been applied in this case, such an analysis was
> required. Because [the expert's] opinion failed to incorporate all
> aspects of the economic reality, it should not have been admitted.

*Id*. (internal citation omitted).

Like the economist in *Craftsmen Limousine*, Dr. Phillips fails to account for several non-anticompetitive market factors at work at the time of Plaintiffs' alleged losses.  First, the most obvious explanation for Plaintiffs' declining fortunes is the lawful entry into the market by a competing venue hosting A-list DJ performances.  But Dr. Phillips fails utterly to account for this undisputed change in market dynamics.  [*See, generally*, Phillips rpt.; *Exh. A-3*].  Addressing this issue, Dr. Phillips explains:

> A. Yeah, before Beta began, [Plaintiffs' clubs] were the only
> nightclubs that had A-list deejays. They would have had all of the
> market.
>
> ***
>
> Q. Okay. Now, let's assume for a moment that Mr. Roulier didn't
> exercise any anticompetitive behavior. Okay? What difference
> would it have made if Mr. Roulier as the historical talent buyer for
> four years for the company decided to leave because he felt like he
> was mistreated by the owner of the company, Mr. Christou, and
> formed a new competing club? Have you done anything to
> calculate what the impact would have been of just a new club in the
> marketplace, okay, with no anticompetitive impact?
>
> A. No. You know, it would be involving speculation and dealing
> with hypotheticals. I haven't done anything like that. It's speculation.

[Phillips dep. p. 230, ln. 17 – p. 231, ln. 13; *Exh. A-4*].  Despite discounting his ability to analyze how a new competitor might affect Plaintiffs' market share, Dr. Phillips admits that:

> A. If the new seller is successful, they ought to be able to take
> market share away from the sellers who we call incumbents and
> the incumbents should suffer loss.

Q. With totally legitimate competitive behavior, right?

A. It's possible. We see entry and exit all the time in markets without there being a monopoly power.

Q. But you didn't do anything to attempt to evaluate what that impact would have been regardless of the anticompetitive behavior that is alleged?

A. No. . . .

[Phillips dep. p. 233, ln. 12 – p. 234, ln. 2; ***Exh. A-4***].

Contrary to Dr. Phillips' assertion that any attempt to account for the effects of a lawful competitor into Plaintiffs' geographic market would be "speculation," the law requires an antitrust expert to include such undisputed market realities in his evaluation of antitrust harm to a market.  *See **Concord Boat***, 207 F.3d at 1056-57; ***Craftsman Limousine***, 363 F.3d at 777.   Instead of making appropriate efforts to analyze the market impact of a lawful competitor's entry, <u>Dr. Phillips assumes that Beta had zero impact on the incumbent Plaintiff nightclubs</u>.   By assuming ***no*** impact from an undisputed market entrant, rather than analyzing the actual effects, Dr. Phillips engages in the worst kind of speculation.   As a result, Dr. Phillips' conclusions concerning antitrust harms to the alleged tied product market and to the Plaintiffs are clearly unreliable speculation that would mislead the fact finder, and should therefore be excluded.  ***Concord Boat***, 207 F.3d at 1057.

Next, Dr. Phillips fails to analyze the effect of Mr. Roulier's departure from Plaintiffs' employ and Plaintiffs' resulting loss of institutional knowledge and business acumen in booking DJ performances.  [Phillips rpt. at 42; ***Exh. A-3***].   In his deposition

testimony, Dr. Phillips admits that Plaintiffs suffered a detrimental change in experience

level and business connections following Mr. Roulier's departure:

> Q. What do you know about the experience level of the SoCo talent buyers?
>
> A. Just what I've read in the depositions, their description of their experience.
>
> Q. Do you consider them to be as experienced as Mr. Roulier?
>
> A. No.
>
> Q. What do you know about what A-list deejays and their agents think about SoCo's talent buyers that have been in place since 2008?
>
> A. I know from the depositions there have been issues. I know that they're trying hard. I believe that they are relatively inexperienced. They're doing the best they can given the absence of Brad. That's how I view it.

[Phillips dep. p. 266, ln. 4-18; *Exh. A-4*]. Despite acknowledging this undisputed decline

in Plaintiffs' experience and knowledge following Mr. Roulier's departure, Dr. Phillips

makes no effort to account for this significant and undisputed change in the competitive

landscape before concluding that Plaintiffs and the alleged tied product market suffered

anticompetitive harms. [*See, generally*, Phillips rpt.; *Exh. A-3*].

Next, Dr. Phillips acknowledges in his deposition the importance of Mr. Roulier's

relationships with A-list DJs to booking those artists, saying that "without Roulier, you

can easily see they don't have the relationships, for example, that Roulier had when he

was working for SoCo." [Phillips dep. p. 230, ln. 4-6; *Exh. A-4*]. Dr. Phillips further

acknowledged the importance of relationships to the booking process:

Q. And your report assumes that A-list deejays have elected not to play at the SoCo clubs solely due to tying and coercion; is that right?

A. No. There may be other reasons.

Q. Such as?

A. I think it's reasonable that there are artists who have relationships with the booking agent, for example, I described earlier. So I think artists, you know, even in this market had relationships with Brad that he took with them (sic).  So it wasn't just the tying and coercion. Artist relationships are important with the talent buyer.

[Phillips dep. p. 241, ln. 15 – p. 242, ln. 1; *Exh. A-4*].   Despite acknowledging the importance of relationships to Plaintiffs' and Mr. Roulier's respective abilities to sign A-list DJs, Dr. Phillips makes no attempt to incorporate this obvious lawful cause of Plaintiffs' decline in A-list DJ signings into his analysis.  [*See, generally*, Phillips rpt.; *Exh. A-3*].

Expert testimony is also properly excluded where its probative value is outweighed by its potential to mislead or confuse a jury.  *See, e.g.*, **Corey Airport Services,** 632 F.Supp.2d at 1299 (probative value of expert's opinions outweighed by the possibility that the trier of fact would give too much credence to the testimony because the expert has a Ph.D. in economics).  Like the expert in **Corey Airport**, Dr. Phillips' qualifications and experience may blind jurors to the absence of proper methodology behind his opinions about anticompetitive harms.  For this reason, Dr. Phillips' opinions regarding anticompetitive harms to the Plaintiffs and to the alleged tied product market should be excluded.

E.       DR. PHILLIPS' OPINIONS INCLUDE IMPROPER LEGAL CONCLUSIONS.

"[W]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." ***U.S. Information Sys., Inc. v. Int'l Brotherhood of Electrical Workers***, 313 F.Supp.2d 213, 227 (S.D.N.Y. 2004) (italics in original) (citing ***United States v. Scop***, 846 F.2d 135, 142 (2nd Cir. 1988)).   Here, Dr. Phillips states the legal conclusions that "Bradley Roulier has used the market power held by Beatport to coerce and tie A-list DJs to perform only at the Beta nightclub"; "Beta has monopoly power in this market and has used this monopoly power to raise prices to the final consumer"; and, "[t]ying the services of Beatport to performing at Beta has damaged the A-list DJ market." [Phillips rpt. at 41; ***Exh. A-3***].   While expert economists may explain whether particular conduct is indicative of collusion by testifying that the climate of a specific market is consistent with a conspiracy, they may not cross the line and opine that the defendants *in fact* conspired. ***U.S. Information Sys., Inc.***, 313 F.Supp.2d at 240.

An expert's "characterizations of documentary evidence as reflective of collusion, and his characterizations of particular bids as 'signals,'" are not appropriate expert testimony. ***City of Tuscaloosa v. Harcros Chemicals, Inc.,*** 158 F.3d 548, 562 (11th Cir. 1998).   Here, Dr. Phillips offers the following impermissible testimony:

> Q. That's the basic fact, is that treatment on Beatport is what is the basic threat to normal competition that you have defined in this case?
>
> A. Yes, it has led to tying and coercion of deejays to play for a certain venue in a market.

[Phillips dep. p. 125, ln. 7-11; ***Exh. A-4***].

A. The accounts given by Mr. Christou, for example, and those accounts by Brad Roulier led me to think that besides the Beatport connection, that there was anticompetitive conduct in the departure of Roulier.

Q. How so?

A. Well, he took with him to his new business relationships and information that he had developed while under the employment of Christou and then used those to create his own business[.]

[*Id*. p. 12, ln. 7-16]. Dr. Phillips also adds the following inadmissible opinions to his rebuttal report: "It is factual that these promises and threats occurred." [Rebuttal rpt. at 3; **Exh. A-5**]. "This tie in and the coercion that took place gave Beta a large share of the market for 'A-list' DJ performances in the Denver area." [*Id*.]. "As owner of both entities [Beta and Beatport], Roulier orchestrates anticompetitive tying and coercion." [*Id*. at 14]. "The managers of Beatport are aware of what Roulier is doing, and in fact have directly cautioned Roulier to stop using Beatport to help DJs." [*Id*.]. "Beatport and Roulier have coerced DJs." [*Id*. at 15]. "There is a continuing record of anticompetitive behavior." [*Id*. at 16]. "Beta and Beatport have restrained trade in the Denver nightclub market." [*Id*. at 18]. "These threats and promises were made for the purpose of driving the SOCO clubs out of business." [*Id*. at 18]. Each of these statements by Dr. Phillips includes impermissible commentary about the legal significance of factual events or documentary evidence, or opines about the state of mind or intent of a Defendant. Applying **City of Tuscaloosa** and **U.S. Information Sys.**, *supra*, such commentary is proscribed because it misleads jurors as to the legal consequences of such "facts."

In **Specht v. Jensen**, 853 F.2d 805 (10th Cir. 1988), the court held that "[w]hile testimony on ultimate facts is authorized under Rule 704, … testimony on ultimate

questions of law is not favored.  The basis for this distinction is that testimony on the ultimate factual questions aids the jury in reaching a verdict; testimony which articulates and applies the relevant law, however, circumvents the jury's decision-making function by telling it how to decide the case." *Id*. at 808.  Here, Dr. Phillips has repeatedly made reference to certain conduct constituting an antitrust tie, or certain conduct being coercive, or certain conduct having been motivated by conspiracy and anticompetitive intent.  Such opinions impermissibly instruct the jury how to decide the case.  *Id*.  In *Specht*, the "expert's testimony painstakingly developed over an entire day the conclusion that defendants violated plaintiffs' constitutional rights." *Id*.  The Court should prevent a similar infringement on the Court's and the jury's respective domains here, by precluding the foregoing testimony which would usurp the Court's duty to instruct the jury on matters of law and the jury's duty to decide matters of fact.

## F.  DR. PHILLIPS' REBUTTAL REPORT FURTHER ERODES HIS OPINIONS.

Dr. Phillips offers a rebuttal to Dr. Langenfeld's critique of his initial report.  [*See* Rebuttal rpt.; ***Exh. A-5***].  It does little more than restate his original conclusions, and offers absolutely no additional analysis to repair the deficiencies in his methods as detailed above.   Most importantly, Dr. Phillips still provides no analysis of the relationship, if any, between the market for EDM downloads and the market for promotion of DJs.  Dr. Phillips again fails to analyze Beatport's market share, if any, in the actual alleged tying product market: the market for DJ promotion.

Dr. Phillips criticizes Dr. Langenfeld for not offering definitions of the relevant product markets in this case.    [Rebuttal rpt. at 4; ***Exh. A-5***].   First, it is neither Dr. Langenfeld's role nor Defendants' burden to define the antitrust markets underlying Plaintiffs' claims.   Nevertheless, Dr. Langenfeld articulates that the tying product market at issue here is the market for promotional development opportunities for DJs. [Langendfeld rpt. at 4-5, 14, 18-19; ***Exh. A-15***].   Dr. Langenfeld also articulates that the appropriate alleged tied product market definition must include, at a minimum, non-A-list DJs and non-litigant venues throughout the greater Denver metro area where live DJ performances are held based on the substitutability of those performances and venues as admitted by Dr. Phillips.  [***Id***. at 27-29].

Rather than addressing these well-reasoned criticisms, Dr. Phillips offers selected deposition testimony to bolster his original conclusions but fails to acknowledge unfavorable testimony from the same witnesses.  [*See, e.g.,* Rebuttal rpt. at 5, 10, 13, 16; ***Exh. A-5***].   He also cites to "trade and industry literature" such as the website [www.gearslutz.com](www.gearslutz.com) to bolster his market share and market power analysis (in the wrong tying product market), but these new citations simply parrot his original unreliable sources.  [*See* Rebuttal rpt. at 6, 12; ***Exh. A-5***].   For example, Dr. Phillips expands his original examination of the share of music distributed by Venga Music through Beatport versus iTunes and other online retailers to include additional record labels such as Dancephonic, Soundsector, and IQ Sounds.  [***Id***. at 12].   What he fails to do (again) is to analyze whether any of these labels distribute A-list DJ music.  Because Dr. Phillips fails to conduct any analysis or provide any reliable methodology to explain how these

particular music labels distribution statistics inform on the distribution of music by A-list DJs across the spectrum of available online retail sites, including iTunes, the examination is unreliable and the conclusions that flow from it remain inadmissible.  [*Id*.]

Even if Dr. Phillips' assertion that the library of EDM downloads available on iTunes overlaps only ten percent with Beatport's download library, which Defendants expressly deny, his analysis still fails to support his conclusion that Beatport has market power over A-list DJs.  [*Id*. at 7 ("Beatport has less than 10% of its files in common with iTunes")].  Consider that Dr. Phillips asserts that Beatport sells music for 3,000 direct suppliers and another 15,000 labels.  [*Id*. at 2].  If each of those suppliers and labels represented only one DJ, which is absurdly conservative, then Beatport sells EDM downloads for 18,000 different DJs.  If only ten percent of those 18,000 DJs are available on iTunes, then 1,800 DJs that sell EDM downloads also sell downloads on iTunes.

By Plaintiffs' own definition for "A-list DJs," this submarket consists of only the Top 100 listed in DJ Magazine at any given moment.  [*Id*. at 2].  If the Top 100, or the A-list as Plaintiffs would call them, are included among the conservatively-estimated 1,800 DJs that sell EDM downloads on both Beatport and iTunes, then Dr. Phillips' tying market definition is fatally flawed because it excludes iTunes.  What is worse, Dr. Phillips did absolutely no investigation or analysis of this obvious possibility.  He did no investigation because he knows that the result of such an analysis will likely show that the overlap between iTunes and Beatport for A-list DJs is one hundred percent, necessitating the inclusion of iTunes in the alleged tying product market.  If iTunes is

included in the alleged tying product market, Dr. Phillips knows that Beatport will not control sufficient market share to satisfy the rule of reason.  In Dr. Phillips' own words, "*if after defining the market, even if Beatport had a small market share, then the claims in the case wouldn't have merit because deejays would have other readily substitutable options to Beatport and whatever anticompetitive accusations or allegations there may be against Beatport*."  [Phillips dep. p. 123, ln. 10 – p. 124, ln. 2 (emphasis added); *Exh. A-4*].

As discussed above, Dr. Phillips has not reached out to a single A-list DJ to ask if Defendants threatened, coerced, or made promises to compel them to boycott SOCO and play exclusively at Beta.  The single DJ who has testified in this action, Charissa Saverio, said unequivocally that Mr. Roulier never threatened her, and she did in fact play for both SOCO and Beta after Beta opened:

> Q. Am I right that you aren't here today to swear that Mr. Roulier directly threatened you, saying that you'd suffer consequences on Beatport if you played at The Church or Vinyl?
>
> [Objection omitted]
>
> A.  I'd like to see him try.  No, he's never said that. Of course not.
>
> Q. In fact, you played at Mr. Christou's clubs after you played at Beta; isn't that right?
>
> A.  I think once.

[Saverio dep. p. 96, ln. 15-25; *Exh. A-18*].  In light of the complete absence of a single A-list DJ coming forward to join Plaintiffs' suit or at least substantiate Plaintiffs' allegations, Dr. Phillips must provide more than blind adherence to Plaintiffs' version of events, patchwork analysis that avoids investigating the real questions, and tendering

anonymous websites and out-of-context quotes as his "proof" to validate his methods and conclusions.   Such sub-standard economic analysis serves no purpose in this action other than to mislead and confuse the issues.   The Court should reject Dr. Phillips' speculative attempts to prop up Plaintiffs' unfounded and illogical allegations.

Plaintiffs undoubtedly hope that Dr. Phillips' rebuttal report will give them sufficient grounds to eke out purported fact disputes.   Dr. Phillips' untimely and unavailing attempt to repair the analytical flaws revealed during his deposition through his rebuttal report still fails to include any analysis of the relationship, if any, between the market for EDM downloads and the market for promotion of DJs.   He provides no analysis of Beatport's market share, if any, in the *actual* alleged tying product market: the market for DJ promotion.   And Dr. Phillips still fails to provide any reasoned methodology to support limiting his tied product market definition to just the litigant venues.   The simple truth is that Dr. Phillips' opinions derive from unreliable methods, do not fit this case, and are, therefore, inadmissible.   His protestations to the contrary, no matter how forceful, cannot save his opinions from exclusion.

## CONCLUSION

Dr. Phillips fails to identify a tying product market that fits the Plaintiffs' anticompetitive theory of the case.   This failure, without more, is fatal to Dr. Phillips' opinions regarding the supposed tying product market definition.   He compares apples to oranges when he defines the alleged tying product market as the market for EDM downloads while simultaneously testifying that Beatport and Mr. Roulier were leveraging the promotion of DJs, not the sale of songs.   Dr. Phillips compounds this problem by

asserting an overly-narrow definition of the alleged tied product market, which does not fit the allegations or undisputed market realities of this case.  The methods he applies to support these ill-fitting conclusions are patently and cumulatively unreliable as a matter of law.  The Court should exclude these misfit opinions because they bear no logical relationship to the Plaintiffs' claims or to the expert's own descriptions of the undisputed market realities of this case.   *See* ***Bitler***, 391 F.3d at 1121.   Even if Dr. Phillips' proffered evidence had derived from reliable methodologies, which it does not for all the reasons described above, it still lacks sufficient bearing on the issues at hand to satisfy the ***Daubert*** requirement for "fit."   *Id*.

"It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." ***Dodge***, 328 F.3d at 1222.   Here, the dearth of reliable methods to support of Dr. Phillips' narrowly-tailored product market definitions reveal his conclusions to be unreliable, *ipse dixit* speculation intended to create a colorable market share argument under the rule of reason.  By his own admission, Dr. Phillips ensured that his market definitions would provide Beatport with market share and market power, else Plaintiffs would have no case.   Dr. Phillips' failure to include any analysis of the obvious changes in the alleged tied product market, or to incorporate undisputed facts that contradict the Plaintiffs' claims, further demonstrate the lack of reliability of his methods.

These flaws, along with his proscribed assumptions concerning the alleged anticompetitive conduct and his opinions expressing legal conclusions, will tend to cause his opinions to mislead, rather than aid, the fact finder.  Given these additional

failings, Dr. Phillips' opinions cannot be salvaged and should be excluded by this Court under Fed. R. of Evid. 702, 704, **Daubert**, and its progeny.  For all of the foregoing reasons, Defendants Beatport, LLC, Bradley Roulier, and BMJ&J, LLC, respectfully request this Court issue an order excluding the Plaintiffs' proffered expert testimony by Owen R. Phillips, Ph.D., and for all other relief as this Court deems just and proper.

## CERTIFICATE OF COMPLIANCE

Pursuant to D.C.Colo.LCivR. 7.1(A), counsel for Defendant Beatport, LLC, Katherine M.L. Pratt, Esq., conferred with counsel for Plaintiffs, Jeffrey S. Vail, Esq., prior to filing this Motion.  Mr. Vail indicated the Plaintiffs oppose this Motion.

Respectfully submitted this 4th day of January, 2012.

_s/ Katherine M.L. Pratt_          .
George V. Berg, Jr.
Katherine M.L. Pratt
BERG HILL GREENLEAF & RUSCITTI LLP
1712 Pearl Street
Boulder, CO  80302
Phone:  (303) 402-1600
Fax:  (303) 402-1601
gvb@bhgrlaw.com
kmlp@bhgrlaw.com

*Attorneys for Defendant Beatport, LLC*

_s/ Martin D. Beier_          .
Joe L. Silver
Martin D. Beier
Nicholas E. Mitchell
SILVER & DeBOSKEY, P.C.
The Smith Mansion
1801 York Street
Denver, CO  80206
Phone: (303) 399-3000
Fax: (303) 399-2650
silverj@s-d.com
beierm@s-d.com
nmitchell@s-d.com

*Attorneys for Bradley Roulier and BMJ&J, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of January, 2012, I electronically filed the foregoing **DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESS OWEN R. PHILLIPS, Ph.D.** with the Clerk of the Court using the CM/ECF system which will send notification to such filing to the following e-mail addresses:

Jeffrey S. Vail
THE LAW OFFICE OF JEFF VAIL, LLC
8310 South Valley Highway, Third Floor
Englewood, CO  80112
Tel. (303) 800-8237
Fax. (303) 800-8237
E-mail: jvail@vail-law.com

*Attorney for Plaintiffs*

Joe L. Silver
Martin D. Beier
Nicholas E. Mitchell
Silver & DeBoskey, P.C.
The Smith Mansion
1801 York Street
Denver, CO  80206
Tel. (303) 399-3000
Fax. (303) 399-2650
E-mail: silverj@s-d.com
        beierm@s-d.com
        nmitchell@s-d.com

*Attorneys for Bradley Roulier and BMJ&J, LLC*

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

*s/ Cheryl Stasiak*

_____
Cheryl Stasiak