**Exhibit A-3**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 10-CV-02912-CMA-KMT

REGAS CHRISTOU,
R.M.C. HOLDINGS, L.L.C. D/B/A THE CHURCH,
BOUBOULINA, INC. D/B/A VINYL,
MOLON LAVE, INC. D/B/A 2 A.M.,
CITY HALL, LLC,
1037 BROADWAY, INC. D/B/A BAR STANDARD F/K/A THE SHELTER,
776 LINCOLN ST., INC. D/B/A FUNKY BUDDA LOUNGE
1055 BROADWAY, INC. D/B/A THE LIVING ROOM

  Plaintiffs,

v.

BEATPORT, LLC,
BRADLEY ROULIER,
BMJ&J, LLC D/B/A BETA NIGHTCLUB AND BEATPORT LOUNGE,
AM ONLY INC.,

  Defendants.

---

## ECONOMIC REPORT OF OWEN R. PHILLIPS, PH.D.

---

  I am Owen R. Phillips.  I received my Ph.D. in economics from Stanford University in 1980.  I am currently a Professor of Economics in the Economics and Finance Department and Associate Dean in the College of Business at the University of Wyoming.  I have taught and done research in antitrust economics for over twenty-five years.  I teach industrial organization economics at both the undergraduate and graduate level.  Course material in these classes develops the theory of market structures and exposes students to the prominent works on business conduct.  Economic analysis is applied to major antitrust cases.  I have been employed as an economist at the Antitrust Division of the Department of Justice.  I have been a visiting

**Exhibit A-3**

professor at the Harvard Business School in the Negotiations, Organizations, and Markets (NOMs) Department.   I have extensive experience studying the music industry and markets for live music performances.  I was retained by the plaintiff as an expert economist in the antitrust action brought by Nobody in Particular Presents against Clear Channel Communications, Inc., et al. (Civil Action No. 01-N-1523 (D. Colo.), alleging illegal tying and monopolization related to the promotion of rock music concerts.  I serve as the expert economist in the Live Concert Antitrust litigation against Clear Channel Communications, Inc. that has certified concert ticket holders as a class of individuals allegedly harmed by the business conduct of Clear Channel (MDL No. 1745 For the Central District of California) in the nationwide promotion of music concerts.  This action is ongoing for the test markets Denver and Los Angeles.

A copy of my curriculum vita, more completely listing my qualifications and publications, and previous testimony is attached as Exhibit 2.  It shows a number of refereed papers published in the most prestigious economic journals, including the *American Economic Review*, *The Rand Journal of Economics*, *The Review of Economics and Statistics*, and the *Journal of Law and Economics*.  I am being compensated for my work as an expert at the rate of $350 per hour.

Claims of tying, monopolization, and attempted monopolization require a definition of the relevant markets in which the parties operate and an analysis of the market power of the participants in those markets.  I have been asked by the Plaintiffs to define relevant markets in this case. I have also been asked to estimate market shares and evaluate the market power and the alleged anticompetitive conduct of the Defendants as it impacts market efficiency and welfare in the relevant markets.  Finally I have been asked to provide an opinion on how the Plaintiffs may have been harmed by this conduct.  My opinions are based upon my skills, knowledge,

**Exhibit A-3**

experience, education and training, and are based upon the information available to me as of the date of this report. My opinions may be supplemented and refined as more information is obtained.

At this point in time I have reviewed:  (1) the trade and business literature, newspaper articles, and other publicly available financial documents; (2) information on nightly performances of disc jockeys and ticket revenues produced by both the Plaintiffs and Defendants; and (3) a significant number of emails and recorded phone calls produced by the parties in this case.   I have not reviewed all documents produced by Defendants which number tens of thousands of emails, because it is my understanding these additional documents would not assist my analysis, would be largely duplicative of information I have reviewed, or have been produced so recently that they have not been fully reviewed by Plaintiffs' counsel to advise of what is contained in them.  I have not had the benefit of any deposition testimony.  The Document Log (Exhibit 1) at the end of this report provides a list of source material I have reviewed.

## I. <u>Background and Complaint Allegations</u>

Plaintiffs are collectively referred to as the South of Colfax Nightlife District, or "SOCO" in the Complaint.  As listed above they are Regas Christou; R.M.C Holdings, L.L.C. ("The Church"); Bouboulina, Inc. ("Vinyl"); Molon Lave, Inc. ("2 A.M."); City Hall, LLC; 1037 Broadway, Inc. ("Bar Standard" f/k/a "The Shelter"); 776 Lincoln St., Inc. ("Funky Buddha"); and 1055 Broadway, Inc. ("The Living Room").

Plaintiff nightclubs, in particular The Church and Vinyl, rely heavily on live performances by well-known disc jockeys (DJs) who electronically mix, sample, and compose music during their live performances.  This music is played over high-quality sound systems at

**Exhibit A-3**

nightclubs for dancing.  DJs typically purchase large quantities of music to mix and sample in the course of creating their compositions.  Historically DJs have used music on vinyl records for this purpose; today the vast majority of DJs use digital music files and often purchase and download these files from online vendors.  Beatport is an online music vendor known to offer a wide selection of high-fidelity dance music files for download.[1] The music is offered free of digital rights management (DRM) controls.  DRM controls make it difficult or impossible to use music files with the major software and hardware programs favored by DJs.[2]  DJs develop reputations as artists who creatively mix and match music in a style generally known as "Electronic Dance Music" for audiences who go to nightclubs.  DJs greatly value Beatport downloads when they perform at a nightclub.  DJs can be highly paid artists who have the potential to attract large dance crowds.  The most visible DJs sell albums and single recordings on the Beatport website.

Defendants are Beatport, LLC ("Beatport"); Bradley Roulier; BMJ&J, LLC ("Beta"); and AM Only, Inc. ("AM Only").  These parties are collectively referred to as "Defendants" where appropriate.

From 1998 to 2007, Bradley Roulier worked for Plaintiff Regas Christou.  During this time, Roulier and others conceived Beatport.  Beatport became a corporate entity in 2003.  Three

---

[1] From the Beatport website, www.beatport.com (downloaded March 28, 2011):

Beatport is the recognized leader of electronic music downloads by DJs and fans alike delivering content in premium-encoded formats that match the professional performance quality standards of the world's leading sound systems. Beatport.com allows users to access the world of club music through secure, legal, hi-speed, high quality downloads in MP3, MP4 and WAV formats on a pay per download basis from an impressive library of the world's leading independent labels.

[2] "Beatport has always been DRM free for one main reason.  There is no professional DJ technology that decodes DRM.  And so for Beatport, that means it's simply not compatible with our industry."  Jonas Tempel, former Beatport CEO, quote from interview available at http://www.beatportal.com/feed/item/on-the-hot-seat-beatport-ceo-jonas-tempel/, last accessed July 23, 2011.

**Exhibit A-3**

of the world's top DJs—William Renkosik (a/k/a "Bad Boy Bill"), Richard ("Richie") Hawtin, and John Aquaviva have ownership in Beatport.  Roulier has been an owner of Beatport since its inception and he is an employee of Beatport.[3]

Beatport has become a commercial success.  In 2010 it had 1.8 million registered users and claims to have more than 2 million unique monthly visitors.[4] It sells music in 131 countries. It employs 70 people and has offices in Denver, Germany, and Japan.[5]  Beatport has 3,000 direct suppliers of dance music and licensing agreements with 15,000 dance-themed labels; it has paid out more than $100 million in music royalties to label partners since 2004.[6]  Beatport revenues have increased from $274,973 in 2004 to $39,263,871 in 2010.[7]

By its own reporting, Beatport is reputed to be the industry standard for Electronic Dance Music played by DJs. At least 65% of its customers are DJs from around the world.[8]  They pay $1.49 to $3.49 for a download.  The company reports that 80% of a track's sales are in the first 14 days after the track is released.[9]  Favorable promotion by Beatport of single recordings and DJ albums can strongly impact sales.

---

[3] Defendant Beatport, LLC's Objections and Responses to Plaintiffs' First Set of Discovery Requests, May 9, 2011, pp. 11 and 15.  Roulier's ownership has ranged from 10.0% in 2004 to 5.5% currently.

[4] Anthony Bruno, Digital Domain, Billboard, October 16, 2010, p. 10.

[5] Greg Griffin, Tuned into the market track record of Denver entrepreneur.  Denver Post, July 31, 2010, p. B5.  See also Beatport Digital Download Network presentation.

[6] Anthony Bruno, Digital Domain, Billboard, October 16, 2010, p. 10.  Also Defendant Beatport, LLC's Objections and Responses to Plaintiffs' First Set of Discovery Requests, May 9, 2011, p. 13.

[7] Defendant Beatport, LLC's Objections and Responses to Plaintiffs' First Set of Discovery Requests, May 9, 2011, pp.11-12.

[8] Anthony Bruno, Digital Domain, Billboard, October 16, 2010, p. 10.  Another estimate of the customer base is 70% DJs (The Visionaries, Billboard, June 28, 2008 p.16).

[9] Ibid.

Beatport has many avenues to provide enhanced promotion of DJs, including featuring an individual DJs "chart" (list of favorite songs) on Beatport's front page, highlighting a DJs recent releases on Beatport's website, links to a DJs music in Beatport's various marketing emails to its 800,000 customer email list,[10] inviting DJs to Beatport tour events and "Pool Parties,"[11] and holding "remix" contests for the DJ's music which requires individuals to purchase an individual DJ's music to use for their entry in the contest.  There are many examples of DJs recognizing the importance of Beatport to their careers and asking Beatport for help.[12]

Bradley Roulier left the employment of Christou at the end of 2007 and opened his own nightclub "Beta" in March 2008.  Roulier wants Beta "to be the top nightclub in North America and to be globally recognized."[13]  Beatport and Beta are closely tied through common ownership and history—Mr. Roulier has an ownership interest in both companies, he intentionally named

---

[10] See BP 156258 & 156259 Roulier email outlining how Beatport will promote the Beatport tour, including email blasts to 800,000 person email list.  See BP 136780 for example of marketing email message. R-1281-83 is an example of weekly marketing email from Beatport providing links to "featured exclusive" tracks by certain artists.

[11] R-1207 email from WME (agency) asking Brad to put a certain DJ on the Beatport Miami Pool Party schedule as a favor to Joel Zimmerman.  BP 157138 – DJ Dan wants to play 2008 WMC Pool Party, but no slot is available, and his manager complains that he has been a very good partner with Beatport.  BP 212626 and BP 213046 – Ryan Saltzman at Bullitt asks Roulier to add some of his artists to Beatport's WMC pool party lineup, showing importance to agents/DJs of playing at WMC, and specifically at Beatport's annual pool party.

[12] BP 135039 October, 2009 email from DJ Dan's manager asking for Beatport support on DJ Dan's upcoming release.  BP 136636 – Joel Zimmerman at William Morris emails Roulier that Kaskade's next album release is May, 2010 and that he "would like to do something special" with Beatport.  BP 213031 – Email chain re: Paul van Dyk (top DJ) collaboration with Beatport.  BP 213128 – Negotiations for Paul van Dyk exclusive.  BP 212789 – Steve Goodgold, an agent, contacts Roulier about one of his artists who is launching a label and wants a contract with Beatport to distribute.  BP 215141 – Toronto promoter inquiring about a Beatport DJ contest, and hoping the winner will be offered some exposure on Beatport.  BP 215108 – DJ's Kered & Kiraly, write Roulier asking for help with Beatport, Roulier forwards to Beatport people to make happen.  BP 215081 – DJ Daniel Maher asks Roulier for an artist profile on Beatport.

[13] Defendant Roulier's Responses to Plaintiffs' First Set of Discovery Requests, June 29, 2011 p. 9.

**Exhibit A-3**

his nightclub "Beta" because it sounds like "Beatport,"[14] and an area within Beta is branded as the "Beatport Lounge."

It is alleged in the Complaint that Beatport has the capability to block a DJ from its online Electronic Dance Music marketplace if it chooses to do so in response to that DJ performing at one of SOCO's venues. It is also alleged is that Beatport has the ability to enhance or reduce promotion of a DJ within its online Electronic Dance Music marketplace and associated media outlets if it chooses to do so in response to that DJ performing at SOCO's venues.  The Complaint alleges that reduced promotion is threatened if a DJ performs at a SOCO venue, and enhanced promotion is provided in exchange for that DJ performing at Beta.

The Complaint alleges that Roulier and Beatport understand this leverage, and in early 2008 began, through words and actions, to communicate to most sought after  "A-List" DJs[15] and their agents that, if these DJs wanted full access to and promotional support from Beatport when performing within the Denver metro area they must perform only at Beta.  Because of the critical importance of access to Beatport and promotional support from Beatport to DJs and their labels, many DJs refused to perform at SOCO's venues and performed only at Beta.

The Complaint alleges that access to Beatport has been illegally tied to performing only at the Beta nightclub in the Denver area.  This action has forced A-List DJs to exclusively deal only with the Beta nightclub, and has vertically foreclosed the access by SOCO nightclubs to A-

---

[14] *See* BP-157094, email from Roulier to investors in Beta stating that "I really like the name 'Beta'. . . It relates very closely to "Beatport" and has a logical connection."

[15] As discussed below there is an accepted ranking of the "top100" DJs from DJ Magazine's Top-100 List.  This list is used to define the best DJs in this report.  Rankings change from year to year as the list is published annually.  For example Joel Zimmerman, better known by his stage name deadmau5 (pronounced "dead mouse"), is listed in DJmag.com Top 100 DJs as11th Place (2008), 6th Place (2009), and 4th Place (2010).  A top 100 ranked DJ also is referred to as an "A-list" DJ in this report.   Nightclub talent buyers will speak of lesser-known DJs as "B-list", "C-list", and "D-list" talent (Interview with Jonny Shuman, talent buyer for R.M.C. Holdings, August 11, 2011). There may be a small number of additional DJs who are not contained in the DJ Magazine Top-100 List but who are considered by some individuals to be "A-List," at least within certain geographic areas.

**Exhibit A-3**

List DJs in the Electronic Dance Music business.  This action is an attempt to monopolize and has given Beta monopoly control over the provision of the best electronic dance music in the Denver area.  In general trade has been restrained.

## II.  <u>Summary of Conclusions</u>

I define two relevant markets through which the Plaintiffs and Defendants interact.  They are:

    (1)  *digital downloads of DRM-free, high fidelity Electronic Dance Music suitable for playing on high-performance sound systems globally(digital download market);*

    (2)  *live performances by A-List DJs playing Electronic Dance Music at nightclubs in the Denver metro area (A-List DJ market).*

In the digital download market Beatport has a 70% to 80% market share, and I conclude that Beatport has monopoly power in this market.  DJs greatly value access to and promotion from Beatport.  Having their releases featured and promoted by Beatport is essential to the financial success of A-list and other prominent DJs.

Bradley Roulier, as an owner of Beatport and Beta, and in cooperation with DJ talent agency AM Only, leveraged Beatport's monopoly in the digital download market to tie DJ access to and promotion from Beatport with performances at the Denver nightclub, Beta.  Favorable treatment from Beatport depended on exclusively playing at Beta.

DJs were coerced to not play at nightclubs owned by the Plaintiffs.  Coercion took the form of Beatport, Beta and Roulier, exploiting Beatport's monopoly power, refusing to deal or threatening a refusal to deal with A-List DJs who perform at Plaintiffs' Denver nightclubs.  Defendant AM Only actively cooperated with this refusal to deal.

As a result of tying and coercion the market share of Beta in the A-List DJ market rose from zero in early 2008 to 90% in 2010.  I conclude that Beta has monopoly power in the A-List DJ market.  Even if Beta does not yet have monopoly power in the A-List DJ market, their rapid

increase in market share suggests there is a dangerous probability that Beta will achieve monopoly power in that market.

I conclude that the monopoly power of Beatport and Beta has damaged final consumers who pay to listen and dance to live performances by A-List DJs.   In analyzing the period 2008-2010 in which Beta has operated in the A-List DJ market there are 15% fewer A-List DJs performing in the market and cover prices are at least 14% higher for performances by A-List DJs than comparable figures for 2006-2007.  Consumers have less choice, with Beta essentially being the only provider of entertainment in this market.

 DJs have been harmed by the anticompetitive actions of the Defendants.  There are 15% fewer performances in the Denver metro area and payments for performances have declined.  For the years 2006-2007 the average nightly salary for an A-List DJ was $8,452.  For the years 2009-2010 nightly salaries are $8,196, down 3.0% from the earlier years.  If just the year 2010 is considered A-List DJ salaries average $6,873, down 19%.

The Church and Vinyl nightclubs have experienced revenue declines of 75% and 50% respectively for nights they attempted to regularly schedule A-List DJs.  These declines are caused by the Defendants' anticompetitive behavior.

## III.  <u>Definition of Relevant Market and Market Power</u>

A market consists of a collection of goods or services that are viewed by buyers as being close substitutes for one another.  A relevant market must satisfy the two-part definition of (*i*) a relevant *product* market, which itself consists of those goods that are reasonably interchanged and/or interchangeable by consumers for the same purposes; and (*ii*) a relevant *geographic* market, which is comprised of the area of commerce within which buyers can and do turn for alternative sources of supply.

**Exhibit A-3**

In practice, antitrust economists frequently rely on the following definition of a relevant market:  A *relevant market is a product or group of products[16] and a given geographic area such that if a firm were the only present and future seller of the product or group of products in that area, then it could profitably charge prices above the competitive level*.  In this regard, identification begins with the *narrowest* definition of a product (or product group) and expands the collection until all reasonable substitutes are included.

This definition provides a way to deal with such questions as how close a substitute should be to merit inclusion in the market and how to deal with possible differences in buyer perceptions of interchangeability and seller perceptions of who are competitors.  A product (or product group) does not comprise a relevant antitrust market if enough buyers perceive other products (or product groups) to be sufficiently close substitutes such that when the price of the product (or product group) rises they switch a large enough volume of purchases to substitutes to render the price increase unprofitable.[17]  This approach to market definition is essentially that adopted by the United States Department of Justice and the Federal Trade Commission in their Horizontal Merger Guidelines, Washington, DC, August 19, 2010 and earlier versions such as the one issued on April 8, 1997 (hereafter Merger Guidelines).

Economists are rarely given the opportunity to observe a significant price increase (*e.g.,* on the order of 5%), by a firm or group of firms from which a change in sales and profits can

---

[16] The terms product and products may refer to either goods or services. See United States Department of Justice and the Federal Trade Commission in their Horizontal Merger Guidelines, Washington, DC, August 19, 2010 and earlier versions such as the one issued on April 8, 1997.

[17] This concept is given more structure by the Small but Significant and Non-transitory Increase in Price (SSNIP) test, used to define a relevant market.  The1982 the U.S. Department of Justice Merger Guidelines introduced the SSNIP test.  The SSNIP test determines whether a hypothetical group of products controlled by a monopoly could profit from a price increase of 5% for at least one year, all other factors held constant. If sufficient numbers of buyers are likely to switch to alternative products and the lost sales would make this price increase unprofitable, then the hypothetical product group should not be considered a relevant market. A larger basket of related products should be considered and a new SSNIP test performed.

**Exhibit A-3**

then be measured.  Thus, the definition of a relevant market as defined in the Merger Guidelines is a guiding principle.  The Merger Guidelines recognize that the *collective* perceptions of buyers and sellers and other persons close to the industry also must be relied upon to make a determination of the relevant market.  Specifically, if participants in and others close to the industry perceive goods to be close substitute in the sense defined by the Merger Guidelines, economists are inclined to place the goods in the same market.  Information on perceptions is gathered from many sources.  It can come from consumer surveys, interviews with individuals in the industry, advertising campaigns, company documents, trade and business journals, investment analysts, and other sources.

        In antitrust economics market power is the capability of one firm to raise prices without losing sales.  In such a situation, the seller has some degree of control over prices and the quantity of output sold.  Market power is a term used in conjunction with monopoly power. I shall use the terms synonymously, but in legal circles monopoly power represents a substantial degree of market power.[18]  Market share is a widely used measure for the existence of monopoly power.[19]  A large market share corresponds to a low elasticity of demand, and correspondingly small cross-price elasticities with other products, which allows a seller to raise price or maintain relatively high prices with little loss of sales.  Along with market share, other factors that point to

---

[18] Areeda and Kaplow define market power as the capacity to act other than as would a perfectly competitive firm. Monopoly power is the capability to control price or to exclude competition.  Monopoly power is often understood as a significant degree of market power.  Phillip Areeda and Louis Kaplow, Antitrust Analysis, 4th ed.  Boston: Little Brown, 1988, p. 470.

[19] In Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 464, (1992) the Court writes that market power "has been defined as 'the ability of a single seller to raise price and restrict output.'"  Fortner Enterprises Inc. v. United States Steel Corp, 394 U.S., at 503 (1969); United States v. E. I. Du Pont de Nemours & Co., 351 U.S. 377,391 (1956).  "The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market."  Jefferson Parish Hospital District v. Hyde, 466 U.S., at 17; United States v. Grinnell Corp., 384 U.S. 563, 571 (1966); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 611-613 (1953).

the presence of monopoly power are evidence of price increases, high profitability, strategic behavior that blocks the entry of potential competitors, and the existence of barriers to entry.

## IV.   Plaintiffs' Relevant Market

### A.  The Product Markets

The appropriate point of view for this analysis is that of the consumer—while music production may generally utilize the same inputs, the focus of analysis must be on the distinctive uses, qualities, and prices of the end product from the point of view of the consumer, who in much of this analysis is the DJ.  As a consumer group they are relatively specialized and sophisticated in their music interests.

DJs are a sophisticated consumer group because a market has developed for their services.  DJs compete to be the best performers at nightclubs that provide dance music for audiences who represent a final consumer group.  DJs travel nationally and internationally to perform for audiences.  As their popularity increases, DJs hire booking agents, sell recordings, and go on tour, just as other well-known music artists do.

### B.  Electronic Dance Music

Beatport differentiates itself from potential competitors such as Apples iTunes by offering services uniquely tied toward the Electronic Dance Music community. For example, unlike iTunes and other competing generic music vendors, Beatport began by offering music free of DRM and other transfer and modification controls.[20] As a result, DJs could more effectively use and re-mix music from Beatport during their live performances.  From its inception Beatport

---

[20] *See* Jonas Tempel, former Beatport CEO, quote from interview available at http://www.beatportal.com/feed/item/on-the-hot-seat-beatport-ceo-jonas-tempel/, last accessed July 23, 2011. ("Beatport has always been DRM free for one main reason.  There is no professional DJ technology that decodes DRM.  And so for Beatport, that means that it's simply not compatible with our industry.")  Not until January 6, 2009 did Apple announce that it would offer iTunes with a "DRM-free format with higher-quality 256 kbps AAC encoding. . . ."  (See http://www.apple.com/pr/library/2009/01/06Changes-Coming-to-the-iTunes-Store.html accessed on August 12, 2011).

**Exhibit A-3**

also offered its music in three formats:  MP3, MP4, and WAV formats, each progressively less compressed for better sound.[21]  MP3 and MP4 tracks are compressed and encoded at varying bitrates, from very low quality up to 320 kbps. The WAV format is uncompressed for highest relative sound quality.  DJs prefer the WAV format for their music.[22]  With respect to these product characteristics iTunes is playing catch-up.

Beatport also differentiates itself from Apples iTunes with its music genre;[23] it restricts itself to electronic dance music, and focuses on offering a wider variety of tracks within the electronic dance music genre as well as numerous exclusive tracks that are not yet available anywhere else.[24]  It is reported that music on Beatport is categorized into 19 specialized music genre classifications tailored to nightclub performances.[25]  They include Breaks, Chill Out, Deep House, DJ Tools, Drum & Bass, Dubstep, Electro House, Electronica, Hard Dance, Hardcore/Hard Techno, Hip-Hop House, Indie Dance/Nu Disco, Minimal, Progressive House, Psy-Trance, Tech House, Techno, and Trance.[26]  In July 2008, Beatport created distinct genres for the Indie Dance and Nu Disco sub-genres, both of which were previously recognized as

---

[21] See Beatport website https://knowledgebase.beatport.com/kb/article/000116.

[22] See BP 157418 – January 3, 2008 email from Funktion One, the hardware manufacturer that built the system in Beta, recognizing that .mp3s are "really unacceptable in terms of sound quality" and that dance clubs need .wav files.  This is a key feature that differentiates Beatport from iTunes and only Beatport sells .wav files.  Jonas Tempel, Beatport CEO, says "we actually have the music before it's hot . . . So we really get it so soon that we are actually part of the hit-making process. . . instead of selling music only in sound-degraded mp3 format [like iTunes], Beatport has lossless WAV files for perfect sound at $1 more per track.  Mark Brown, The global record store with 6,500 labels under contract, Beatport.com is conquering the world.  Rocky Mountain News, October 13, 2007, p. 5.

[23] In BP 214103 Roulier writes "Our sustainable competitive advantage over I-Tunes is we can filter you to the content you want if . . . you know the genre, artist label or remixer."

[24] *See* Beatport's Response to Plaintiffs' First Set of Discovery Requests, May 9, 2011, Interrogatory No. 2, and BP-00009-00011, an example of Beatport's standardized exclusive contract addendum.

[25] http://en.wikipedia.org/wiki/Beatport.  Also http://www.beatport.com/ genres.

[26] *Ibid*.

**Exhibit A-3**

Electronica.[27]  In June 2010 the following number of tracks were available in each genre: 24,000 breaks, 67,000 chill out, 45,000 deep house, 12,000 dj tools, 25,000 drum and bass, 11,000 dubstep, 66,000 electro house, 61,000 electronica, 15,000 hard dance, 12,000 hard techno, 78,000 hip hop, 134,000 house, 20,000 indie dance, 38,000 minimal, 112,000 progressive house, 18,000 psy trance, 88,000 tech house, 97,000 techno, 75,000 trance.[28]  DJs and other specialized consumers find Beatport distinctive because "accessibility to the rare club mixes [is] unavailable elsewhere."[29]  Beatport estimates its recordings have only a 10% overlap with iTunes.[30]

    Not only does Beatport fill these specialized music genres, it distinguishes itself by being the first vendor to offer new music.  In a 2007 interview Jonas Tempel, then CEO of Beatport said, "We actually have the music before it's hot . . . we really get it so soon that we are actually part of the hit-making process.  Traditional brick-and-mortar models and even iTunes -- people come there looking for specific songs."[31]  In April 2011 Beatport offered 50 exclusive song selections.[32]  In December 2010 it offered 101 exclusive music tracks.[33]  More than 20,000 new tracks are offered each week.[34]  Matthew Adell, current CEO of Beatport says, "DJs come to

---

[27] *Ibid*.

[28] *Ibid*.

[29] The iconic Samantha Fox and Marc Mysterio Partner, PR Newswire, September 16, 2009.

[30] DJ Ron Slowmowicz, Beatport Interview—Jonas Tempel, About.com, (n.d.) downloaded August, 17, 2011.

[31] Mark Brown, The Global Record Store with 6,500 Labels Under Contract, Beatport.com is Conquering the World, Rocky Mountain News, October 13, 2007, p. 5.

[32] http://rapid4all.org/forums/music/1828718-va-beatport-exclusive-selection-14-04-2011-a.html.

[33] http://www.yourapid.com/download-free/1556650-va-beatport-december-exclusives-selection-02-2010.html.

[34] HTML5 Report.com July 19, 2011 http://html5.tmcnet.com/topics/html5/articles/198455-beatport-empowers-djs-with-new-html-5-website.htm.  "On average, Beatport adds 20,000 new tracks each week, thousands of which are exclusive to Beatport. To easily find new music, DJs can use an extensive set of filters to sort by dozens of subgenres, release timing, popularity and even more." Also Beatportal July 18, 2011 http://www.beatportal.com/feed/item/our-crusade-to-simplify-searching-on-the-new-beatport/.

**Exhibit A-3**

Beatport to find unique tracks that will make their sets unique . . ."[35]  Sales data for Beatport's exclusive tracks from 2007-2011 show revenues of $137.88 million on its exclusive tracks alone, demonstrating that a significant number of Beatport's customers desire music available only at Beatport.[36]  Being the first to provide dance music downloads is important to Beatport's profitability.

Accordingly, Beatport itself and the industry in general recognize that Beatport and its direct competitors compete in a distinct market from the sales of digital music downloads generally, and that Apples iTunes and other mass-market music download vendors are not competitors in Beatport's market.  Beatport recognizes its own competitors as limited to Juno Downloads, Traxsource, Trackitdown, DJ Download, Satellite Records, What People Play, and Stompy.[37]

Beatport has entered into a strategic partnership with the German company, Native Instruments GmbH, which manufactures Traktor, the dominant hardware system used by DJs. Traktor provides organic and seamless integration of dance music downloads. As a result of this partnership, DJs are more likely to use music downloaded from Beatport during their composition and live performances.  As Native Instruments' CEO Daniel Haver noted in a press release, "We strongly believe in Beatport as the most relevant and upfront platform for purchasing club music on the internet . . . With the Traktor Beatport Player, we are making our Traktor technology available to Beatport customers, and by that perfectly complement the Beatport 2.0 experience. This is just the first step in our close partnership with Beatport, and DJs

---

[35] HTML5 Report.com July 19, 2011 http://html5.tmcnet.com/topics/html5/articles/198455-beatport-empowers-djs-with-new-html-5-website.htm.

[36] See BP-220292 spreadsheet.

[37] *See* BP-220161-220171, Beatport's Internal Strengths, Weaknesses, Opportunities, Threats (SWOT) analysis of its self-identified competitors.

all around the world can look forward to many more exciting developments in the time to come."[38]

Beatport is recognized as an essential tool to the professional and financial success of DJs.  Beatport's own analysis of its competitors shows that "Beatport outperforms competitors in both daily traffic and daily reach . . . Juno Downloads and Traxsource are the only contenders, but their traffic rank is much lower than Beatport."[39] As Beatport states on its website as of November 9, 2010, "Beatport is the most relevant online source of electronic music in the world." Beatport's website states that it is the "recognized leader in electronic dance music downloads for DJs and club music enthusiasts."  Former CEO Jonas Tempel describes Beatport as ". . . the authentic online deejay shop focused on the music that deejays need to excel and pack dance floors."[40]  Current Beatport CEO Matthew Adell writes:

> While we are, at heart, a record store, we like to think of ourselves as a champion of the DJ community. Our customers are at the core of everything we do at Beatport. Our staff is filled with people who are incredibly passionate about Electronic Dance Music and a lot of us are DJs. We like to say that Beatport was designed for DJs by DJs.[41]

If iTunes was a reasonable substitute and in the same market as Beatport, the price premium for song downloads set by Beatport could not be sustained.  Prices for iTunes downloads range from $.69 to $1.29,[42] while for Beatport a newly released exclusive track is priced at $2.49. A newly released non-exclusive track is generally priced at $1.99 for the first eight weeks after its release date.  Most of Beatport's sales are from these downloads. General

---

[38] http://www.audiocourses.com/article691.html  2004 press release.

[39] *See* BP-220163.

[40] Lyn Berry-Helmlinger, "It has a nice Beatport.com, and you can dance to it," The Denver Business Journal, January 25, 2004, p. A19.

[41] Beatportal July 14, 2011 http://www.beatportal.com/feed/item/the-new-beatport-designed-for-djs-by-djs/.

[42] http://www.apple.com/pr/library/2009/01/06Changes-Coming-to-the-iTunes-Store.html.

**Exhibit A-3**

content is priced at $1.39 per track. Classic tracks are priced at $1.99 per track. Tracks downloaded as .wav files, which have a higher sound quality than standard .mp3 files, cost $1.00 more than these prices.[43]

When asked about these prices, Beatport CEO Jonas Tempel said in a 2009 interview: "It is my opinion, and the opinion of everyone at Beatport, that we cannot sell the content any cheaper. The economics of the sale just don't allow for pricing that is competitive with other commercial sites. And quite honestly, we don't intend to compete with iTunes."[44]  In the same interview Tempel says, "I don't think iTunes and Beatport have much in common besides that we both sell digital music."[45]  "Whereas iTunes showcases Jennifer Lopez, we highlight Full Intention.  [I]t's unlikely that Apple will market to the nightclub market anytime soon."[46]

Beatport's Strengths, Weaknesses, Opportunities, Threats (SWOT) analysis of its perceived competitors does not list iTunes, and focuses on the strengths and weaknesses of its competitors using these same factors that define its market, including exclusive tracks, high-fidelity file formats, focus on the dance music genre and DJs as customers, and the use of re-mix contests to drive traffic.[47]  Beatport's SWOT analysis of its competitor's prices also supports this market definition:  Juno Download's most expensive tracks sell for $1.89; Traxsource charges up

---

[43] Defendant Beatport, LLC's Objections and Responses to Plaintiffs' Second Set of Discovery Requests, June 22, 2011, pp. 9-10.

[44] In the hot seat:  Beatport CEO Jonas Tempel, Beatportal, January 28, 2009
http://www.beatportal.com/feed/item/on-the-hot-seat-beatport-ceo-jonas-tempel

[45] *Ibid*.

[46] Michael Paoletta, Dance Follows Own Beat in Online Music Revolution, <u>Billboard</u>, January 10, 2004.

[47] *See* BP-220161-220171.

to $3.99 per track; DJ Download charges "above $2 per piece"; Satellite records charges between $1.49 and $1.99 per track; and Stompy charges up to $2.99 per track.[48]

Beatport's SWOT analysis suggests that the market for digital downloads of DMR-free, high-fidelity Electronic Dance Music, especially when focused on rare or exclusive content specific to the electronic dance music genre, exhibits very low cross-elasticity of demand with the broader market for digital music downloads such as those offered by iTunes.

For purposes of SOCO's antitrust claims, the first relevant product market is the market for:

• *digital downloads of DRM-free, high fidelity Electronic Dance Music, suitable for playing on high-performance sound systems*.

There are no reasonable substitutes for digital downloads of DRM free, high fidelity Electronic Dance Music songs for use in nightclubs or on high quality sound systems. This product market is distinct because of the above-mentioned peculiar characteristics, industry recognition, and specialized vendors.

### C.  A-List DJs

"A-List DJs" are a distinct market in the industry for live DJ performances. This market is known and recognized by both consumers and industry insiders. The group of A-List DJs is commonly considered to be the top 100 list as published annually in the trade magazine, DJ Magazine, and its related website.[49]  Plaintiffs, Defendants, and the industry in general recognize

---

[48] *Ibid.*

[49] Founded January 31, 1991, DJ Magazine is a British monthly magazine dedicated to Electronic Dance Music (EDM) and DJs. The magazine publishes two annual "top 100" lists, one for DJs and one for nightclubs. See http://en.wikipedia.org/wiki/DJ_Magazine.

**Exhibit A-3**

the importance of <u>DJ Magazine</u> Top-100 rankings in classifying "A-List" DJs.[50] As the magazine reports, the Top 100 DJ poll is the "world's leading DJ Poll. We attract over 350,000 votes a year and have over 10,000,000 people viewing our results every year."[51]

The Poll was first introduced in 1995 and is now considered the benchmark for both DJs and clubs who book them."[52] Lisa Lash, reputed to be the world's number one female DJ reminds her fans "It's that time of year again to vote for your 5 favourite DJs in the all important DJ Mag Top 100 DJs Poll . . . ."[53] Funky House Music a producer of dance music writes, "It's that time of year again folks, the mother of all dj polls is upon [us]. The DJ Mag Top 100 DJ poll 2006 voting has officially started . . .cast your votes for your favorite Funky House DJ!"[54] There is substantial support showing DJ Magazine's top-100 DJ poll is recognized within the industry as the most authoritative source for who is an "A-List" DJ.

This market is characterized by unique pricing and booking practices. A-List DJs have the ability to draw large crowds willing to pay a cover premium on the basis of the DJs talent and name recognition. There are no reasonable substitutes for live performances by A-List DJs playing Electronic Dance Music because the market shows (1) that these DJs are paid

---

[50] BP 136831 – Roulier emails the DJ Mag top-100 list to support his claim that top DJs play at Beta. BP 156300 – Roulier emails the DJ Magazine top-100 list to Beatport colleagues to make sure all are users of Beatport. BP 156787 – In one marketing push, Roulier sent personal emails to all of the DJ Magazine Top-100 DJs list. R-2067-89 – An agent forwards email chain to Roulier, asking Beta to raise the fee for Markus Shultz from $6k to $10k because "he's ranking really well" (referencing his rank on the <u>DJ Magazine</u> Top-100 list).

[51] DJ Mag home page http://www.djmag.com/contact/?op=about accessed on August 18, 2011.

[52] *Ibid.*

[53] http://www.djlisalashes.com/ accessed August 18, 2011.

[54] http://www.funkyhousemusic.com/tag/dj-mag/ accessed August 18, 2011. The company's website goes on to say: "Here it is – your chance to play a vital role in deciding the outcome of the most important poll in dance music. DJ Magazine Top 100 DJs Poll is taken so seriously by clubbers, promoters and DJs worldwide for one reason – because it is a 100% public vote."

**Exhibit A-3**

significantly more than other DJs for their services, and related (2) ticket or cover charges for these A-List performances are significantly higher than other DJ performances.

This analysis uses the DJ Magazine Top-100 ranking for the applicable year as the baseline for which DJs are "A-List" compared to non-"A-List" or unranked DJs, with the top-100 DJs as determined by this poll comprising "A-List" DJs for that year.  Using this method of classification, it can be shown that A-List DJs, as a group of performers, are distinct from other DJs.

Specifically, the following summarizes nightly payments made for ranked A-List and unranked DJs at The Church and Vinyl:

**Table 1: Difference in Nightly Payments to Ranked vs. Unranked DJ's**

| Year | Venue | Number of Performances with A-List DJ | Average Salary for A-List DJ[1] | Number of Performances with an Unranked DJ | Average Salary for an Unranked DJ | Difference |
|------|-------|------|------|------|------|------|
| 2006 | Church[2] | 20 | $ 8,610 | 29 | $  4,736 | $ 3,849 |
| 2006 | Vinyl[2] | 21 | 7,690 | 40 | 3,471 | 4,220 |
| 2007 | Church | 18 | 6,581 | 35 | 4,371 | 2,209 |
| 2007 | Vinyl | 25 | 10,314 | 30 | 4,349 | 5,965 |
| 2008 | Church | - | No salary available | 46 | 4,606 | ---- |
| 2008 | Vinyl | 2 | 6,780 | 77 | 4,247 | 2,533 |
| 2008 | Beta[3] | 29 | 10,228 | 81 | 4,317 | 5,910 |
| 2009 | Church | 1 | 4,975 | 43 | 2,906 | 2,069 |
| 2009 | Vinyl | 1 | 6,000 | 54 | 3,567 | 2,433 |
| 2009 | Beta | 25 | 9,630 | 109 | 4,081 | 5,549 |
| 2010 | Church | 1 | 4,975 | 21 | 3,597 | 1,378 |
| 2010 | Vinyl | - | No salary available | 36 | 2,162 | ---- |
| 2010 | Beta | 22 | 6,959 | 129 | 2,785 | 4,173 |

[1] Ranked in Top 100 DJs by DJ Magazine for each year.
[2] The Church and Vinyl salary data for 2006-2007 were provided by attorneys in the file "Updated_DJ_Worksheet."  The Church and Vinyl salary data for 2008-2010 were provided by attorneys in the file "8-25-11 Updated_DJ_Worksheet."
[3] Beta salary data provided in the file "Beta's_response_to_Interrogatory_No._1".  Data were included if salary information was available.

**Exhibit A-3**

For the years shown A-List DJs have salaries that average $3,663 above unranked DJs; the difference is statistically significant at the .01 level.

A similar comparison can be done for cover charges at The Church, Vinyl, and Beta for performances of A-List DJs:

**Table 2: Average Cover Charges at The Church, Vinyl, and Beta**

| Year | Vinyl & Church Average A-List DJ Cover[1,2] | Vinyl & Church Average Unranked DJ Cover[1,2] | Beta Average A-List DJ Cover[3,4] | Beta Average Unranked DJ Cover[3,4] |
|---|---|---|---|---|
| 2006 | $15.21 | $14.01 | N/A | N/A |
| 2007 | $16.96 | $15.16 | N/A | N/A |
| 2008 | $15.77 | $15.19 | $20.32 | $14.53 |
| 2009 | $16.31 | $15.10 | $19.22 | $10.78 |
| 2010 | $16.89 | $16.47 | $17.50 | $13.47 |

[1] Data used to determine averages were provided in the files "Bouboulina_Sales" and "RMC_Holdings_Sales". Average cover price was determined by using ticket level data to determine total tickets sold and total revenue. Vinyl data included ticket and revenue data from Saturday nights only.  The Church data included ticket and revenue data from Thursday nights only.

[2] A t-test was performed to determine if the cover charge of an unranked DJ was less than the cover charge for an A-List DJ.  The test showed a statistically significant difference in the cover charge for an unranked DJ vs. a ranked DJ (t value of -4.27, Pr>(t) of <0.0001).

[3] Data used to determine averages were provided in the file "Beta's_response_to_Interrogatory_No._1".

[4] A t-test was performed to determine if the cover charge of an unranked DJ was less than the cover charge for an A-List DJ.  The test showed a statistically significant difference in the cover charge for an unranked DJ vs. a ranked DJ (t value of -9.96, Pr>(t) of <0.0001).

During the years before Beta opened, 2006-2007, Vinyl and The Church set a cover that was on average $1.20 (or 8.6%) higher in 2006 for A-List performances and $1.80 (or 11.9%) more in 2007.  Beta in 2009 and 2010 set cover prices that were on average $8.44 (78.3%) and $4.03 (29.9%) higher for A-List DJs, respectively.  These price differentials for all three nightclubs are evidence that A-List DJs are a distinct market for nightclub entertainment.  The

**Exhibit A-3**

notably high differentials for Beta are a first indication of Beta's capability to secure A-List DJs without competitive challenge.

In defining a product market for A-List DJs, it is necessary to consider DJ performances at different venues.  DJ performances tend to be at nightclubs (also referred to as "dance clubs"), but they perform also at concert halls such as the Fillmore and Ogden theaters, and amphitheaters such as Red Rocks.  These venues represent different markets; viewing a top DJ at a nightclub is a different entertainment experience than attending a concert by the same DJ at an amphitheater such as Red Rocks. Red Rocks, for example, consists of many rows of raised seats with no dance floor, whereas nightclubs provide extensive dance floors for smaller audiences—a significant difference for those who enjoy the dancing aspect of DJ performances.

Nightclubs like The Church, Vinyl, and Beta charge admission based on a "soft cover" charge; rarely is the advance purchase of a ticket required.  Cover charges facilitate spur of the moment participation, whereas performances at concert halls or amphitheaters generally require advance planning because tickets often must be purchased in advance of the event.  Concert tickets generally sell at prices higher than the average cover charges at nightclubs.  As shown above cover charges range in the $15 to $20 range.  Based on my independent analysis of concert ticket data, the average concert ticket price in Denver for the same period was over $30.

Nightclubs generally, and The Church, Vinyl, and Beta specifically, tend to limit admission to patrons 18 or 21 years of age and older, whereas festivals at amphitheaters and performances at concert halls such as the Ogden are normally open to all ages.  This is a significant factor in light of the targeted demographic for nightclubs, which are often meeting places for single adults.

Nightclubs tend to provide a more extensive selection of drink and food service than do concert halls or amphitheaters, and invest a great deal of time, money and effort in providing a much more sophisticated and elegant patron experience at their clubs than do concert halls and amphitheaters.  Critical differences include the number of and access to bars (The Church has nine bars located throughout the facility, such that patrons are rarely more than a few feet away—the Ogden has only two, and Red Rocks often requires a walk of 100 yards or more to the nearest alcohol vendor).  The quality and selection of drinks is dramatically different—while nightclubs generally provide full bars with knowledgeable bartenders capable of preparing almost any concoction, concert halls are normally limited to a few beer choices and simple mixed drinks, and often only beer is available at amphitheaters.

Nightclubs also provide VIP areas and bottle-only service to higher-paying clientele, often in lushly appointed private areas with couches and tables—a kind of experience wholly lacking in the experience at concert halls and amphitheaters.   Similarly, nightclubs often provide a high-end food offering such as the fresh sushi bar at The Church. Finally, the dance experience itself is normally far superior at nightclubs than at concert halls and amphitheaters because nightclubs allow circulation of traffic where patrons can get "up close and personal" with the celebrity DJs they have come to see, and are often characterized by permanent and very expensive installations of laser and LED lighting systems that are typically not available or installed at concert halls or amphitheaters.

Altogether, the experience of viewing a live performance by an A-list DJ in a nightclub is significantly different than viewing a performance by an unranked DJ or by the same DJ in a concert hall or amphitheater.  The second product market relevant to SOCO's antitrust claims is the market for:

> • *live performances by A-list DJs playing Electronic Dance Music at nightclubs.*

There are no reasonably substitutable services for live performances by A-list DJs playing Electronic Dance Music at nightclubs because substitution of non-live performances or live performances by other genres of music and/or lesser quality performers, or the substitution of a different venue with substantially different characteristics, would not support the prices paid for these artists nor the admission prices consumers pay for their performances. Beta admits to being a participant in this market.[55]

### D.  The Geographic Markets

The relevant geographic market for digital downloads of DRM-free, high fidelity Electronic Dance Music is global because digital downloads are possible anywhere that an internet connection exists.  Hence there is not a geographic restriction on this product market.

The relevant geographic market for live performances by A-list DJs playing Electronic Dance Music is the Denver metropolitan area because there is generally low cross-elasticity of demand by consumers between metropolitan areas for music entertainment.[56]  Survey data indicate that consumers travel less than 100 miles for entertainment.[57]  Advertising for nightclub performances is done locally.  Beta admits that it competes in this geographic market and only

---

[55] Defendant BMJ&J, LLC's Responses to Plaintiffs' First Set of Discovery Requests, June 27, 2011 p. 10.

[56] Clear Channel/Live Nation for example recognizes geographic market boundaries for live music in terms of radio and venue ownership.  Specifically, Clear Channel's 2001 10K Report details its radio and venue markets in the United States as metropolitan areas.  The 2008 10K Report as well details venue markets that are local.  Los Angeles is described as its second largest market and Denver is number eighteen.  These markets are local and have the geographic dimension of a metropolitan area.  In each market Clear Channel lists the number of radio stations and venues it owns.

[57] See National Household Travel Survey, Federal Highway Administration, U.S. Department of Transportation, Chapter 15, 2008, http://www.fhwa.dot.gov/policy/2008cpr/chap15.htm .

**Exhibit A-3**

advertises its nightclub performances in the Denver metro area.[58]  Similarly, SOCO's marketing and advertising efforts are limited to the Denver metro area.

### E.  Relevant Markets

Combining the relevant product market definition with the relevant geographic market definition completes the two part definition of the relevant markets.  The relevant markets of interest in this matter are:

- *global digital downloads of DRM-free, high fidelity Electronic Dance Music suitable for playing on high-performance sound systems;*

- *live performances by A-list DJs playing Electronic Dance Music at nightclubs in the Denver metro area.*

## V.  Market Shares

### A.  Digital Downloads Market

The trade literature shows that Beatport has at one time or continues to have competition in the digital download market, but competitors have very small market shares.  Beatport itself estimates that it has an 80% share of dance music downloads worldwide.[59]

A market share for Beatport can be constructed using the company's daily traffic rank analysis, showing the number of visitors to Beatport and competitor websites.  Beatport uses such counts to assess its competition.[60]  From web traffic charts, Beatport has the 4,763th most popular website on the internet and 0.00100% of internet traffic.  The ranking of competitor websites and percent of traffic, as identified by Beatport in its SWOT analysis are as follows:  Juno 21,953 (0.00029%) most popular, Traxsource 45,109 (0.00019%) most popular, Trackitdown 7,287,810

---

[58] Defendant BMJ&J, LLC's Responses to Plaintiffs' First Set of Discovery Requests, June 27, 2011 pp. 10-12.

[59] Greg Griffin, Tuned into the market track record of Denver entrepreneur, <u>Denver Post</u>, July 31, 2010, p. B5.

[60] See <u>Unlocking Our Competitors SWOT Analysis</u> BP220163.

(0.00000%) most popular, DJ Download 117,846 (0.00005%) most popular, Satellite Records 647,520 (0.00001%), What People Play 119,454 (0.00012%) and Stompy 1,008,152 (0.00000%).[61]   Using percents of traffic, Beatport has a 60% market share.   Beatport's SWOT analysis recognizes only Juno and Traxsource as "the only contenders" in Beatport's market.[62] When considering the web traffic percents of only Beatport, Juno, and Traxsource, Beatport has a 68% share of the market.   Beatport's own SWOT analysis suggests that, because Beatport's use of flash coding on its website, its web traffic ranking is likely significantly underestimated.[63]

Venga Digital, a British maker of digital dance music tracks reviewed 18 months of royalty receipts from 2008 through 2009, and in this way estimated the market share of Beatport. Their accounting records showed Beatport with 69.48% of Venga music downloads, iTunes 9.51%, DJDownload 8.74%, Juno 5.81%, Stompy 2.40%, and the rest of market about 4%.[64]

In a telephone conversation between Christou and Roulier, Roulier describes the market position of Beatport as follows:

> [DJs] call me about Beatport stuff . . . they want to shop with us, they want their labels on there, they want exclusive . . . they want free tracks . . . we have all the leverage in the world with these artists because Stereo Distribution, the #1 distributor in the world with these artists just went out of business . . . nobody buys CDs anymore . . . who's the first call we get from? Tiesto [the worlds #2 DJ]. Do you want worldwide exclusive?"[65]

---

[61] These counts from Alexa website  http://www.alexa.com/  last accessed on August 31, 2011.  Last three months figures used, ending August 31, 2011.

[62] *Ibid*.

[63] *Ibid.*

[64] See Dance music download stores market share, http://lockdon.blogspot.com/2010/01/dance-music-download-stores-market.html  last viewed August 19, 2011.

[65] Christou 17 (Exhibit E).

Similarly, many well recognized DJs and Agents have indicated that they consider Beatport to be the dominant provider in the digital downloads market.[66]

Hence I believe Beatport is the dominant seller in the digital downloads market with a 70%-80% market share.  It is perceived by many consumers to be the only source of music downloads, a view strengthened by the significant number of downloads exclusive to Beatport. Beatport perceives itself as being the dominant provider of dance music downloads in the relevant market.

**B. Live Performances by A-List DJs in the Denver Metro Area**

I use the annual DJ rankings compiled by <u>DJ Magazine</u> to define A-List DJs for a given year.  A rank-ordered list of the top-100 DJs for 2006, 2007, 2008, 2009 and 2010 derived from <u>DJ Magazine</u>'s rankings is attached as Table 5. Also shown for comparison are performances of the DJs ranked in the top-30 of DJ Magazine's list at The Church, Vinyl and Beta.  Performances by these DJ's in the Denver metro area are tabulated as follows.  The only nightclubs in the Denver metro area that feature A-list DJs are The Church, Vinyl and Beta.

**Table 3:  A-List DJs Performing in Denver Metro Area**

| Year | Church top 30 DJs | Vinyl top 30 DJs | Beta top 30 DJs | Total Top 30 | Church top 100 DJs | Vinyl top 100 DJs | Beta top 100 DJs | Total Top 100 |
|---|---|---|---|---|---|---|---|---|
| **2006** | 16 | 12 | 0 | 28 | 21 | 23 | 0 | 44 |
| **2007** | 7 | 11 | 0 | 18 | 19 | 19 | 0 | 38 |
| **2008** | 3 | 3 | 14 | 20 | 8 | 4 | 36 | 48 |
| **2009** | 2 | 1 | 15 | 18 | 2 | 1 | 33 | 36 |
| **2010** | 1 | 0 | 13 | 14 | 6 | 1 | 27 | 34 |

Market shares are calculated for these three venues. Regardless of how the numbers are presented, the trend is clear: following the opening of Beta, the market share of top-30 and top-

---

[66] *See, e.g.*, CHRISTOU-28 (DJ Rap, noting that Beatport is "the only electronic store that counts apart from iTunes . . . and they're the only ones that sell [electronic dance music]" and describing Beatport as a "monopoly"); CHRISTOU-58 (Agent David Brady noting that "there's nothing bigger than Beatport to get my products out there, I mean they're massive around the world").

**Exhibit A-3**

100 DJs at The Church and Vinyl dropped to approximately 10% while the market share of Beta rose to approximately 90%. Figure 1 graphs the progression of market shares since 2006.

### VI. The Acknowledged Market Power of Beatport and Beta

DJs and agents in the industry recognize the existence of Beatport's market power when they explain how they are coerced to perform at Beta to the exclusion of other nightclubs in the Denver metropolitan area. The testimony is powerful. Below I provide a sample of recorded conversations, in their native form, between Plaintiffs and DJ performers or their agents.

In a conversation between Regas Christou and Scott Fallwell, a nightclub talent promoter in Las Vegas, Mr. Fallwell states that they cannot partner with SOCO because of Beatport's control over DJs. Mr. Christou asks "How does Beatport have control over the DJs?" and Fallwell responds "He's [Roulier] leveraging, he's giving DJs additional exposure on the website.[67]  In a related exchange between Fallwell and Christou:

> *Christou*: I'm having trouble booking the A-listers.

> *Fallwell*: I'm telling you, that guy Brad's f***ing everything up, he's even making it difficult on people in other cities . . . he's got so much clout and so much power now because of goddamn Beatport it's crazy. The DJs support Beatport, it's crazy.

> *Christou:* What is the big deal here, Scott?

> *Fallwell*: The website is really powerful, because Beatport sells the MP3s to all of the up and coming DJs, and the up and coming DJs are the ones who play it in the clubs, and get popularity going for the songs, so consumers go to Beatport to buy the music, so it sells more records for the DJs, it increases the DJs popularity. It's a really powerful thing that he's built, and he did it really quickly, and he captured the market. He's got the loyalty of the booking agents, the managers, and the DJs.[68]

---

[67] *See* CHRISTOU-000012 (recorded phone call between Regas Christou and Scott Fallwell).

[68] Christou 40 (Exhibit L).

When Jonny Shuman, the talent agent for the Plaintiffs, tries to book Charissa Saverio (DJRap), Saverio responds by saying:

> My main concerns, obviously, is always going to be Beatport . . . that's the whole reason I'm sticking with Brad right now just because of the whole monopoly over the Beatport thing, you know, it's a problem, you know if we leave [Beta] there we get a lot of grief with Beatport, and we don't want to have that situation."[69]

In a follow-up conversation between Shuman and Saverio, Saverio tells Shuman:

> I can't afford to have the whole of Beatport think that I'm a sell out and not give me any support over this.  I mean, it's the only electronic store that counts, apart from iTunes.  And they're [Beatport] the only ones that sell house [electronic dance music]."[70]

In a call between Jonny Shuman and David Brady of Spin Booking Agency in Toronto, discussing SOCO's difficulty in booking A-List DJs signed with the Armada label, including Armin van Buuren, one of the label's owners and himself the #1 DJ in the world, the following exchange takes place:

> *Brady*:  the label [Armada] is a priority with Beatport, and making sure that artists are getting good profile, and getting their singles on Beatport. They've had 7 singles in the last few months be #1 on Beatport. Whichever way it cuts it, they do not want to jeopardize their relationship with Beatport . . .
>
> *Shuman*:  [van Buuren]'s gonna play at Brad's club when he comes?"
>
> *Brady*:  He's gonna play at Brad's club, and it's not about the money . . . he'd rather play your venue, but it's the situation with Beatport.
>
> *Shuman*:  I mean, what if I come back and offer you $35,000.
>
> *Brady*: "It's not about the money . . . I'm just telling you, it's not about the money, it's about the relationship they have with Beatport . . . they don't want to f**k it up . . . they're using their Beatport connections to make sure things happen, otherwise nobody would give a flying f**k here . . . but it's all to do with, the revenue they generate . . . we need Beatport whether we like it or not, I cannot work without that source to get my product out there, because there's

---

[69] *See* CHRISTOU-0000026 (recorded phone call between Jonny Shuman and Charissa Saverio p/k/a DJ Rap).

[70] *See* CHRISTOU-28 (recorded phone call between Jonny Shuman and Charissa Saverio p/k/a DJ Rap).

**Exhibit A-3**

nothing bigger than Beatport to get my products out there, I mean they're massive around the world."[71]

This testimony not only documents that market agents perceive Beatport to have enormous market power, but it also describes how this power is wielded through the tie-in between Beatport and Beta.

Proof of market power also exists through the prices Beta can sustain in competition against the Vinyl and The Church for dance audiences.  Table 4 shows that Beta collects cover charges that are significantly higher than that of The Church or Vinyl.  For the three years 2008 through 2010 the average premium is 32.9%. This is because Beta has essentially captured all of the market for A-List DJs.

**Table 4: A-List DJ Average Cover Charges at The Church, Vinyl, and Beta**

| Year | Vinyl[1] | Church[2] | Vinyl & Church Average | Beta[3] | Beta Premium[4] |
|------|----------|-----------|------------------------|---------|-----------------|
| 2006 | $17.09 | $11.93 | $15.21 | N/A | |
| 2007 | $18.73 | $14.62 | $16.96 | N/A | |
| 2008 | $15.49 | $16.33 | $15.77 | $20.32 | +28.9% |
| 2009 | $16.31 | $10.90 | $12.59 | $19.22 | +52.6% |
| 2010 | $16.89 | $14.04 | $14.95 | $17.50 | +17.1% |

[1]Vinyl data includes only A-List DJs on Saturday nights.
[2]The Church data between 2006 and 2008 included only A-List DJs on Thursday nights. The Church data in 2009 and 2010 included Friday night data for ranked DJs.  There were no ranked DJs playing on Thursday nights at the Church in these years.
[3]It appears that Beta has significantly understated its average cover charge based on data produced in discovery by Beta which, for example, recorded only 70 ticket sales for its 12/20/08 Tiesto show (then the DJ Magazine #2 DJ in the world).  Reports suggest that more than 1,000 people attended the show, and that the highest cover charges were $60 in advance and $70 at the door.  Similar patterns of underreporting such high-dollar value cash sales at Beta suggest that Beta's average cover charge was actually far higher than reported herein.
[4]Beta Premium compares Beta cover charges to the average of Church and Vinyl cover charges in same year.
***Additionally, this cover charge trend holds up when analyzing only DJ Magazine Top-30 DJs, where Beta's cover charges average 24.8% higher than The Church and Vinyl over the entire period March 2008 through December 2010.

---

[71] *See* CHRISTOU-58 (recorded phone call quoting David Brady).

In summary, the market shares held by Beatport and Beta in the relevant markets, the accounts given by market participants with respect to the combined power held by the two companies in their respective markets, and the fact that relatively high prices are sustained by Beatport for its downloads and by Beta for its cover charges, point to the presence of monopoly power in the market and suggest the existence of anticompetitive conduct in the markets.

## VII. Anticompetitive Conduct of Defendants

Roulier said in a March 14, 2008 interview with the Denver Post, "[w]ith [Beta's] relationship with Beatport we think most of the DJs will want to play for us."[72]  In an exchange of email between Brad Roulier and Brad Owen at Windish Agency, who represents several A-List DJs, Roulier offers to help with Beatport promotion of Windish artists. Upon receiving the offer Owen writes back that "the Beatport tie-in is great for quite a few of our clients."[73]  There is an extensive list of email communications in this case where Defendants Beatport and Beta make it clear to DJs and agencies that they will receive better treatment at Beatport if they perform at Beta.[74]  This section of my report begins to document the fact that exclusive performances at Beta are tied to Beatport access and support.  Because of the tie, artists are coerced to perform only at Beta in the Denver metro area.

Since approximately January 2008, near the March 2008 opening of Beta, SOCO made extensive and repeated efforts to book performances by A-list DJs, many of whom had played at

---

[72] Kathleen St. John, aiming to be continent's alpha club, Beta charts a new course for LoDo Clubs, denverpost.com, March 14, 2008.

[73] BP155741 dated July 15, 2008.

[74] See, e.g., BP-157525 (email from Brad Roulier to Paul Morris, owner of AM Only) ("DJs are going to want to play for me . . . we can get behind them and promote them using our tremendous resources that we have developed [referring to Beatport]); BP-132812 (email from Donnie Estopinal, partner in Beta, to agent Joel Zimmerman) ("Beta's new recurring Friday night event called "Noise" and adds that they "hope to have a 'Noise' featured artist page on Beatport.com so that might be a little bonus for the people that play for us"); BP-156095 (Email from AM Only agent Alex Chaykin to Brad Roulier) ("I have a large roster and really want to align with your guys with the whole Beatport connection").

SOCO's venues on multiple prior occasions. However, due to the market control of digital downloads through Beatport, and Roulier's promises of support if DJs played at Beta and threats of no support if DJs play at a SOCO club, Plaintiffs have been unable to book more than a handful of A-list DJs, and have suffered economic damages as a result. DJ promoters in the industry have told Plaintiffs this is the reason for their unwillingness to book with SOCO.

### A.  Examples of Tying and Coercion

Specific cases that tie DJs/artists to Beatport and Beta at the exclusion of The Church and Vinyl include the following.

### Tiesto

The link between a DJs business relationships with Beatport and performances at Beta is exhibited in an exclusive agreement between AM Only's top DJ, Tiesto, and Beatport. Beatport signed a key deal with Tiesto that gave him $100k/year guaranteed revenue plus several hundred thousand dollars more as a percentage of mix sales in exchange for exclusive releases.[75] From all appearances, however, the agreement requires more of Tiesto. Prior to the opening of Beta, Tiesto performed annually at either The Church or Vinyl. Since the opening of Beta, Tiesto has not performed at either The Church or Vinyl despite offers from the Plaintiffs to book Tiesto.

### Charissa Saverio (DJ Rap)

In late 2008, The Church was negotiating a "residency," or long-term contract for multiple future performances with Charissa Saverio ("DJ Rap"), who had a large and devoted following in the Denver metro area. However just before formalizing the agreement with DJ Rap, Roulier told her that she would be required to play at Beta and to not play at The Church if

---

[75] BP 215106 – Guaranteed payments to Tiesto plus percentage of profits on certain sales in exchange for exclusives and Tiesto promoting Beatport.  See also BP 215078, BP 215066, BP 215026 – Tiesto/Beatport deal email.

**Exhibit A-3**

she wanted continued access and label support on Beatport.[76]  Roulier communicated directly to DJ Rap's booking agency, Bullit Booking, via email that he would retaliate against DJ Rap if she played at SOCO clubs.[77]  Mr. Roulier then emailed his partner, Jerry Murdock, who has ownership interest in both Beta and Beatport, to complain about DJ Rap's plans to play for SOCO.[78]  After this email, DJ Rap confirms that Mr. Murdock called her and told her that Mr. Roulier intended to pull her recordings off Beatport.[79]  Mr. Roulier then decided to unilaterally begin advertising that DJ Rap would be performing at Beta, rather than at SOCO's club, without informing or asking permission from DJ Rap or her agent, Ryan Saltzman.[80]  When Mr. Saltzman emailed Mr. Roulier to inquire what was happening, he explained to Mr. Roulier that DJ Rap had been offered $5500 plus hotel to perform for SOCO, and asked if Roulier could match that offer.[81]  Mr. Roulier responded "[n]o way call me."[82]

---

[76] Christou 28 (Exhibit I): Call between Jonny Shuman and Charissa Saverio (DJRap):

> *Saverio*: I can't tell you the emails I've seen, I can't send this stuff to you because I'm just going to get in so much trouble that it's not worth it . . . if it was just a matter of a gig, I could say fine, if it wasn't a threat to my label . . . if you understood the tactics that are being used . . . believe me, I'd prefer to play where I've been playing [The Church] because I get treated better . . . and you're going to find every DJ who has a label is going to have the same problem.
>
> *Shuman*: Did they say they were going to take you off Beatport?"
>
> *Saverio*: I can't say any more, because I'm going to get into trouble if I say this stuff . . . It's not worth the grief I'm going to cause my label . . . I can't afford to have the whole of Beatport think that I'm a sell out and not give me any support over this. I mean, it's the only electronic store that counts, apart from iTunes. And they're the only ones that sell house [electronic dance music].

[77] BP 156127-- 6/27/08 email from Roulier to Rap. Also BP 156254– Email from Brad to Joe Sigmund at Bullitt (Rap's agency) discussing her potential performance at The Church "if so she will never ever ever play for me . . . ."

[78] BP-156180 – 6/27/08 email from Roulier to J. Murdock.

[79] BP-012897 – 12/15/10 email from DJ rap to Roulier noting "Jerry [Murdock] called me and told me you were livid and wanted to pull my labels [off Beatport] . . . I hope Beatport understands that I am appreciative of all the support."

[80] BP-155646.

[81] *Ibid*.

**Exhibit A-3**

DJ Rap expressed to SOCO's talent buyer that she would much rather perform at The Church because she was treated better by SOCO's management, but because DJ Rap could not risk the financially damaging retribution threatened by Roulier and Beatport she canceled her performance at Vinyl, performing instead at Beta on August 2, 2008.[83]

### Joel Zimmerman (DJ Deadmau5)

In another instance, Mr. Christou and SOCO's talent buyer attempted to book Joel Zimmerman ("DJ Deadmau5"), an A-list DJ, to play at Vinyl following the DJ's performance earlier that day at Red Rocks. SOCO's talent buyer offered $15,000 for Deadmau5 to perform for two hours at Vinyl, more than double the market rate for such a performance at the time. DeadMau5 expressed interest in the offer, but after conferring with his agent stated that he could not accept out of fear of angering Mr. Roulier.

### Sharam

In the spring and summer of 2009, Sharam's agent Narguess Farahi was concluding negotiations with SOCO's talent buyer Jonny Shuman to arrange a performance by Sharam at Vinyl on September 5, 2009.[84]   Shuman and Farahi agreed to hold the September 5, 2009 date for Sharam's performance.[85]   When Roulier became aware of this, he told Sharam on a phone call that if he played Vinyl there would be no more favors on Beatport.[86]   After this call, Sharam

---

[82] *Ibid.*

[83] CHRISTOU-28.

[84] CHRISTOU-7428.

[85] CHRISTOU-012064 – May 13, 2009 email from Farahi to Shuman "Per our last conversation I have September 5th on hold for you."

[86] CHRISTOU-12753: Internet chat conversation between April Chase (SOCO employee) and Thomas Havens (then Beatport employee) where Havens said that he overheard Brad complaining to Beatport's label manager Clark Warner that he was upset Sharam was scheduled to play at Vinyl, and that he told Sharam that if he plays at Vinyl he will never again get favors on Beatport.

cancelled his Vinyl performance and played at Beta instead on September 3, 2009.[87]

Immediately after this cancellation, Sharam and Roulier emailed discussing the added support

Sharam's new album launch would receive on Beatport, specifically confirming with Mr. Roulier

that his album launch would receive "adequate front page support," and inquiring about the

status of a planned remix contest using one of his label artists.[88]

**BT**

BT was contracted to play at a SOCO venue in September 2008, but on July 7, 2008 BT's

agent Alex Chaykin from AM Only notified SOCO that BT had to cancel the performance due to

conflict with his "family schedule."[89]  Shortly thereafter, Mr. Roulier helped expedite the

handling of a problem BT was having with his sales on Beatport.[90]  BT then performed at Beta

just a few weeks later than originally scheduled to perform for SOCO.  When Jonny Shuman,

SOCO's talent buyer inquired with BT's agent Alex Chaykin about the justification for this

cancellation when BT then played at Beta, Mr. Chaykin responded that the cancellation was less

about the family schedule and in fact was because BT "has a long relationship with Brad that

goes into the whole BEATPORT area."[91]

**Other Artists**

In addition to these specific cases, Roulier implicitly raises the connection between good

treatment from Beatport and playing at Beta to a number of other DJs.   A tie-in between

---

[87] C-7551, 7579, 7608, 8985, 9006, 12064, 12315, 13249, 2559 – Booking emails showing plans to book Sharam at Vinyl for 9/5/09. C- 13330 – Narguess cancels 9/5/09 Sharam date.

[88] BP-155842.

[89] C-2189, 2285, 2308, 2318, 2319 – BT booking for 8/28/08 at SOCO, including confirmation and contract from AM Only.  C-2384 – Alex Chaykin cancels BT show because of "family schedule."

[90] BP-154601 – August 19, 2008 email chain between BT, Clark Warner, Brad Roulier.

[91] CHRISTOU-003130 – August 1, 2009 email chain between J. Shuman and A. Chaykin.

Beatport and Beta is suggested to MSTRKRFT,[92] Sasha,[93] Gabriel,[94] Infected Mushroom,[95] Dirty South,[96] Matt Darey,[97] Bob Sinclair,[98] Felix da Housecat,[99] Mark Knight,[100] Crystal Method,[101] Kyau & Albert,[102] Brett Johnson,[103] and Paul van Dyk.[104]

AM Only, a talent agency representing many of the world's A-List DJs, is an active participant in the coercion of DJs to play at Beta.  Paul Morris and his agency AM Only clearly have a motivation to book with Roulier and Beta.  Morris wants his DJs to receive optimal placement and promotion on Beatport because this improves their sales, profile, and resulting live performance booking fees, and he wants to make sure that his DJs are selected to perform at the various high-profile events Beatport puts on each year—events that are key in the industry and establish upcoming trends such as the annual WMC Beatport Pool Party in Miami, the various Beatport Tours and other festivals sponsored by Beatport (including several of the large annual festivals in the Denver area), the Beatport Las Vegas Pool Part series, etc.   AM Only

---

[92] BP157525.

[93] BP 155732, BP156090, BP156197, BP 156811, and BP215069.

[94] BP 159208.

[95] BP 154662.

[96] BP157144.

[97] BP156311.

[98] BP157135.

[99] BP159033.

[100] BP155212.

[101] BP148674.

[102] BP154567.

[103] BP155428.

[104] BP157150 and BP157389.

knowingly participates in Beta's, Beatport's and Mr. Roulier's tying and monopolization

practices.

   AM Only participates by communicating to DJs, agents, and labels, that Beatport would

punish DJs if they played at SOCO's clubs, and by refusing to pass offers for performances from

SOCO's personnel to A-list DJs represented by AM Only or to provide SOCO personnel dates

when it's a-List DJs are available to perform.[105] In an email exchange dated January 15, 2008, in

which AM Only is negotiating with Roulier over prices and DJs who will play at Beta, Paul

Morris writes with respect to scheduling MSTRKRFT "that I have cancelled the show at the

Church and pulled all business from them so I need this date."[106]  Later in June of 2008, AM

Only presents Roulier with a roster of DJs who can play at Beta.  AM Only writes to Roulier that

we "want to align with you guys with the whole Beatport connection."[107]

   AM Only also told SOCO's talent buyer that he would provide a list of DJs that SOCO

did not have access to, confirming Defendants' efforts to set up a two-tiered system where only

Beta could book A-list DJs.[108] SOCO would be limited to booking AM Only's B-list DJs. This

arrangement would not allow SOCO to effectively compete with Beta. In addition, on at least

---

[105] CHRISTOU-23. In a telephone conversation between SOCO's talent buyer and Alex Chaykin, an agent at AM Only, Mr. Chaykin suggested that the president of AM Only instructed him not to permit SOCO to book its top DJs. Also during this conversation, Mr. Chaykin implied that because of Beatport's influence over DJs and Beatport's connection to Beta, AM Only was to reserve its top DJs for performance at Beta, and that it was only permitted to book second-tier DJs at SOCO's venues. In another conversation between SOCO's talent buyer and Alex Chaykin of AM Only, when pressed as to why AM Only would not let SOCO book A-list DJs, Mr. Chaykin stated that it "has a lot to do with [AM Only's top] artists and their relationship with Brad [Roulier] and Beatport."

[106] BP157525.

[107] BP156095 email dated June 4, 2008.

[108] CHRISTOU-34 (Recorded phone call between J. Shuman and AM Only agent Matt Rodriguez where Shuman states "you can tell me who we won't be able to get because of whatever shit [referring to conspiracy among Defendants]," to which Mr. Rodriguez responds "exactly, exactly."

two occasions, DJs who had agreed to perform at SOCO's venues cancelled scheduled performances shortly after changing their management representation to AM Only.[109]

More recently, Mr. Christou partnered with a second talent buyer operating out of Arizona in an effort to book A-list DJs at SOCO's clubs. AM Only informed this second talent buyer that its A-list DJs were available to play at the buyer's clubs in Phoenix, Arizona, but that these same DJs were not available on the same dates to play in Denver at SOCO's venues. It appears AM Only brokered this arrangement, and was motivated by its financial interest in currying favor with Beatport in order to enhance the promotion and access provided by Beatport to DJs represented by AM Only.

## VII. Harm to Plaintiffs

The most important DJ dance night at Vinyl is Saturday and the most important night at The Church is Thursday. Before the opening of Beta, Thursdays at The Church hosted A-list DJs; Saturdays at the Vinyl featured A-list DJs. Both clubs are open for business on Thursday, Friday and Saturday. Revenues (combined door charges and bar receipts) for The Church and Vinyl remained steady month-to-month in 2006. Vinyl averaged about $41,500 in Saturday revenues and The Church averaged about $20,500 in Thursday revenues. In 2007 the averages were respectively $40,000 and $20,800, and the first two months of 2008 they were $38,100 and $21,200. These revenue numbers began to fall dramatically after Beta opened on March 4, 2008. Figure 2 graphs this change in revenues from 2006 to 2010.

---

[109] Mr. Christou and SOCO's talent buyer identified dates when Beta had already announced its performance lineup, next identified A-list DJs that had not yet committed to other venues on those same dates, and then attempted to book these DJs to play at SOCO's venues. Again, SOCO's efforts were rebuffed, demonstrating Defendants' intent to not only prevent SOCO from booking top DJs that Beta hoped to book, but also Defendants' intent to prevent SOCO from booking any top DJ that would allow SOCO to effectively compete with Beta in the local market for live performances by A-list DJs (information provided through Plaintiffs' attorney).

**Exhibit A-3**

For the remainder of 2008 the revenues decreased as Vinyl and The Church began to have trouble booking top DJs.  Saturday and Thursday averages for March-December 2008 fell to $29,300 at Vinyl and $17,100 at The Church. As the effects of this anticompetitive behavior spread, and as patrons no longer viewed Vinyl and The Church as places to see the world's top DJs, the numbers grew worse in 2009 ($19,500/Saturday at Vinyl and $6,200/Thursday at The Church) and 2010 ($22,600 /Saturday at the Vinyl and $2,200/Thursday at The Church). This represents a drop of almost $20,000 per Thursday and Saturday night over a three year period (March, 2008 to present), representing a significant market impact of several million dollars.

The cause of this fall in revenue is explained in Figure 3.  Plaintiffs were not able to book A-List DJs to perform at their nightclubs, while Beta has grown dramatically in top DJ bookings. In 2010 Beta had more than three times the top bookings than Vinyl and The Church combined. Bookings at Vinyl and The Church have fallen by more than 75% between 2007 and 2010, with the beginning of this decline coinciding almost exactly with the opening of Beta.

These declines cannot be attributed to poor economic times and/or poor management at The Church and Vinyl.  Figures 4 and 5 compare Thursday, Friday, and Saturday night revenues at these nightclubs.  On the other nights of the week—Friday and Saturday at The Church and Thursday and Friday at the Vinyl, the musical format focuses on commercial pre-recorded dance music and other music formats such as "Latin Night."  On all nights of the week where the format is not focused on performances of A-list DJs, revenues at both nightclubs are steady or increasing.  For the nights that market and focus on performances by A-List DJs, revenues are declining.  In both figures the significant decline begins in 2008.

With regard to the decline in operations at The Church and Vinyl a customer writes the following:

**Exhibit A-3**

For the past 6 or so years I've been a patron of your fine establishments. I do not work in the industry, but I do like to have a good time . . . preferably at The Church and Vinyl. I'm concerned my good times may be nearing an end at The Church. The reason I say this is because from my observations the upcoming talent booked for The Church and Vinyl looks marginal in respect to the electronica genre. I'm doubtful I'm the only one of your loyal customers making this disappointing observation.[110]

## VIII. <u>Barriers to Entry</u>

The same factors that are diminishing the business of The Church and Vinyl are barriers to entry for a new nightclub seeking to offer the music of A-List DJs in the Denver metro area. If the nightclub cannot book quality DJ talent, it cannot successfully compete.  The declining revenues of the Plaintiffs are proof.  At the same time, Beta is in a position to grow its market share, given its ties to Beatport.   The cost of outfitting and opening a dance club with sufficient capacity to support hiring A-List DJs is a significant barrier to entry in this market.[111]

Beatport's core customers are electronic dance music DJs.[112]  It has created and nurtured a loyal DJ customer base by providing them with high fidelity downloads of electronic dance music that are not available elsewhere and promoting DJs as artists.  This loyal customer base is a barrier to entry to any new provider of electronic music with similar genres.  Beatport was first to recognize this market for DJs.[113]  Economic theory teaches that firms first in a market carry a significant competitive advantage because of reputation, customer loyalty, and cost advantages

---

[110] Christou-138 email from Dusty Beardall dated April 29, 2008.

[111] In BP157525 Roulier complains that he cannot "overpay" DJs because Beta cost more than $3 million to build.

[112] Ibizavoice.com, Beatport Turns 5:  Inside the Mind of Jonas Tempel, CEO, http://www.ibiza-voice.com/story/news/1613 downloaded August 18, 2011.

[113] Beatport. To-Go. In the Hot Seat: Beatport CEO Jonas Tempel, January 28, 2009.  Also The Visionaries, <u>Billboard</u>, June 28, 2008, The Visionaries, pp. 16-20.

that come from learning-by-doing.[114]  Since the creation of Beatport there has been no

significant entry in its market.

## IX. <u>Conclusions: Harm to the Markets</u>

It is my opinion that Beatport sells music downloads in a market for which the

company holds substantial market share.  I define the market as *digital downloads of DRM-free,*

*high fidelity Electronic Dance Music suitable for playing on high-performance sound systems.*

Beatport has a 70 to 80% share of this market, which give Beatport market power.  The

prominent owner of Beatport, Bradley Roulier has used the market power held by Beatport to

coerce and tie A-List DJs to perform only at the Beta nightclub, a venue owned by Roulier. As a

result of these anticompetitive practices, Beta has a 90% share of *live performances by A-list DJs*

*playing Electronic Dance Music at nightclubs in the Denver metro area.*  Beta has monopoly

power in this market, and has used this monopoly power to raise prices to the final consumer.

Tying the services of Beatport to performing at Beta has damaged the A-List DJ market.

For final consumers who attended performances in the relevant market, there were fewer

performances and higher prices.  During the years 2006-2007 at The Church and Vinyl there

were 46 top-30 DJ's performing and 82 top-100 performing (Table 3).  Cover prices averaged

$16.09 (Table 4).  For the years 2009-2010, the number of top-30 artists was 32 and there were

70 top 100 artists (Table 3).  Cover prices increased on average to $18.36.  Thus the number of

top-100 DJs fell by about 15% and prices increased by 14% for the period 2009-2010, resulting

in lower selection and higher prices for final consumers in the market.[115]

DJs have been harmed by the anticompetitive actions of the Defendants.  From Table 1

the average performance salaries can be calculated across years.  For the years 2006-2007 the

---

[114] See for example Michael E. Porter, Competitive Advantage, Chapter 5.
[115] If average cover charges for Beta are calculated for the period 2008-2010, the price increase to the final consumer
is 18%.

**Exhibit A-3**

average is $8,452.36.  For the years 2009-2010 nightly salaries are $8,195.96, down 3.0% from the earlier years.  If just the year 2010 is considered DJ salaries average $6,872.74, down 18.7% from the two years 2006-2007.  Hence since the entry of Beta, cover prices have increased, there are fewer DJ performances, and the amount paid to DJs has fallen.

The nightclubs The Church and Vinyl owned by the Plaintiff Regis Christou have been damaged.  Saturday revenues at the Vinyl have fallen by more than 50% after 2008.  Thursday revenues at The Church have fallen by about 75%.  These declines are not the result of a recession, poor management, or a comparatively weaker venue than Beta, because Friday and Saturday revenues at The Church are increasing and Thursday and Friday revenues at Vinyl are either holding steady or increasing.  Combined revenues at Vinyl for these nights are increasing.

**Exhibit A-3**

The foregoing constitutes my economic report in this matter.

Dated:   August 31, 2011

_____*/s/ Owen R. Phillips*_____

Owen R. Phillips, Ph.D.

**Exhibit A-3**





**Figure 1: Top 30 and top 100 market shares of A-List Djs for The Church, Vinyl, and Beta during years 2006 (1), 2007 (2), 2008 (3), 2009 (4) and 2010 (5).**

**Exhibit A-3**



**Figure 2: Church & Vinyl Revenues per night, derived from POS records**
**(Note: Beta opened March, 2008)**

**Exhibit A-3**



**Figure 3: Top-DJ Market Share in Denver, derived from business records produced by the parties.**

**Exhibit A-3**



**Figure 4:  Church Revenues For Thursday (A List DJ Performances) Compared to Friday and Saturday Revenues**



**Figure 5:  Vinyl Revenues For Saturday ( A List DJ Performances) Compared to Thursday And Friday Revenues**

**Exhibit A-3**

**Table 5:  Top 100 DJs Per djmag.com**

| Rank | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|
| 1 | Armin van Buuren | Armin van Buuren | Armin van Buren | Armin van Buuren | Paul van Dyk |
| 2 | Davud Guetta | Tiesto | Tiesto | Tiesto | Armin van Buuren |
| 3 | Tiesto | David Guetta | Paul van Dyk | John Digweed | Tiesto |
| 4 | Deadmau5 | Above & Beyond | Above & Beyond | Paul van Dyk | Christopher Lawrence |
| 5 | Above & Beyond | Paul van Dyk | David Guetta | Sasha | DJ Dan |
| 6 | Paul van Dyke | Deadmau5 | Ferry Corsten | Above & Beyond | Ferry Corsten |
| 7 | Gareth Emery | Ferry Corsten | Sasha | Carl Cox | Sasha |
| 8 | Markus Schulz | Markus Schulz | Markus Schultz | Ferry Corsten | John Digweed |
| 9 | Ferry Corsten | Gareth Emery | John Digweed | Infected Mushroom | Above & Beyond |
| 10 | Axwell | Sander Van Doorn | Infected Mushroom | David Guetta | Deep Dish (Sharam) |
| 11 | ATB | ATB | Deadmau5 | Deep Dish (Sharam) | Carl Cox |
| 12 | Sander Van Doorn | Infected Mushroom | Carl Cox | Paul Oakenfold | Infected Mushroom |
| 13 | Dash Berlin | Sasha | Sander van Doorn | Markus Schultz | ATB |
| 14 | Infected Mushroom | Axwell | Paul Oakenfold | Hernan Cattaneo | Paul Oakenfold |
| 15 | Steve Angello | Andy Moor | Richie Hawtin | Sander van Doorn | Hernan Cattaneo |
| 16 | Sebastian Ingrosso | Bobina | Hernan Cattaneo | Eddie Halliwell | Judge Jules |
| 17 | Laidback Luke | John Digweed | James Zabiela | James Zabiella | Eddie Halliwell |
| 18 | Judge Jules | Carl Cox | Andy Moor | Astrix | Marco V |
| 19 | Afrojack | Cosmic Gate | Eddie Halliwell | Richie Hawtin | Markus Schulz |
| 20 | Aly & Fila | Steve Angello | Axwell | Marco V | Gabriel & Dresden |
| 21 | Fedde le Grand | Roger Shah | Eric Prydz | Judge Jules | James Zabiela |
| 22 | Carl Cox | Aly & Fila | Kyau & Albert | Fedde le Grand | John Acquaviva |
| 23 | Swedish House Mafia | Paul Oakenfold | Gareth Emery | Gabriel & Dresden | Flash Brothers |
| 24 | Cosmic Gate | John O'Callaghan | Sven Vath | Erick Morillo | Amadeus |
| 25 | Bobina | Sebastian Ingrosso | ATB | Roger Sanchez | Erick Morillo |
| 26 | Benny Benassi | Benny Benassi | Anderson Noise | ATB | Benny Benassi |
| 27 | Sasha | Laidback Luke | Joachim Garraud | Sven Vath | Sander Kleinenberg |
| 28 | Simon Patterson | Richie Hawtin | Bobina | DJ Yahel | DJ Yahel |
| 29 | John Digweed | Fedde le Grand | Fedde le Grand | Umek | Offer Nissim |
| 30 | Eric Prydz | DJ Feel | Dubfire | Andy Moore | Andy Moor |
| 31 | Richie Hawtin | Lange | Aly & Fila | Gareth Emery | David Guetta |
| 32 | Andy Moor | Hernan Cattaneao | Judge Jules | BennyBenassi | Sander van Doorn |
| 33 | John O'Callaghan | Daft Punk | Umek | Axwell | Richie Hawtin |
| 34 | Roger Shah | Eric Prydz | Matt Darey | Mauro Picotto | Gareth Emery |
| 35 | Kaskade | Bob Sinclar | Rickey Stone | Sander Kleinenberg | Phil Kieran |
| 36 | Headhunterz | Joachim Garraud | Ricardo Villalobos | Eric Prydz | Nick Warren |
| 37 | Chuckie | Kyau & Albert | Lange | Blank & Jones | DJ Skazi |
| 38 | Bob Sinclar | James Zabiela | Daft Punk | Bad Boy Bill | Steve Lawler |

**Exhibit A-3**

Table 5
continued

| | | | | | |
|---|---|---|---|---|---|
| 39 | Avicii | Umek | Benny Benassi | Pete Tong | D-Formation |
| 40 | Kyau & Albert | Christopher Lawrence | Bob Sinclair | DJ Vibe | Ricky Stone |
| 41 | DJ Feel | Eddie Halliwell | Deep Dish (Sharam) | Tiga | Astrix |
| 42 | Moonbeam | Simon Patterson | Mark Knight | Steve Lawler | Roger Sanchez |
| 43 | Joachim Garraud | Offer Nissim | Astrix | Danny Tenaglia | Bad Boy Bill |
| 44 | Daft Punk | Judge Jules | Marco V | Ronski Speed | Sven Vath |
| 45 | Lange | Sean Tyas | The Thrillseekers | Nic Fanciulli | Thrillseekers |
| 46 | Sean Tyas | Dufire | Laidback Luke | Steve Angello | Donald Glaude |
| 47 | Eddie Halliwell | Martin Solveig | Danny Tenaglia | Nick Warren | DJ Vibe |
| 48 | Erick Morillo | Sven Vath | Menno de Jong | Matt Hardwiick | Kyau & Albert |
| 49 | James Zabiela | Richard Durand | Marco Lenzi | Ricardo Villalobos | Chris Liebing |
| 50 | Umek | Marco V | Andy C | James Holden | Tiga |
| 51 | Paul Oakenfold | Kaskade | Offer Nissim | Mark Knight | Matt Darey |
| 52 | Matt Darey | tyDi | Martin Solveig | Thrillseekers | Bob Sinclair |
| 53 | Mark Knight | Erick Morillo | Adam Sheridan | Marco Bailey | James Holden |
| 54 | Richard Durand | Matt Darey | Sean Tyas | Anderson Noise | Lange |
| 55 | Martin Solveig | Astrix | DJ Feel | Lange | Wrecked Machines |
| 56 | tyDi | Menno de Jong | Yahel | Offer Nissim | Dion Mavath |
| 57 | Hernan Cattaneo | Thrillseekers | Roger Sanchez | Kyau & Albert | Pete Tong |
| 58 | Sven Vath | Nick Warren | DJ Shah | Justice | Danny Tenaglia |
| 59 | Astrix | Dirty South | Sander Kleinenberg | Matt Darey | George Acosta |
| 60 | Super8 & Tab | Roger Sanchez | John O'Callaghan | Timo Maas | Blank & Jones |
| 61 | Andy C | Mark Knight | Blank & Jones | Danny Howells | DJ Sammy |
| 62 | Myon & Shane 54 | Wally Lopez | Cosmic Gate | Meno de Jong | Joachim Garraud |
| 63 | Marcel Woods | Leon Bolier | Steve Angello | Bob Sinclair | Timo Maas |
| 64 | Roger Sanchez | Blank & Jones | Simon Patterson | John Acquaviva | Matt Hardwick |
| 65 | Wally Lopez | Justice | Gabriel & Dresden | Agnelli & Nelson | Frank Trax |
| 66 | Mat Zo | Laurent Wolf | Richard Durand | Fatboy Slim | Steve Angello |
| 67 | Marco V | Astral Projection | Laurent Wolf | Andy C | Danny Howells |
| 68 | Leon Bolier | Boyz Noize | Matt Hardwick | Ricky Stone | Simon Posford |
| 69 | Ronski Speed | Ronski Speed | Chris Leibnig | Donald Glaude | John Graham |
| 70 | Wolfgang Gartner | Sander Kleinenberg | Erick Morillo | Deysn Masiello | Deysn Masiello |
| 71 | W&W | Ricardo Villalobos | DJ Hype | Daft Punk | Mauro Picotto |
| 72 | Boyz Noise | Chuckie | Signum | Martin Solveig | Menno de Jong |
| 73 | D-Block & S-TE-FAN | Sharam | Justice | BT | BT |
| 74 | Dubfire | Marcel Woods | Dirty South | Chris Liebing | Scott K |
| 75 | Dirty South | Lisa Lashes | Wally Lopez | Valentino Kanzyani | Tall Paul |
| 76 | John B | Moonbeam | Magda | Trentenmoller | MIKE Push |
| 77 | Daniel Kandi | Rank 1 | Lisa Lashes | Jeff Mills | Filo & Perl |
| 78 | Arty | Sebastien Leger | Pete Tong | John Graham | DJ Tarkan |

**Exhibit A-3**

Table 5
continued

| | | | | | |
|---|---|---|---|---|---|
| 79 | BT | Marcus Schossow | DJ Vibe | Robbie Rivera | Anderson Noise |
| 80 | Boy George | Steve Lawler | Bad Boy Bill | The Chemical Brothers | Fatboy Slim |
| 81 | Pete the Zouk | Skazi | Tiddy | Luciano | Serge Devant |
| 82 | Fatboy Slim | Super8 & Tab | Greg Downey | Hype | Umek |
| 83 | Skazi | Pete Tong | Marcel Woods | Lisa Lashes | Victor Calderone |
| 84 | Paul Kalkbrenner | Tocadisco | Nick Warren | Filo & Peri | Darude |
| 85 | Pete Tong | Sied van Riel | Solar System | Lee Burridge | Fergie |
| 86 | Bloody Beetroots | Tiga | Skazi | Armand van Helden | Talla 2 XLC |
| 87 | Arnej | Daniel Kandi | Mike Koglin | Magda | Ronski Speed |
| 88 | Joris Voorn | Mike Koglin | Mauro Picotto | Dave Seaman | Lee Burridge |
| 89 | Dada Life | Luciano | Sebastien Leger | Victor Calderone | Mario Piu |
| 90 | Noisecontrollers | DJ Yahel | The Chemical Brothers | Dave Clarke | Axel Karakasis |
| 91 | Showtek | Myon & Shane 54 | Steve Lawler | Richard Durand | Steve Porter |
| 92 | Laurent Wolf | John B | Fatboy Slim | Westbam | Yoji Biomenhanika |
| 93 | Claudia Cazacu | Simon Posford | Solarstone | Sebastien Leger | Axwell |
| 94 | Calvin Harris | Fatboy Slim | Astral Projection | Chus & Ceballos | Stanton Warriors |
| 95 | Luciano | Robbie Rivera | Leon Boiler | Wally Lopez | Dave Seaman |
| 96 | Marcus Schossow | Antoine Clamaran | Nic Fanciulli | Booka Shade | Robbie Rivera |
| 97 | Sied van Riel | Nic Fanciulli | Ronski Speed | Adam Beyer | Andy C |
| 98 | The Thrillseekers | Bui Boratto | Tocadisco | Dirty South | Agnelli & Nelson |
| 99 | Justice | Alex MORPH | Booka Shade | Erol Alkan | Lisa Lashes |
| 100 | DJ Vibe | Andy C | Alex Morph & Woody van Eyden | Laurent Garnier | Dave Clarke |

**Exhibit A-3**

**Exhibit 1**
**Document Log**

**Legal Documents and Pleadings:**

Regas Christou, et al, Plaintiffs, v. Beatport, et al, Defendants, United States District Court for the District of Colorado, Civil Action No. 10-cv-02912-CMA-KMT, December 1, 2010 (Complaint).

Defendant Beatport Digital Download Network presentation.

Defendant Beatport, LLC's Objections and Responses to Plaintiffs' First Set of Discovery Requests, May 9, 2011.

Defendant Beatport, LLC's Objections and Responses to Plaintiffs' Second Set of Discovery Requests, June 22, 2011.

Defendant BMJ&J, LLC's Responses to Plaintiffs' First Set of Discovery Requests, June 27, 2011.

Defendant Roulier's Responses to Plaintiffs' First Set of Discovery Requests, June 29, 2011.

**Documents Produced by Defendants and Plaintiffs:**

See references in footnotes to numbered documents.

AMO-344, 348

BP-012897, 019303, 132812, 135017, 135037, 135039, 135094, 136376, 136382, 136559, 136636, 13665, 136780, 136831, 136839, 137194, 137757, 137806, 137837, 148668, 148674, 148748, 153585, 153788, 154029, 154567, 154584, 154601, 154662, 154851, 154948, 154978, 155089, 155212, 155428, 155500, 155507, 155538, 155646, 155673, 155732, 155741, 155782, 155842, 155875, 156066, 156090, 156095, 156097, 156123, 156127, 156149, 156155, 156180, 156192, 156197, 156254, 156258, 156259, 156263, 156278, 156284, 156300, 156307, 156311, 156743, 156787, 156811, 156861, 156887, 156962, 156965, 156969, 157012, 157014, 157030, 157070, 157079, 157085, 157094, 157109, 157127, 157135, 157138, 157144, 157150, 157167, 157418, 157525, 159033, 159169, 159208, 172602, 206610, 212626, 212627, 212629, 212640, 212680, 212762, 212763, 212769, 212789, 212838, 212963, 212977, 212996, 213031, 213046, 213124, 213125, 213128, 213302, 213305, 214950, 215026, 215066, 215069, 215078, 215081, 215103, 215106, 215108, 215110, 215123, 215141, 215165, 215167, 215171, 215187, 217841, 218514, 220000

**Exhibit A-3**

CHRISTOU-5, 7, 8, 12, 17, 23, 26, 27, 28, 34, 36, 40, 58, 202, 2189, 2285, 2308, 2318, 2319, 2384, 2393, 2394, 2558, 3130, 5325, 6867, 7428, 7475, 7551, 7579, 7608, 7943, 8907, 8985, 9006, 12064, 12315, 12753, 13249, 13330, 16229, 19218, 19799, 37042

ROULIER-27, 31, 366, 586, 1207, 1235, 1281, 1962, 2067, 2117, 7665, 7772, 7776, 8657, 8773

**Other Court Documents:**

Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 464, (1992).

Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, (1969).

United States v. E. I. Du Pont de Nemours & Co., 351 U.S.377,391 (1956).

Jefferson Parish, Hospital District v. Hyde, 466 U.S., 2 at 17 (1984).

United States v. Grinnell Corp., 384 U.S. 563, 571 (1966).

Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 611-613 (1953).

**Congressional/Government Reports:**

National Household Travel Survey.  Federal Highway Administration, U.S. Dept. of Transportation, Chapter 15, 2008, http://www.fhwa.dot.gov/policy/2008cpr/chap15.htm

U.S. Department of Justice and the Federal Trade Commission.  Horizontal Merger Guidelines, Washington, D.C., April 18, 1997 and August 19, 2010.

**Media/Trade/Business Publications:**

Berry-Helmlinger, Lyn. "It has a nice Beatport.com, and you can dance to it" The Denver Business Journal, January 25, 2004, p. A19.

Brown, Mark.  The global record store with 6,500 labels under contract, Beatport.com is conquering the world.  Rocky Mountain News, October 13, 2007, p. 5.

Bruno, Anthony.  Digital Domain, Billboard, October 16, 2010, v122, i.41, p. 10.

Griffin, Greg.  Tuned into the market track record of Denver entrepreneur, Denver Post, July 31, 2010, p. B5.

Paoletta, Michael.  Dance follows own beat in online music revolution, Billboard, January 10, 2004, p v116, i.2, p. 3.

**Exhibit A-3**

Pop icon Samantha Fox & Marc Mysterio partner with Denver based world leading retailer Beatport , PR Newswire, September 16, 2009.

St. John, Kathleen. Aiming to be continent's alpha club, Beta charts a new course for LoDo Clubs, denverpost.com, March 14, 2008.

Swamy, Mini.  Beatport empowers DJs with new HTML 5 website.  HTML 5 Report, http://html5.tmcnet.com/topics/html5/articles/198455-beatport-emplowers-djs-with-new-html-5-website.htm.

The Visionaires. Billboard, June 28, 2008, v120, i.26, p.16.


**Texts and Academic Articles:**

Areeda, Phillip and Louis Kaplow, Antitrust Analysis, 4th ed.  Boston:  Little Brown, 1988.

Porter, Michael.  Competitive Advantage.  New York:  Free Press, 1985.


**Websites:**

Alexa website, http://www.alexa.com/  August 31, 2011.

Apple website, http://www.apple.com/pr/library/2009/01/06changes-coming-to-the-itunes-store.html.

Audio Courses Press Release.  http://www.audiocourses.com/article691.html

Beatport Exclusive Selections, April 4, 2011.  http://rapid4all.org/forums/music/1828718-va-beatport-exclusive-selection-14-04-2011-a.html.

Beatport Exclusive Selections, December, 2010.  http://www.yourapid.com/download-free/1556650-va-beatport-december-exclusives-selection-02-2010.html.
Beatportal.  http://www.beatportal.com/feed/item/our-crusade-to-simplify-searching-on-the-new-beatport/.  July 18, 2011.

Beatportal.  http://www.beatportal.com/feed/item/the-new-beatport-designed-for-djs-by-djs/. July 14, 2011.

Beatport website, www.beatport.com, (downloaded March 28, 2011).

Dance music download stores market share.http://lockdon.blogspot.com/2010/01/dance-music-download-stores-market.html  last viewed August 19, 2011.

DJ Mag home page http://www.djmag.com/contact/?op=about  accessed on August 18, 2011.

**Exhibit A-3**

DJ Mag http://www.funkyhousemusic.com/tag/dj-mag/ accessed August 18, 2011.

Lisa Lashes Official Website http://www.djlisalashes.com/ accessed August 18, 2011.

Wikipedia.  Beatport.   http://en.wikipedia.org/wiki/Beatport.

Wikipedia.  DJ Magazine.  http://en.wikipedia.org/wiki/DJ_Magazine.


**Other Relevant Documents:**

Clear Channel 10K Report for 2001.

Clear Channel 10K Report for 2008.


**Interviews:**

Author interview with Jonny Shuman, August 11, 2011.

Author interview with Regus Christou, August 11, 2011.

Interview with Jonas Tempel available at http://www.beatportal.com/feed/item/on-the-hot-seat-beatport-ceo-jonas-tempel/, last accessed July 23, 2011.

Interview with Jonas Tempel by DJ Ron Slomowicz, About.com, http://dancemusic.about.com/od/digitaldownload/a/BeatportInterv.htm.

Interview with Jonas Tempel.  Beatport Turns 5 Inside the Mind of Jonas Tempel, http://www.ibiza-voice.com/story/news/1613.

**Exhibit A-3**

**Exhibit 2**

**UNIVERSITY OF WYOMING**
**COLLEGE OF BUSINESS STANDARD VITA**
**Last Revision:  June 2011**


<u>NAME</u>          Owen Richard Phillips

<u>CONTACT INFORMATION</u>

| | |
|---|---|
| Department of Economics & Finance | work:  (307) 766-2195 *direct* |
| University of Wyoming | (307) 766-2178 *department* |
| 1000 East University, Dept 3985 | home:  (307) 742-0908 |
| Laramie, WY  82071 | fax:    (307) 766-5090 |
| | e-mail: owenphil@uwyo.edu |


<u>EDUCATION</u>

1975          B.A., Stanford University, Palo Alto, CA.  Double Major in Economics and Political Science, Honors with Distinction, Phi Beta Kappa.

1980          Ph.D., Economics, Stanford University, Palo Alto, CA.

<u>ACADEMIC POSITIONS</u>

2010 - Present, Associate Dean, College of Business, University of Wyoming, Laramie, WY.

1995 - Present, Professor, Economics, Department of Economics and Finance, University of Wyoming, Laramie, WY.

2005 - 2006, Visiting Scholar of Business Administration, Harvard Business School, Harvard University, Boston, MA.

1999 - 2005 and 1993 - 1996, Chairman, Department of Economics and Finance, University of Wyoming, Laramie, WY.

1988 - 1994, Associate Professor, Economics, Department of Economics and Finance, University of Wyoming, Laramie, WY.

1985 - 1987, Assistant Professor, Economics, Department of Economics, University of Wyoming, Laramie, WY.

1979 - 1985, Assistant Professor, Economics, Department of Economics, Texas A&M University, College Station, TX.

**Exhibit A-3**

OTHER EXPERIENCE

 2006 - 2010, Economist, Enhanced Oil Recovery Institute, University of Wyoming, Laramie, WY.

 1988 - 1991, Field Economist, Antitrust Division, United States Department of Justice, Laramie, WY.

 1988, Visiting Economist, Antitrust Division, United States Department of Justice, Washington, D.C.

CURRENT JOB DESCRIPTION

   12.5% Teaching, 37.5% Research, 50% Administration

TEACHING

| Year | Semester | Course Number & Title | Cr. Hrs. | Enrollment |
|------|----------|----------------------|----------|------------|
| 2010 | Fall | ECON 5820 Adv. Ind. Org | 3 | 8 |
| 2009 | Fall | ECON 5820 Adv. Ind. Org | 3 | 3 |
| 2007 | Fall | ECON 5820 Adv. Ind. Org | 3 | 3 |
| 2006 | Fall | ECON 5820 Adv. Ind. Org | 3 | 7 |
| 2005 | Spring | ECON 5820 Adv. Ind. Org | 3 | 9 |
| 2004 | Fall | ECON 4820 Ind. Org | 3 | 13 |
| 2003 | Fall | ECON 5820 Adv. Ind. Org | 3 | 6 |
| 2002 | Fall | ECON 4820 Ind. Org | 3 | 18 |
| 2001 | Fall | ECON 4320 Math Econ | 3 | 18 |
| 2000 | Fall | ECON 5370 Adv Math Econ | 3 | 7 |
|  |  | ECON 5020 Adv Micro Analysis | 3 | 7 |
| 2000 | Spring | ECON 4340 Econometrics | 3 | 30 |
| 1999 | Fall | ECON 5820 Adv Ind Org | 3 | 5 |
| 1999 | Spring | ECON 4020 Inter Micro | 3 | 41 |
|  |  | ECON 4340 Econometrics | 3 | 20 |
| 1998 | Fall | ECON 4020 Inter Micro | 3 | 29 |
|  |  | ECON 4320 Math Econ | 3 | 14 |
| 1998 | Spring | ECON 1020 Intro Micro | 3 | 58 |
|  |  | ECON 4340 Econometrics | 3 | 18 |
| 1997 | Spring | ECON 4020 Inter Micro* | 3 | 48 |
| 1996 | Fall | ECON 5820 Adv Ind Org | 3 | 6 |
| 1996 | Summer | ECON 4020 Inter Micro | 3 | 25 |
| 1996 | Spring | ECON 4020 Inter Micro | 3 | 70 |
| 1995 | Fall | ECON 4320 Math Econ | 3 | 8 |

*Course televised statewide.

Exhibit A-3

PUBLICATIONS

Books:

Maurice, S. Charles, and Phillips, Owen R., 1992, Economic Analysis:  Theory and Application, Homewood, IL:  Richard D. Irwin, Inc., Sixth Edition, 738 pages. (Textbook for upper level undergraduates.)

Maurice, S. Charles, and Phillips, Owen R., 1986, Economic Analysis: Theory and Application, Homewood, IL: Richard D. Irwin, Inc., Fifth Edition, 642 pages. (Textbook for upper level undergraduates.)

Maurice, S. Charles, Phillips, Owen R., and Ferguson, Charles, E., 1982, Economic Analysis:  Theory and Application.  Homewood, IL: Richard D. Irwin, Inc., Fourth Edition, 550 pages.  (Textbook for upper level undergraduates.)

Refereed Journal Articles:

Viscusi, W. Kip, Phillips, Owen R. and Kroll, Stephan, October 2011, "Risky Group Investment Decisions with Real Time Information," forthcoming, Journal of Risk and Uncertainty.

Phillips, Owen R., Menkhaus, Dale J. and Thurow, John, February 2011, "The Small Firm in a Quantity Choosing Game:  Some Experimental Evidence," Review of Industrial Organization, Volume 38(2), pp. 191-207.

Phillips, Owen R. and Menkhaus, Dale J., December 2010, "The Culture of Private Negotiations: Price Drift in Bilateral Bargaining," Journal of Economic Behavior and Organization, Volume 76(3), pp. 705-715.

van 't Veld, Klaas T. and Phillips, Owen R., October 2010, "The Economics of Enhanced Oil Recovery:  $CO_2$ Demand and Incremental Oil Production in the Powder River Basin," The Energy Journal, Volume 31(3), pp. 31-55.

Phillips, Owen R., Menkhaus, Dale J., Nagler, Amy M., and Bastian, Chris T., October 2010, "Experimental Work on Subsidies, Moral Hazard, and Collusion in Agricultural Markets," Contemporary Economic Policy, Volume 28(4), pp. 488-501.

Menkhaus, Dale J., Phillips, Owen R. and Yakunina, Alla, V., May 2009, "Inventories and Public Information in Private Negotiation:  A Laboratory Market Study," American Journal of Agricultural Economics, Volume 91(2), pp. 503-517.

Phillips, Owen R. and Menkhaus, Dale J., February 2009, "Maintaining Tacit Collusion in Repeated Ascending Auctions," Journal of Law and Economics, Volume 52, pp. 91-109.

**Exhibit A-3**

Menkhaus, Dale J., Phillips, Owen R., Bastian, Chris T., and Gittings, Lance B., November 2007, "The Matching Problem (and Inventories) in Private Negotiation," <u>American Journal of Agricultural Economics</u>, Volume 89(4), pp. 1073-1084.

Aadland, David, Caplan, Arthur J. and Phillips, Owen R., October 2007, "A Bayesian Examination of Information and Uncertainty in Contingent Valuation," <u>Journal of Risk and Uncertainty</u>, Volume 35(3), pp. 149-178.

Phillips, Owen R., Weatherford, Larry R., Mason, Charles F., and Kunce, Mitch, October 2005, "Passenger Leaks and the Fate of Small Community Air Service," <u>Economic Inquiry</u>, Volume 43(4), pp. 785-794.

Menkhaus, Dale J., Phillips, Owen R., and Bastian, Chris, T., December 2003, "Impacts of Alternative Trading Institutions and Methods of Delivery on Laboratory Market Outcomes," <u>American Journal of Agricultural Economics</u>, Volume 85(5), pp. 1323-1329.

Menkhaus, Dale J., Phillips, Owen R., and Coatney, Kalyn, T., November 2003, "Shared Agents and Competition in Laboratory English Auctions," <u>American Journal of Agricultural Economics</u>, Volume 85(4), pp.829-839.

Phillips, Owen R., Menkhaus, Dale J., Coatney, Kalyn, T., June 2003, "Collusive Practices in Repeated English Auctions: Experiment Evidence on Bidding Rings," <u>American Economic Review</u>, Volume 93(3), pp. 965-979.

Yakunina, Alla V., Menkhaus, Dale J., Phillips, Owen R., and Esipov, Victor E., June 2003, "Non-Performance Risk and Transaction Costs in Laboratory Forward and Spot Markets," <u>Journal of Comparative Economics</u>, Volume 31(2), pp. 257-274.

Menkhaus, Dale J., Phillips, Owen R., Johnston, Allison, F.M., and Yakunina, Alla V., Spring/Summer 2003, "Price Discovery in Private Negotiation Trading for Forward and Spot Deliveries," <u>Review of Agricultural Economics</u>, Volume 25(1), pp. 89-107.

Mason, Charles F. and Phillips, Owen R., December 2002, "In Support of Trigger Strategies: Experimental Evidence from Two-Person Noncooperative Games," <u>Journal of Economics & Management Strategy</u>, Volume 11(4), pp. 685-716.

Phillips, Owen R. and Phillips, Lori J., January 2002, "The Market for Academic Journals," <u>Applied Economics</u>, Volume 34(1), pp. 39-48.

Phillips, Owen R., Menkhaus, Dale J., and Krogmeier, Joseph L., December 2001, "Laboratory Behavior in Spot and Forward Markets," <u>Experimental Economics</u>, Volume 4(3), pp. 243-256.

Sterbenz, Frederic and Phillips, Owen R., October 2001, "Bargaining Experiments with Deadlines and Random Delays," <u>Economic Inquiry</u>, Volume 39(4), pp. 616-626.

**Exhibit A-3**

Phillips, Owen R. and Mason, Charles F., March 2001, "Collusion in Horizontally Connected Markets: Multimarket Producers as Conduits for Learning," in <u>Multiunit Organization and Multimarket Strategy</u>: <u>Advances in Strategic Management</u>, Volume 18, pp. 205-227, Oxford UK: JAI Press.

Mason, Charles F. and Phillips, Owen R., March 2001, "Dynamic Learning in a Two-Person Experimental Game," <u>Journal of Economic Dynamics and Control</u>, Volume 25(9), pp. 1305-1344.

Phillips, Owen R., Menkhaus, Dale J., and Krogmeier, Joseph L., March 2001, "Production to Order or Production to Stock: The Endogenous Choice of Institution in Experimental Auction Markets," <u>Journal of Economic Behavior and Organization</u>, Volume 44(3), pp. 333-345.

Phillips, Owen R. and Menkhaus, Dale J., January 2001, "Random Shocks in Experimental Spot and Forward Auction Markets," <u>Quarterly Review of Economics and Finance</u>, Volume 41(4), pp. 545-560.

Menkhaus, Dale, J., Bastian, Chris, T., Phillips, Owen R., and O'Neill, Patrick, D., April 2000, "Supply and Demand Risks in Forward and Spot Markets: Implications for Agriculture," <u>Journal of Agricultural and Applied Economics</u>, Volume 32(1), pp. 159-173.

Mason, Charles F. and Phillips, Owen R., March 2000, "Vertical Integration and Collusive Incentives: An Experimental Analysis," <u>International Journal of Industrial Organization</u>, Volume 18(3), pp. 471-496.

Mason, Charles F. and Phillips, Owen R., January 2000, "An Experimental Evaluation of Strategic Preemption," <u>International Journal of Industrial Organization</u>, Volume 18(1), pp. 107-135.

Menkhaus, Dale J., Bastian, Chris T., Phillips, Owen R., and O'Neill, Patrick D., December 1999, "Endogenous Choice of Institution under Supply and Demand Risks in Laboratory Forward and Spot Markets," <u>Journal of Agricultural and Resource Economics</u>, Volume 24(2), pp. 553-571.

DelRossi, Alison F. and Phillips, Owen R., October 1999, "Pretrial Bargaining in the Face of a Random Court Decision: Evidence from Laboratory Games," <u>Journal of Risk and Uncertainty</u>, Volume 18(3), pp. 271-293.

Krogmeier, Joseph L., Menkhaus, Dale J., Phillips, Owen R., and Schmitz, John D., December 1997, "An Experimental Economics Approach to Analyzing Price Discovery in Forward and Spot Markets," <u>Journal of Agricultural and Applied Economics</u>, Volume 29(2), pp. 327-336.

Mason, Charles F. and Phillips, Owen R., October 1997, "Mitigating the Tragedy of the Commons through Cooperation:  An Experimental Evaluation," Journal of Environmental Economics and Management, Volume 34(2), pp. 148-172.

Mason, Charles F. and Phillips, Owen R., May 1997, "Information and Cost Asymmetry in Experimental Duopoly Markets," The Review of Economics and Statistics, Volume 79(2), pp. 290-299.

Phillips, Owen R. and Mason, Charles F., January 1997, "Wars of Attrition in Experimental Duopoly Markets," Southern Economic Journal, Volume 63(3), pp. 726-742.

Phillips, Owen R. and Mason, Charles F., Autumn 1996, "Market Regulation and Multimarket Rivalry," The Rand Journal of Economics, Volume 27(3), pp. 596-617.

Kogut, Carl A. and Phillips, Owen R., December 1994, "Individual Decision Making in an Investment Setting," Journal of Economic Behavior and Organization, Volume 25(3), pp. 459-471.

Phillips, Owen R., October 1993, "Negative Option Contracts and Consumer Switching Costs," Southern Economic Journal, Volume 60(2), pp. 304-315.  Solicited by the Federal Trade Commission regarding review of Negative Option Rules.  See Federal Register, Volume 63 (161), August 20, 1998.

Mason, Charles F., Phillips, Owen R., and Nowell, Clifford, November 1992, "Duopoly Behavior in Asymmetric Markets: An Experimental Evaluation," The Review of Economics and Statistics, Volume 74(4), pp. 662-670.

Phillips, Owen R. and Mason, Charles F., Autumn 1992, "An Experimental Investigation of Mutual Forbearance in Conglomerate Markets," The Rand Journal of Economics, Volume 23(3), pp. 395-414.

Phillips, Owen R., October 1991, "Vertical Restrictions and the Number of Franchises," Southern Economic Journal, Volume 58(2), pp. 423-429.

Phillips, Owen R., Battalio, Raymond C., and Kogut, Carl A., July 1991, "Sunk and Opportunity Costs in Valuation and Bidding," Southern Economic Journal, Volume 58(1), pp. 112-128.

Mason, Charles F., Phillips, Owen R., and Redington, Douglas B., March 1991, "The Role of Gender in a Noncooperative Game," Journal of Economic Behavior and Organization, Volume 15(2), pp. 215-235.

Greenhut, Melvin L. and Phillips, Owen R., October 1988, "A Path to Efficiently Regulated Transport Rates," International Journal of Transport Economics, Volume 15(3), pp. 243-256.

**Exhibit A-3**

Ormiston, Michael B. and Phillips, Owen R., May 1988, "Nonlinear Price Schedules and Tied Products," Economica, Volume 55(218), pp. 219-233.

Phillips, Owen R. and Schutte, David P., February 1988, "Identifying Profitable Self-Service Markets: A Test in Gasoline Retailing," Applied Economics, Volume 20(2), pp. 263-272.

Battalio, Raymond C., Kagel, John H., and Phillips, Owen R., October 1987, "Optimal Prices and Animal Consumers in Congested Markets: A Reply," Economic Inquiry, Volume 25(4), pp. 721-722.

Battalio, Raymond C., Kagel, John H., and Phillips, Owen R., April 1986, "Optimal Prices and Animal Consumers in Congested Markets," Economic Inquiry, Volume 24(2), pp. 181-193.

Butler, Henry N., Lane, Walter J., and Phillips, Owen R., November, 1984, "Profitable Alternatives to Tying: The Futility of Antitrust Attacks on Tie-In Sales," Hastings Law Review, Volume 36(2), pp. 173-215.

Jennings, Daniel, F. and Phillips, Owen R., Autumn 1984, "Organizational Innovation and the Development of Market Niches:  New Directions in Entrepreneurial Research," Journal of Management Proceedings, pp. 140-142.

Phillips, Owen R. and Butler, Henry N., Summer 1984, "The Law and Economics of Residential Real Estate Markets in Texas:  Regulation and Antitrust Implications," Baylor Law Review, pp. 623-665.

Phillips, Owen R. and Battalio, Raymond C., Autumn 1983, "Two-Part Tariffs and Monopoly Profits When Visits are Variable," Bell Journal of Economics, Volume 14(2), pp. 601-606.

Schmid, Gregory and Phillips, Owen R., 1980, "Textile Trade and the Pattern of Economic Growth: The International Cotton Fiber Market," Welwirtschaftliches Archiv., Volume 116(2), pp. 294-305.

Articles Under Submission/Working Papers:

Mason, Charles F. and Phillips Owen R., "Imminent Entry and the Transition to Multimarket Rivalry:  Messy Markets in a Laboratory Setting."

Phillips, Owen R. and Menkhaus, Dale J., "Inventories, Cournot Outcomes, and the Decline Effect in Repeated Multiple-Unit Auctions."

Phillips, Owen R., Pillutla, Madan, M., and Erdal, Kara, "Do People Do What They Say:  Exploring Consistency between Words and Offers in Ultimatum Games."

**Exhibit A-3**

van't Veld, Klaas T. and Phillips, Owen R., Pegging Input Prices to Output Prices in Long-Term Contracts: $CO_2$ Purchase Agreements in Enhanced Oil Recovery."

Menkhaus, Dale J. and Phillips, Owen R., "The Reinforcing Effects of Limited Matching and Advance Production in Privately Negotiated Exchange."

McGrimmon, Tucker S., Phillips, Owen R. and Menkhaus, Dale J., "Beliefs and Bargaining Power: A Behavioral Approach to Price Formation in Private Negotiation with Public Information."

Phillips, Owen R., Menkhaus, Dale, J. and Brodie, Allison, "Reserve Prices and Tacit Collusion in Laboratory English Auctions."

Phillips, Owen R., Nagler, Amy M., Huang Shanshan, Menkhaus, Dale J., and Bastian, Christopher, T., "When Sellers Choose Buyers and Buyers Choose Sellers in Private Negotiation."


## SELECTED GRANT AWARDS

Phillips, Owen R. and  van 't Veld, Klaas T., 2010-2012, "The Economics of Carbon Capture Storage," University of Wyoming School of Energy.

Phillips, Owen R., Menkhaus, Dale J. and Bastian, Christopher T., 2009-2010, "Subsidies and Taxes in the Markets for Enhanced Oil Recovery and Carbon Capture Storage," University of Wyoming School of Energy.

Griffin, Kenyon N., Phillips, Owen R. and Weatherford, Larry R., 2002-2004, "Improving Passenger Air Service," State of Wyoming.

Menkhaus, Dale J. and Phillips, Owen R., 2000-2002, "Price Discovery in Alternative Trading and Delivery Institutions," United States Department of Agriculture, National Research Initiative.

Menkhaus, Dale J. and Phillips, Owen R., 1999-2000, "Competition in Laboratory English Auctions," United States Department of Agriculture, Grain Inspection, Packers and Stockyards Administration.

Menkhaus, Dale J., Phillips, Owen R., and Bastian, Chris T., 1997-1999, "An Experimental Analysis of the Impact of Uncertainty in Forward and Spot Markets," United States Department of Agriculture, National Research Initiative.

Mason, Charles F. and Phillips, Owen R., 1989-1991, "Collusion in Multi-Market Rivalry," National Science Foundation.

**Exhibit A-3**

Battalio, Raymond C., Phillips, Owen R., and Saving, Thomas R., 1985-1989, "Market Institutions and Market Outcomes:  A Pipeline Story," National Science Foundation.


## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

Professional Memberships:
American Economic Association, American Law and Economics Association, Economic Science Association.

Grant Refereeing:
National Science Foundation, United States Department of Agriculture.

Manuscript Refereeing:
American Economic Review, Applied Economics, Economic Inquiry, Economic Journal, Economic Theory, Economica, Games and Economic Behavior, International Journal of Industrial Organization, Journal of Economic Behavior and Organization, Journal of Political Economy, Journal of Risk and Uncertainty, Quarterly Journal of Economics, Review of Industrial Organization, Southern Economic Journal.


## HONORS AND AWARDS

1992 November, Mortar Board Cap and Gown Society, "Top Prof" Teaching Award, University of Wyoming, Laramie, WY.

1992 April, Outstanding Senior Research Award, College of Business, University of Wyoming, Laramie, WY.

2000 April, Outstanding Senior Research Award, College of Business, University of Wyoming, Laramie, WY.

2003 April, Outstanding Senior Research Award, College of Business, University of Wyoming, Laramie, WY.

2003 May, PacifiCorp Award for Entrepreneurial Activity and Economic Development, University of Wyoming, Laramie, WY.

## PAPERS PRESENTED/SYMPOSIA/INVITED LECTURES/PROFESSIONAL MEETINGS/WORKSHOPS (Since 2006)

2010, May 15, "Real-Time Information and Group Litigation Decisions," American Law and Economics Association Meetings, Princeton, NJ.

**Exhibit A-3**

2009, June 23, "Scoping Profitable $CO_2$ Projects in Wyoming," Third Annual Wyoming $CO_2$ Conference, Casper, WY.

2009, June 20, "The Maverick Firm in Experimental Duopoly Markets," workshop in Industrial Organization: Theory, Empirics, and Experiments, University of Salento, Lecce, Italy.

2009, May 16, "The Maverick Firm in Experimental Duopoly Markets," American Law and Economics Association Meetings, San Diego, CA.

2008, May 30, "Identifying Profitable $CO_2$ Projects in Wyoming," keynote address at Second Annual Wyoming $CO_2$ Conference, Casper, WY.

2008, March 26, "The Law and Economics of $CO_2$ as a Pollutant and Commodity," invited presentation at Vanderbilt University Law School, Nashville, TN.

2008, February 22, "The Law and Economics of $CO_2$ as a Pollutant and Commodity," invited presentation at the University of New Mexico, Albuquerque, NM.

2008, February 1, "Maintaining Tacit Collusion in Repeated Ascending Auctions," invited presentation at the University of Oklahoma, Norman, OK.

2007, October 19, "Experimental Work on Subsidies, Moral Hazard, and Collusion in Agricultural Markets," North American Economic Science Association Meetings, Tucson, AZ.

2007, April 6, "Boundaries of Fairness in Ultimatum Games," invited presentation at the University of Colorado at Denver, Denver CO.

2007, April 2 and 3, "Tacit Collusion in Repeated Ascending Auctions," and "Bargaining and Cheap Talk" (with Tyson Sackett), invited presentations at Vanderbilt University Law School, Nashville, TN.

2006, November 15, "Sustaining Enhanced Oil Recovery:  Lessons from the Permian Basin," Stroock Forum on Wyoming Lands & People, Laramie, WY.

2006, October 25, "Boundaries of Fairness in Ultimatum Games," College of Business Seminar Series, University of Wyoming, Laramie, WY.

2006, September 29, "Maintaining Tacit Collusion in Repeated Ascending Auctions," North American Economic Science Association Meetings, Tucson, AZ.

**Exhibit A-3**

STUDENT ADVISING/GRADUATE SUPERVISION

Graduate Committees (Last Seven Years)

|  | Member | Chair | Supervised Degrees Completed |
|---|---|---|---|
| MS | 7 | 5 | 4 |
| PhD | 5 | 4 | 3 |

Ph.D. Students:   Inam Rahim, Anne Alexander, Laurel Ballard, Kirk (Tucker) McGrimmon, Benjamin Cook.

M.S. Students:   Beth Abbott, Ilya Bass, Andrew Hall (MBA), Philip Hsu, Mary Kominsky, Tyson Sackett, Owen Davis, Lindsey Rittmueller, Allison Brodie.


CONSULTING/LITIGATION SUPPORT/EXPERT TESTIMONY (Since 2001)

Nobody in Particular Presents, Inc. v. Clear Channel Communications Inc., et al., U.S. District Court of Colorado (2001), Plaintiff Attorneys: Davis Graham & Stubbs; Walter L. Gerash Law Firm, Denver, CO.

Winning Events, Inc. v. The Denver Newspaper Agency LLP, U.S. District Court of Colorado (2002), Plaintiff Attorneys: Rothgerber, Johnson & Lyons, Denver, CO.

Confre Cellars, Inc. v. Scott Robinson, et al., U.S. District Court of Colorado (2002), Defendant Attorneys: Rothgerber, Johnson & Lyons, Denver, CO.

City and County of Denver v. Herklotz Ventures, Inc., Adams County, Colorado District Court (2002), Plaintiff Attorneys: May and Associates, Centennial, CO.

Olson & Hierl, LTD. v. Nova Solutions, Inc., Circuit Court of Cook County,   Illinois (2004), Defendant Attorneys: Webb, Lewis & Meyers, Denver, CO.

Marquis Furniture, Inc. v. Mathis Bros. Furniture Co., Inc., et al., U.S. District   Court of Oklahoma (2004), Plaintiff Attorneys: Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, OK.

Background Information Services, Inc. v. Lexisnexis Courtlink, Inc., et al., U.S. District Court of Colorado (2005), Plaintiff Attorneys: Ducker, Montgomery, Aronstein & Bess, Denver, CO; Powers Phillips, Denver, CO.

Live Concert Antitrust Litigation as it relates to Kevin J. MacLaughlan, et al. v. Clear Channel Communications, et al., U.S. District Court for the Central District of California

**Exhibit A-3**

(2006), Plaintiff Attorneys: Hagens Berman Sobol Shapiro, Chicago IL; Squiteri & Fearon, New York, NY; Wexler Toriseva Wallace, Chicago, IL.

<u>State of North Dakota and the University of North Dakota v. National Collegiate Athletic Association</u>, State of North Dakota, Northeast Central Judicial District (2006), Plaintiff Attorneys: Mayer Brown Rowe & Maw, Chicago IL; Fabian & Clendenin, Salt Lake City, UT.

<u>Christy Sports, LLC v. Deer Valley Resort Company</u>, U.S. District Court for the District of Utah, Central Division (2007), Plaintiff Attorneys: Kruse Landa Maycock & Ricks, Salt Lake City, UT; Jones & Keller, Denver CO.

<u>Riviera Drilling & Exploration Company v. Gunnison Energy Corporation, et al.</u>, U.S. District Court for the District of Colorado (2008),  Plaintiff Attorneys: Hill & Robbins, Denver, CO.

<u>Jesse A. Cole, M.D. Plaintiff, v. St. James Healthcare and Sisters of Charity Leavenworth Health System, Inc.</u>, Montana Second Judicial Court Silver Bow County (2009), Plaintiff Attorneys: C. Richard Anderson, Butte, MT.

Intrawest, Cross Resort Pass Product Arbitration for Copper Mountain and Winter Park (2010-11), Attorneys: William Baum, Intrawest, Winter Park, CO; Michael Zimmerman, Snell & Wilmer, Salt Lake City, UT.

<u>Regas Christou, et al. v. Beatport, LLC et al.</u>, U.S. District Court for the District of Colorado (2010), Plaintiff Attorneys: The Law Office of Jeff Vail, Denver, CO.