IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 10-cv-02912-RBJ-KMT

REGAS CHRISTOU,
R.M.C. HOLDINGS, L.L.C. D/B/A THE CHURCH,
BOUBOULINA, INC D/B/A VINYL,
MOLON LAVE, INC. D/B/A 2 A.M.,
CITY HALL, LLC,
1037 BROADWAY, INC. D/B/A BAR STANDARD F/K/A THE
SHELTER,
776 LINCOLN ST., INC. D/B/A FUNKY BUDDHA LOUNGE, and
1055 BROADWAY, INC. D/B/A THE LIVING ROOM,

      Plaintiffs,

v.

BEATPORT, LLC,
BRADLEY ROULIER,
BMJ&J, LLC D/B/A BETA NIGHTCLUB AND BEATPORT
LOUNGE, and
AM ONLY, INC.,

      Defendants.

---

## ORDER

---

This matter comes before the Court on defendant Beatport L.L.C.'s Motion to Dismiss

[CM/ECF document #15]; defendant AM Only, Inc.'s Motion to Dismiss [#25]; defendants

Bradley Roulier and BMJ&J L.L.C.'s Motion to Dismiss [#32], and Defendant Beatport L.L.C.'s

Motion for Sanctions [#30].  All of these motions have been fully briefed.

**Facts**

Beginning during the 1990's, plaintiff Regas Christou founded several nightclubs in Denver, including R.M.C. Holdings, L.L.C. ("The Church"), Molon Lave, Inc. ("2 A.M."), 1037 Broadway, Inc. ("Bar Standard f/k/a "The Shelter"), City Hall L.L.C. ("City Hall"), 775 Lincoln St., Inc. ("Funky Buddha Lounge"), and 1055 Broadway, Inc. ("The Living Room"). Mr. Christou is also affiliated with Bouboulina, Inc. ("Vinyl"). These clubs are alleged to comprise the South of Colfax Nightlife district ("SOCO"). Complaint [#1] at 3.

The SOCO clubs, especially The Church and Vinyl, emphasize "Electronic Dance Music" and live performance by DJs. *Id.* at ¶4. Mr. Christou has been instrumental in developing the Electronic Dance Music market in Denver. *Id.* at ¶16. Both The Church and Vinyl are nationally recognized clubs in the Electronic Dance Music scene. *Id.* ¶17.

Defendant Bradley Roulier is a co-founder and member of Beatport, LLC ("Beatport") and founder and member of BMJ&J, L.L.C. d/b/a Beta Nightclub ("Beta"). *Id.* at ¶6. Starting in 1998, Mr. Roulier was employed by Mr. Christou as a talent buyer and assisted in booking top DJs to perform at SOCO venues. *Id.* at ¶18. While he was still employed by Mr. Christou, Mr. Roulier, along with several partners, conceived of the idea that would become Beatport. *Id.* at ¶19. In 2003, Beatport was founded as an online marketplace for downloading music that catered to consumers and producers of Electronic Dance Music. *Id.* at ¶19-20. Mr. Christou co-signed a $50,000 loan to start Beatport in exchange for Mr. Roulier's promise that Mr. Christou would later be given partial ownership of the company. *Id.* at ¶20. Mr. Christou also initially assisted in Beatport's promotion by advertising Beatport in SOCO's print and online advertisements, distributing promotional flyers, and financing a promotional video. *Id.* at ¶23. Mr. Roulier never transferred any ownership interest to Mr. Christou. *Id.* at 33.

2

By 2005 Beatport was a commercial success, with over one million purchases and song downloads from the website. *Id.* at ¶24. The website claims that "Beatport is the most relevant online source of electronic music in the world." *Id.* at ¶ 31. Beatport gained popularity and success by differentiating itself from other music marketplaces such as Apple's iTunes. *Id.* at ¶26. Unlike other music download websites, Beatport offered music at higher bit rates and without Digital Rights Management (DRM) controls, which enabled DJ's to re-mix and use music downloaded from Beatport during their live performances. *Id.* Beatport's dominance in the Electronic Dance Music community meant that Beatport became financially important for DJs. *Id.* at ¶25. Plaintiffs allege that favorable promotion, or the lack thereof, on Beatport can "make or break album sales." *Ibid.*

Beatport entered into a partnership with German hardware manufacturer, Native Instruments GmbH, to provide the seamless integration of music downloads from Beatport and hardware used by DJs. *Id.* at ¶27. Plaintiffs believe that Native Instruments GmbH has subsequently acquired a majority interest in Beatport due to Beatport's importance to the Electronic Dance Music community. *Id.* at ¶29.

Mr. Roulier initially expressed interest in purchasing The Church from Mr. Christou, but instead he opened a competing nightclub in Denver. While still employed by Mr. Christou, and while still in negotiations regarding the purchase of The Church, Mr. Roulier opened the nightclub Beta in March 2008. Plaintiffs allege that Mr. Roulier and the other defendants leveraged their ownership of Beatport to coerce DJs to boycott SOCO's venues and only perform at Beta's Beatport lounge. *Id.* at ¶34. Plaintiffs allege that Beatport has the ability to remove all artists on a DJ's label from its online marketplace if the DJ performs at a SOCO venue. *Id.* at ¶46.

3

Beatport allegedly began using its position to coerce DJ's into performing only at Beta in 2008. *Ibid.* Because access and promotion on Beatport are critical to both a DJ's and a label's success, many DJs and agents were allegedly compelled to agree with Beatport and Beta's demands. For example, plaintiffs allege that DJ Charissa Saverio ("DJ Rap"), just prior to formalizing an agreement with The Church, was contacted by Mr. Roulier and told that if she wanted continued access and label support on Beatport she must play at Beta and not at The Church. *Id.* at ¶ 52. Mr. Roulier told DJ Rap's booking agency, Bullit Booking, that "he would pull both of DJ Rap's record labels entirely off Beatport if DJ Rap played at SOCO's clubs." *Id.* DJ Rap canceled her performance at The Church and instead performed at Beta.

Plaintiffs quote an "owner of a major Electronic Dance Music record label" as saying that Beta and Mr. Roulier are "using their Beatport connections to make sure things happen." *Id.* at ¶ 54. In an interview with the Denver Post, Mr. Roulier was quoted as saying "[w]ith [Beta's] relationship with Beatport we think most of the DJs will want to play for us." *Id.* at ¶55.

As a result plaintiffs allege that the SOCO clubs were squeezed out of the market. Plaintiffs brought the present action alleging nine claims for relief: (1) Unlawful tying in violation of 15 U.S.C. §1 against Beatport, Beta and Mr. Roulier; (2) Monopolization in violation of 15 U.S.C. §2 against Beta and Mr. Roulier; (3) Attempted monopolization in violation of 15 U.S.C. §2 against Beta and Mr. Roulier; (4) Conspiracy to Monopolize in violation of 15 U.S.C. §2 against all defendants;[1] (5) Conspiracy to eliminate competition by unfair means in violation of 15 U.S.C. §1 against all defendants; (6) Theft of trade secrets in violation of C.R.S. § 7-74-101 against Beatport, Beta, and Mr. Roulier; (7) Violation of the Racketeer Influenced and Corrupt Organization Act (RICO), 28 U.S.C. §1962 against all

---

[1] This claim originally included defendant AM Only, Inc. AM Only was dismissed on September 27, 2011. [# 102].

defendants; (8)  Intentional interference with prospective business expectances against Mr.

Roulier[2]; and (9) Civil conspiracy against all defendants.

Beatport filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on January 12,

2011 [#15].  Plaintiffs responded [#38] and Beatport replied [#57].  Defendants Bradley Roulier

and BMJ&J (Beta) also filed a motion to dismiss pursuant to Fed. R. Civ. P. 8(a), 9(b), 12(b)(1),

and 12 (b)(6) on February 7, 2011 [#32].  Plaintiffs responded [#42] and Beta replied [#59].

**Standard**

Motion to Dismiss: 12(b)(6)

When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) the Court "must

accept all the well-pleaded allegations of the complaint as true and must construe them in the

light most favorable to the plaintiff."  *Alvarado v. KOB-TV, L.L.C.,* 493 F.3d 1210, 1215 (10th

Cir. 2007) (citing *David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996).

However, a complaint must set forth a plausible, not merely a possible, claim.  *Bell Atlantic*

*Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Atwell v. Gabow,* 311 F. App'x. 122, 125 (10th

Cir. 2009).  "To survive a motion to dismiss, a complaint must contain factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937,

1949 (2009) (quoting *Twombly*, 550 U.S. at 570).

Motion to Dismiss: 9(b)

Allegations of fraud are subject to a heightened pleading standard.  The requirements of

Rule 9(b) dictate that "[i]n alleging a fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of

a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The complaint must "set forth

the time, place and contents of the false representation, the identity of the party making the

---

[2] This claim was originally asserted against Mr. Roulier and AM Only.

statement and the consequences thereof." *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citing *Lawrence Nat'l Bank v. Edmonds,* 924 F.2d 176, 180 (10th Cir. 1991)).

**Conclusions**

Defendants seek the dismissal of all claims asserted against them.  Prior to the evaluation of plaintiffs' antitrust claims the Court must first evaluate plaintiffs' definition of the relevant markets:

Relevant Markets

In order to state a cause of action under either Section 1 or Section 2 of the Sherman Act, the plaintiff must adequately define the relevant market.  Defining the relevant market for purposes of antitrust analysis requires the plaintiffs to define both a product market and a geographic market.  Plaintiffs allege two separate relevant markets in their Complaint.  The first such market is "the market for digital downloads of DRM-free, high fidelity Electronic Dance Music suitable for playing on high performance sound systems.  Complaint ¶35.  In plaintiffs' estimation, this is a distinct submarket of the broader market for the sale of Electronic Dance Music.  *Id.* at ¶37.  Due to the costs associated with re-mixing and finding sufficient audio fidelity, plaintiffs allege that there are no reasonably substitutable products.  The substitution of other musical genres or formats would be insufficient and unreasonably costly.  *Id.* at ¶36. Because digital downloads are available anywhere an internet connection exists, plaintiffs define their relevant geographic market as global.

The second market pertinent to plaintiffs' claims is "the market for live performance by A-list DJs playing Electronic Dance Music.  Complaint ¶38.  "A-list" DJs are allegedly a distinct sub-market in the broader market for live performances by DJs.  *Id.* at ¶37.  Plaintiffs argue that this sub-market is recognized by both consumers and industry insiders and is "characterized by

unique pricing and sensitivity to price changes." *Id.* This product, according to plaintiffs, also has no reasonable substitute. Plaintiffs define the geographic market as the "Denver metro area" because of the "low cross-elasticity of demand by consumers inside the Denver metro area with providers outside of it." *Id.* at ¶38.

Defendants argue that all of plaintiffs' antitrust claims must fail because they have failed properly to define the relevant market. In particular, Beta and Mr. Roulier argue that plaintiffs do not address reasonable interchangeability or cross-elasticity of demand in the proposed relevant markets. Defendants also argue that plaintiffs' definitions of the submarkets are insufficient.

The plaintiff must define the relevant market by making specific reference to "the reasonable interchangeability of use or the cross-elasticity of demand between the product and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). A plaintiff's failure sufficiently to define the relevant market is cause for dismissal of the claim. *Campfield v. State Farm Mutual Automobile Ins.*, 532 F.3d 1111, 1118 (10th Cir. 2008). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand…even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Ibid.* (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997)).

Plaintiffs argue that they have adequately defined the market in their complaint. The Court agrees. In plaintiff's market for "digital downloads of DRM-free, high fidelity Electronic Dance Music" plaintiffs have alleged that there are "no reasonable substitutes." Complaint ¶36. Plaintiffs argue that there is no substitute because of unique characteristics in the industry, such

as the need to re-mix the music, and the demand for high quality sound. *Ibid.* Although plaintiffs do not also use the phrase "cross-elasticity of demand," that is not fatal to their market definition. The basic test for product market definition is "reasonable interchangeability." *Telecor Communications, Inc. v. Southwestern Bell*, 305 F.3d 1124, 1131 (10th Cir. 2002). "Interchangeability may be measured by, and is substantially synonymous with, cross elasticity." *Ibid.* (citing *Brown Shoe Co*, 370 U.S. at 325). Plaintiffs have alleged a product market definition that addresses the reasonable interchangeability of other products.

The second product market alleged by plaintiffs is the market for "live performances by A-list DJs playing Electronic Dance Music." Complaint ¶38. Here, plaintiffs address interchangeability by stating that there are "no reasonably substitutable services…because substitution of non-live performances or live performances of other genres of music would impose on consumers a substantial and unreasonable cost." *Id.* at ¶39. According to plaintiffs, A-list DJs are a distinct sub-market because A-list DJs are able to draw larger crowds to venues, and consumer are willing to pay more for the tickets based on the DJ's talent and name recognition. *Ibid.* The plaintiffs do not, as Beatport would like, list or describe other reasonable substitutes. However, that is excusable given plaintiffs' theory that there are no reasonable substitutes for these services. Plaintiffs have addressed reasonable interchangeability with regard to their product market. Plaintiffs also address potential cross-elasticity of demand in the geographic market: "there is extremely low cross-elasticity of demand by consumers inside the Denver metro area with providers outside of it." *Id.* at ¶38. In other words, consumers in the Denver Metro area are unlikely to travel outside of that market to attend a show.

The Court finds that plaintiffs' pleadings amount to "more than a cursory mention of a relevant product and geographic market." *Total Renal Care, Inc. v. Western Nephrology and*

*Metabolic Bone Disease, P.C.*, 2009 WL 2596493 at *7 (D. Colo. Aug. 21, 2009).  This Court

agrees with the sentiment of the Second Circuit, as well as other circuits, that "[b]ecause market

definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure

to plead a relevant product market."  *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir.

2001).

Therefore, the Court will not dismiss plaintiffs' antitrust claims for failure to sufficiently

define the relevant market.  Each claim, and defendants' arguments in favor of dismissal, will be

addressed below.

### (1) UNLAWFUL TYING: CLAIM 1

Plaintiffs' first claim for relief alleges that defendants Beatport, Beta, and Mr. Roulier

violated Section 1 of the Sherman Act through an unlawful tying arrangement.  Beatport, Beta,

and Mr. Roulier assert three arguments that support their contention that plaintiffs fail to state a

claim for unlawful tying.  First, defendants argue that plaintiffs fail to plead that Beatport had

sufficient economic power in the tying product market.  Second, plaintiffs fail to plead that the

alleged tying arrangement had a substantially adverse effect on competition in the tied market.

Third, plaintiffs lack standing. [3]

### Failure to Plead Sufficient Market Power & Failure to Plead Adverse Effect on Competition

The Court will address defendant's first two arguments together.  To support a claim for

illegal tying, the plaintiff must set forth sufficient facts to allege (1) two separate products; (2) a

sale or agreement to sell one product or service conditioned on the purchase of another; (3) seller

has sufficient power in the tying product's market to enable it to restrain trade in the market for

the tied product; and (4) a substantial volume of commerce affected in the tied product market.

---

[3] Beta and Mr. Roulier adopt Beatport's standing argument in their Motion to Dismiss [#32 at 7].

*Fortner Enterprises v. U.S. Steel Corp.*, 394 U.S. 495, 498-99 (1969).  In their motion to dismiss, defendants initially argued that plaintiffs insufficiently alleged facts to prove any element. However, in their reply defendants have narrowed their objections to those facts alleged in the third element: sufficient power in the tying product's market [#57 at 2].

Plaintiffs define the two separate products as "Electronic Music downloads and live performance by DJs." Complaint ¶70.  Plaintiffs have alleged sufficient facts such that the Court finds that it is plausible that these are in fact distinct products.  Plaintiffs have also alleged facts, and described a few specific instances, in which the defendants conditioned sales, promotion, and availability on Beatport with an agreement to perform only at Beta.  *See* Complaint, ¶¶52-53, 43.  Plaintiffs have also alleged facts that could plausibly demonstrate that a substantial amount of interstate commerce in DJ performance is affected.  *See id.* ¶¶ 17, 52-53, 62-63, 67, 76. Plaintiffs has adequately alleged the first, second and fourth elements.

Defendants maintain that even if these other elements are met, plaintiffs have not sufficiently pled the third element.  Defendants argue that plaintiffs have not indicated what share of the alleged product market they possess.  Plaintiffs are correct that the test for a tying claim does not require that plaintiffs demonstrate that defendants have "monopoly" power in the tying market.  Courts use two tests to analyze tying claims: the *per se* rule and the "rule of reason." *See Jefferson Parish Hospital Dist. 2 v. Hyde,* 466 U.S. 2 (1984).  In a per se analysis the Court focuses on the seller's share of the tying market.  *Nobody in Particular Presents, Inc. v. Clear Channel Communications*, 311 F.Supp.2d 1048 (D. Colo. 2004) (citing *Jefferson Parish*, 466 U.S. at 17).  "When a seller's share of the tying market is high, or when the seller offers a unique product that competitors are not able to offer, the Supreme Court has held that the likelihood that market power is being used to restrain competition in a separate market is

sufficient to make a *per se* condemnation appropriate." *Id.*  Under a rule of reason analysis the Court must first make a determination "of whether the challenged restraint has a substantially adverse effect on competition….The inquiry then shifts to an evaluation of whether the procompetitive virtues of the alleged wrongful conduct justifies the otherwise anticompetitive impacts." *Law v. National Collegiate Athletic Association*, 134 F.3d 1010, 1016 (10th Cir. 1998) (internal citations omitted).

To survive defendants' motion to dismiss, plaintiff must plead sufficient facts to demonstrate that the defendants had sufficient power to force or coerce the tying of the products. Here, plaintiffs allege that defendants have sufficient market power in the market for Electronic Dance Music downloads.  The Court finds that plaintiffs have pled sufficient facts to demonstrate that their claim is plausible. *See* Complaint ¶¶30-31, 42, 71-72.  Plaintiffs have also pled sufficient facts to demonstrate that the restraint has had a substantially adverse effect on competition for live performances of A-List DJs. *See id.* ¶¶ 52-53, 55, 63, 76, 99.

Defendants Beta and Mr. Roulier advance a related argument that SOCO's Section 1 claims must fail because they have failed to plead substantial foreclosure of the market.[4] However, under the rule of reason standard a plaintiff need only plead facts of anticompetitive conduct if the parties compete in the same market. *See Nobody in Particular Presents Inc. v. Clear Channel Communications,* 311 F.Supp.2d 1048, 1097-98 (D. Colo. 2004).  Here, plaintiffs have pled facts that demonstrate the required alleged anticompetitive effect within the same market.  Although more facts and evidence will be necessary to prove their tying claims, plaintiffs currently have pleaded sufficient facts in their complaint to survive a motion to dismiss.

---

[4] Beta and Mr. Roulier's argument advocates for the dismissal of all plaintiffs' section 1 claims, both claims 1 and 5.

Standing

Defendants next argue that plaintiffs lack standing to bring a tying clam under §1 of the Sherman Act because they did not purchase on-line music downloads or live performances by A-list DJs playing Electronic Dance Music.  Defendants allege that while Vinyl and The Church may have standing, plaintiffs have failed to allege sufficient facts to demonstrate an injury against the other SOCO clubs.  Further, Defendants maintain that Mr. Christou, as an individual, does not have standing to bring an antitrust claim on behalf of a corporation.

Antitrust standing requires plaintiff to show "(1) an antitrust injury; and (2) a direct causal connection between the injury and a defendant's violation or the antitrust law." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006) (citing *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1254 (10th Cir. 2003)).  Under Tenth Circuit law, two categories of parties have standing to challenge an illegal tying arrangement: "the purchasers who are forced to buy the tied product to obtain the tying product…and the competitor who is restrained from entering the market for the tied product." *Sports Racing Services, Inc. v. Sports Car Club of America*, 131 F.3d 874, 887 (10th Cir. 1997).

*(a) SOCO Nightclubs[5]*

Plaintiffs assert that they possess standing to bring an antitrust claim by virtue of their status as competitors who are foreclosed from the market.  First, plaintiffs must establish a cognizable antitrust injury that flows from defendants' conduct.  Here, plaintiffs have alleged that the market for live performance of A-list DJs, in which the SOCO clubs participate, is restrained by defendants' activities.  Plaintiffs Vinyl and The Church allege antitrust injuries of lost past and future profits, decreased ability to compete, and decreased value of real property

---

[5] Defendants argue that the complaint lacks specific allegations with regard to Molon Lave, Inc ("2am"), City Hall, L.L.C. ("City Hall"), 1037 Broadway, Inc. ("Bar Standard"), 776 Lincoln St., Inc. ("Funky Buddha Lounge"), and 1055 Broadway, Inc. ("The Living Room").

[#1] ¶122).  All of the SOCO clubs allege, in general, that the defendants' unlawful practices have "prevented SOCO from competing in the market for live Electronic Dance Music…and foreclosed to SOCO an amount of business and profit substantial enough as to not be merely *de minimis*." *Id*. at ¶77.  The SOCO nightclubs further allege that they have been further injured in its loss of actual and potential customers and profits, reputation, and ability to form business partnerships and book live performances.

Under the second prong, plaintiffs must allege a direct causal connection between these injuries and the defendants' conduct.  SOCO alleges that defendants' tying practices foreclosed significant portions of the market, causing the aforementioned injuries.  *Id*. at ¶76.  SOCO further alleges that revenue from patrons' visiting all of SOCO's clubs has decreased since SOCO's ability to book A-list DJs has been impaired by defendants conduct.  *Id*. at ¶78.  SOCO also alleges that defendants' conduct was and is specifically aimed at excluding the SOCO clubs from the market.  *Id*. at ¶48.

To bring a claim for unlawful tying the plaintiffs must be a member of one of the two categories described in Tenth Circuit law.  Plaintiffs allege that they fit in the second category of allowed plaintiffs: a "competitor who is restrained from entering the market for the tied product." *Sports Racing,* 131 F.3d at 887.  As has been discussed above, SOCO has repeatedly alleged that they have been foreclosed from the market for live performance of A-list DJs.

As to defendants' argument that plaintiffs have not demonstrated that Beatport has sufficient economic interest, the Court finds that plaintiffs have alleged that Beatport, through common ownership and through the "Beatport Lounge," has an economic interest in allegedly forcing DJs to perform only at Beta.  Therefore, given all of the facts described above, the Court finds that all of the SOCO clubs have standing to bring an antitrust claim for unlawful tying.  To

survive further, SOCO will need to present additional evidence and facts to prove harm to SOCO nightclubs other than Vinyl and The Church.  However, at this point the Court finds there are sufficient facts to support antitrust standing.

### (b) Mr. Christou

In their reply, defendants argue that Mr. Christou does not have standing to pursue antitrust claims in his individual capacity.  Section 4 of the Clayton Act authorizes private individuals to bring antitrust suits.  An individual who is "injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States…" 15 U.S.C. §15(a).  By virtue of the "by reason of" language, courts have imposed a standing requirement requiring legal causation.  *See Western Systems, Inc. v. Dynatech Corp.*, 610 F.Supp.2d 585, 588 (D. Colo. 1985).  The Court must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Assoc. General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983).

"Standing cannot be established without an antitrust injury, but the existence of an antitrust injury does not automatically confer standing."  *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 652 n. 14 (10th Cir. 1992).  An 'antitrust injury' is an injury of the type "antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Id.*  Although defendants are correct that it is "settled law that shareholders and employees do not have standing to sue for antitrust violations that injure a corporation," the Court interprets plaintiffs' argument to be that Mr. Christou himself has suffered injury to his "business or property," separate from the injury sustained by the named corporations.  The

14

question now is whether Mr. Christou has stated sufficient facts to demonstrate that he was directly injured by anti-competitive behavior and thus can maintain standing.

In their complaint, plaintiffs argue that "the reputation of SOCO's clubs and Mr. Christou have been diminished, resulting in inability to form business partnerships and greatly increased costs of booking live performances, including but not limited to A-List DJs." Complaint ¶78. However, Mr. Christou cannot demonstrate sufficient causation to satisfy the Clayton Act by damage to his reputation: "injury to his reputation, dignity and emotional damages are not the type of injuries redressable by the antitrust laws…" *Tal v. Hogan*, 453 F.3d 1244, 154 (10th Cir. 2006).

It is further alleged that the defendant's actions have negatively affected the real property value of the SOCO component properties (#1, ¶78). Mr. Christou can assert personal injury based on the loss of property value of his SOCO properties. To evaluate whether this injury is sufficient, the Court looks to factors enumerated by the Supreme Court: "(1) the causal connection between the antitrust violation and the plaintiff's injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's injury – i.e. whether it is one intended to be redressed by the antitrust laws; (4) the directness or indirectness of the connection between the plaintiff's injury and the market restraint resulting from the alleged antitrust violation; (5) the speculative nature of the damages sought; and (6) the risk of duplicative recoveries or complex damages apportionment." *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406-07 (10th Cir. 1992) (citing *Cargill, Inc. v. Monfort, Inc.,* 479 U.S. 104 (1987)). The Tenth Circuit has formulated this inquiry into a two-part test: (1) whether there was an antitrust injury, and (2) whether the antitrust injury resulted directly from the antitrust violation. *See id* at 407, n.2.

Applying the above factors, the Court finds that Mr. Christou has not alleged sufficient facts to demonstrate that he has suffered an antitrust injury that is the direct result of an antitrust violation. Plaintiffs offer no facts that show that Mr. Christou is the owner of the properties affected, how the valuations of the properties were affected, or how the defendants' actions caused or at least contributed to the devaluation of real property. While plaintiffs state that Mr. Christou owns the named corporations, they give no indication as to the ownership of the physical property. There are simply not enough facts here to find that Mr. Christou has standing. Therefore, defendant's Motion to Dismiss is GRANTED as to plaintiff Regas Christou.

### (2) MONOPOLY & ATTEMPTED MONOPOLY: CLAIMS 2 & 3

Defendants Beta and Mr. Roulier argue that plaintiffs' second claim for monopoly and third claim for attempted monopoly should be dismissed, because plaintiffs have failed to define the relevant market and have failed to make factual allegations that support their monopolization claims.[6] As discussed above, the Court finds that plaintiffs have sufficiently defined the relevant markets to survive a motion to dismiss. Therefore, the Court will address Beta's and Mr. Roulier's remaining argument.

Beta and Mr. Roulier argue that plaintiffs have failed to plead a claim for monopoly because: (1) they are incapable of monopoly or attempted monopoly, because they are not a supplier in the market for A-list DJs; (2) Plaintiffs fail to allege specific barriers to entry or durability; and (3) Plaintiffs have not alleged a specific intent to monopolize.

First, the plaintiffs are not arguing that defendants maintain a monopoly in the market for A-list DJs. Rather, their allegation is that defendants' have created a monopoly in the market for A-list DJ *performances*. Both plaintiffs and defendants are alleged to be members of that

---

[6] Plaintiffs do not assert a claim for violation of Sherman Act §2's prohibition of unlawful monopolies against defendant Beatport.

market.  In their complaint plaintiffs argue that Mr. Roulier opened a competing nightclub,

Complaint ¶32, and Mr. Roulier pressured DJs to boycott performances at SOCO's clubs.  *Id.* at

¶¶44, 48, 60, 67.  Defendants contend that plaintiffs' monopoly claim must fail, because

defendants are purchasers not suppliers of A-list DJs.  This misconstrues plaintiffs' argument:

plaintiffs allege monopolization in the supply of performances to the public, not A-list DJs

themselves.

Defendants next argue that plaintiffs' monopolization claim must fail because plaintiffs

fail "to specifically allege barriers or durability, and SOCO has not distinguished Beta's relative

growth as arising from anything other than Beta's own efforts and good timing."  [#32 at 7-8].  I

do not agree that plaintiffs have failed to allege these factors.  Plaintiffs describe the high entry

barriers associated with the live performance market:  "the industry expertise needed to manage

the required venue; the ability to develop a reputation in the industry as being a desirable and

popular venue; the legal and regulatory costs of acquiring events permits and liquor licenses; and

the costs of acquiring and maintaining venues for the performance of live music of sufficient size

and quality to generate enough revenue to pay A-list DJs' fee."  Complaint ¶103.  As to

durability, plaintiffs state that defendants' activities are ongoing.  *See id.* at ¶97.  As to

defendants' argument that the plaintiffs have not distinguished their growth from anything other

than "Beta's own efforts and good timing," defendants need only glance through the complaint

to see that plaintiffs accuse Beta of all sorts of nefarious conduct aimed at squeezing plaintiffs

out of the market and gaining a monopoly.  Whether those allegations are true still must be

determined, but plaintiffs' allegations are contained in the Complaint.

Beta and Mr. Roulier also argue that plaintiffs' attempted monopolization claim fails

because plaintiffs have not alleged the required elements.  In order to make out a claim for

attempted monopoly, plaintiffs must allege "(1) relevant market…; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt." *TV Comm'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992).

As discussed above, the Court finds that plaintiffs have adequately pled the relevant market. Plaintiffs have adequately alleged the third and fourth elements as well. Plaintiffs have pled a specific intent to monopolize by stating that "Beta and Mr. Roulier engaged in the predatory and anticompetitive conduct described above, including illegal tying, exclusive dealing, reciprocal dealing, monopoly leveraging, market allocation, group boycott and the concerted combination of these actions with the specific intent to destroy competition and monopolize the relevant market." Complaint ¶106. These alleged activities demonstrate a specific intent to monopolize, as well as actions in furtherance of an attempted monopoly. Plaintiffs elaborate further on these actions in paragraphs 83 through 97 in their complaint.

In order to successfully state a claim for attempted monopoly plaintiffs must satisfy the second element: dangerous probability of success on the merits. In support of this element plaintiffs point to the following statement in their complaint: "Beta and Mr. Roulier currently control significantly more than half the market for live performance by A-list DJs in the Denver metro area, and have demonstrated dangerous probability of achieving monopoly power in the relevant market." Complaint, Doc. #1, ¶ 107. Beta and Mr. Roulier argue that this statement is insufficient and not specific enough to adequately plead the required element. However, this statement taken together with the other allegations in the Complaint demonstrates allegations of rapid growth and dominance in the relevant market. *See* Complaint ¶¶34, 50-53, 67-68. The Court finds that plaintiffs have adequately stated a claim for attempted monopoly.

### (3) ANTITRUST CONSPIRACY: CLAIMS 4 & 5

In their fourth claim for relief, plaintiffs assert an action for Conspiracy to Monopolize in violation of Section 2 of the Sherman Act.  Claim five asserts an action for Conspiracy to eliminate conspiracy by unfair means in violation of Section 1 of the Sherman Act.  Beatport argues that both of these claims fail because (1) plaintiffs do not support their allegation of a specific intent to monopolize; (2) plaintiffs have not demonstrated that the alleged violation cannot be explained by lawful free market behavior, and (3) related entities and individuals cannot conspire with each other to violate antitrust laws.[7]  Beta and Mr. Roulier contend that the conspiracy claims must fail because: (1) defendants are not competitors at the same market level; (2) a corporation cannot conspire with its own employees; and (3) plaintiff cannot demonstrate that defendants had a specific intent to monopolize.

Conspiracy to Monopolize: Claim 4

To make out a conspiracy to monopolize claim the plaintiff must plead facts which allege "(1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize." *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1028 (10th Cir. 2002).

Plaintiffs have alleged sufficient facts to demonstrate the existence of a conspiracy to monopolize.  Specifically, plaintiffs allege that Beatport and Beta are closely tied through common ownership, complaint ¶43, that Beatport and Beta cross-promote, *id.* at ¶44, and Beatport and Beta's financial interests are aligned.  *Ibid.*  Further, plaintiffs' complaint alleges that defendants communicated with agents and A-list DJs and coerced them to play only at Beta and further the exclusion of SOCO clubs from the market.  *Id.* at ¶48-49.  Plaintiffs allege that

---

[7] Defendants Beta and Mr. Roulier adopt Beatport's argument on this point in their Motion to Dismiss [#32, p. 9].

"Defendants agreed to tie access to and promotion by Beatport's electronic marketplace to the condition that DJs boycott SOCO's clubs and perform exclusively at Beta." *Id.* at ¶110. These facts demonstrate evidence of a common scheme.

Plaintiff likewise alleges overt acts committed in furtherance of the conspiracy, i.e., that defendants contacted DJs and agents in order to obtain their monopoly. *Id.* ¶¶48, 49.

The third element requires that plaintiffs demonstrate an appreciable effect on interstate commerce. Plaintiffs allege a substantial effect on the market for A-list DJs. *See* Complaint ¶116. Although plaintiffs focus on the performance market in the Denver metro area, the reach of Beatport's website is international, and the DJs themselves come from areas beyond the Denver metro area. Therefore, plaintiffs have adequately pled the third element.

Finally, plaintiffs must demonstrate that the defendants had the specific intent to monopolize. In their motions to dismiss, Beatport, Beta, and Mr. Roulier argue that plaintiffs have failed adequately to plead this factor. However, the Court finds that the above referenced facts, if taken as true, demonstrate that defendants had a specific intent to conspire to form a monopoly. Thus, plaintiffs have adequately stated a claim for conspiracy to monopolize.

Conspiracy to Eliminate Competition by Unfair Means: Claim 5

A claim for conspiracy to eliminate competition by unfair means requires the plaintiff to allege facts that show that the "defendant entered a … conspiracy that unreasonably restrains trade in the relevant market." *TV Communications Network, Inc. v. Turner Network*, 964 F.2d 1022, 1027 (10th Cir. 1992). The Court must then determine whether the conspiracy "(1) constitutes a per se violation of the statute or (2) its purpose or effect is to create an *unreasonable* restraint of trade." *Ibid.*

Defendants' arguments can be summarized as follows: (1) defendants cannot conspire with one another, because they are either employees or closely related entities; (2) plaintiffs have not pled sufficient facts under a per se analysis; and (3) plaintiffs have not demonstrated that the defendants' behavior cannot be explained by a lawful purpose.

Defendants argue that "[a] corporation is not capable of conspiring with itself." *Lantec*, 306 F.3d at 1028 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769-72 (1984)). Beatport, as well as Beta and Mr. Roulier, argue that related entities cannot, by definition, enter into a conspiracy. Nor can a corporation conspire with its own employees.

*Copperweld* holds that "wholly owned subsidiar[ies]…are incapable of conspiring with each other for purposes of §1 of the Sherman Act." 467 U.S. at 777. *Copperweld* does not hold, as defendants state, that "related entities" cannot conspire with each other. Here, Beatport is not a wholly owned subsidiary of Beta. This Court does not find that the actions of Beta and Beatport "must be viewed as that of a single enterprise for purposes of §1 of the Sherman Act." *Id.* at 771. Although some common ownership exists between Beta and Beatport, it is not sufficient in this case to warrant dismissal of plaintiffs' antitrust conspiracy claims under *Copperweld*.

Defendants also argue that an entity cannot conspire with its own employees, i.e., Mr. Roulier cannot, by definition, conspire with Beta or Beatport. However, while "a corporation cannot conspire with itself for antitrust purpose…[the Tenth Circuit] recognizes a limited exception to the intra-corporate doctrine where the employees of a corporation have an independent personal stake and thus stand to benefit from conspiring with the corporation to restrain trade." *Bell v. Fur Breeders Agricultural Co-op.*, 348 F.3d 1224, 1233 (10th Cir. 2003) (internal citations omitted). As part owner of Beatport and owner of Beta, Mr. Roulier has an

"independent personal stake" in restraint of trade of Beta's competitors.  This situation sits firmly within the "independent personal stake" exception.

Second, defendants attack plaintiffs' fifth claim because they have not alleged sufficient facts under a per se analysis.  In their response, plaintiffs clarify that they are proceeding under a rule of reason analysis.  *See Mid-West Underground Storage v. Porter*, 717 F.2d 493, 497 (10th Cir. 1983) (holding that "conspiracies of the type alleged herein should be assessed under the rule of reason.").  It is unnecessary for plaintiffs to meet the per se pleading standards.

Beatport also argues that "the complaint contains no facts to suggest that any of the impacts about which plaintiffs complain cannot be explained by lawful behavior."  [#15 at 10].  Defendants argue that *Twombly* requires that plaintiffs demonstrate that the alleged antitrust violation cannot be explained by lawful free market behavior.  Instead, per defendants' argument, Beatport's, Beta's, and Mr. Roulier's actions can "just as easily be explained by the fact that in 2008 Beta was a new club that generated intense interest in the marketplace."  *Id.* at 10-11.  *Twombly* holds that "proof of a §1 conspiracy must include evidence tending to exclude the possibility of independent action."  550 U.S. at 554.  If taken as true, the above discussed facts support viable arguments that tend to exclude the possibility that defendants were motivated by lawful independent purposes.  Plaintiffs need not disprove all possible lawful explanations at this stage.  Thus, plaintiffs have adequately stated a claim for conspiracy to eliminate competition by unfair means.

Therefore, defendants' motions to dismiss are DENIED as to plaintiffs' claims four and five.

(4) THEFT OF TRADE SECRETS: CLAIM 6

In plaintiffs' sixth claim for relief plaintiffs contend that defendants misappropriated their trade secrets, including login information for profiles on MySpace, lists of MySpace "friends," confidential lists of personal cell phone numbers and email addresses for DJs, agents, and promoters, and customer lists. Beatport moves to dismiss this claim because plaintiffs have (1) failed to allege sufficient allegations to demonstrate that plaintiffs' lists are trade secrets, specifically, that plaintiffs' MySpace profile and "friends" list do not qualify as trade secrets; and (2) plaintiffs do not allege that the misappropriation was known by Beatport.[8]

"Under Colorado law, to prove theft or misappropriation of a trade secret, plaintiff must show: (i) that he or she possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and, (iii) that the defendant knew, or should have known, that the trade secret was acquired by improper means." *Gates Rubber Co. v. Bando Chemical Indus. Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993).

Trade Secrets

A "trade secret" is the "whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." C.R.S. §7-74-102(4). Additionally, the owner of the trade secret must have "taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." *Ibid.* Apart from the MySpace profiles and "friends," the other asserted trade secrets allegedly stolen by defendants qualify as trade secrets under Colorado law because they

---

[8] Defendants Beta and Bradley Roulier do not challenge claim 6 in their Motion to Dismiss [#32].

are "listings of names, addresses, or telephone numbers, or other information relating to any business…which is secret and of value." *Ibid.* Plaintiffs claim that these lists and online profiles are secured and safeguarded and access is restricted to specific personnel. Complaint ¶129.

Beatport argue that plaintiffs' MySpace profile cannot constitute a trade secret. Plaintiffs argue that this is an issue of first impression in the circuit. The Court has not found relevant case law on point in this or any circuit. However, the Tenth Circuit has outlined several factors that courts should consider in making trade secret determinations: "(1) whether proper and reasonable steps were taken by the owner to protect the secrecy of the information; (2) whether access to the information was restricted; (3) whether employees knew customers' names from general experience; (4) whether customers commonly dealt with more than one supplier; (5) whether customer information could be readily obtained from public directories; (6) whether customer information is readily ascertainable from sources outside the owner's business; (7) whether the owner of the customer list expended great cost and effort over a considerable period of time to develop the files; and (8) whether it would be difficult for a competitor to duplicate the information." *Hertz v. Luzenac Group*, 576 F.3d 1103, 1115 (10th Cir. 2009) (citing *Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306-07 (Colo. App. 1990)).

Beatport contends that information such as a list of MySpace "friends" is broadcast to the public via the Internet and thus cannot be considered a trade secret. Plaintiffs, however, maintain that social networking profiles are customer lists according to the factors laid out in *Colorado Supply* and *Hertz*. First, plaintiffs took reasonable steps to protect the secrecy of the information. Plaintiffs state that they "secured and safeguarded [the profiles] to prevent access to or use by anyone other than those limited personnel requiring access." Complaint ¶129. Plaintiffs secured the profiles through web profile login and passwords. *Id.* at ¶131.

The second factor is similar to the first, asking the Court to inquire whether access to the information was restricted. Plaintiffs have pled that the login and password information was restricted to personnel who required access in order to promote SOCO clubs. *Id.* at ¶129, 131.

The third factor asks whether employees knew the customers' names from general experience. This factor is not specifically addressed in the complaint, but the nature of the alleged trade secrets at issue militate in favor of trade secret status. Social networking sites enable companies, such as the SOCO clubs, to acquire hundreds and even thousands of "friends." These "friends" are more than simple lists of names of potential customers. "Friending" a business or individual grants that business or individual access to some of one's personal information, information about his or her interests and preferences, and perhaps most importantly for a business, contact information and a built-in means of contact. Even assuming that employees generally knew the names of all of the "friends" on SOCO's MySpace pages, it is highly unlikely, if not impossible, that employees knew the contact information and preferences of all those on the "friends" list from general experience.

The fourth factor addresses whether customers dealt with more than one supplier. MySpace members or members of other social networking sites may "friend" as many businesses or individuals as they wish. It is possible if not probable that plaintiffs' MySpace "friends" were friends with other Denver clubs. Nothing prevents Beatport from "friending" an identical list of people.

However, the fifth and sixth factors highlight the trade secret-like use of the MySpace profile and friends lists. Both factors in effect direct the Court to look at whether the alleged misappropriator could have obtained the same information from a public directory or another source outside of the plaintiffs' business. These factors appear to address the crux of the parties'

disagreements.  Beatport frames the list as a mere list of people's names.  In Beatport's estimation this list is open to the public, and anyone could easily see and write down who SOCO's "friends" are.  However, plaintiffs contend that this list is actually akin to a database of contact information.  The trade secret is not merely the list of names but their email and contact information as well as the ability to notify them and promote directly to them via their MySpace accounts.  Plaintiffs argue that "the critical information consisting of these friends' personal contact information and their permission to be contacted cannot be compiled from publicly available sources."  Docket #38, p. 21, ¶5.  The names themselves, readily available to the public, are not the important factor.  The ancillary information connected to those names cannot be obtained from public directories and is not readily ascertainable from outside sources, and thus this militates in favor of trade secret classification.

The seventh factor asks whether the owner of the customer list expended great cost and effort to develop it.  Although plaintiffs' complaint does not plead a specific dollar amount, it appears that SOCO expended at least some cost and effort in developing the social networking aspect of its business.  While employed by SOCO, Mr. Roulier was paid to "assist in building, maintaining and using these lists and web profiles."  Complaint ¶128.  This indicates that SOCO expended some amount of money, time, and resources into developing these lists for promotional purposes.

Finally, the Court must consider whether a competitor could easily duplicate the information.  Given adequate time and effort, Mr. Roulier could most likely duplicate or nearly duplicate the list of MySpace friends that SOCO had developed.  However, this would involve individually contacting thousands of individuals with friend requests, and it is by no means clear that all of those individuals would grant Beatport permission to contact them.  While Mr. Roulier

may be able to duplicate a near approximation of the list, duplicating it exactly and doing so within a time frame in which the list would still be useful to him is less likely.

Whether plaintiffs' MySpace friends list is a trade secret is question of fact. *See Hertz v. Luzenac Group*, 576 F.3d 1103, 1106 (10th Cir. 2009). However, given the weight of the *Colorado Supply* factors, the Court finds that plaintiffs have alleged sufficient facts to maintain their trade secret claim at the motion to dismiss stage.

<u>Misappropriation by Beatport</u>

Beatport contends that plaintiffs have not pled sufficient facts to demonstrate that Beatport knew or should have known that the trade secrets were acquired by improper means. Beatport argues that a court in this district has already rejected the proposition that Beatport can be held strictly liable for any misappropriation on the part of its employee, Mr. Roulier. *Ciena Communications v. Nachazel*, No. 09-cv-02845, 2010 WL 3489915 (D. Colo. Aug. 31, 2010). Beatport further states that this lack of basis warrants an award of attorney's fees and costs pursuant to C.R.S. §7-74-705.

*Ciena* does not stand for the proposition for which Beatport is offering it. It does not hold that an employee's misappropriation can *never* be imputed to the employer, rather, it holds that "[a]n employer who is unaware of an employee's misappropriation of another's trade secret would not be liable…." *Id.* at *4. In *Ciena*, the employee allegedly misappropriated the trade secrets prior to being hired by the new employer. The Court found that the plaintiff had pled insufficient facts to demonstrate that the employee's company had misappropriated any trade secrets or even known of the employee's alleged misappropriation. Plaintiffs here allege that Mr. Roulier misappropriated the trade secrets *while* he was a member and officer at Beatport. In *Ciena*, there were no allegations that the employee actually used the stolen trade secrets, while

here it is alleged that Mr. Roulier misappropriated and used plaintiffs' trade secrets. Mr. Roulier's relationship with the company is also not equivalent. He is a co-founder and officer of Beatport, not a mere employee.

Even if Beatport and Mr. Roulier's relationship were purely employee-employer, however, the language of the statute allows misappropriation to be attributed to the employing company if company "knew or should have known that the trade secret was acquired by improper means." *Gates Rubber Co. v. Bando Chemical Indus.*, 9 F.3d 823, 847 (10th Cir. 1993). Plaintiffs have alleged a public use of the misappropriated trade secrets, i.e., the promotion of Beatport via plaintiffs' MySpace page and friends. That is sufficient, at this stage of the case, to support the implied allegation that Beatport knew or should have known of improper acquisition.

The Court finds that plaintiffs' have sufficiently pled misappropriation of trade secrets as against Mr. Roulier, Beta, and Beatport. Defendants' Motions are DENIED as to claim 6. An award of attorney's fees is not warranted.

<u>(5) RICO: CLAIM 7</u>

Plaintiffs' seventh claim alleges violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, against all defendants. Plaintiffs allege that defendants created an informally organized enterprise to pursue the goal of leveraging Beatport's influence to exclude SOCO's clubs from the market for A-list DJs and prevent SOCO from competing with Beta. Beatport, Mr. Roulier, and Beta argue that (1) plaintiffs have pled insufficient facts pursuant to Fed. R. Civ. P. 8 and 9(b) to make out the adequate predicate acts and a general racketeering claim, and (2) plaintiffs have failed adequately to plead an "enterprise."

To make out a claim under RICO, plaintiffs must plead sufficient facts to make plausible (1) conduct; (2) of an enterprise; (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The "threat of treble damages and injury to reputation which attend RICO actions justify requiring plaintiff to frame its pleadings in such a way that will give the defendant, and the trial court, clear notice of the factual basis of the predicate acts." *Cayman Exploration Corp. v. United Gas Pipe Line Company,* 873 F.2d 1357, 1362 (10th Cir. 1989). The requirement of Fed. R. Civ. P. 9(b) that fraud must be pled with particularity applies to RICO claims. *Ibid.* This means that the complaint "must set forth the time, place and contents of the false representations, the identity of the party making the false statements, and the consequences thereof." *Lawrence Nat'l Bank v. Edmonds,* 924 F.2d 176, 180 (10th Cir. 1991).

Defendants argue that plaintiffs have not met the requirements of Rule 9(b) with regard to their predicate acts. The plaintiffs must plead facts that demonstrate that the alleged enterprise engaged in a "pattern of racketeering activity." Defendants must have engaged in racketeering activity as enumerated in §1961(1) of RICO. Racketeering activity is defined "to mean any of numerous acts 'chargeable' or 'indictable' under enumerated state and federal laws, including state-law murder, arson, and bribery statutes, federal mail and wire fraud statutes." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 509 (1985). These acts are referred to as "predicate acts" and are listed in §1961. Where, as here, the alleged predicate offense involves fraud, "to meet Rule 9(b), a plaintiff must identify with specificity the circumstances constituting the fraud in the predicate acts." *Brooks v. Bank of Boulder*, 891 F.Supp. 1469, 1477 (D. Colo. 1995). To show a pattern of racketeering activity, plaintiffs "must show the defendant committed racketeering predicate offenses which are related and amount to or pose a threat of continued

criminal activity." *Id.* at 1477-78 (citing *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239 (1989)).

Plaintiffs allege that defendants' scheme includes predicate acts of "wire fraud, mail fraud, bank fraud and theft.[9]" Complaint ¶141. Plaintiff's allegations of mail and bank fraud include little more than this bare assertion. Plaintiffs plead no specific facts that indicate mail fraud. *See Id.* at ¶¶137-154. Plaintiffs' allegations of fact regarding bank fraud amount to an allegation that customers who purchased tickets at Beta and the Beatport Lounge used money paid through various financial institutions. To state a claim for bank fraud plaintiffs must plead facts that allege that defendant: "knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses…" 18 U.S.C. § 1344. The fact that Beta and Beatport customers may have paid through various financial institutions is insufficient to allege bank fraud.

Plaintiffs also argue that they have alleged sufficient facts to make out the predicate act of wire fraud. To do so plaintiffs must demonstrate that the defendants "devised or [intended] to devise any scheme or artifice to defraud…by means of wire, radio, or television communications in interstate or foreign commerce…." 18 U.S.C. §1343. In support of their wire fraud claim, plaintiffs allege that the "enterprise" communicated to patrons of live performance by A-list DJs in the Denver metro area via MySpace pages belonging to The Church and Vinyl [ #1, ¶142]; fraudulent communications to SOCO via phone and email that represented their intention to "alternate" A-list DJs with SOCO's clubs, *id.* at ¶145; and the "Enterprise used interstate wire and mail communications to carry out its activities…." *Id.* at ¶150. These facts are insufficient

---

[9] Theft of trade secrets is not a qualifying "racketeering activity" as defined by the statute. *See* 18 U.S.C. § 1961(1).

to meet the specificity requirements of Rule 9(b).  Aside from the reference to MySpace communication, plaintiffs have not alleged any specific circumstances, details, or dates that indicate how and when the alleged Enterprise carried out its wire fraud.  These facts do not demonstrate a pattern of racketeering activity.  *See* 18 U.S.C. §1961(5).  Plaintiffs do not meet RICO's pleading requirements. *See Cayman Exploration Corp.*, 873 F.2d at 1362.  Therefore, the Court finds that plaintiffs have failed to state a claim with regard to their RICO claim.  Defendants' Motion to Dismiss is GRANTED as to Claim 7.

(6) CIVIL CONSPIRACY: CLAIM 9

Beatport argues that plaintiffs' claim for civil conspiracy should be dismissed because they assert "nothing new and fail for the same reasons Plaintiffs' antitrust, RICO, and trade secret claims fail." [#15, p. 19].  To make out the elements of a civil conspiracy claim under Colorado law, plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.  *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989).  That the basis of this claim serves as the factual bases for other claims is not grounds for dismissing plaintiffs' civil conspiracy claims.  Plaintiffs' surviving claims may serve to fulfill the third element of "one or more unlawful overt acts."

Therefore, plaintiffs' civil conspiracy claim as asserted against all defendants[10] will not be dismissed.  Defendants' Motion to Dismiss is DENIED as to Claim 9.

**Defendant Beatport's Motion for Sanctions [#30].**

On February 7, 2011 Beatport filed a Motion for Sanctions pursuant to Fed. R. Civ. P. 11.  The subject of the motion was the Complaint.  Beatport argued that not only are Mr. Vail's legal claims insufficient, but that "the nature of the insufficiency demonstrates that Mr. Vail either

---

[10] Defendants Beta and Mr. Roulier did not argue that this claim should be dismissed in their motion to dismiss.

undertook no legal research whatsoever or ignored well-established law when drafting Plaintiffs'

complaint." [#30 at 6]. Further, Beatport states "even a cursory review of an antitrust law

treatise, a review of a few of the leading civil RICO cases, and basic research regarding who can

properly be liable for the alleged theft of a trade secret would have revealed the lack of legal

foundation of Plaintiffs' allegations." *Ibid.*

Rule 11, as applicable here, provides that when an attorney files a complaint, he "certifies

that to the best of [his] knowledge, information and belief, formed after an inquiry reasonable

under the circumstances," that (1) it was not filed for an improper purpose, (2) the claims are

warranted by existing law or a nonfrivolous argument for extending the law, and (3) there is, or

likely will be after a reasonable opportunity for further investigation or discovery, evidentiary

support for the factual allegations. Fed. R. Civ. P. 11(b). In other words, an attorney may not

file a complaint for which there is not a good faith basis in fact and in law. Subsection (c) of the

rule authorizes courts to impose appropriate sanctions for violation of the rule.

The motion seeking Rule 11 sanctions was filed before plaintiffs responded to the motion

to dismiss. It was filed before plaintiff provided its Rule 26 disclosures. It was, of course, filed

before Beatport had any idea how the Court might rule on the motion to dismiss.

The motion contends, first, that plaintiffs' claims were all "frivolous." This section of the

motion amounts to a summary of the arguments presented in the motion to dismiss. As it turns

out, the Court did not dismiss the antitrust claims other than those of Mr. Christou,

notwithstanding Beatport's suggestion that even a cursory review of an antitrust treatise would

compel otherwise. The Court did not dismiss the trade secret claim. The Court did dismiss the

RICO claims, but the fact that claims do not survive a motion to dismiss does not mean that they

were filed in bad faith or that they lacked a good faith basis. Disagreement and fact disputes are

the stuff of the adversarial system.  The Court does not find that the RICO claims were "frivolous" to the point that they warrant Rule 11 sanctions.

Beatport also argues that plaintiff's counsel did not conduct an adequate pre-filing investigation of the factual bases for the claims.  This argument is largely based on defendants' Google research of the websites of certain DJs.  This research purportedly showed either that a DJ did not list dates at Beta (for example, Tiesto, Armin van Buuren, Christopher Lawrence, Sharam, Bad Boy Bill, Deadman5 are shown as having no listings at Beta in 2010) or that a DJ did list dates at plaintiffs' clubs in those years (for example, DJ Rap is shown as having been at two of the plaintiffs' clubs in 2010).  The implication is that defendants could not have coerced those DJ's to perform at Beta to the exclusion of plaintiffs' clubs.  From that premise, defendants draw the conclusion that plaintiffs' counsel inadequately investigated the antitrust claims.

In fact, the premise itself was mistaken, as defendants appear to admit in their reply. [#47] at 2-3.  Moreover, as indicated by the description of certain recorded conversations in plaintiffs' response brief at 4-5 – whether or not those recordings ultimately are admissible under the Rules of Evidence – defendants would have been wise to await the disclosures before assuming and asserting that plaintiffs' counsel had made such an inadequate investigation as to justify Rule 11 sanctions.

In short, having reviewed not only the Complaint and the briefing on the motion to dismiss but also the motion, response and reply concerning Rule 11 sanctions, the Court finds that defendants have not shown the lack of a good faith basis for the allegations of the Complaint that would warrant such sanctions.  Rather, it appears to this Court that the motion reflects a lack of judgment.  That is not to say, of course, that it is improper to seek sanctions for violations of Rule 11.  It is to say that using Rule 11 prematurely and carelessly is improper.

Rule 11(c)(2) provides that the Court may award the party who prevails on a Rule 11 motion its reasonable expenses including attorney's fees incurred with respect to the motion. The Court exercises its discretion in this instance not to impose sanctions.  However, with respect to all future matters, the Court will consider sanctions if necessary and appropriate. Please always bear in mind that hard feelings between the parties do not alter counsel's obligation to conduct their zealous representation with the courtesy and civility due to one another.

**Order**

1. Defendant Beatport's Motion to Dismiss [#15], and defendants Bradley Roulier's and Beta's Motion to Dismiss [#32] are GRANTED in part and DENIED in part.  The motions are GRANTED as to all antitrust claims asserted by Mr. Christou individually and as to plaintiffs' RICO claim.  The motions are otherwise DENIED.

2. Defendant AM Only's Motion to Dismiss [#25] is DENIED as MOOT.[11]

3. Defendant Beatport's Motion for Sanctions [#30] is DENIED.

DATED this 14th day of March, 2012.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge

---

[11] Defendant Am Only was dismissed with prejudice on September 27, 2011.  [#101].