IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 10-cv-02912-RBJ-KMT

REGAS CHRISTOU,
R.M.C. HOLDINGS, L.L.C. d/b/a The Church,
BOUBOULINA, INC. d/b/a Vinyl,
MOLON LAVE, INC. d/b/a 2 A.M.,
CITY HALL, LLC,
1037 BROADWAY, INC. d/b/a Bar Standard f/k/a The Shelter,
776 LINCOLN ST., INC. d/b/a Funky Buddha Lounge, and
1055 BROADWAY, INC. d/b/a The Living Room,

      Plaintiffs,

v.

BEATPORT, LLC,
BRADLEY ROULIER, and
BMJ&J, LLC d/b/a Beta Nightclub and Beatport Lounge,

      Defendants.

---

## ORDER

---

This matter is before the Court on (1) Defendants' Motion to Exclude Plaintiffs' Expert

Owen R. Phillips, Ph.D. [docket #122]; (2) Plaintiffs' Motion for Sanctions for Spoliation

[#123]; (3) Defendants' Motion to Exclude Plaintiffs' Expert Witness Jay E. Freedberg [#134];

(4) Defendant Beatport's Supplemental Motion for Sanctions Pursuant to Federal Rule of Civil

Procedure 11 [#137]; (5) Defendants' Combined Motion for Summary Judgment [#148]; (6)

Renewed Stipulated Motion to Set Dates Certain for Pre-trial Deadlines [#174]; and (7)

[Plaintiffs'] Unopposed Motion to Supplement Response to Motion to Exclude Jay E. Freedberg,

CPA [#189].

## FACTS[1]

In the 1990's Regas Christou founded several nightclubs in Denver's "South of Colfax Nightlife District."  Two of these nightclubs, The Church and Vinyl, developed national reputations as venues for "Electronic Dance Music" (sometimes referred to as "EDM"). Electronic Dance Music features live performances by disc jockeys who mix songs or "tracks" on expensive synthesizers and other computer based equipment and are viewed as artists in their own right.  Each year DJ Magazine produces a list of the "Top 100" DJ's in the EDM world. These "A-List DJ's" command larger audiences and are in high demand by nightclubs.  They also perform in other venues such as, in Colorado, the Ogden and Fillmore theaters and the Red Rocks amphitheater.

From 1998 to 2007 Bradley Roulier was employed by Mr. Christou as a "talent buyer." As such, and apparently with considerable success, he assisted in booking A-List DJ's and other DJ's for Mr. Christou's clubs.  Mr. Roulier and others also conceived of the idea of creating an online marketplace for promoting and selling (downloading) Electronic Dance Music.  Mr. Christou liked the idea and provided both financial and promotional support to Mr. Roulier and his partners.  This idea led to the creation of Beatport in 2003.  Beatport was enormously successful and has grown to become the largest online site that caters essentially exclusively to producers and consumers of Electronic Dance Music.

Anyone can download music from the Beatport website.  However, the tracks sold on Beatport are designed especially for DJ's.  They are free of Digital Rights Management or "DRM," which means they can be mixed and re-mixed on the types of equipment used by DJ's. They are meant to be played at loud volume on very expensive, high fidelity equipment that is

---

[1] A more extensive recitation of the facts cans be found in the Court's order of March 14, 2012 which addressed defendants' motions to dismiss and a previous defense motion for sanctions.

available in the venues in which these DJ's work.  Accordingly, the average cost of a single track is higher than tracks that can be downloaded on mass-market sites such as Apple's iTunes. Although many of the same DJ's do sell tracks on iTunes and various other online sites, Beatport considers itself to set the standard in the market that it serves.

In 2007 Mr. Christou and Mr. Roulier had a falling out, the cause of which is immaterial to the pending motions.  Mr. Roulier left Mr. Christou, and in 2008 he founded his own competing club called Beta in the Lower Downtown area of Denver.  The gist of the present suit is plaintiff's claim that Mr. Roulier has been threatening A-List DJ's that their tracks will not be promoted on Beatport if they perform in Mr. Christou's clubs, and as a result, Beta has largely taken over the Denver market.

### PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on December 1, 2010.  They originally asserted nine claims for relief: (1) illegal tying in violation of section one of the Sherman Act against all defendants; (2) monopolization (section two of the Sherman Act against defendants Beta and Mr. Roulier; (3) attempt to monopolize against Beta and Mr. Roulier; (4) conspiracy to monopolize against all defendants; (5) conspiracy to eliminate competition by unfair means in violation of section one of the Clayton Act; (6) theft of trade secrets; (7) violation of the Racketeer Influenced and Corrupt Organizations Act; (8) intentional interference with prospective business expectancies against Mr. Roulier; and (9) civil conspiracy against all defendants.

In its order of March 14, 2012 [#146] the Court dismissed the RICO claim and found that that Mr. Christou personally lacked standing to assert the antitrust claims.  With those exceptions, however, the Court denied the motions to dismiss.  It also denied defendants' motion for sanctions.

3

Defendants filed their motion for summary judgment on March 15, 2012. The Court heard oral argument on summary judgment on July 11, 2012. However, plaintiffs' claims rested in part on the testimony of expert witnesses. Defendants had filed "Daubert" motions challenging the admissibility of the experts' opinions, and they requested an evidentiary hearing on those motions. That hearing was held on January 15, 2013. The Court now is in a position to rule on those motions, the summary judgment motion, and the other pending motions.

## I.      THE DAUBERT MOTIONS.

### A.  <u>Rule 702</u>.

Federal Rule of Evidence 702 provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, Rule 702 assigns the trial judge "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). An opinion is <u>reliable</u> if the witness is qualified to give it, and it is based upon reliable scientific principles and sufficient facts. The Court may consider such factors as whether the expert's theories or methods can be tested; whether they have been subjected to peer review and publication; whether there is a known error rate; and whether they have gained a degree of acceptance in the relevant community. *Daubert,* 509 U.S. at 593-94. Opinions are <u>relevant</u> if they will be of assistance to the jury, that is, is there a "fit" or logical relationship between the proffered testimony and the factual issues in the case.

The objective of *Daubert's* gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The plaintiff need not "prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community. Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements." *Goebel v. Denver & Rio Grande Western R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (internal citations omitted). However, the Court is mindful that Rule 702 was intended to create a liberal standard for the admissibility of expert testimony, not to create new barriers. *See Cook v. Rockwell Intern. Corp.,* 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006).

**B. Defendants' Motion to Exclude Plaintiffs' Expert Witness Owen R. Phillips, Ph.D. [#122].**

Dr. Phillips' opinions are expressed in his report of August 31, 2011 [#122-3]. He was deposed on November 3, 2011 [#122-4]. His opinions were criticized in the report of an expert engaged by the defendants, Dr. James A. Langenfeld, dated November 18, 2011 [#122-15]. Dr. Phillips then prepared a rebuttal to the Langenfeld critique, issued on December 21, 2011 [#122-5]. Both experts testified at length during the Daubert hearing on January 15, 2012.

In brief summary, Dr. Phillips' opinions are as follows:

1. The relevant tying market is "digital downloads of DRM-free, high fidelity Electronic Dance Music suitable for playing on high-performance sound systems globally (digital download market)."

5

2. The relevant tied market (also the market that defendants are attempting to monopolize) is "live performances by A-List DJs playing Electronic Dance Music at nightclubs in the Denver metro area (A-List DJ market)."

3. Beatport has very significant market power, amounting either to monopoly power or near monopoly power, in the digital download market.

4. Mr. Roulier, who has an ownership interest in Beatport, leveraged Beatport's market power in the digital download market to coerce A-List DJ's to perform at Beta and not to perform at The Church or Vinyl when they accepted night club gigs in Denver.

5. The tie-in arrangement has helped to give Beta a monopoly or near monopoly in the A-List DJ market.

6. This has caused damage to competition for A-List DJ's which has harmed both the DJ's and the patrons of Electronic Dance Music performances in Denver nightclubs.

7. The defendants' anticompetitive behavior has caused The Church and Vinyl to experience significant revenue declines on the evenings they devote to Electronic Dance Music performances.

*See* Report [#122-3] at 8-9.

Reliability.

Dr. Phillips' qualifications were not contested.  Briefly, he received his Ph.D. in economics from Stanford University in 1980.  He has taught and done research in antitrust economics for more than 25 years, presently as a Professor of Economics and Associate Dean of the College of Business at the University of Wyoming.  He has also been a visiting professor at the Harvard Business School, and he has worked as an economist at the Antitrust Division of the

Department of Justice.  He has published 23 peer-reviewed articles on antitrust economics.  He has frequently served as an expert witness in federal courts in Colorado and elsewhere.

The point of beginning in the analysis of a tying or a monopoly claim is identification of the relevant markets in which the defendant operates.  *See Telecor Communications, Inc. v. Southwestern Bell Telephone Company,* 305 F.3d 1124, 1130 (10th Cir. 2002).  Ultimately the determination of the relevant market or markets is a question of fact.  *Id.* at 1131.  The primary focus of defendants' motion to exclude Dr. Phillips' testimony is on his opinions regarding the relevant markets.

Dr. Phillips testified that antitrust economists use three methods to define the relevant market: (1) a formal study of cross-price elasticity; (2) the Small but Significant and Non-transitory Increase in Price ("SSNIP") test developed by the United States Department of Justice and the Federal Trade Commission in 1982 and incorporated into their Horizontal Merger Guidelines; and (3) the application of "practical indicia."  The latter test stems from *Brown Shoe v. United States,* 370 U.S. 294 (1962).  The Court identified seven factors that are examples of practical indicia that can be used to determine the boundaries of a submarket within a product market: (1) industry or public recognition of the submarket as a separate economic entity; (2) the product's peculiar characteristics and uses; (3) unique production facilities; (4) distinct customers; (5) distinct prices; (6) sensitivity to price changes; (7) specialized vendors.  The *Brown Shoe* factors have been recognized as being relevant to the determination of primary markets as well as submarkets.  *See, e.g., In re Live Concert Antitrust Litigation,* 247 F.R.D. 98, 124 (C.D. Cal. 2007).[2]

---

[2] Although this case arose in the context of a class certification dispute, it contains an excellent discussion of several antitrust principles in a factual setting somewhat akin to that presented here.  I nevertheless might not have singled out a California district court's decision when the menu of Tenth Circuit and Supreme Court decisions is quite full but for the fact that defendants not only urged me to read it but to use it as a model for decision.

Although Dr. Phillips had a great deal to say about interchangeability of products and cross-elasticity of demand, he did not perform a formal study of cross-elasticity.  He states that "economists are rarely given the opportunity to observe a significant price increase (*e.g.,* on the order of 5%), by a firm or group of firms from which a change in sales and profits can then be measured."  Report [#122-3] at 10.  He therefore considers cross-price elasticity to be difficult to study.  Based upon the reading I have done, that view is not unreasonable.

Dr. Phillips did apply both of the other methods in reaching his relevant market definitions.  Defendants do not quarrel with the reasonableness of either of the two methods.  Dr. Phillips' testimony during the Daubert hearing featured a series of PowerPoint slides that he used to explain his application of the SSNIP test and *Brown Shoe's* seven practical indicia to specific facts that he obtained from cited documents, deposition testimony and interviews.

I will not attempt to discuss in detail the facts and analysis that are set forth in a 43-page report (66 including exhibits), a 22 page rebuttal report, and approximately two and one half hours of hearing testimony.  However, with respect to the "Digital Download Market," key facts on which Dr. Phillips relies include the following.

- Beatport is the largest online site that caters exclusively to Electronic Dance Music, particularly to DJ's who buy and sell EDM tracks and albums on line.

- Apple's iTunes is a much larger online source of music downloads.  However, Mr. Roulier and others distinguish Beatport from iTunes on several grounds.  Beatport's tracks have always been DRM-free; iTunes did not begin offering a DRM-free format until 2009.  Beatport offers tracks in MP3, MP4 and WAV formats, the latter being the highest quality preferred by some DJ's and clubs; iTunes does not offer WAV format.  Beatport offers 19 specialized music genre classifications tailored to

nightclub performances.  Beatport is often the first vendor to offer new music.  It offers numerous exclusive tracks that DJ's want to make their sets unique.  Beatport has a strategic partnership with the German company, Native Instruments GmbH, which manufactures the dominant hardware system used by DJ's.  Beatport's tracks tend to be longer.  Significantly, tracks downloaded from iTunes range from 69 cents to $1.29.  A newly released exclusive track is priced by Beatport at $2.49.  Non-exclusive tracks are generally priced at $1.99 (classic) and $1.39 (general).  Tracks download as WAV files cost $1.00 more than these prices.

- Notwithstanding the higher prices, Beatport has been a huge commercial success.  In 2010 it had 1.8 million registered users, and it claims to have more than two million monthly visitors.  Its revenues have increased from $274,973 in 2004 to $39,263,871 in 2010.  Beatport estimates that it has an 80% share of EDM downloads worldwide.

- According to an internal analysis, Beatport believes that it competes in a distinct market from the sales of digital music downloads on iTunes and other mass-market vendors.  It considers its competitors in its market to be Juno Downloads, Traxsource, Trackitdown, DJ Download Satellite Records, What People Play, and Stompy.

- Dr. Phillips cites statements from several DJ's and others who recognize Beatport's market power and Beatport's ability to wield that power to accomplish its objectives.

- Because Beatport competes online, the geographic market is worldwide.

With respect to the A-List DJ market, both parties cite DJ Magazine's annual list of the top 100 DJ's as defining the category.  Dr. Phillips accepts that definition.  In reaching his opinions regarding the A-List DJ market, Dr. Phillips cited the following facts among others:

- Statistics compiled for the years 2006 through 2010 at The Church and Vinyl, and for 2008 through 2010 for Beta, show that A-List DJ's receive significantly higher compensation for a single performance than unranked DJ's.

- A-List DJ's attract larger crowds, and nightclubs charge higher cover charges when the top DJ's perform.

- Although top DJ's perform at venues other than nightclubs, concerts generally have seated audiences as compared to nightclubs where a dance floor is the focal point. Consumers generally purchase relatively expensive concert tickets in advance; nightclubs charge cover charges that are generally less expensive and cater to "spur of the moment" decisions by not requiring advance reservations.  Concert venues generally are open to everyone; nightclubs, which offer alcohol and appeal to single adults, have age restrictions.  Nightclub patrons can get "up close and personal" with the celebrity DJ's.  Altogether, nightclubs are a difference experience and attract a different crowd.

- In 2006 and 2007, i.e., before Beta opened, The Church and Vinyl combined averaged more than 40 performances by A-List DJ's per year.  From 2008 through 2010 they averaged one or two A-List DJ performances per year.  Beta averaged between 22 and 29 performances by A-List DJ's per years during 2008 through 2010.

- There is anecdotal evidence that A-List DJ's and their representatives recognize the importance of promotion on Beatport to their success, and that Mr. Roulier and

Beatport have used Beatport's market power to pressure them to book performances at Beta and not to perform at The Church or Vinyl.[3]

- Patrons are thought to be willing to travel up to 100 miles for entertainment.  In any event, the three nightclubs in Denver are the only nightclubs presently offering live performances by A-List DJ's of Electronic Dance Music in Colorado.

Unsurprisingly, Dr. Phillips testified, in response to leading questions, that his opinions were based upon sufficient facts and data.

In their 62-page motion, defendants express numerous criticisms of Dr. Phillips' methods and conclusions.  These criticisms were amplified in the report and testimony of the defendants' antitrust economics expert, Dr. Langenfeld.  He, like Dr. Phillips, is a Ph.D. economist.  He currently is a Managing Director and Principal of the Chicago consulting firm of Navigant Economics as well as an Adjunct Professor at the Loyola University Law School.  He has impressive professional experience at the Federal Trade Commission and elsewhere; an extensive list of publications on antitrust and economics topics; many and substantial expert witness experience.  His qualifications to express opinions in the field of antitrust economics have not been challenged.

Dr. Langenfeld accuses Dr. Phillips of admitting that he developed his "Digital Download" market "in order to generate a sufficiently high market share necessary to support the

---

[3]  Some of the anecdotal evidence relied upon by plaintiffs is in the form of recorded telephone calls, during which a DJ or representative of the DJ made statements to the effect that they were threatened with lack of promotion on Beatport unless they avoided the Christou clubs and played at Beta when in Denver.  These individuals apparently do not reside within the subpoena power of this Court.  Apparently they have not been deposed and might not, despite the parties' reputations and clout in the industry, be willing voluntarily to testify at trial.  Defendants argue that the recorded statements are inadmissible hearsay.  Judge Nottingham discussed somewhat similar evidentiary issues in *Nobody in Particular Presents, Inc. v. Clear Channel Comm'ns* ("*NIPP*"), 311 F. Supp. 2d 1048, 1095-96 (D. Colo. 2004).  His comments suggest a view that e-mail messages showing persons agreeing to a tying arrangement were not hearsay but were "verbal acts."  He also addressed the coconspirator exception to the definition of hearsay and the present sense impression exception to the hearsay rule.  The parties' positions on these evidentiary rules did not receive much analysis in their various briefs.  I am not suggesting or requesting motions in limine.  I am simply suggesting that the parties take a hard look at these issues.

claims in this case." Report [#122-15] at 22.  He cites Dr. Phillips' deposition at page 123 for

that statement.  I have reviewed the deposition testimony and find that this is not a fair

interpretation of what Dr. Phillips said.  Aside from that unfortunate misstep, however, there

were a number of points of professional disagreement between the two men as to which

reasonable minds could differ.[4]  Suffice it to say that I have carefully considered Dr.

Langenfeld's lengthy report, including his exhibits, and his testimony.

     I have also considered Judge Wilson's comments on Dr. Phillips' opinions in *In re*

*Concert Antitrust Litigation,* 247 F.R.D. at 124-27, 140-46, and Judge Nottingham's comments

on Dr. Phillips' opinions in *NIPP,* 311 F. Supp. 2d 1048, 1057-59, 1065, 1067, 1077, 1081-93,

1097, 1100-03, 1110-12, 1120.  In both of these antitrust cases Dr. Phillips was retained by the

plaintiff as an expert in antitrust economics.

     In *NIPP,* as here, Dr. Phillips did not do a cross-elasticity study in defining the relevant

market.  Judge Nottingham concluded that such a study is not always necessary and noted that

Dr. Phillips relied on recognized factors including economic data, industry materials, pricing

data and public recognition of the market.  *Id.* at 1120.  The court did not formally rule on

defendants' Daubert challenge, but it did find that Dr. Phillips' opinions were sufficiently

reliable for admission on the issue of market definition under Daubert.  *Id.*  The court relied

heavily and continually on Dr. Phillips' analysis throughout its opinion.

     The court in *In re Concert Antitrust Litigation* did not conduct a Daubert analysis.  247

F.R.D. at 116 n.17.  It criticized some of Dr. Phillips' opinions, just as it criticized some of the

opinions of defendants' expert.  At the Daubert hearing in the present case Dr. Phillips testified

---

[4] One point that Mr. Langenfeld emphasizes to some extent and that defendants' brief emphasizes even more is that "downloads" are the wrong market; the key to Beatport's power is access and promotion.  I do not find that there is actual disagreement.  Mr. Phillips agrees that Beatport's ability to promote or withhold active promotion of a DJ's tracks, albums and charts is what gives it power.  Downloads are a means of measuring market share and can be said to be a measure of successful promotion.  *See* Phillips Rebuttal Report [#122-5] at 8.

12

that while he did not agree with Judge Wilson's criticisms, he took them to heart and believes that he addressed the issues in his reports and opinions here, in particular, that he considered and applied all seven of the *Brown Shoe* practical indicia.

Ultimately, however, how Dr. Phillips' opinions fared in those cases does not determine the fate of his opinions here.

<u>Relevance</u>

"Relevant markets," a "tying product," a "tied product," "market power," "monopoly," "monopsony," and how those terms fit the facts of this case are largely beyond the ken of a typical lay juror. I have little doubt that the testimony of Dr. Phillips, and that of Dr. Langenfeld, will be of assistance to the jury in understanding the facts and the issues of this case. That is why the use of such experts is common in antitrust cases. These opinions are therefore relevant.

<u>Conclusion</u>

As indicated above, the Court's task is not to decide which expert is correct. Rather, it is to decide whether Dr. Phillips' opinions are so far divorced from recognized science in his field, and so unsupported by facts, as to be unworthy of being heard at all. I conclude that he is highly qualified to render opinions in antitrust economics, and that his opinions are reliable and relevant within the meaning of Rule 702. Defendants' criticisms go to the weight to be given to his testimony by the jury, not to its admissibility. Accordingly, the motion to exclude his testimony is denied.

**C.  <u>Jay E. Freedberg</u>.**

Mr. Freedberg is plaintiffs' damages expert. Like Dr. Phillips and Dr. Langenfeld, Mr. Freedberg has prepared a lengthy report. [#134-2]. His opinions are that (1) because of the decline in A-List DJ performances after Beta opened, The Church and Vinyl suffered losses of

profits on their respective Thursday and Saturday EDM nights in the amounts of $746,923 (The

Church) and $422,621 (Vinyl); and (2) because of the reduction in profitability, plaintiffs lost

$2,144,286 in the value of their business enterprise as at December 31, 2010.

    1.  Lost Profits.

Reliability

    Mr. Freedberg is a Certified Public Accountant who has additional certifications in

business valuation and financial forensics.  He is currently a Vice President, Director and Senior

Analyst in the Denver firm of Shuster & Company.  His qualifications have not been contested in

this case.  He does not purport to have expertise in antitrust matters, nor has he attempted to form

opinions regarding the merits of plaintiffs' claims.  Rather, his role was to attempt to determine

what money damage the plaintiffs have sustained if liability and causation are otherwise proven.

    There is nothing mysterious about the lost profits calculation.  Mr. Freedberg first

examined actual cover charge revenue realized by The Church and Vinyl on their respective

EDM nights in 2006 and 2007.  He then projected "expected" cover charge revenue for 2008

through 2010, essentially on the initial assumption that things would stay about the same.

However, recognizing that the economic downturn during those years probably would have

caused a decrease in cover charge revenues, he attempted to account for that, using North

American Industry Classification System statistics for revenue changes in Colorado Bars,

Nightclubs and Drinking Establishments during those years.  He calculated historical (2006-

2007) revenues from food, beverage and miscellaneous sales and assumed that that the average

percentage of cover charge revenue from those years could be projected over the 2008 to 2010

period.  This gave him "total revenue" projections for 2008 through 2010.  Finally, he projected

the two clubs' "variable expenses" (cost of goods sold, advertising, bank fees, equipment rent,

payroll taxes) from the 2006-2007 experience to 2008 through 2010, and subtracted those projected expenses to determine "lost profit" during the three-year period.

In short, his methodology was, first, to project revenues that probably would have been realized had the business continued as in the past; next to account for factors unrelated to the case that probably would have impacted revenues; and finally to deduct projected expenses. Mr. Freedberg testified at the Daubert hearing that he used a methodology that is suggested by the American Institute of Certified Public Accountants in a technical practice aid. It is a methodology, he states, that is generally accepted in the accounting industry.

Defendants (including Dr. Langenfeld) do not take issue with the basic methodology, but they are critical of his application of the methodology in several respects. They contend that it is unreasonable to ignore revenue from other nights and from plaintiffs' other clubs and bars that offset the alleged losses on Thursdays at The Church and Saturdays at Vinyl. They challenge his failure to adjust for factors other than the economic downturn that might have reduced revenues, such as the mere entry of a new and strong competitor in the market. They challenge his revenue projections, including his omission of 2005 revenue data. They question the conversion of lost sales on Thursday and Saturday nights to lost profits by the use of a variable cost to sales ratio estimated for all nights. They imply that Mr. Freedberg's reliance on information provided by plaintiffs' counsel raises questions about his numbers. In addition, during cross-examination defense counsel pointed out at least one mistake in his lost profits chart.

Mr. Freedberg presumably can correct a mistake without materially changing his opinions. Whether he can provide reasonable and persuasive answers to the various other challenges defendants have raised is another matter.

<u>Relevance</u>

Calculation of lost profits is not something that a lay juror does on a daily basis.  Mr. Freedberg's explanation of how he went about it would be of assistance to the jury.

<u>Conclusion as to Lost Profits Testimony</u>

I return to the core of what Daubert is about.  No one questions Mr. Freedberg's credentials.  His methods as such were not challenged.  His work is essentially basic accounting.  Mr. Langenfeld and defense counsel challenged certain assumptions and even mistakes in Mr. Freedberg's calculations.  But there is no need for a gatekeeper to shield the jury from "junk science" or from someone who is out in left field, detached from the mainstream of his profession.  His assumptions can be challenged on cross-examination and through expert testimony.  Defendants' issues go to the weight, not the admissibility, of the opinions.  The Court finds that the lost profits opinions are reliable and relevant within the meaning of Rule 702.

2.  <u>Lost Enterprise Value</u>

<u>Reliability</u>

Mr. Freedberg testified that there are three commonly accepted methods to determine the value of a business: (1) calculation of net asset value; (2) comparable sales; and (3) the income method, i.e., capitalization of earnings.  He did not use the net asset method, because it does not reflect good will, which he believes is a significant component of the value of plaintiffs' enterprise.  He could not use the comparable sales method, because he could not identify any comparable sales.  This is not surprising given that there are apparently only three nightclubs in Colorado that feature live performance by A-List DJ's of Electronic Dance Music.  Defendants

did not question the use of the capitalization of earnings method or even the capitalization rate that Mr. Freedberg used. *See* Langenfeld Report [#122-15] at 58.

Relevance

A calculation of lost enterprise value, if otherwise relevant to the case, would be of assistance to the jury. The question in my mind is "fit," that is, whether there is a logical relationship between Mr. Freedberg's testimony regarding lost enterprise value and the factual issues in this case. The opinion as to the lost enterprise value as at December 31, 2010 seems, at least to me, to rest on two critical assumptions. First, that Mr. Christou intended to sell the two clubs in or about December 2010. Second, that events occurring after December 31 2010 are not relevant.

With respect to the possibility of a sale in or about December 2010, plaintiffs have pointed to deposition testimony by Mr. Christou that he had had conversations with Mr. Roulier in the 2006-2007 time frame about Mr. Roulier's possibly buying The Church, and that they were "pretty close to the numbers." Deposition [#14-6] at 72. He testified that Mr. Roulier suggested that Vinyl be turned into a condominium project, which he also thought was "not a bad idea." *Id.* at 72-73. This vague testimony, before Mr. Roulier left and formed Beta, does not say much about the relevance of the value of Mr. Christou's clubs at the end of 2010.

Moreover, even if it can be established that Mr. Christou did wish to sell at that time, is the alleged loss in enterprise value perpetual? What is the value of the enterprise today? If plaintiffs prevail, what happens to the value of the enterprise? Would damages for lost enterprise value as of December 31, 2010 permit Mr. Christou to have his cake and eat it too?

These questions were not answered during the Daubert hearing or in plaintiffs' brief. *See* Response [#140] at 13-14. Recognizing that, plaintiffs have filed a motion to supplement their

position regarding Mr. Freedberg's lost enterprise value opinion.  [#189]  Defendants do not

oppose this motion but "reserve their right" to file a response.  Accordingly, motion #189 is

granted.  The supplement provides authority for the common sense proposition that past lost

profits and present lost enterprise value are not necessarily mutually exclusive.  However, it does

little to answer the questions in the Court's mind about the logical relationship between this

opinion and the facts of this case.  A response to this motion is not necessary.

<u>Conclusion as to Lost Enterprise Value</u>

Because I am not granting the motion to exclude Mr. Freedberg's testimony entirely, and

because the basic questions I have raised have still not been addressed to my satisfaction, I elect

to reserve judgment on the lost enterprise value opinion.  If plaintiffs press this part of Mr.

Freedberg's testimony, then I will decide whether to strike it in whole or part in the context of

what is presented at trial.  Suffice it to say at this point that I have my doubts.

## II.    SUMMARY JUDGMENT [#148]

Summary judgment may be granted only if there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Defendants

filed an 82-page motion for summary judgment, supported by 39 exhibits that collectively

comprised 676 pages of documents, on the day following the Court's denial of their motions to

dismiss.  It seeks dismissal of all of the plaintiffs' claims.  Obviously this was not prepared

overnight.  It does not address the Court's analysis of the legal issues.  For all these reasons, the

motion is less helpful than it might have been.  Nevertheless, I have read it, the response, and the

reply.  I have also reviewed the transcript of the oral argument.

A. **The Antitrust Claims.**

Defendants raise six groups of arguments as to why the antitrust claims should be dismissed:

1. Plaintiffs' Cannot Prove Causation. Motion [#148] at 36-41.

Defendants argue that plaintiffs have not properly defined the relevant market. That reflects defendants' disagreements with Mr. Phillips' opinions, which I have held will not be excluded. Defendants argue that there is no proof that Beatport has sufficient market power to coerce or attempt to coerce A-List DJ's to shun Mr. Christou's clubs and play only at Beta. That turns on genuine and material fact disputes. Defendants argue that plaintiffs made the most profit ever in 2010 when they had the fewest performances by A-List DJ's. That begs the question whether the decrease in performances by A-List DJ's caused losses on Thursday and Saturday nights, notwithstanding successes in other areas of their business.

2. Plaintiffs' Lack Standing. *Id.* at 41-44.

This was addressed by the Court in ruling on the motions to dismiss.

3. Plaintiffs Have Not Presented Evidence Defining the Relevant Market. *Id.* at 43-51.

This again gets back to defendants' disagreement with Dr. Phillips. The determination of the relevant markets is a question of fact. Whether Beatport had market or monopoly power in the alleged tying market is a question of fact. Whether Mr. Roulier used Beatport's power to threaten and attempt to coerce A-List DJ's into playing at Beta rather than The Church or Vinyl if they performed in Denver is a question of fact. Whether the alleged tie-in succeeded and whether it was a cause of the decline in A-List DJ performances at Mr. Christou's clubs and the precipitous rise of such performances at Beta is a question of fact. Whether there was a

conspiracy and, if so, who the conspirators were, are questions of fact.  Whether Beta possesses

monopoly power in the relevant market, and if so, whether that power was willfully acquired or

maintained as distinguished from growth or development as a consequence of a superior product,

*see United States v. Grinnell,* 384 U.S. 563, 570-71 (1966) are questions of disputed fact.

    4.  <u>Plaintiffs Cannot Show that Beatport had an Economic Interest in Requiring A-List DJ's to Perform at Beta</u>.  *Id.* at 51-55.

This gets into the motives of Mr. Roulier, as a part owner of Beatport, and the

relationship between Beatport and Beta, which plainly present issues of fact.

    5.  <u>Conspiracy Claims</u>.  *Id.* at 55-59.

This essentially goes into whether Beatport, Beta and Mr. Roulier did conspire, or even

legally can conspire, with each other.  The former presents issues of disputed fact.  The Court

addressed the legal issue in its March 14, 2011 order.

    6.  <u>Attempt to Monopolize Fails as a Matter of Law</u>.  *Id.* at 69-72.

Defendants argue that plaintiffs have no evidence of a dangerous probability that Beta

will achieve a monopoly.  Defendants suggest that there more than 400 drinking establishments

in Denver, and that Beta accounts for just over one percent of the total revenues for such

establishments.  Alternatively, defendants suggest that there are approximately 32 nightclubs in

Denver that play dance music, and Beta accounts for only three percent of the total number of

nightclubs.  As indicated above, the determination of the relevant market is a question of fact.

Lumping Beta in with 400 drinking establishments or even other nightclubs who do not cater to

patrons who seek out Electronic Dance Music, live performances by DJ's including A-List DJ's,

complete with the high end equipment and sound that are features of the Christou and Roulier

clubs, is questionable.  In any event, it is not for a judge to determine the relevant market as a matter of law.

In short, the Court finds that the antitrust claims are riddled with fact disputes that are not susceptible to summary disposition.

### B.  **Misappropriation of Trade Secrets**.

Defendants argue that the Sixth Claim, sounding in theft or misappropriation of trade secrets, should be dismissed as a matter of law.  The Court addressed the legal issue in its order of March 14, 2012.

### C.  **Civil Conspiracy**.

Defendants argue that the civil conspiracy claims fail for the same reasons that the antitrust conspiracy claims fail.  Motion [#148] at 67.  The antitrust conspiracy claims have not failed in the sense that the Court has declined to enter summary judgment dismissing them.  The Court does question the necessity of clogging this case down with state law claims in view of the plain statement of plaintiff's counsel during the Daubert hearing that the strength of the case as plaintiffs view it is in their tying and attempt to monopolize claims.

Nevertheless, when one considers the elements of civil conspiracy under Colorado law – that (1) two or more persons (2) with an object to be accomplished (3) had a meeting of the minds on the object or a course of action (4) and took one or more overt acts (5) resulting in damages to the victim – it is evident that there are genuine issues of material fact in dispute that preclude summary disposition.  Defendants argue that "Plaintiff will tout a handful of ambiguous statements by Mr. Roulier and a variety of inadmissible statements by third-parties, who Plaintiffs did not bother to depose."  *Id.*  The ambiguity of Mr. Roulier's statements is for the jury to consider.  Whether and to what extent plaintiffs will attempt to gain admission of third-

party out-of-court statements remains to be seen, as does whether any or all of them might be admissible.

**D.   Lack of Subject Matter Jurisdiction.**

Defendants argue that if the federal claims were dismissed, the Court would no longer have "supplemental jurisdiction."  I agree.  They argue that there is no independent basis for jurisdiction, i.e., diversity jurisdiction.  I agree.  However, so long as the antitrust claims continue, the state claims can tag along.  It is tempting to decline supplemental jurisdiction and thereby simplify this case somewhat for the jury, the Court and even the parties.  *See* 28 U.S.C. § 1367(c).  However, that would create the risk of a new case in state court, thus continuing the economic debacle that has fallen on Mr. Christou and Mr. Roulier because of their stubborn refusal to get along.  I find it to be better to try to resolve all their issues now.

**E.   Interference with Prospective Business Advantage.**

Defendants argue that this claim is time barred.  They argue, and plaintiffs do not dispute, that the applicable period of limitations is two-years from the date plaintiffs knew of should have discovered all material facts essential to support the elements of the claim.  This case was filed on December 1, 2010.  However, among other things, plaintiffs received phone calls from DJ Rap in the summer and fall of 2008[5] to the effect that she was being pressured by Mr. Roulier not to play at Mr. Christou's clubs.  Defendants also cite to an email authored by Mr. Christou's talent buyer Jonathan Shuman dated October 30, 2008 [#148-36] that contains a reference to "Lawsuit."  *Id.* at 3.

Suffice it to say that the evidence cited by defendants does not clearly show that plaintiffs knew or should have known all material facts essential to support this claim.  The jury will make

---

[5] Generally the defendants have taken the position that statements of that kind captured in recorded telephone calls constitute inadmissible hearsay.  Presumably defendants offer this statement only as it relates to notice.

that decision.  Moreover, if one assumes that a common law claim of interference with plaintiffs' prospective advantage in terms of doing business with DJ Rap (who in any event appears not to have been an A-List DJ in 2008) were barred, it would not necessarily preclude a claim based on interference with plaintiffs' prospective advantage of doing business with A-List DJ's in 2009 and 2010, such as DJ Sharam and DJ Dan whom plaintiffs apparently tried to book in 2009.

Alternatively, defendants argue that plaintiffs cannot demonstrate a reasonable prospect of a business relationship with A-List DJ's during the relevant period.  Plaintiffs point to DJ Sharam's deposition testimony that DJ Dan discussed the Denver situation, and that Mr. Roulier was (successfully) exerting pressure to avoid playing at Mr. Christou's clubs and to play only at Beta.  [#159-11] at 2-3.  Both DJ Sharam and DJ Dan did play at Beta in 2009.  [#159-8] at 15, 16.  This may not be overwhelming evidence, but it is enough to get by summary disposition.

## III.   OTHER PENDING MOTIONS

### A.  Plaintiffs' Motion for Sanctions for Spoliation [#123].

This case was filed on December 1, 2010.  At or about that time plaintiffs served a "litigation hold letter" on the defendants, directing them to preserve several categories of documents, including text messages.  However, defendants took no steps to preserve the text messages on Mr. Roulier's iPhone.  Defendants did not disclose any text messages in response to plaintiffs' first discovery requests served on May 19, 2011.  In August 2011, according to Mr. Roulier, he lost his iPhone and with it any text messages saved on it.  Plaintiffs contend that this "spoliation" of evidence should be sanctioned by an adverse jury instruction.

Defendants do not dispute that there were text messages on the phone or that those messages were lost with the phone.  However, they note that Mr. Roulier has testified that he did not use text messages to book DJ's.  Therefore, defendants argue, it is sheer speculation that his

text messages contained relevant evidence. Further, defendants responded fully to the May 19, 2011 discovery, thus showing that there was nothing responsive in the text messages.

I agree that plaintiffs do not know whether the text messages contained, or even probably contained, relevant evidence. However, the fact that Mr. Roulier did not use texting to book DJ's is hardly proof that his text messages did not contain relevant evidence. Moreover, although defendants state that defendants "found no responsive text messages," they do not indicate that defense counsel reviewed Mr. Roulier's text messages and determined that they contained nothing of relevance. I note as well that the extensive motions practice that has characterized this litigation has revealed significant differences between the parties as to what is relevant and what is not. The point is that neither the plaintiffs nor the Court will ever know.

Spoliation sanctions are proper when "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Turner v. Public Serv. Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007)). Defendants had a duty to preserve Mr. Roulier's text messages as potential evidence, but they did not do it. Those text messages, few as they might have been, should have been preserved and either provided to the plaintiffs or potentially made the subject of further proceedings before the Court.

Nevertheless, the Court has no basis to assume that the loss of the phone was other than accidental, or that the failure to preserve the text messages was other than negligent. I agree that some sanction is appropriate. A commercial party represented by experienced and highly sophisticated counsel cannot disregard the duty to preserve potentially relevant documents when

a case like this is filed.  However, an adverse jury instruction is too harsh and is unwarranted as a sanction for the negligent "spoliation" of evidence in the circumstances presented here.

Accordingly, the Court grants the motion but orders as a sanction that plaintiffs will be permitted to introduce evidence at trial, if they wish, of the litigation hold letter and defendants failure to preserve Mr. Roulier's text messages.  Plaintiffs may argue whatever inference they hope the jury will draw.  Defendants may present evidence in explanation, assuming of course that the evidence is otherwise admissible, and argue that no adverse inference should be drawn.

**B.  Beatport's Supplemental Motion for Sanctions [#137].**

Beatport moved for Rule 11 sanctions against plaintiffs' counsel on February 7, 2012, arguing that none of the claims asserted in the Complaint were warranted by existing law or a nonfrivolous argument for extending, modifying or reversing existing law.  They did so while their motion to dismiss was pending and before the Court addressed it.  It turned out that for the most part Beatport's motion was denied on March 14, 2012.  [#146].  The Court denied the motion for sanctions and found that the filing of the motion was premature and reflected a lack of judgment.  *Id.* at 33.

Ten days after filing its first motion for sanctions, but still before the Court issued its order on the motions to dismiss, Beatport filed a supplemental motion for sanctions [#137].  The supplemental motion is 44 pages in length and makes numerous arguments.

First, defendants point to a surreptitiously recorded telephone conversation between Mr. Christou and gentleman named Scott Feiwell whom defendants describe as a "Las Vegas Promoter."  *Id.* at 2.  The call reflects a desire by Mr. Christou to "break" Mr. Roulier and Mr. Feiwell's suggestion that if he were to file a lawsuit, Beatport would knuckle under rather than fight it.  Mr. Feiwell was full of advice, including that he include "restraint of trade, interstate

25

commerce, defamation of character," perhaps 10 different things, and even throw in a racketeering claim, even though he might not be able to prove it. *Id.* at 3. Mr. Feiwell cautioned that the judge might dismiss some of the claims "right away," but what matters is that he would scare Mr. Roulier off. *Id.* Mr. Christou responded that if Mr. Feiwell would "get something like that (for) me," he would pursue it. *Id.* But, Mr. Christou asked, "Please, be quiet about it and you let me know and I will take care of you." *Id.* at 4.

This telephone conversation reflects poorly on both men. Filing a lawsuit for the purpose of bringing the opponent to his knees because of the cost or distraction of the suit, as opposed to its merits, would be an abuse of the legal process. However, the fact remains that Mr. Christou retained excellent counsel, and counsel determined what claims to bring. Without any evidence I will not assume that these lawyers did not believe that there was a good faith basis in fact and law to sign the Complaint containing the claims asserted in it. The fact that the Court largely denied defendants' motion to dismiss, while not dispositive of Mr. Christou's allegedly improper motive, also tends to suggest that the claims did not lack a legal basis.

The Court did dismiss the RICO claim. A RICO claim by its nature is a severe charge, and such claims must be filed with caution and care. I do think that plaintiffs should have thought a little longer and harder before asserting RICO here. However, the Court did not find when it dismissed that claim, and does not find now, that it was so shallow as to be substantially groundless, frivolous or vexatious. I come back to my reliance on the good faith of counsel, which I do not override without demonstrable good cause. Just as I believe plaintiffs could have been more careful about asserting a RICO claim, I believe defendants should have been more cautious about accusing reputable counsel of incompetent and even unethical conduct.

Defendants find fault with the investigation conducted by plaintiffs' counsel, suggesting that counsel relied too heavily on the client for information.  Again, however, defendants have provided nothing that suggests to this Court that plaintiffs' counsel either violated Rule 11 or otherwise failed to live up to their professional responsibilities.  Defendants state that discovery has shown that some witnesses, including some DJ's, take issue with plaintiffs' recollection or interpretation of telephone conversations.  That does not prove that the plaintiffs' versions are incorrect.  In any event, there are recordings that do tend to support the plaintiffs' claims.

Defendants also fault plaintiffs for not consulting with Dr. Phillips before they filed this case.  That may or may not have been wise.  However, it appears to me that his analysis largely supports the claims in the Complaint, and I am not prepared to assume that this simply reflects that he is a "hired gun."

Defendants complain that Mr. Christou never sent Mr. Roulier a "cease and desist" letter, nor did he pick up the telephone and ask defendants to stop their alleged conduct.  I agree that greater efforts probably should have been made to resolve this dispute out of court.  That can be said of many lawsuits.  It does not make the filing of the suit sanctionable.  To some extent this complaint is the stork calling the great blue heron stilted.

Defendants question the role of plaintiffs' other clubs, which they label the "coat-tail" plaintiffs, in this case.  I do wonder about that.  Unless plaintiffs have some reasonable ground for leaving those entities in the case, I suggest that they be voluntarily dismissed.  The whole "South of Colfax Nightclub District" is relevant background, but the case appears to be about the three nightclubs that feature Electronic Dance Music.

In sum, I do not find that the conduct of which defendants complain is sanctionable under Rule 11 or otherwise.

**C.   Renewed Stipulated Motion to Set Dates Certain for Pre-Trial Deadlines [#174].**

This is a joint motion to set pretrial deadlines that were not included in the magistrate judge's Final Pretrial Order issued May 15, 2012 [#169] or the magistrate judge's Amended Minute Order issued May 24, 2012.  The suggested dates for deposition designations are fine.  However, before any deposition designations are filed, counsel should meet, confer, and exercise their best efforts to reduce deposition testimony to what is truly necessary and to resolve disputes.  If there are disputes remaining, the Court will need hard copies with disputed portions designated and brief marginal notations indicating the parties' positions.

The Court does not wish to receive trial briefs.  However, the Court requests that before the trial preparation conference on June 7, 2013 counsel will have done the following: (1) dismissed any claims and defenses that the party does not intend to pursue at trial; (2) exercised their best efforts to reach agreement on jury instructions; and (3) with respect to jury instructions as to which there is an unresolvable dispute, provide a brief indication of supporting authority.  You should bring hard copies of such authority to the conference.

There is no need to submit preliminary or introductory instructions.  The Court only wants instructions that would normally be given following the close of the evidence, i.e., an instruction describing the claims and defenses; the typical general instructions concerning burdens of proof, evidence, credibility, etc.; elements of claims and defenses; damages; a closing instruction briefly describing the deliberation process; and verdict form(s).  If the parties and the Court can agree on a set of instructions at the trial preparation conference, the Court will instruct the jury before opening statements.  In that event, the instructions will be given with the proviso that they are subject to revision, and that a final set of instructions will be given before closing arguments.

**Order**

1. Defendant's Motion to Exclude Plaintiff's Expert Owen R. Phillips [#122] is DENIED.

2. Plaintiffs' Motion for Sanctions for Spoliation [#123] is GRANTED.  The sanction ordered is set forth above.

3. Defendants' Motion to Exclude Plaintiff's Expert Jay F. Freedberg [#134] is DENIED.

4. Defendants Supplemental Motion for Sanctions [#137] is DENIED.

5. Defendant's Motion for Summary Judgment [#148] is DENIED.

6. The parties' Renewed Stipulated Motion to Set Dates Certain for Pre-Trial Deadlines [#174] is GRANTED, subject to the Court's comments.

7. [Plaintiffs'] Unopposed Motion to Supplement Response to Motion to Exclude Jay E. Freedberg, CPA [#189] is GRANTED.

   DATED this 23rd day of January, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge