IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 10-cv-02912-RBJ-KMT

REGAS CHRISTOU,
R.M.C. HOLDINGS, L.L.C. d/b/a The Church,
BOUBOULINA, INC. d/b/a Vinyl,
MOLON LAVE, INC. d/b/a 2 A.M.,
CITY HALL, LLC,
1037 BROADWAY, INC. d/b/a Bar Standard f/k/a The Shelter,
776 LINCOLN ST., INC. d/b/a Funky Buddha Lounge, and
1055 BROADWAY, INC. d/b/a The Living Room,

      Plaintiffs,

v.

BEATPORT, LLC,
BRADLEY ROULIER, and
BMJ&J, LLC d/b/a Beta Nightclub and Beatport Lounge,

      Defendants.

---

ORDER on PENDING MOTIONS

---

Once again the parties present the Court with several motions. With one exception, the motions have been fully briefed. The case remains set for a jury trial beginning June 24, 2013.

## **FACTS**[1]

This lawsuit is the result of a falling out between two friends and business colleagues. In the 1990's Regas Christou founded several nightclubs in Denver's South of Colfax Nightlife District ("SoCo"). At issue in the present case are two of these nightclubs, The Church and Vinyl. Both clubs developed national reputations as venues for "Electronic Dance Music" (sometimes referred to as "EDM"). Electronic Dance Music features live performances by disc

---

[1] The Court has summarized the facts in its orders of March 14, 2012 and January 23, 2013. This more abbreviated summary is provided to put the pending motions in context and to note the deletion of certain parties on both sides.

jockeys who mix songs or "tracks" on expensive synthesizers and other computer based equipment and are viewed as artists in their own right. Each year DJ Magazine produces a list of the "Top 100" DJ's in the EDM world. These "A-List DJ's" command larger audiences and are in high demand by nightclubs as well as other entertainment venues.

Mr. Christou employed Bradley Roulier as a "talent buyer" from 1998 to 2007, and he had a significant role in Mr. Christou's success including, among other things, by booking A-List DJ's to perform in his clubs. Mr. Roulier and others also conceived of the idea of creating an online marketplace for promoting and selling (downloading) Electronic Dance Music. Mr. Christou liked the idea and provided both financial and promotional support to Mr. Roulier and his partners. This idea led to the creation of Beatport in 2003. Beatport was enormously successful and has grown to become the largest online site that caters essentially exclusively to producers and consumers of Electronic Dance Music.

Although anyone can buy music through the Beatport website, the tracks sold there are designed especially for DJ's. They are free of Digital Rights Management or "DRM," which means they can be mixed and re-mixed on the types of equipment used by DJ's. They are meant to be played at loud volume on expensive, high fidelity equipment that is available in the venues in which these DJ's work. Accordingly, the average cost of a single track is higher than tracks that can be downloaded on mass-market sites such as Apple's iTunes. Although many of the same DJ's do sell tracks on iTunes and various other online sites, Beatport considers itself to set the standard in the market that it serves.

In 2007 Mr. Roulier left Mr. Christou, and in 2008 he founded his own competing club called Beta in the Lower Downtown area of Denver ("LoDo"). The gist of the present suit is plaintiff's claim that Mr. Roulier has been threatening A-List DJ's that their tracks will not be

2

promoted on Beatport if they perform in Mr. Christou's clubs, and as a result, Beta has largely taken over the Denver market for Electronic Dance Music performances by the top DJ's.

## PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on December 1, 2010. They originally asserted nine claims for relief: (1) illegal tying in violation of section one of the Sherman Act against all defendants; (2) monopolization (section two of the Sherman Act against defendants Beta and Mr. Roulier; (3) attempt to monopolize against Beta and Mr. Roulier; (4) conspiracy to monopolize against all defendants; (5) conspiracy to eliminate competition by unfair means in violation of section one of the Clayton Act; (6) theft of trade secrets; (7) violation of the Racketeer Influenced and Corrupt Organizations Act; (8) intentional interference with prospective business expectancies against Mr. Roulier; and (9) civil conspiracy against all defendants.

In its order of March 14, 2012 [#146] the Court dismissed the RICO claim and found that that Mr. Christou personally lacked standing to assert the antitrust claims. With those exceptions, however, the Court denied the motions to dismiss. It also denied defendants' motion for sanctions. Defendants filed their motion for summary judgment on March 15, 2012. The Court addressed that motion and a number of other motions, including "Daubert" motions, in its order of January 23, 2013.

On March 26, 2013 plaintiffs moved to dismiss their claims against Beatport due to an informal resolution of their disputes and in addition voluntarily to dismiss the claims of all but the two clubs that feature Electronic Dance Music against the remaining defendants. The Court's granting of those motions narrowed the parties to R.M.C. Holdings, LLC, d/b/a The Church and Bouboulina, Inc., d/b/a Vinyl, plaintiffs v. Bradley Roulier and BMJ&J, LLC d/b/a Beta Nightclub and Beatport Lounge, defendants.

## **PENDING MOTIONS**

**Defendants' Motion to Strike and Exclude Supplemental Expert Opinions and Report of Jay Freedberg [#197]: GRANTED IN PART, DENIED IN PART.**

Defendants contend that Mr. Freedberg's "99-page" supplemental report, dated March 4, 2013, contains "dramatically" changed opinions that, if allowed, would be so prejudicial that either the Court should strike them or, at a minimum, continue the trial so that the defendants and their expert can prepare to defend against them. Plaintiffs respond that there really isn't anything new here, and that defendants declined their offer to make Mr. Freedberg available for another deposition two months ago. There appears to be some hyperbole on both sides of this dispute.

The Court will not permit Mr. Freedberg to repackage his damages opinion in a different format or to reflect an "alternative" approach. This case was filed on December 1, 2010. A scheduling order established deadlines, including for disclosure of expert opinions which were developed and disclosed. The Court held a "Daubert" hearing on January 15, 2013 and subsequently issued its order of January 23, 2013. In that order the Court expressed some misgivings about Mr. Freedberg's opinion on "lost enterprise value," although it did not strike that opinion. This was not intended to be an invitation to Mr. Freedberg to modify his opinions to meet the Court's concerns. The disclosure deadlines have to have meaning in fairness to both parties.

On the other hand, if there is no change in methodology, for example the method of calculating lost profits, and the supplement does nothing substantively beyond updating the calculation to including data for the years 2011 and 2012 that literally did not exist and therefore could not have been included by Mr. Freedberg in his initial report, then it is not a matter of providing an untimely opinion. Nor do I find that that type of supplementation would be prejudicial to the defendants. Their attack on Mr. Freedberg's opinion, apart from the error that

was disclosed during the Daubert hearing, is on his methodology, not the raw data. The defendants are armed with their own very able expert who should have little added burden in responding to the supplemented opinion, if that is all that it contains.

Likewise, I am not persuaded that the lost profits calculation must stop on the date of the complaint as a matter of law. While that might be a general rule in private antitrust litigation, the cases cited by the defendants make it clear that "in appropriate cases, the trial court, following the filing of a supplemental complaint, may permit the recovery of damages resulting from wrongful acts committed subsequent to the filing of the action." *William Inglis & Sons Baking Co. v. ITT Continental Baking Company, Inc.,* 668 F.2d 1014, 1057 (9th Cir. 1981). *Accord, Borger v. Yamaha International Corp.,* 625 F.2d 390, 398 (2d Cir. 1980). I see no reason why, at least in a tying/attempt to monopolize case such as this one where the alleged misconduct has continued to the present time, there is something magic about the date the complaint was filed. If there is a rational basis for such a cutoff, the defendants have not provided it to me.

The cases cited above are conditioned upon the plaintiff's filing a "supplemental complaint." The Court grants leave to the plaintiffs to file an amended or supplemental complaint. Again, however, Mr. Freedberg will be limited to the methodology used and illustrated in his original opinion. He may "update" the damages by including data for the years 2011 and 2012 that did not exist when he prepared his report, and he may correct the error that was disclosed at the January 15, 2013 hearing, but that is all. It is too late for "alternative" approaches. Expert opinions are not a moving target. The Court requests and expects that Mr. Freedberg strictly comply with these limitations.

**Defendants' Motion in Limine to Exclude Evidence Referring or Relating to Charissa Saverio, aka DJ Rap [#204]: GRANTED IN PART, DENIED IN PART.**

Despite listing Ms. Saverio as a may-call witness in the Final Pretrial Order, defendants now ask the Court to exclude her testimony entirely.[2] They claim that her testimony is irrelevant because she is not an A-List DJ. Evidence is "relevant" if it has any tendency to make a fact that is of consequence to the resolution of a case more or less probable than it would be without the evidence." Fed. R. Evid. 401. The fact that she has not been an A-List DJ in recent years does not render her testimony irrelevant.[3] If, for example, the defendants pressured her to play at Beta and not at The Church or Vinyl as a condition of being promoted on Beatport, that would be have some tendency to show that defendants were willing to use their Beatport leverage to cause prominent DJ's to stay away from plaintiffs' clubs.

Defendants' hearsay objection is more problematic. Ms. Saverio made some statements during a surreptitiously recorded telephone conversation with plaintiffs' talent buyer, Jonny Shuman, that tend to indicate that she thought that her ability to be promoted on Beatport would be jeopardized if she played at plaintiffs' clubs rather than Beta. She repeated many of the same comments in a surreptitiously recorded telephone conversation with Mr. Christou. I have listened to both recordings, and although transcripts of these recordings (and other recordings that are the subject of motion #207, discussed below) have not yet been provided to the Court, a portion of the recording of the Shuman conversation was played during Ms. Saverio's deposition [#226-3] and transcribed contemporaneously by the reporter as part of the deposition. *Id.* at

---

[2] Defendants listed Ms. Saverio "to testify about her relationships with Mr. Roulier and Jonny Shuman, her personal observations of the EDM industry, the DJ Magazine Top 100, the threats and promises alleged by Plaintiffs, and any matter raised during her deposition." Final Pretrial Order [#169] at 18 (¶b(2)(xx)).

[3] Plaintiffs suggest that Ms. Saverio is an A-List DJ even though she is not listed in DJ Magazine's Top 100 DJs. The use of that list to define an A-List DJ has previously been accepted by the parties, the experts and the Court, and plaintiffs may not now adopt a new definition to facilitate their argument about Ms. Saverio.

deposition pages 36-49. I have read that transcription as well as the other excerpts from the deposition that are included in docket #226-3.

These are out of court statements. Plaintiffs suggest, but do not in response to this motion do much to support, the idea that the statements can be offered to show the declarant's (Ms. Saverio's) state of mind. I will address that idea in detail in discussing motion #207. Suffice it to say that I am not persuaded that the relevance of the statements can be separated from the truth of what they assert.

Plaintiffs also suggest in a footnote that the statements can be admitted as non-hearsay verbal acts, citing *Nobody in Particular Presents, Inc. v. Clear Channel* ("NIPP")*,* 311 F. Supp. 2d 1048, 1095 (D. Colo. 2004) In that case the court found that "[c]onversations as to the making and terms of an oral agreement" likely would be admissible as verbal acts, not hearsay, because the words spoken have independent significance, i.e., they constituted the tying agreement and were admissible to establish that they were spoken, not to establish their truth. *Id.* However, Ms. Saverio's recorded statements were not made to the alleged tying company. Their admission would not constitute the tying agreement, and I cannot see how they would be considered to be a verbal act. Rather, they would be relevant only to the extent that they supported the truth of the implied statement that Ms. Saverio was the victim of a tying arrangement forced upon her by the defendants.

Therefore, I conclude that the recorded statements are inadmissible hearsay unless the rules either define them as non-hearsay or there is an applicable exception to the hearsay rule. Plaintiffs argue that Fed. R. Evid. 801(d)(2)(e), which provides a co-conspirator exception to the definition of hearsay, applies. They suggest that Ms. Saverio is a "co-conspirator" with the

defendants. However, her recorded statements make her out to be an unwilling "victim" of pressure exerted alleged by or on behalf of the defendants, not a conspirator with them.

I am aware that in *NIPP*, the court suggested that communications between the alleged tying company, on the one hand, and the artists, agents or labels who allegedly were the victims of the tying arrangement, on the other hand, might be admissible under the co-conspirator "exception" to the hearsay rule. *Id.* at 1095. Tying arrangements are illegal conspiracies under Section 1 of the Sherman Act, and the court held that the co-conspirator "exception" to the hearsay rule may be applied to correspondence confirming a tying agreement if the other requirements of the exception are met. *Id.* Again, however, it seems significant to me that in *NIPP* the communications were directly between the tying company and the "victims," and that they evidenced the victims' agreement to the arrangement. The recording at issue here is not of a communication between Ms. Saverio (or her representatives) and Mr. Roulier (or his representatives). Rather, construing the recording(s) to plaintiffs' benefit, they reflect Ms. Saverio's description to Mr. Shuman and Mr. Christou of what she interpreted to be a threat of the loss of promotional opportunities on Beatport if she played plaintiff's clubs rather than Beta. I do not disagree with Judge Nottingham's application of the co-conspirator "exception" in that case, but in my view, it is not on point.

Alternatively, plaintiffs suggest that these hearsay statements are admissible under the residual exception, Rule 807. Plaintiffs argue that there is a sufficient circumstantial guarantee of trustworthiness because Ms. Saverio confirmed the statements during her deposition. I do not agree. After testifying that she was "disgusted" that the call had been taped, Ms. Saverio acknowledged the voices but refused to say much more. When asked whether she thought she would get in trouble if she did not perform at Beta, she said "everything is on that tape that you

8

need to hear." Deposition [#226-3] at deposition page 49. But, when counsel followed up with the question, "I'm just asking you to tell me," she responded, "I don't recall." Counsel then asked, "[w]as it implied that your labels would be harmed if you did not perform," she again responded, "I don't recall." *Id.* Counsel then tried the question, "[d]id you talk to other DJs about being coerced by Beatport," again generating the answer, "I don't recall." *Id.* at 50. Even when she was asked whether she remembered the phone conversation she responded, "I don't recall." *Id.*

During the recorded conversation Ms. Saverio said, "And the people who've said this stuff to me, who are very high up the ladder on this, who aren't agents, who, you know, it's not Brad, the people who are like Brad's bosses and things like that, you know, I'm friends with, are like you're about to fucking make some serious enemies, needlessly." Depo. at 41 [#226-3 at 15](transcription of recording as it was played). Nowhere did Ms. Saverio specifically attribute any threats to Mr. Roulier. Some of her statements were made in response to leading questions. They were made in the context of her explaining and justifying to Mr. Shuman why she had booked an appearance at Beta and why she was not presently able to commit to plaintiffs' clubs. When I combine the vagueness of Ms. Saverio's statements as to who said what to whom, the context in which the statements were made, her refusal to discuss the underlying facts during her deposition, and therefore, the defendants' inability to engage in any meaningful cross examination concerning those facts, I conclude that there are sufficient questions that I cannot find that it is in the interest of justice to admit these statements under the residual exception.

As another alternative plaintiffs suggest that the "recorded recollection" exception to the hearsay rule applies. Fed. R. Evid. 803(5). That exception covers a matter that the witness once knew about, now cannot recall, but was made at a time when the matter was fresh in the witness'

memory. Having reviewed the entirety of the deposition excerpts filed as #225-3, I am not satisfied that the witness could not recall the matters discussed during the surreptitiously recorded telephone call. Rather, the Court finds that it is more likely than not that she refused to answer follow-up questions or to have her memory refreshed by the recording because she did not wish to take sides in the Christou-Roulier fight or to make additional statements that could harm her career.

The Court holds only that the surreptitious recording is inadmissible (unless the defendants were somehow to open the door to it). If Ms. Saverio is not produced as a live witness by one party or the other at trial, and if portions of her deposition will be used by one or both parties, the Court will rule on objections in due course. That is not before the Court on motion #204.

**Defendants' Motion in Limine to Exclude Evidence of Interference with Prospective Business Expectancies Barred by the Statute of Limitations [#205]: DENIED.**

In its order of January 23, 2013 [#190] the Court expressly addressed this issue. It held, and the parties did not dispute, that the applicable period of limitations was two years from the date plaintiffs knew or should have known all material facts essential to support the elements of the claim, and that this presented an issue of fact for the jury. *Id.* at 22. *See* C.R.S. § 13-80-108(6).

Notwithstanding that order, defendants ask the Court to exclude evidence, most notably, the same surreptitious recording of the Saverio-Shuman telephone call. The Court addressed that call, and mooted defendants' obvious anxiety, in ruling on motion #204. But if the recording were otherwise admissible, the fact that it occurred before the period of limitations would not make it inadmissible. The fact that a tort claim arising before that the limitations period is barred does not require the preclusion of evidence that pre-dated that period, whether that evidence

relates to the tort claim or the antitrust claim or both. On the contrary, if the defendants press their limitations defense, then they presumably will have to introduce evidence that supports a finding that plaintiffs should have discovered their tort claim more than two years before December 1, 2010.

**Plaintiffs' Motion in Limine to Exclude Neighborhood Crime Evidence Pursuant to Rules 403, 602 and 701 [#206]: DENIED.**

The apparent concern is that defendants will present evidence that DJs shy away from the SoCo clubs (such as The Church and Vinyl) because of the reputation that SoCo is a high crime area. I would like to have a better idea of what the actual evidence is, and its context, and therefore I elect not to rule on this issue *in limine*. However, for guidance to the parties, I will say that evidence as to whether DJs are concerned about crime in their decision-making will likely have to come from DJs. What the defendants think about what motivates the DJs is probably inadmissible as speculation, and DJs' comments to the defendants about their fear of the criminal activity in the area are probably inadmissible as hearsay.

Incidentally, I would be surprised if these parties could select a jury on which not one juror is aware that there is crime in SoCo and in LoDo, particularly during the late night and early morning hours when the clubs are hopping and when the bars are letting out. Jurors bring their background, experience and common sense with them. However, whether crime in either location has anything to do with DJs' decisions as to where to play is likely a matter of speculation unless it comes "straight from the horse's mouth."

**Defendants' Motion in Limine to Exclude the Introduction of Certain Audio Recordings at Trial [#207]: GRANTED.**

Defendants ask the Court to exclude recordings of statements of eight witnesses: David Brady, Lainie Copicotto, Thomas Havens, Charissa Saverio, Steve Goodgold, Alex Chaykin,

11

Ryan Saltzman and Matt Rodriguez. The "normal" way that parties present witnesses is by calling them to testify at trial. If a witness cannot be compelled to come to court, and cannot be persuaded to do so either, then the "normal" way is to take a deposition and to present the deposition testimony at trial. Plaintiffs seem not willing, or perhaps not able, to use these "normal" procedures. I do understand that these people do not want to become involved in this nasty spat between Mssrs. Christou and Roulier, and it's hard to blame them. Nevertheless, the evidence by surreptitious recording method is not a particularly savory process.

But the question remains, savory or not, can they do it? As for the Saverio recording, I have answered the question: "no." With respect to the other seven recordings, defendants offer three arguments. First, they argue that plaintiffs cannot authenticate the records of Brady, Copicotto or Goodgold, because they have no one who has sufficient personal knowledge to identify the speaker or provide the date of the recording. Plaintiffs respond that Jonny Shuman participated in the conversations and can provide the authenticating information. That is a matter that more properly would be determined by the Court after hearing Mr. Shuman's testimony.

Second, defendants argue that the recordings contain inadmissible lay opinions. That objection is overly broad. Having read the transcripts of each of the challenged recordings, I find that there might be improper opinions in them, but even so, there are many things that are not opinions. Defendants have made no showing on a recording by recording, line by line, basis of what they consider to be improper opinions. As such, the Court declines to rule on that objection in the abstract.

Third, defendants object on grounds of hearsay and hearsay-within-hearsay. The recorded statements were, of course, made outside the court. If they are offered for their truth they are "hearsay" unless the rules define them not to be hearsay; and if they are hearsay, they

are inadmissible unless there is an applicable exception to the rule against the admission of hearsay.

Plaintiffs argue that these recordings are defined as non-hearsay by the co-conspirator "exception." Fed. R. Evid. 801(d)(2)(E). For the same reasons discussed above as to Ms. Saverio, I conclude that that "exception" does not apply.

Next plaintiffs argue these recordings are not hearsay because they are evidence of the DJs' state of mind, that is, that the DJs or their agents believed that they would suffer harm (the loss of promotion on Beatport) if they performed at plaintiffs' clubs, and therefore did not do so, even if the defendants might not have actually carried out the threat. I discussed that argument above as well. The problem with this theory is that, in substance, its relevance is the truth of the statements. If a DJ or his agent merely speculated that Mr. Roulier might be angry if the DJ performed at plaintiffs' clubs, then the evidence of the DJ's state of mind would be irrelevant and speculative. If the DJ had received an actual threat, and formed his state of mind based on the threat, then the evidence in reality is being offered to prove that an illegal tie-in existed. As such, the relevance of the statement is to prove its truth, and it is hearsay.

Finally, plaintiffs argue that the recordings are admissible under the residual exception to the hearsay rule. I discussed that exception earlier and determined that it did not justify admission of the Saverio recording. However, it must be applied on a recording by recording basis. The Court may admit hearsay statements under this exception as a matter of discretion if it determines that (1) the statement has circumstantial guarantees of trustworthiness equivalent to that of the exceptions listed in Rules 803 and 804; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than other evidence that the proponent can obtain through reasonable efforts; and (4) admission of the evidence will serve the purposes

of the rules and the interest of justice; and (5) the proponent gives the adverse party reasonable notice of his intent to offer the statement and its particulars so that the adverse party has a reasonable opportunity to meet it. Fed. R. Evid. 807 (a) and (b).

If, as defendants state – and plaintiffs do not dispute – plaintiffs did not depose Brady, Copicotto or Goodgold, and they will not be present at trial, I will stop there. Plaintiffs might not have been able to compel these three individuals to testify at trial, but they offer no reason why they could not have obtained their testimony in a deposition. I will not impose on the defendants a duty to take depositions of individuals whom they do not wish to call at trial and who apparently the plaintiffs cannot produce at trial. I conclude that it is not in the interest of justice to admit the surreptitious recordings of these individuals in that circumstance.

With respect to recordings of Havens, Chaykin, Saltzman and Rodriguez, I do not have sufficient information to make a decision. Neither party provided transcripts of the recordings to the Court to my knowledge. I have attempted to listen to the four recordings on the disk provided. What purports to be the Havens recording is all but unintelligible. The Chaykin recording (and the recording of "Paul" that is part of the Chaykin portion of the tape) is audible but appears to provide no meaningful information. The Saltzman recording, at least in the form provided, is relatively useless, as the Shuman end of the conversation cannot be heard. The Rodriguez recording, like the Chaykin recording, is audible but does not seem to provide meaningful information.

If plaintiffs persist in wanting to play those four recordings, then they will need to provide the Court with (1) a clear and complete transcript of the recording, and (2) copies of any portions of the depositions of those individuals where they discussed the information on the recording. Please note, I have glanced at the deposition excerpts contained in docket #235. I did

14

not immediately find portions that related to the recordings. I might have missed them, but it is the parties' burden to identify and provide excerpts of the depositions that they believe do or do not support admission of the recordings under Rule 807.

Among other things, I want to know what statements were made; if statements of third persons were quoted or summarized (the purported "hearsay within hearsay"), were those statements of the defendants or someone else; did the defendants know of and have copies of the recordings when the depositions were taken; if so, did defense counsel examine the deponent about the recorded statements; was the witness asked follow-up questions about the statements or implications in the recordings (as occurred in Ms. Saverio's deposition); and did the witness confirm, reject or purport not to recall the statements?

Accordingly, at this time the motion *in limine* to exclude the recordings is granted, subject to reconsideration upon receipt of the information described above as to four of the recordings.

### Plaintiffs' Motion in Limine to Exclude Drug Use Evidence Pursuant to Rules 401, 402 and 403 [#208]: GRANTED.

Plaintiff suggests, plausibly enough, that evidence that anyone consumed illegal drugs is irrelevant to the issues in this case. Defendants' response goes something like this: (1) Jonny Shuman and Thomas Turner, who replaced Mr. Roulier at plaintiffs' clubs, have made comments that suggest that they use or condone the use of such drugs; (2) that at shows they were less professional, less experienced and less competent than Mr. Roulier; (3) therefore, that explains the decline in successful bookings of A-List DJs at plaintiffs' clubs. They will have to come up with something better than that before evidence of the use of illegal substances by anyone involved in this case will be admitted.

**Plaintiffs' Motion in Limine to Exclude Testimony of Scott Feiwell Pursuant to Rules 401, 402, 403, 701 and 702 [#211]: GRANTED.**

This time it's the defendants who wish to present a recorded telephone conversation. In the conversation, apparently recorded surreptitiously by Mr. Christou, Mr. Feiwell, a Las Vegas businessman, suggests that Christou file a suit against Roulier because Roulier was abusing his power. So far that is harmless enough, but Feiwell, apparently viewing himself as an expert on the psychology of litigation, assures Christou that Roulier will knuckle under rather than fight him in court. Helpfully, he suggests that Christou "slap him" with claims of restraint of trade, defamation, maybe "10 different things," even throw in a racketeering claim. "How could I prove that?" Mr. Christou wonders. "I don't think you have to prove it," Feiwell replies. "You just have to scare him off." Mr. Christou appears to like what he's hearing, adding that Mr. Feiwell should be quiet about it, but that "I will take care of you." Motion [#211] at 2-3.

This reminds me of the saying, "you couldn't make this stuff up." I can understand why the defendants would like the jury to hear this recording. It makes Mr. Christou out to be someone who might be perfectly willing to file a suit, regardless of its merits, just to bring Mr. Roulier to his knees. Maybe he is such a person, and maybe in a sense he deserves to have to "eat his words." But that is precisely why it will not be admitted. It is a good example of evidence that has the potential to cause one or more jurors to make decisions on an emotional basis rather than on the merits of the case. What Mr. Christou's motives were when the case was actually filed may or may not be reflected by this conversation. His motives may or may not be germane to an abuse of process claim. However, they have little if any relevance to the issues to be presented to the jury in this case, and to the extent there is any relevance at all, it plainly is substantially outweighed by the danger of unfair prejudice to the plaintiffs. Fed. R. Evid. 403.

This ruling addresses only the recorded conversation discussed above. If Mr. Feiwell has something relevant to say that passes muster under Rule 403, fine. The juicy phone conversation, however, is out.

**Plaintiffs' Motion in Limine to Exclude Testimony of Jerry Murdock Pursuant to Rule 37 [#212]: DENIED.**

Defendants did not disclose Mr. Murdock in their Rule 26 disclosures as an individual likely to have discoverable information whom the defendants might use to support their claims or defenses. It is evident from the parties' statements about him in the motion, response and reply that he should have been disclosed. I would have been much more impressed with the defendants' response if they had openly acknowledged, without equivocation, that they blew it.

Mr. Murdock is, however, disclosed as a "may call" witness for the defendants in the Final Pretrial Order [#169], entered by Magistrate Judge Tafoya on May 15, 2012. *Id.* at ¶6(b)(2)(xvi). Defendants there reported that "Mr. Murdock, investor in Beta, may testify about communications he allegedly had with Charissa Saverio and Bradley Roulier and his personal observations of Beta's business operations." This disclosure was made more than one year before trial, albeit after the passing of the discovery cutoff. It is also evident from the motion, response and reply that plaintiffs were well aware of Mr. Murdock well before the discovery cutoff, let alone the listing in the Final Pretrial Order. There is no evidence of any significant prejudice to the plaintiffs. Witness preclusion is a possible sanction for non-compliance with disclosure rules, but when there is no significant prejudice to the opposing party, this sanction should be used only when less drastic sanctions are not practical or when the Court determines that the more drastic sanction is necessary because of a pattern of misconduct.

As a mild "sanction in this instance, the Court orders that the defendants make Mr. Murdock available for a 90-minute deposition (not including cross examination, if any) if plaintiffs so request, at the defendants' expense (fees and costs).

**Plaintiffs' Motion in Limine to Exclude Evidence of Regas Christou's Personal Financial Information Pursuant to Rules 401, 402 and 403 [#213]: GRANTED.**

The response to the motions states, "the defense will show that Mr. Christou and his clubs are using his superior financial resources to quash competition and maintain a monopoly in the immediate Denver area, establishing their unclean hands." Response [#227]. Well no, they won't. There is no antitrust counterclaim in this case. It is doubtful, in the extreme, that this purported evidence would establish the equitable defense of "unclean hands," if indeed equitable defenses will even be an issue in what is essentially a damages case. And even if "unclean hands" were somehow established to be an appropriate defense, that does not invite the introduction of Mr. Christou's personal financial information, whatever it might be. It is not relevant, at least not for the reasons suggested by the defendants in their response.

**Defendants' Motion in Limine to Exclude Plaintiffs' Untimely Supplemental Document Production [#247]: DENIED.**

Plaintiffs have responded to this motion, but defendants' time to reply has not run. However, the Court has only so much time to devote to the parties' motion practice, including the multiple motions in limine on both sides, and that time has come. Accordingly, the Court simply declines to rule *in limine* on this issue. That does not mean that the subject documents necessarily will be admitted.

For the parties' guidance I will say this much. There is a difference between a party's duty to supplement its discovery responses, which continues to and through the trial, and the question of a document's admissibility. However, the parties submitted their exhibit lists as

18

attachments to the Final Pretrial Order. If a document was not listed there, it presumptively will not be admitted.

The fact that videos were used by the plaintiffs in a May 13, 2013 deposition does not make them admissible. If they were available to plaintiffs before the Final Pretrial Order but not listed, then unless plaintiffs provide some reasonable excuse for not doing so, the Court likely will not admit them.

Photographs of the three clubs, if they merely are intended to give the jurors an idea of what these clubs look like, likely will be admitted. I am not sure what is accomplished by putting the label "demonstrative" on them. All photographs are demonstrative in the sense that they show what they show. The only "demonstrative" exhibits that counsel are never required to produce to the opposing party in advance of trial, at least in cases I try, are such things as Power Point slides or white-board bullet points that might be used by counsel as a form of "outline" of counsel's opening statement or closing argument. Beyond that, I expect documents to have been provided to opposing counsel in a timely manner in advance of trial unless there is a good reason not to have done so or the document is truly harmless. Photographs of the two facilities probably fit in the latter category.

Information that did not exist at the time of the Final Pretrial Order is not necessarily inadmissible. It depends on what it is, when plaintiffs obtained it, and when they then disclosed it. I will make those decisions once I have seen the document and heard the explanation.

Finally, apropos the last paragraph of plaintiffs' response, the fact, if it is a fact, that defendants might have done the same thing doesn't make it right. What does a parent say when the errant child protests, "Johnny did it too"? It might be a good idea for counsel to confer again

and reach mutually agreed resolutions of late disclosure problems on both sides. Otherwise, the "good for the goose, good for the gander" rule will be applied.

### **ORDER**

1. Defendants' Motion to Strike and Exclude Supplemental Expert Opinions and Report of Jay Freedberg [#197]: GRANTED IN PART, DENIED IN PART.

2. Defendants' Motion in Limine to Exclude Evidence Referring or Relating to Charissa Saverio, aka DJ Rap [#204]: GRANTED IN PART, DENIED IN PART.

3. Defendants' Motion in Limine to Exclude Evidence of Interference with Prospective Business Expectancies Barred by the Statute of Limitations [#205]: DENIED.

4. Plaintiffs' Motion in Limine to Exclude Neighborhood Crime Evidence Pursuant to Rules 403, 602 and 701 [#206]: DENIED.

5. Defendants' Motion in Limine to Exclude the Introduction of Certain Audio Recordings at Trial [#207]: GRANTED.

6. Plaintiffs' Motion in Limine to Exclude Drug Use Evidence Pursuant to Rules 401, 402 and 403 [#208]: GRANTED.

7: Plaintiffs' Motion in Limine to Exclude Testimony of Scott Feiwell Pursuant to Rules 401, 402, 403, 701 and 702 [#211]: GRANTED.

8. Plaintiffs' Motion in Limine to Exclude Testimony of Jerry Murdock Pursuant to Rule 37 [#212]: DENIED.

9. Plaintiffs' Motion in Limine to Exclude Evidence of Regas Christou's Personal Financial Information Pursuant to Rules 401, 402 and 403 [#213]: GRANTED.

10. Defendants' Motion in Limine to Exclude Plaintiffs' Untimely Supplemental Document Production [#247]: DENIED.

DATED this 4th day of June, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge