IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 10-cv-02912-RBJ-KMT

REGAS CHRISTOU,
R.M.C. HOLDINGS, L.L.C. d/b/a The Church,
BOUBOULINA, INC. d/b/a Vinyl,
MOLON LAVE, INC. d/b/a 2 A.M.,
CITY HALL, LLC,
1037 BROADWAY, INC. d/b/a Bar Standard f/k/a The Shelter,
776 LINCOLN ST., INC. d/b/a Funky Buddha Lounge, and
1055 BROADWAY, INC. d/b/a The Living Room,

      Plaintiffs,

v.

BEATPORT, LLC,
BRADLEY ROULIER, and
BMJ&J, LLC d/b/a Beta Nightclub and Beatport Lounge,

      Defendants.

---

### ORDER

---

Defendants Bradley Roulier and BMJ&J, LLC, d/b/a Beta Nightclub move post-trial for an award of attorney's fees and "excess costs" against plaintiffs and one of their lawyers, claiming that plaintiffs' claims were groundless and pursued in bad faith. The motion is granted in part and denied in part.

### **BACKGROUND**

The Court has summarized the basic facts of this case in several pretrial orders. The story starts in the 1990's. Regas Christou founded several nightclubs in Denver's South of Colfax Nightlife District. Two of his clubs, The Church and Vinyl, developed prominence both locally and nationally in the electronic dance music scene. This is a type of music wherein disc

jockeys mix songs on expensive synthesizers and other computer based equipment; perform for live audiences; and develop national, even international, reputations and followings in their own right. Each year DJ Magazine produces a list of the "Top 100" DJ's in electronic dance music. These DJ's, sometimes referred to by the parties here as "A-List DJ's," charge substantial sums for a performance. But because they attract larger audiences and add prestige to the location, clubs compete with other clubs, concert halls, and other venues to book their performances.

Mr. Christou employed Bradley Roulier as a "talent buyer" for a short time in 1998 and again from 2001 to 2007. The responsibility of the talent buyer includes developing relationships with DJ's and their agents and booking them for performances. Mr. Roulier was good at it and had a significant role in Mr. Christou's success. While still working for Mr. Christou, Mr. Roulier and others conceived of the idea of creating an online marketplace for promoting and selling electronic dance music. Mr. Christou liked the idea and provided both financial and promotional support to Mr. Roulier and his partners. This idea led to the creation of Beatport, LLC in 2003. Beatport has grown to become the largest online site that deals exclusively with electronic dance music.

Although anyone can buy music through the Beatport website, the tracks sold there are designed especially for DJ's. They are free of "Digital Rights Management" which means they can be mixed and re-mixed on the types of equipment used by DJ's. They are meant to be played at loud volume on expensive, high fidelity equipment that is available in the venues in which these DJ's work. Accordingly, the average cost of a single track is higher than tracks that can be downloaded on mass-market sites such as Apple's iTunes. Although many of the same DJ's do sell tracks on iTunes and various other online sites, Beatport considers itself to set the standard in the market that it serves.

Mr. Roulier hoped to purchase one of Mr. Christou's clubs, but their negotiations on a price were not successful. In 2007 Mr. Roulier left Mr. Christou, and in 2008 he founded his own competing club in the Lower Downtown area of Denver. The two former colleagues and friends had a bitter falling out, culminating in the filing this lawsuit on December 1, 2010. In addition to Mr. Christou, the plaintiffs included his two clubs that featured electronic dance music – R.M.C. Holdings, LLC, d/b/a The Church; and Bouboulina, Inc., d/b/a Vinyl – and five other nightclubs that Mr. Christou owned in Denver. Named as defendants were Beatport, LLC; Mr. Roulier; Mr. Roulier's club, BMJ&J, LLC, d/b/a Beta Nightclub and Beatport Lounge; and an agency that dealt with a number of the top DJ's, AM Only Inc.

Plaintiffs originally asserted nine claims for relief: (1) illegal tying in violation of section one of the Sherman Act against all defendants; (2) monopolization (section two of the Sherman Act against defendants Beta and Mr. Roulier; (3) attempt to monopolize against Beta and Mr. Roulier; (4) conspiracy to monopolize against all defendants; (5) conspiracy to eliminate competition by unfair means in violation of section one of the Clayton Act; (6) theft of trade secrets; (7) violation of the Racketeer Influenced and Corrupt Organizations Act; (8) intentional interference with prospective business expectancies against Mr. Roulier; and (9) civil conspiracy against all defendants. As discussed below, by the time the case was presented to a jury in the summer of 2013 only the first three claims (tying, monopolization and attempt to monopolize) were left.

To say that the case was hard-fought would be an understatement, perhaps evidenced by the fact that the electronic file of the case now contains 303 separate entries. Included were motions to dismiss, motions for summary judgment, Daubert motions, discovery disputes,

sanctions motions, and many others.  Without recounting the history of the case in detail, the following landmarks occurred along the way.

- Plaintiffs' claims against AM Only Inc. were settled following a joint settlement conference and, therefore, were dismissed.

- In an extensive written order issued March 14, 2012 [ECF No. 146] the Court granted defendants' motion to dismiss for failure to state a claim upon which relief could be granted pursuant to Fed. R. Civ. P. 12(b)(6) as to the antitrust claims asserted by Mr. Christou individually and as to plaintiffs' RICO claims. The Rule 12(b)(6) motion was denied in all other respects.  The Court also denied a motion for Rule 11 sanctions against plaintiffs' attorney Jeffrey Vail that had been filed by Beatport.

- In a written order issued January 23, 2013 [ECF No. 190] the Court denied defendants' motion for summary judgment; defendants' "Daubert" motions to exclude plaintiffs' experts Owen R. Phillips and Jay F. Freedberg; and another motion for Rule 11 sanctions filed by Beatport.

- On March 26, 2013 plaintiffs filed an unopposed motion to dismiss their claims against defendant Beatport with prejudice, following the settlement of those claims.  [ECF No. 199].  That motion was granted.  [ECF No. 217].

- On the same day, March 26, 2003, plaintiffs moved to dismiss, with prejudice, the remaining claims of Mr. Christou individually and the claims of his five nightclubs other than The Church and Vinyl.  [ECF No. 200].  The Local Rule 7.1.A certification indicated that the remaining defendants, Mr. Roulier and BMJ&J, LLC, did not oppose the motion provided that they received costs as

prevailing parties and preserved their right to seek attorney's fees after final judgment. The motion was granted with the indication that the Court would address costs and attorney's fees at the end of the case. [ECF No. 218].

- On June 4, 2013 the Court issued another omnibus order addressing numerous motions filed by both sides. [ECF No. 259]. Among other things the Court largely (but not entirely) denied defendants' efforts to exclude various categories of plaintiffs' anticipated evidence.

- The case was tried to a jury June 24-28 and July 1-3 and 8-10, 2013. During the course of the trial the plaintiffs narrowed their claims to two alternative "tying" claims, monopolization and attempt to monopolize. On July 10, 2013 the jury rendered its verdict in favor of the defendants on all remaining claims.

- On July 17, 2014 the Court entered its final judgment in favor of defendants Bradley Roulier and BMJ&J, LLC and against R.M.C. Holdings, Inc. (The Church) and Bouboulina, Inc. (Vinyl). The Court awarded defendants costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1. [ECF No. 296].

- The pending motion for attorney's fees and "excess costs and expenses" was filed by defendants Brad Roulier and BMJ&J, LLC on July 31, 2013.

- On the same day, July 31, 2013 those defendants also filed a Bill of Costs seeking an award of costs in the amount of $42,101.23. [ECF No. 298].

- On August 19, 2013 plaintiffs filed a document stipulating to the award against them of $6,717.68 in costs but objecting to the remaining $35,383.55 of costs requested by the defendants. [ECF No. 299].

- On August 21, 2013 the Clerk of Court taxed costs in favor of the two defendants and against the two plaintiffs in the amount of $19,258.  [ECF No. 302].

## STANDARD

The prevailing party in civil cases is generally entitled to an award of costs under Fed. R. Civ. P. 54(d)(1).  *See also* D.C.COLO.LCivR 54.1.  However, under the "American Rule," absent statutory or contractual authorization, the prevailing party ordinarily cannot recover his attorney's fees against the loser.  *Hall v. Cole,* 412 U.S. 1, 5 (1973).  This rule is based on the belief that individuals with potentially valid claims or defenses might refrain from pursuing them for fear that if they lose the case, they would face not only the burden of their own attorney's fees but the opponent's fees as well.  *See Kornfeld v. Kornfeld,* 393 F.App'x 575, 578 (10th Cir. 2010).

There is, however, a narrow exception to the American rule.  If a federal court finds that a party has acted "in bad faith, vexatiously, wantonly or for oppressive reasons," it can award attorney's fees to the successful party.  *Hall,* 412 U.S. at 5; *Kornfeld,* 393 F. App'x at 578.  In the Tenth Circuit there is a "high bar" for awards under this bad faith exception, and at a minimum the trial court must make a finding of "bad intent or improper motive."  *Mountain West Mines, Inc. v. Cleveland-Cliffs Iron Co.,* 470 F.3d 947, 953-54 (10th Cir. 2006) (citing *Sterling Energy, Ltd. v. Friendly Nat'l Bank,* 744 F.2d 1433, `1435 (10th Cir. 1984)).

Attorney's fees as a sanction can also be awarded against a party's attorney.  If an attorney "multiplies the proceedings in any case unreasonably and vexatiously, the court may require that he or she personally pay the "excess costs, expenses, and attorney's fees reasonably incurred" by the opposing party.  28 U.S.C. § 1927.  An attorney is subject to that sanction if he acts "recklessly or with indifference to the law, as well as by acting in the teeth of what he knows

6

to be the law." *Miera v. Dairyland Ins. Co.,* 143 F.3d 1337, 1342 (10th Cir. 1998) (citing *In re TCI Ltd.,* 769 F. 2d 441, 445 (7th Cir. 1985). Also, if the court finds that a pleading was submitted by an attorney for an improper purpose, or without a good faith belief formed after a reasonable inquiry that the claims in the pleading were warranted by facts and law, and that a monetary sanction is warranted for effective deterrence, the attorney can be assessed reasonable attorney's fees and other expenses resulting from the conduct. Fed. R. Civ. P. 11(c)(4). *See Alcohol Monitoring Systems, Inc. v. Actsoft, Inc.,* No. 07CV2261-PAB-MJW, 2012 WL 4476623, at *1 (D. Colo. Sept. 28, 2012).[1]

## ANALYSIS

Defendants' arguments boil down to a request for sanctions because (1) the Complaint named plaintiffs who had no legitimate reason to be included; (2) some claims were so weak that they were abandoned but not until the middle of the trial; (3) the theft of trade secrets claim was particularly egregious; and (4) plaintiffs should have admitted in response to a request for admission that they had no evidence to support their tying claim. I am not persuaded by any of these arguments in isolation, but I do find that there is a reason for a sanction in this case.

---

[1] Defendants also cite a Colorado statute that mandates an award of reasonable attorney's fees against a party or attorney if the court determines that a civil action brought in a court of record in Colorado, in whole or in part, lacked substantial justification, i.e., was substantially frivolous, groundless or vexatious. C.R.S. § 13-17-102. However, defendants offer no analysis supporting their assumption that the state statute applies here. This case was filed in federal court. Jurisdiction was based upon alleged violations of federal statutes pursuant to 28 U.S.C. §§ 1331 (violations of the Sherman Act and RICO). Supplemental jurisdiction under 28 U.S.C. 1337 was asserted as to the additional state law claims. I have found no clear authority on this Erie issue, but I do note that several judges in this district have held that the state statute is preempted to the extent it conflicts with Rule 11 of the Federal Rules of Civil Procedure and its procedural safe-harbor provisions. *Martinson v. Professional Bureau of Collections,* No. 09CV2145-MSK-BNB, 2010 WL 3777282, at *3 (D. Colo. Sept. 21, 2010); *Spratt v. Leinster,* No. 06CV1526-WDM-KLM, 2007 WL 2412826, at *1 (D. Colo. Aug. 21, 2007); *Hantz Air, L.L.C. v. J.; Mesinger Corporate Jet Sales, Incl.,* No. -05CV330-RPM, 2007 WL 1520106, at *1 (D. Colo. May 22, 2007); *McCoy v. West,* 965 F. Supp. 34, 35-36 (D. Colo. 1997). In my view the Colorado statute is procedural and has no application to a case brought in federal court based upon federal question jurisdiction.

A. <u>**Claims of the "Pre-Trial Plaintiffs".**</u>

Defendants first argue that a monetary sanction should be imposed based on the inclusion of Mr. Christou individually and his five clubs other than The Church and Vinyl in the list of plaintiffs. All of these claims were dismissed or withdrawn before trial. Nevertheless, asserting that the claims of these "Pre-Trial Plaintiffs" were filed and maintained in a "transparent attempt to expand this litigation and increase the cost of defense," Motion [ECF No. 297] at 14, defendants seek attorney's fees under C.R.S. §§ 13-17-102 and 103. In addition, they seek an award of $353,368.31 against plaintiff's attorney Jeffrey Vail to cover the expert witness fees defendants incurred for their expert Dr. Langenfeld. *Id.* at 15.

1. <u>Mr. Christou's antitrust claims</u>.

The Court granted defendants' Rule 12(b)(6) motion to dismiss the antitrust claims of Mr. Christou individually in its order of March 14, 2012. Ironically, this was after finding that plaintiffs had alleged sufficient facts to warrant the denial of defendants' motion to dismiss the claims of the five Pre-trial Plaintiff clubs. [ECF No. 146 at 12-14. I found that Mr. Christou had not alleged sufficient facts to show that he had suffered an economic injury separate from the injury sustained by his clubs, and that injury to his reputation was not redressable by the antitrust laws. *Id.* at 14-16.

As indicated *supra* at 7 n.1, I have concluded that C.R.S. 13-17-102 (and similarly 13-17-103) is procedural and inapplicable in this case. Even if these statutes were applicable, however, I would not find that the inclusion of Mr. Christou as a plaintiff with respect to his antitrust claims was substantially without justification. The basic dispute in the case was between Mr. Christou and Mr. Roulier. Although the Court concluded that the economic injury appeared to

have been sustained by the clubs rather than by Mr. Christou individually, it was largely a technical legal issue and was fair game for argument. Including Mr. Christou as an antitrust plaintiff certainly cannot be labeled as having been done with a bad intent, improper motive, or otherwise in such bad faith as to justify an exception to the American Rule.

2. <u>Mr. Christou's Remaining Claims and the Claims of Clubs other than The Church and Vinyl</u>.

I do agree that the remaining claims of Mr. Christou individually and his five clubs other than The Church and Vinyl were weak. In particular, plaintiffs never developed any expert testimony or other credible evidence that defendants' allegedly anticompetitive conduct caused measurable injury to any of the other Christou clubs. The Court did deny, for the most part, defendants' Rule 12(b)(6) motion to dismiss, but the motion did not focus separately on the claims of the Pre-Trial Plaintiffs. Similarly, while the Court denied defendants' summary judgment motion, that motion too did not focus separately on the claims of the Pre-Trial Plaintiffs. Those motions and orders focused on the substance of the claims of the plaintiffs collectively rather than on whether the Pre-Trial Plaintiffs belonged in the caption. Therefore, plaintiffs cannot take much comfort in the denial of the dispositive motions as to these claims.

Nevertheless, there are several problems with defendants' argument. First, defendants have provided no evidence of the marginal cost to them of defending against these plaintiffs. The fact that the claims of the Pre-Trial Plaintiffs were not singled out for attention in defendants' prolific motion practice speaks for itself. Original defendant Beatport's supplemental motion for Rule 11 sanctions [ECF No. 137] aptly labeled Mr. Christou and the clubs other than The Church and Vinyl as "coat-tail plaintiffs." *Id.* at 14. The suggestion of defendants' counsel that a proportional one-eighth of all attorney's fees incurred by the defendants prior to April 8, 2013 (when the Court granted plaintiffs' motion to dismiss these claims) should be allocated to each of

the six Pre-Trial Plaintiffs, such that plaintiffs would now pay six-eighths of defendants' total attorney's fees incurred before April 13, 2008 because these plaintiffs were named, bears no relation to the reality of the case.

Second, the fact is that plaintiffs voluntarily moved to dismiss the claims of the Pre-Trial Plaintiffs, with prejudice, three months before trial.  Generally "a defendant may not recover attorney's fees when a plaintiff dismisses an action with prejudice absent exceptional circumstances."  *AeroTech, Inc. v. Estes,* 110 F.3d 1523, 1528 (10th Cir. 1997) (providing as an example of an exceptional circumstance a litigant's repeated practice of bringing claims and then dismissing them with prejudice after inflicting substantial litigation costs on the opposing party).  Here, the plaintiffs voluntarily dismissed, with prejudice, parties who were peripheral to the core issues of the case and whose listing in the caption of the case has not been shown to have added any significant litigation burden to the defense.

Similarly, the suggestion that the substantial expert witness fees incurred by these defendants for their antitrust expert Dr. James Langenfeld of Navigant Economics should be entirely assessed against plaintiffs' lawyer Jeffrey Vail "for the inclusion of the Pre-Trial Plaintiffs and their baseless claims in this lawsuit" [ECF No. 297 at 15] simply detracts from the credibility of the motion.  The Navigant fees were incurred in response to the core antitrust claims, not the presence of these peripheral players.

Finally, I note that the claims of the Pre-Trial plaintiffs were maintained for six months after the Davis Graham lawyers entered as co-counsel for the plaintiffs.  Yet defendants expressly seek no relief against those members of the plaintiffs' legal team.  In their reply defendants explain that "Mr. Vail was always in the driver's seat."  [ECF No. 303 at 9].  That is

contrary to my observation.  From their entry into the case to the conclusion of the trial the Davis Graham lawyers played a very active co-counsel role.

**B. <u>Withdrawal of Claims During Trial</u>.**

Defendants' second argument is that plaintiffs and Mr. Vail should be sanctioned for waiting until the middle of the trial to withdraw "four groundless claims."  Specifically, plaintiffs withdrew their claims for conspiracy to monopolize, theft of trade secrets, intentional interference with prospective business advantage, and civil conspiracy on the eighth day of trial. I am not persuaded.

In the first place the fact that the claims were withdrawn during trial, after plaintiffs had had the opportunity to evaluate the claims in the context of the evidence presented to that point, does not necessarily indicate that the claims were brought or maintained to that point in bad faith or that counsel maintained the claims unreasonably and vexatiously.  The Court denied defendants' motion for summary judgment as to these claims.  While that ruling is not dispositive of the attorney's fees claim, it reflects that the Court found that the claims were plausible, and that there were genuine disputes of material fact concerning them.

Second, the Court itself recommended during the trial that the plaintiffs simplify their claims.  In the Court's view the "conspiracy to monopolize" claim was largely redundant of the tying and monopolization/attempt to monopolize claims, and it was unnecessarily confusing. The same redundancy and potential to confuse comments potentially applied to the interference with prospective business advantage and civil conspiracy claims.  I will discuss the theft of trade secrets claim in more detail later in this order.  Suffice it to say here that the Court always expects parties and counsel to reevaluate claims (and defenses) during the course of a case,

including during the course of a trial, and to eliminate claims (and defenses) that are marginal or confusing.

And again, if maintenance of the four claims until the middle of trial were a basis to impose a sanction, then defendants' decision to take a pass on the rest of the plaintiffs' team of lawyers is difficult to justify.  The Court agrees with defendants' implicit admission that there is no basis for impugning the motives or abilities of the Davis, Graham lawyers.  But I likewise do not find in the mid-trial dismissal of certain claims a basis for impugning the motives or professionalism of Mr. Vail.

### C.  <u>Theft of Trade Secrets</u>

Defendants single this claim out for individual attention.  Plaintiffs' Sixth Claim asserted a violation of the Colorado version of the Uniform Trade Secrets Act.  C.R.S. § 7-74-101 et seq. Plaintiffs contended that The Church and Vinyl maintained more than 10,000 "friends" in MySpace profiles; that these lists were developed by Mr. Roulier and others while they were employed by Mr. Christou's clubs; that they were known by Mr. Roulier to be trade secrets; but that Mr. Roulier or his representatives, without permission, took the lists, web profile login and password when he left (and posted related information on the Beta website), resulting in actual or potential damage to plaintiffs.  Colorado law provides that if a claim of misappropriation of trade secrets is made in bad faith, a court may award attorney's fees to the prevailing party.  C.R.S. § 7-74-105.

There was, in fact, evidence supportive of the claim.  The MySpace information was taken by Mr. Roulier or his employees.  After repeated demands were made, the information was returned or at least removed from the Beta website.  The value of the lists was disputed, and the extent of injury to the plaintiffs was debatable.  But there is no basis to find that the claim was

asserted in bad faith.  Representatives of Beta did, without right or permission, take this information.

   **D.  <u>The Tying Claim</u>.**

   Defendants argue that, in violation of Rule 36 of the Federal Rules of Civil Procedure, plaintiffs refused to admit that they had no evidence supporting their tying claim.  This, they argue, was made clear by the jury's finding for the defendants on the tying claims (as it did on the monopolization and attempt to monopolize claims).

   A request to admit that the opposing party has no evidence to support a claim is, in substance, little different than a request that the party concede that summary judgment should be entered dismissing the claim.  But as I have indicated, this Court denied defendants' motion for summary judgment as to the antitrust claims, thereby finding that there was a genuine issue of material fact, and that the claim should not be dismissed as a matter of law.  The Court also denied defendants' Rule 50 motion for the entry of judgment as a matter of law on this claim at the conclusion of plaintiffs' case.  [ECF No. 291 at 2].

   These rulings were made because there was some evidence supportive of the tying claim. The gist of the claim was that Mr. Roulier was using his influence with Beatport to force A-List DJ's to perform at Beta and not at The Church or Vinyl, i.e., if the DJ's wished to be able to list and sell their tracks on the Beatport website, they had better patronize Mr. Roulier's club, not Mr. Christou's clubs.  Mr. Christou and his talent buyer, Jonny Shuman, testified to that effect. Mr. Shuman's telephone conference with David Brady (portions of the transcript are filed at ECF No. 301-2) contains evidence to that effect.  *Id.* at 2-3, 5.  There was evidence from a DJ who performed as DJ Rap, initially obtained in a surreptitiously recorded call, that tended to support this theory.  There was statistical evidence concerning the decrease in performances by top DJ's

at the Christou clubs after Beta opened and booked top DJ's to perform at Mr. Roulier's club. The defendants had a different explanation for that phenomenon: DJ's went to Beta because they had a relationship with Mr. Roulier; they were treated better there than at the Christou clubs; and they were interested in performing in a new, state-of-the art club.  The jury rejected plaintiffs' theory, but that does not mean it was utterly devoid of any evidentiary support.

Ironically, the surreptitiously recorded telephone conversation between Mr. Christou and Mr. Feiwell that is the centerpiece of defendants' bad faith contention in the pending motion contains statements of opinion that are supportive of plaintiffs' tying theory.  Near the beginning of the conversation Mr. Christou tells Mr. Feiwell, who is a Las Vegas promoter of some kind, that he was having difficult booking A-List DJ's.  Transcript [ECF No. 297-8] at 2.  In response Mr. Feiwell blames Mr. Roulier and his "clout" with Beatport.  *Id.* at 2-3.  Mr. Feiwell goes on to explain that Beatport is important to the DJ's.  He says that Mr. Roulier has Denver and other cities "locked up" and has been able to lock out people who have been in the markets for years. *Id.* at 4-5.  Mr. Feiwell suggests a business strategy – go for DJ's on the way up rather than current top tier talent and create a loyalty with them.  *Id.* at 9.  Mr. Christou expresses concern that the DJ's are "all tied up with the Beatport thing," and that "[e]verybody's afraid to break out."  Feiwell agrees and reminds him that he told Mr. Christou about that a year ago.  "I knew that was the direction it was going in.  He's built a really powerful thing and he's using the power to his advantage and he's done a really good job instilling fear…."  *Id.* at 10.  Mr. Feiwell questions the legality of what Mr. Roulier is doing, noting that "Dj's aren't going to sue, you know, they aren't going to sue Beatport."  *Id.* at 11.  He suggests that Mr. Roulier's actions were illegal and that Mr. Christou should sue Mr. Roulier for restraint of trade.  *Id.* at 11-13.

Finally, there was opinion testimony provided by a highly experienced and able antitrust expert, Dr. Owen Phillips, that supported the tying claim. In short, it simply is not true that there was no evidence that tended to support the tying claim. Therefore, plaintiffs' refusal to admit a request that there was no evidence cannot be viewed as an improper response, much less a bad faith response.

### E. **Nevertheless, a Sanction is Appropriate.**

Despite the fact that I am not persuaded by any of the defendants' four arguments in isolation, I do find that Mr. Christou undertook this litigation, at least in part, with "bad intent or improper motive." *Mountain West Mines,* 470 F.3d at 953-54. Accordingly some award of attorney's fees and/or costs is appropriate under the bad faith exception to the American Rule. To explain this finding I first return to Mr. Christou's 2009 telephone conversation with Scott Feiwell, the Las Vegas promoter.[2]

Mr. Christou initiates the dark side of the conversation when he asks his friend, with respect to Mr. Roulier, "[h]ow can I break this guy." Transcript [ECF No. 297-8] at 9. Mr. Feiwell is full of bad ideas. After Mr. Feiwell suggests a restraint of trade suit (nothing wrong with that) Mr. Christou asks him how he can prove it. "You don't even have to," ventures Mr. Feiwell, who explains that if Mr. Christou is willing to spend money on lawyers for a little while, Mr. Roulier won't want the distraction or the expense of fighting it out in court. *Id.* at 12. Mr. Christou assures him that he will "go to the end. I would die for it." Mr. Feiwell does offer one rational thought – that Mr. Christou consider a "sit-down" with Mr. Roulier. *Id.* at 15. But Mr.

---

[2] Defendants devoted a full page of their motion to the Feiwell call. [ECF No. 297 at 4-5]. Plaintiffs' response does not mention it at all. Perhaps this is because defendants did not incorporate the Feiwell facts into the Argument section of their motion. Perhaps it is because there is little they could say about it.

Christou responds that he wants no part of that:  "I don't want to talk to them, Scott.  I hate the bastards."  *Id.*

So Mr. Feiwell returns to the theme that a suit in federal court will cause Mr. Roulier to "run for the fucking hills."  *Id.* at 16.  The following dialogue pretty much captures the Feiwell plan:

| | |
|---|---|
| SCOTT: | But I mean, Regas, if you – if you file suit against him, okay? |
| REGAS: | Uh-huh. |
| [SCOTT]: | You know, and you slap him with a restraint of trade, interstate commerce, defamation of character – sue him for like 10 different things, okay, and get the biggest high-powered attorney you can.  He's going to have to sit down and figure it out.  He can't keep doing what he is doing because it doesn't matter.  I mean, a lawsuit like that, if you hit him with four or five different things, he's going to have to hire four or five different lawyers.  And you don't even have to prove everything.  You just have to be able to prove some of it.  Some of it will probably get dismissed right away, but the federal thing, interstate commerce – |
| REGAS: | Mm-hum. |
| SCOTT: | -- okay, you could probably call it racketeering, using undue influence, you know, across state lines.  That's a whole different thing from him not allowing you to book DJs in Denver.  If he's going to people and he's telling people in other cities, you know, you have to, you know – the routing has to be this, this and this – |

REGAS:      Now how can I prove that?

SCOTT:      Um, this is – I don't think you have to prove it.  You just have to –

REGAS:      Scott –

SCOTT:      You just have to scare him into backing off.

REGAS:      Scott, you get something like that from me and I'll be more than

            happy to at least pursue the idea.

SCOTT:      Let me see what I can do.

REGAS:      Do it quiet –

SCOTT:      I'm not – I'll be quiet about it, yeah, I'll be quiet about it.

REGAS:      Please, be quiet about it.  And you let me know and I'll take care

            of you.

*Id.* at 17-19.

Thus, there is direct evidence that Mr. Christou wanted to "break" Mr. Roulier; that he was not willing to sit down with him and try to resolve their differences; that he hated Mr. Roulier; that Mr. Feiwell suggested that he file a federal court lawsuit for restraint of trade but include anywhere between four or five and 10 other claims, including racketeering; and that Mr. Feiwell advised that it didn't matter whether he could prove all of it, because the point was to "scare him off."  Mr. Christou did not disavow this strategy.  On the contrary, he expressed his interest in pursuing it.

There is no direct evidence that Mr. Christou acted on this strategy.  However, I find that a reasonable inference can be drawn, and I now draw such an inference to a preponderance of the evidence, that he did so.  His desire to break Mr. Roulier was evident.  The Complaint filed in this case mirrored the Feiwell strategy.  It asserts multiple other claims, nine in all, several of

which were marginal.  One of those marginal claims was a racketeering claim (which the Court promptly dismissed).  Mr. Christou employed first one and then a team of lawyers to carry on an expensive battle with Mr. Roulier, and he stuck with it to the bitter end.  It is also reasonable to infer that Mr. Christou knew that this strategy was improper, both as a matter of common sense and because he insisted that Mr. Feiwell keep it quiet.  In the end Mr. Feiwell's prediction that Mr. Roulier would run for the hills proved to be as bad as the strategy he recommended, but Mr. Roulier's victory came at a substantial cost.

I do not mean to assign all responsibility to Mr. Christou.  Having presided over most of the pretrial proceedings as well as the trial, I find that both gentlemen shoulder some of the blame for the fees and expenses that accumulated in this case.  This was much like a "divorce," and it was contested with the emotion and rancor sometimes found in marital divorces.  Neither gentleman can be entirely proud of everything he did or said along the way.  The litigation costs were not driven solely by the plaintiffs.  The defendants in the case, including Mr. Roulier and Beta in particular, engaged in very vigorous motions practice.  Nevertheless, the unusual peek behind the curtain that was provided by Mr. Christou's ill-fated recording of his conversation with Mr. Feiwell, in combination with how this case played out, convinces me that he set the course of this litigation to some extent in bad faith.

I do not find that a sanction should be imposed on plaintiffs' counsel.  Significantly, there is no evidence that Mr. Vail had any knowledge of the Feiwell conversation or of Feiwell's strategic advice to Mr. Christou, when the Complaint was filed.  The recording was later uncovered during the discovery process.  I have no reason to believe that Mr. Vail did not form, after a reasonable investigation, a good faith belief that the claims in the Complaint were warranted by the facts as he understood them to be.  My observation of Mr. Vail during the

course of the case was that he appeared to be competent, hard-working, and professional.  I do not believe that the Davis Graham lawyers would have teamed up with him and stood side-by-side with him to the end of the case (including the response to the pending motion) had they thought otherwise.  I previously denied Beatport's Rule 11 motion directed at Mr. Vail, and I now deny these defendants' motion for sanctions against him under 28 U.S.C. § 1927.  The client's wishes like the client's version of the facts must be tempered by the exercise of the lawyer's sound professional judgment.  This case will serve as a reminder of that responsibility.  But I find no basis to find that Mr. Vail multiplied the proceedings vexatiously.

By the time I denied Beatport's Rule 11 motion (as supplemented) against Mr. Vail, the recording of the Feiwell conversation had been revealed.  I criticized Mr. Christou's conduct, but I did not at that time impose a sanction on him.  *See* Order, January 23, 2013 [ECF No. 190] at 25-26.  A Rule 11 motion is directed at the attorney (or unrepresented party) who signs a pleading, not the attorney's client.  But the matter of a monetary sanction against Mr. Christou himself is squarely before me now, and I turn to the difficult task of determining what a fair and appropriate sanction would be.

One major item of expense that defendants are seeking is reimbursement of the Navigant Economics (James Langenfeld) expense.  But beyond the fact that they seek that sanction against Mr. Vail, I am satisfied that it would not be an appropriate sanction against Mr. Christou for the additional reason that that expense is unrelated to the improper conduct.  *Cf. Jackson v. Diversified Collection Services, Inc.,* 485 F. App'x 311, 312 (10th Cir. 2012) (in imposing sanctions under 28 U.S.C. § 1927, the district court must make sufficient findings to "identify the basis for the sanctions, the extent of the multiplicity, and the *costs arising from the objectionable conduct*") (emphasis added).  The "objectionable conduct" here was the assertion of multiple

claims beyond the core restraint of trade claims, including the RICO claim, for the improper purpose of breaking Mr. Roulier financially or at least scaring him off. This has little, if anything, to do with the Navigant work.

The other sanction defendants seek is an award of all of their attorney's fees. That would be grossly excessive. A very substantial part of the attorney's fee bill was incurred in defending against the core antitrust claims, and an award of those fees would not be consistent with the narrow exception to the American Rule. The problem is that it is difficult on the present record to trace specific attorney's fees or costs to the objectionable conduct. For example, the defendants have not attempted to show the Court what costs and fees they incurred because of the RICO claim. They have not shown what costs and fees they incurred because claims other than the antitrust claims were included or because plaintiffs joined the Pre-Trial Plaintiffs. There is no basis in the present record to compare the costs and fees actually incurred to what probably would have been incurred had Mr. Christou filed and pursued a straightforward monopolization, attempt to monopolize and tying case. In order to fix a monetary sanction that fits the offense, another hearing with additional evidence is necessary.

But given the long and expensive history of the case, and what I am guessing is the desire of the parties and the lawyers to bring closure to it, I will suggest for the parties' consideration another resolution, albeit one that I acknowledge to be somewhat arbitrary. Specifically, I ask the parties to consider a sanction with two parts: (1) one-ninth of the $759,323.50 attorney's fees that the Beier Affidavit states were incurred until the last day of trial, i.e., $84,369.28; plus (2) the costs submitted by these defendants in the Bill of Costs that were not taxed by the Clerk's Office, i.e., $22,843.23. The total is $107,215.51.

The parties may decide to resolve the matter on that basis (or some other agreed figure). But if either party notifies the Court within 14 days following the service of this order that he or it objects to this resolution, then the Court will set an evidentiary hearing and determine an award of attorney's fees and/or costs de novo, which could be less or more than the proposed sanction. Otherwise, the Court will enter an Amended Final Judgment that includes the suggested award.

## ORDER

Defendants' Motion for Award of Attorney's Fees, Excess Costs and Expenses [ECF No. 297] is GRANTED IN PART AND DENIED IN PART as indicated in this order.

DATED this 31st day of March, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge